No. 2025-1764

# United States Court of Appeals for the Federal Circuit

---

**CADDO SYSTEMS, INC., 511 TECHNOLOGIES, INC.,**
*Plaintiffs-Appellants*

**v.**

**JETBRAINS AMERICAS, INC., JETBRAINS, INC., JETBRAINS S.R.O.,**
*Defendants-Appellees*

---

Appeal from the United States District Court
for the District of Delaware,
No. 2:22-cv-1033-JLH-LDH, Judge Jennifer L. Hall

---

**CORRECTED
JOINT APPENDIX**

---

Joseph J. Zito
DNL ZITO
1250 Connecticut Ave, 700
Washington, DC 20036
202-466-3500
jzito@dnlzito.com

Benjamin C. Deming
DNL ZITO
3232 McKinney Avenue, 500
Dallas Texas 75204
(214) 799-1145
bdeming@dnlzito.com

*Counsel for Plaintiff-Appellant Caddo Systems, Inc.*

JOINT APPENDIX

TABLE OF CONTENTS

| Date | Description | Appx |
|------|-------------|------|
| 03/31/2025 | Order Granting Defendant's Motion for Summary Judgment | 0001-0004 |
| 03/13/2007 | U.S. Patent No. 7,191,411 | 0005-0015 |
| 12/29/2009 | U.S. Patent No. 7,640,517 | 0016-0026 |
| 01/08/2013 | U.S. Patent No. 8,352,880 | 0027-0041 |
| 07/31/2018 | U.S. Patent No. 10,037,127 | 0042-0057 |
| 11/23/2021 | U.S. Patent No. 11,182,053 | 0058-0074 |
| 08/04/2022 | Complaint (DI 1) | 0075-0131 |
| 03/08/2024 | Second Amended Complaint (DI 169) | 0132-0205 |
| 10/25/2024 | Defendant's Motion for Summary Judgment and Exhibits (DI 269-274) | 0206-3359 |
| 11/08/2024 | Defendant's Statement of Facts (DI 310) | 3360-3365 |
| 11/08/2024 | Defendant's Response to Plaintiff's Statement of Facts (DI 311) | 3366-3371 |
| 11/08/2024 | Plaintiffs' Response to Motion for Summary Judgment (DI 312-314) | 3372-3428 |
| 11/08/2024 | Plaintiffs' Response to Statement of Facts (DI 313) | 3429-3436 |
| 11/08/2024 | Chan Declaration in Support of Plaintiffs' Response to Motion for Summary Judgment and Exhibits (DI 314) | 3437-3786 |
| 11/15/2024 | Reply in Support of Motion for Summary Judgment (DI 323) | 3787-3820 |
| 11/15/2024 | Vivarelli Declaration and Exhibits in Support of Defendant's Reply in Support of Motion for Summary Judgment (DI 324) | 3821-3876 |
| 01/30/2025 | Oral Order (DI 341) | 3877-3878 |
| 02/04/2025 | Defendant's Supplemental Brief in support of its Arguments for the Invalidity of the Asserted Patents (DI 343) | 3879-3930 |
| 02/06/2025 | Plaintiffs' Response to Defendant's Supplemental Brief in support of its Arguments for the Invalidity of the Asserted Patents (DI 344) | 3931-3945 |

| | | |
|---|---|---|
| 02/13/2025 | Joint Status Report following mediation (DI 345) | 3946-3947 |
| 02/25/2025 | Report and Recommendation regarding Motion for Summary Judgment (DI 346) | 3948-3969 |
| 03/11/2025 | Plaintiffs' Objections to Report and Recommendation (DI 351) | 3970-3984 |
| 03/11/2025 | Plaintiffs' Request for Oral Argument | 3985 |
| 03/25/2025 | Defendant's Response to Plaintiffs' Objections to Report and Recommendation (DI 353) | 3986-4000 |
| 04/10/2025 | Final Judgment (DI 357) | 4001-4003 |
| 05/07/2025 | Notice of Appeal (DI 359) | 4004-4006 |
| 05/14/2025 | Notice of Docketing (DI 360) | 4007-4010 |
| 06/02/2022 | Order in *Caddo Systems, Inc., et al v. Microchip Technology Inc.*, No. 6:20-cv-245 (W.D. Tex. June 2, 2022) | 4011-4018 |
| 03/21/2023 | Certificate of Correction in U.S. Patent No. 11, 182,053 | 4019 |
| 06/12/2024 | Order Granting Join Stipulation to Narrow the Case (DI 233) | 4020-4022 |
| 10/16/2024 | Notice of Plaintiffs' Second Reduction of Asserted Claims (DI 263) | 4023-4024 |
| 01/24/2025 | Notice of Plaintiffs' Third Reduction of Asserted Claims (DI 340) | 4025-4027 |
| 09/06/2024 | Report and Recommendation on Claim Construction (DI 248) | 4028-4043 |
| 8/22/2022 – 4/10/2025 | Docket Sheet – *Caddo Systems, Inc. v. Jetbrains Americas, Inc.*  1:22-cv-JLH-LDH | 4044-4081 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CADDO SYSTEMS, INC. and 511 TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 22-1033-JLH-LDH |
| JETBRAINS AMERICAS, INC., JETBRAINS INCORPORATED, and JETBRAINS S.R.O., | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

At Wilmington, this 31st day of March, 2025:

WHEREAS, Magistrate Judge Hatcher issued a Report and Recommendation (D.I. 346) on February 25, 2025, recommending that the Court grant Defendant JetBrains Americas Inc.'s ("JBA's") Motion for Summary Judgment (D.I. 269) and deny the remaining pending motions as moot;

WHEREAS, the R&R concluded that all the asserted claims are invalid under 35 U.S.C. § 101 because they are not directed to patent-eligible subject matter, *see Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014);

WHEREAS, on March 11, 2025, Plaintiffs filed objections (D.I. 351), arguing that (1) the Magistrate Judge erred at step one of the *Alice* test by "oversimplifying" the claims, (2) the Magistrate Judge erred by treating claim 4 of U.S. Patent No. 7,640,517 ("'517 Patent") as representative for purposes of the § 101 analysis, (3) the Magistrate Judge misapplied the relevant case law, and (4) the Magistrate Judge improperly resolved factual disputes in favor of Defendant JBA at step two of the *Alice* test;

**Appx0001**

WHEREAS, on March 25, 2025, Defendant JBA filed a response to the objections (D.I. 353); and

WHEREAS, the Court has reviewed the Report and Recommendation *de novo*, *see* 28 U.S.C. § 636(b)(1);

NOW, THEREFORE, IT IS HEREBY ORDERED that, for the reasons stated below, Plaintiffs' objections (D.I. 351) are OVERRULED, the Report and Recommendation (D.I. 346) is ADOPTED, and Defendant JBA's Motion for Summary Judgment (D.I. 269) is GRANTED.

1. The asserted claims relate to a user interface implemented by software, and I reject Plaintiffs' argument that the Magistrate Judge oversimplified them. I see no error in the Magistrate Judge's conclusion that all the asserted claims are directed to an abstract idea. I am unpersuaded that the Magistrate Judge improperly discounted Plaintiffs' expert evidence on this point, especially since I agree with the Magistrate Judge's conclusion that the proffered expert opinions are untethered to the language of the asserted claims.

2. I reject Plaintiffs' argument that the Magistrate Judge erred by treating claim 4 of the '517 patent as representative. The Magistrate Judge properly applied the law on representativeness to the arguments and record before her. In addition, I have independently reviewed the other asserted claims and, like the Magistrate Judge (D.I. 346 at 10 n.4), I conclude that they are also directed to the same abstract idea and lack an inventive concept. Plaintiffs have not explained how any differences in claim language among the asserted claims requires a different result under § 101.

3. I reject Plaintiffs' argument that the Magistrate Judge misapplied precedent. The R&R properly distinguished cases that involved improvements in the functioning of

2

**Appx0002**

computers and cases with claims covering a particular manner of achieving a result.  This case is neither of those types of cases.

4.  There are no material factual disputes at *Alice* step two that preclude summary judgment.  Plaintiffs argue that because they submitted expert testimony on whether the claim elements or combinations of elements are well-understood, routine, or conventional, it would be inappropriate to grant summary judgment to JBA.  But "the Federal Circuit has made clear that the introduction of expert testimony by the non-movant does not necessarily require the denial of a summary judgment motion."  *F45 Training Pty Ltd. v. Body Fit Training USA Inc.*, No. 20-1194, 2022 WL 17177621, at *13 (D. Del. Nov. 17, 2022) (Bryson, J., by designation) (collecting cases).  "[A]n expert's 'conclusory' assertion that there is an inventive concept is insufficient where the intrinsic evidence demonstrates otherwise."  *See Robocast, Inc. v. Netflix, Inc.*, No. 22-305, D.I. 463, slip op. at 6 (D. Del. Feb 21, 2025).  And, as the Magistrate Judge correctly concluded, summary judgment is appropriate in a case like this, where the "allegedly inventive concept . . . is the abstract idea itself."  (D.I. 346 at 20.)

IT IS FURTHERED ORDERED that the remaining pending motions (D.I. 177, 200, 265, 268, 275, 278, 283, 339) are DENIED as moot.

3

**Appx0003**

IT IS FINALLY ORDERED that the parties shall meet and confer and submit a proposed form of judgment.

Dated: March 31, 2025

_____
The Honorable Jennifer L. Hall
UNITED STATES DISTRICT JUDGE

4



US007191411B2

(12) **United States Patent**

Moehrle

(10) **Patent No.:**    **US 7,191,411 B2**
(45) **Date of Patent:**    *Mar. 13, 2007

(54) **ACTIVE PATH MENU NAVIGATION SYSTEM**

(76) Inventor: **Armin E. Moehrle**, 1824 N. Milwaukee Ave., Chicago, IL (US) 60647

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 91 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/164,520**

(22) Filed: **Jun. 6, 2002**

(65) **Prior Publication Data**

US 2003/0227491 A1     Dec. 11, 2003

(51) **Int. Cl.**
*G06F 3/01*       (2006.01)
*G06F 3/05*       (2006.01)
*G06F 17/30*      (2006.01)

(52) **U.S. Cl.** ...................... **715/855**; 715/829; 715/853; 715/854; 715/847

(58) **Field of Classification Search** ................ 715/854, 715/817, 843, 841, 853, 847, 846, 855, 810, 715/829, 828
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,801,702 | A | * | 9/1998 | Dolan et al. ................. | 715/854 |
| 6,236,400 | B1 | * | 5/2001 | Guerrero ..................... | 715/841 |
| 6,240,410 | B1 | * | 5/2001 | Wical ............................ | 707/4 |
| 6,256,028 | B1 | * | 7/2001 | Sanford et al. ............. | 715/841 |
| 6,621,532 | B1 | * | 9/2003 | Mandt ......................... | 348/841 |
| 6,633,316 | B1 | * | 10/2003 | Maddalozzo et al. ....... | 715/854 |
| 6,832,350 | B1 | * | 12/2004 | Bates et al. .............. | 715/501.1 |

FOREIGN PATENT DOCUMENTS

EP          0947921 A      10/1999

OTHER PUBLICATIONS

"RFC 1738 (RFC1738)", Dec. 1994, Internet RFC/STD/FYI/BCP Archives, pp. 1 and 4.*
Bowler D et al: "Navigation Bars for Hierarchical Web Sites" Student HCI Online Research Experiments, Online! 2001, pp. 1-23, XP002286023 University of Maryland, U.S.
Sun Microsystems Inc: "Quick Start to Using OpenStep Desktop", Online Sep. 1996, XP002286024, pp. 5-1 to 5-9.
IBM: "Fully Navigatable Breadcurm Trails" Research Disclosure, Kenneth Mason Publications, Hampshire, GB, vol. 461, No. 130, Sep. 2002, XP007131244, ISSN:0374-4353.

* cited by examiner

*Primary Examiner*—Raymond J. Bayerl
*Assistant Examiner*—Namitha Pillai
(74) *Attorney, Agent, or Firm*—Jonathan Feuchtwang

(57)          **ABSTRACT**

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item being at least one of a function, a pointer to a location, and a pointer to another level. The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

**6 Claims, 6 Drawing Sheets**





fig. 1a



fig. 1b

**Appx0006**

c:\windows\applications\temp\help.doc

20

fig. 2a

http://www.uspto.gov/patents/applications

fig. 2b



fig. 3



fig. 4



fig. 5a



fig. 5b

fig. 5c



fig. 5d



fig. 5e

Appx0010



fig. 5f

Appx0011

US 7,191,411 B2

# 1

## ACTIVE PATH MENU NAVIGATION SYSTEM

### FIELD OF THE INVENTION

The present invention generally relates to a navigation system used to navigate a hierarchical menu such as a directory structure or a pull-down menu. The menu navigation system of the present invention may be implemented in software executing on a standalone software program or on a client server application. More particularly, the menu navigation system of the present invention allows a user to access different levels in a hierarchical menu system without retracing back to the top level of the hierarchy.

### BACKGROUND OF THE INVENTION

Hierarchical systems are used to organize items by function or theme in order to facilitate efficient locating of functions or locations. Hierarchical systems are used to organize documents into directories or folders and to organize functions into pull-down menus.

Conventionally one of two navigation systems are used to navigate through the various levels of a menu tree. By far the most popular menu navigation system is the so-called collapsing menu system which, for example, is used by many traditional personal computer applications. The distinguishing characteristics of this system are that the navigation always commences from the initial or root level and that the menu collapses or disappears after a selection is made.

Computer software frequently includes dozens of functions. The sheer number of features makes it desirable to organize the functions into a hierarchy of categories to facilitate efficient searching. In a collapsing menu system each level in the hierarchy is presented as a level in the pull-down menu.

FIG. 1A shows a top or root level 10 of a hypothetical menu. Each level 10 of the menu provides a list of menu choices 12. Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead (point) to another level 10 providing a further list of menu choices 12. Selection of an end node will cause the pull-down menu to collapse back to the root level.

FIG. 1B shows the pull-down menu of FIG. 1A with several levels of the hierarchical menu expanded. The menu structure of FIG. 1B collapses back to the root level shown in FIG. 1A once an end node is selected. The defining characteristic of such a conventional navigation system is that navigation is one-way, and always starts from the root level to an end node. This method of navigation becomes cumbersome if the desired function or destination is buried several levels down from the root directory.

To address this shortcoming, conventional operating systems such as Microsoft Windows® provide short-cuts in the form of pre-defined function keys or icons. Such short-cuts enable the user to directly access the desired function associated with the short-cut.

In the absence of a pre-defined short-cut, the user must resort to navigating the menu structure. The problem with the collapsing menu system is that navigation must always commence from the root level. Consequently more experienced users are unable to take advantage of their knowledge of the hierarchical structure to directly access a given level.

FIG. 2A shows a conventional path menu system 20 used to navigate through the directory structure of a disk. Similarly, FIG. 2B shows a conventional universal resource

# 2

locator (URL) command which operates similarly to the DOS path command of FIG. 2A. The conventional disk operating system (DOS) uses a path menu system 20 to navigate between various folders. Each folder represents a different level in the hierarchy. A given folder may contain one or more sub-folders. To access a target or destination level the user must know the path, i.e., the names of the each of the folders from the root folder to the target folder. A system of displaying the contents of each folder is provided to guide the user through the hierarchy. Namely, by typing a command such as DIRECTORY (DIR) the user is provided with the contents of the present folder and the path leading to the present folder. The user may proceed to a sub-level in the hierarchy or may retrace his/her steps to a preceding level by knowing the path.

Navigation using the path menu system requires the user to memorize and enter complex hierarchical sequences. This method of navigation is time consuming not suitable for users who have not memorized the path. Moreover, this method becomes extremely cumbersome as the number of levels increases.

Accordingly, one object of the present invention is to provide a more efficient way of navigating hierarchical menu systems.

### SUMMARY OF THE INVENTION

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item being at least one of a function, a pointer to a location, and a pointer to another level.

The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

According to a further aspect of the invention, pre-defined short-cuts are provided which enable direct access to a given menu item. The Active Path is dynamically constructed when one of the pre-defined short-cuts are executed, with one active link corresponding to each of the menu items necessary to access the given menu item using the graphical user menu system.

Navigation using the Active Path is accomplished by at least of one of rolling over and selecting an active link using a pointing device. Rolling over a given active link triggers the display of sibling menu items on the level associated with the given active link. Selecting a given active link triggers the execution of a function associated with the given active link.

These and other aspects of the present invention will be explained with reference to the drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B are view of a conventional collapsing menu system;

FIG. 2A is a view of a conventional path menu system;

FIG. 2B is a view of a conventional universal resource locator address;

3

FIG. **3** is a block diagram of a conventional computer architecture;

FIG. **4** is a view of the Active Path menu system of the present invention;

FIGS. **5**A and **5**B are views showing how the Active Path is assembled as the user navigates the collapsing menu system; and

FIGS. **5**C–**5**F are views showing how the Active Path is used to navigate.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **3** is a block diagram of a computer **32** on which the software of the present invention operates. In the preferred embodiment, the main logic of the computer **32** is embodied by a general-purpose, programmable microprocessor **34**, which in conventional practice will have an on-board memory cache (not shown) and which may be associated with one or more mathematics or other special-purpose coprocessors (not shown).

The processing logic generally represented by processor **34** is connected by a bus structure **36** to the various other components of the computer **32**. The schematic representation of bus **36** is shown in FIG. **3** as a simple and unitary structure, but in conventional practice, as is known to those in the art, there usually are several buses and communication pathways **36**, operating at different speeds and having different purposes. Further, bus **36** may be segmented and controlled by respective bus controllers, as is also known in the art.

Computer **32** will also have a random access memory unit or units **38** connected to the bus **36**. RAM **38** (which may be DRAM, SDRAM or other known types) typically has loaded into it the operating system of the computer **32** and executable instructions for one or more special applications designed to carry out the invention. Computer **32** also has electronic read-only memory **40** for storing those programs such as the BIOS which are non-volatile and persist after the computer **32** is shut down.

In alternative embodiments of the invention, one or more components of the invention's logic may be "hard-wired" into the ROM **40** instead of loaded as software instructions into RAM **38**. ROM **40** can consist of or comprise electrically programmable read-only memory (EPROM), electrically erasable and programmable read-only memory (EEPROM) of either flash or nonflash varieties, or other sorts of read-only memory such as programmable fuse or antifuse arrays.

In a typical architecture, a computer program suitable for carrying out the invention will be stored on a mass storage device **42**, such as an optical disk or magnetic hard drive. Bus **36** connects mass storage device **42** to RAM **38**. The computer **32** is connected to various peripheral devices used to communicate with an operator, such as display **44**, keyboard **46**, and pointing device (mouse) **48**.

In operation, operating system software such as Microsoft Windows® executes on the computer **32**, and the user interacts with the operating system using the display **44**, keyboard **46**, and pointing device (mouse) **48**.

FIG. **4** shows the Active Path menu system **100** of the present invention which is visually similar to the conventional (DOS) path menu system of FIG. **2**. However, whereas the conventional DOS path is merely a passive display of the hierarchical levels, the Active Path **100** is a graphical user interface enabling the user to directly access any of the hierarchical levels in a given path. Moreover, the

4

Active Path **100** enables the user to directly re-execute the last function without the need to navigate to the function through the menu system, and without the need for a pre-defined short-cut.

As will be explained below, the Active Path **100** may be used in conjunction with a conventional navigation system such as the above-described collapsing menu system or path menu system.

The Active Path **100** consists of a sequential listing of active links **102**, each active link **102** providing direct access to a corresponding level in the hierarchical path and to all of the menu items on the level (sibling menu items). The last active link **102** in the Active Path **100** is termed an end link **103**. The Active Path **100** is dynamically assembled and displayed as the user navigates using the conventional menu screens. The Active Path **100** is assembled automatically without the need for any additional user interaction as the user navigates using the collapsing menu system.

In contrast, a conventional short-cut such as a function key, icon, or the like is static in that it only provides access to a single pre-defined item (function/location) within a given level and does not provide the user with the full range of items available within a given level. Moreover, the definition of a short-cut requires user interaction.

The Active Path **100** is automatically constructed as the user navigates between the various levels **10** of the conventional collapsing menu system. The first active link **102** corresponds to the root level, and each subsequent active link **102** corresponds to a user selected menu item **12** which may be a location or a classification (sublevel) of functions. As will be explained below, the end link **103** points either to a function or a location.

The Active Path **100** of the present invention may be used in place of the menu system **10** to navigate through classes of functions and execute a selected function. Moreover, the Active Path **100** may also be used to navigate to a desired location such as a web address or directory folder.

FIGS. **5**A–**5**E show how the Active Path **100** may be used to navigate to classes of functions. In the embodiment depicted in FIGS. **5**A–**5**D the Active Path **100** is used in conjunction with a conventional collapsing menu system. One of ordinary skill in the art will appreciate that the location of the Active Path **100** in relation to the collapsing menu system **10** and its graphical representation are not critical to the operation of the Active Path **100**.

By manner of illustration, FIG. **5**A shows how the Active Path **100** is sequentially assembled as menu items **12**-*a*, **12**-*b*, and **12**-*c* are selected from the collapsing menu system. Active link **102**-*a* corresponds to menu item **12**-*a* selected from the initial or root level **10**-*a*. Likewise, active link **102**-*b* corresponds to menu item **12**-*b* selected from level **10**-*b*, and active link **102**-*c* corresponds to menu item **12**-*c* selected from level **10**-*c*. Construction of the Active Path **100** occurs automatically as the user navigates through the menu system **10**. It should be noted that active link **102**-*c* is the end link **103** in the Active Path **100**.

Turning now to FIG. **5**B, the menu system (pull-down menu tree) **10** collapses when the user selects end node **12**-*c*, whereas the Active Path **100** persists. As will be described, the active links **102** enable the user to directly access levels **10**-*b* and **10**-*c*, without having to navigate from the root level **10**-*a*. Moreover, end link **103** enables the user to re-execute the function associated with **12**-*c* directly without the need for a pre-defined short-cut.

In operation, the active links **102** of Active Path **100** are accessed using the mouse **48** and mouse buttons **48***a*, **48**-*b* (FIG. **3**).

US 7,191,411 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

Each of the active links 102 in the Active Path 100 may be accessed by either rolling over the active link 102 with the pointer of the pointing device 38, or by immediately selecting the active link 102. As shown in FIG. 5C rolling over the active 102 simply entails manipulating the mouse 48 to position the software pointer 50 over the active link 102. Rolling over an active link 102-b causes the sibling menu items on the level corresponding the active link 102-b to be displayed. It should be noted that simply rolling over an active link 102 does not alter the Active Path 100, it merely causes the sibling menu items to be displayed.

Selection of an active link 102 is accomplished by, for example, positioning the software pointer 50 over the active link 102 and actuating (and releasing) one of the mouse buttons 48-a, 48-b. Selection of an active link 102 causes different results depending on whether or not the selected active link 102 is the end link 103 in the Active Path 100. If the selected active link 102 is not the end link 103, then selection will cause the sibling menu items 12 on the associated level 10 to be displayed and will trigger the construction of a new Active Path 100. For example, selection of menu item 12-b in FIG. 5C will result in the generation of the Active Path 100 shown in FIG. 5D.

Selection of an end link 103 will cause the immediate execution of the associated function (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link 103 in the Active Path 100 (FIG. 5C).

As described above, the Active Path 100 is dynamically constructed as the user navigates the collapsing menu system, and is subsequently retained after the menu tree collapses back to the root level. In addition, the Active Path 100 may optionally be constructed each time a short-cut such as a function key or the like is used. This requires the use of a look-up table 38a (FIG. 3) stored in RAM 38. The look-up table 38a stores each of the pre-defined shortcuts and the associated data necessary to create the active path 100. According to a presently preferred embodiment, the Active Path 100 constructed is the same as would be constructed by accessing the function through the collapsing menu system.

In operation, the look-up table 38a would originally be created by the software developer during initial definition of each of the pre-defined short-cuts (function keys). Moreover, as will be explained, the look-up table 38a may be updated by the user to reference newly created short-cuts.

According to a further aspect of the present invention, the Active Path 100 may be used to define a short-cut on-the-fly. Once the Active Path 100 has been constructed, for example, by navigating the conventional collapsing menu system, the user may store the end link 103 as a shortcut within the lookup table 38a. According to a presently preferred embodiment, this is accomplished by a combination of commands. Thus, for example, the user could be prompted to define a short-cut identifier by clicking mouse button 48-b over end link 103. The Active Path 100 then stores the association between the function (or location) and the user-selected shortcut in the rewriteable table 38a.

As noted previously, the Active Path 100 of the present invention may similarly be used to navigate to a location. Notably, the Active Path 100 is created in the same manner regardless of whether the menu items 12 are functions or locations. The difference in using the Active Path 100 to navigate to locations arises after the Active Path 100 has been generated when the user selects an active link 102. More particularly, the difference is only manifested if the selected active link 102 is not the end link 103.

Notably, in the case of navigating to a location, selecting an active link 102 (other than the end link 103) triggers the access of the associated location. In contrast, when navigating to a class of functions, selection of an active link 102 (other than the end link 103) merely triggers the display of the sibling menu items on the associated level. See, FIG. 5C.

By manner of illustration, FIG. 5E shows a user selecting a location 102b1 by manipulating the pointing device 48 to position the pointer 50 over 102b1 and actuating the mouse key 48a (or 48b). As shown, the selection of a location results in the creation of a new active path 100.

FIG. 5F shows a user selecting an active link 102b2 where the active link 102 points to a classification of items, i.e., to a sublevel in the hierarchy. Notably, in FIG. 5E 102b1 was a location, and its selection within the active path 100 results in the direct navigation to the associated location. In contrast, in FIG. 5F 102b2 is a classification of functions, and its selection results in the display of the sibling menu items. Again, the selection of active link 102b2 is accomplished by selecting a location 102b2 by manipulating the pointing device 48 to position the pointer 50 over 102b2 and actuating the mouse key 48a (or 48b).

One of ordinary skill in the art will appreciate that the Active Path 100 of the present invention may be used in standalone applications such as operating systems, word processors, spreadsheets or the like. Moreover, the Active Path may also be used in a client-server environment. Notably, the Active Path 100 may be used to navigate functions provided on a web site or to navigate between different web addresses.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path 100 and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path 100. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the referred embodiment foresees a replacement of the address bar with the Active Path 100 to avoid redundancy, allow the user to focus on the content and make browsing more efficient. For Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Windows Explorer may replace the Address Bar with the Active Path. This could make the display of the folder window redundant. The user may better take advantage of the screen real-estate by rolling over and "browsing" through the levels of the collapsing menu system.

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path and Cascading

US 7,191,411 B2

7

Style Sheets files (.css) containing the graphic attributes of the Active Path. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the preferred embodiment foresees a replacement of the address bar with the Active Path to avoid redundancy, allow the user to focus on the content and to make browsing more efficient. For Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

The Active Path of the present invention may also be used to navigate audio interfaces. A preferred embodiment for audio interfaces would allow users to navigate to the end point of a path. A certain input command, such as pressing a certain key, would read the sequence and level of the selected path. Users can then select any level of the path and navigate to a new endpoint.

Although a preferred embodiment of the Active Path navigation system of the present invention has been specifically described and illustrated, it is to be understood that variations or alternative embodiments apparent to those skilled in the art are within the scope of this invention. Since many such variations may be made, it is to be understood that within the scope of the following claims, this invention may be practiced otherwise than specifically described.

The invention claimed is:

1. A method for navigating within a multi-level hierarchical collapsing menu structure where each level in the menu contains plural items, each said item being at least one of a function, a pointer to a location, and a pointer to another level, said method comprising the steps of:

providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy;

automatically constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system without the need for any additional interaction with the graphical user system, with one said active link corresponding to each of

8

the items selected, each said active link being independently selectable thereby providing direct access to the hierarchical level from which the corresponding item was selected without the need to navigate using said graphical user menu system; and

displaying the Active Path as an alternative to the graphical user menu system for navigating the multi-level hierarchical collapsing menu structure after the user has finished selecting items using the graphical user system such that the Active Path is displayed after the multi-level hierarchical collapsing menu structure has collapsed;

wherein pre-selecting a given active link triggers the display of sibling menu items on the level associated with said given active link without disturbing the displayed Active Path.

2. The method for navigating according to claim **1**, further comprising:

providing pro-defined short-cuts enabling direct access to a given menu item; and

automatically constructing the Active Path when a pre-defined short-cut is executed, with one said active link corresponding to each of the menu items necessary to access said given menu item using said graphical user menu system.

3. The method for navigating according to claim **1**, wherein selecting a given active link triggers the execution of a function associated with said given active link.

4. The method for navigating according to claim **1**, wherein selecting a given active link triggers display of information associated with said given active link.

5. The method according to claim **1**, wherein a user-defined short-cut is defined on-the-fly by storing a short-cut identifier and an associated plurality of active links in a look-up table.

6. The method for navigating according to claim **1**, wherein pre-selecting a given menu item displayed while pre-selecting the given active link triggers the display of subordinate menu items.

* * * * *

US007640517B2

(12) **United States Patent**

Moehrle

(10) **Patent No.:** US 7,640,517 B2
(45) **Date of Patent:** Dec. 29, 2009

(54) **ACTIVE PATH MENU NAVIGATION SYSTEM**

(76) Inventor: **Armin Moehrle**, 1824 N. Milwaukee Ave., Chicago, IL (US) 60647

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 372 days.

(21) Appl. No.: **11/625,314**

(22) Filed: **Jan. 20, 2007**

(65) **Prior Publication Data**

US 2007/0157127 A1      Jul. 5, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/164,520, filed on Jun. 6, 2002, now Pat. No. 7,191,411.

(51) **Int. Cl.**
*G06F 3/01* (2006.01)
*G06F 3/05* (2006.01)
*G06F 17/30* (2006.01)
(52) **U.S. Cl.** ........................ **715/855**; 715/829; 715/853; 715/854; 715/847
(58) **Field of Classification Search** ................. 715/855, 715/829, 853, 854, 847
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,801,702 | A | 9/1998 | Dolan |
| 6,236,400 | B1 * | 5/2001 | Guerrero .................... 715/841 |
| 6,240,410 | B1 | 5/2001 | Wical |
| 6,256,028 | B1 | 7/2001 | Sanford |
| 6,462,762 | B1 | 10/2002 | Ku |
| 6,597,377 | B1 | 7/2003 | MacPhail |
| 6,621,532 | B1 | 9/2003 | Mandt |
| 6,633,316 | B1 | 10/2003 | Maddalozzo, Jr. et al. |
| 6,832,350 | B1 | 12/2004 | Bates et al. |
| 6,990,638 | B2 | 1/2006 | Barksdale |

FOREIGN PATENT DOCUMENTS

EP      0947921 A      10/1999

OTHER PUBLICATIONS

Bowler D et al, Navigation Bars for Hierarchical Web Sites, Student HCI Online Research Experiments, Onine! 2001, pp. 1-23 XP002286023 University of Maryland, US.
RFC 1738 Dec. 1994, Internet RFC/STD/FYI/BCP Archives pp. 1 and 4.
Sun Microsystems Inc: "Quick Start to Using OpenStep Desktop", Online! Sep. 1996, XP00228624 pp. 51 to 5-9.
IBM: Fully Navigatable Breadcrumb Trails Research Disclosure, Keeth Mason Publications, Hampshire GB, vol. 46', No. 130, Sep. 2002, XP007131244, ISSN:0374-4353.

* cited by examiner

*Primary Examiner*—Namitha Pillai
(74) *Attorney, Agent, or Firm*—Jonathan Feuchtwang

(57) **ABSTRACT**

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item being at least one of a function, a pointer to a location, and a pointer to another level. The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

**7 Claims, 6 Drawing Sheets**



**Appx0016**



fig. 1a



fig. 1b

Appx0017

c:\windows\applications\temp\help.doc

20

fig. 2a

http://www.uspto.gov/patents/applications

fig. 2b



fig. 3

**Appx0018**



fig.4



fig.5a

Appx0019



fig. 5b



fig. 5c



fig. 5d



fig. 5e



fig. 5f

US 7,640,517 B2

# ACTIVE PATH MENU NAVIGATION SYSTEM

This application is a continuation of application Ser. No. 10/164,520 filed Jun. 6, 2002, issued as U.S. Pat. No. 7,191,411.

## FIELD OF THE INVENTION

The present invention generally relates to a navigation system used to navigate a hierarchical menu such as a directory structure or a pull-down menu. The menu navigation system of the present invention may be implemented in software executing on a standalone software program or on a client server application. More particularly, the menu navigation system of the present invention allows a user to access different levels in a hierarchical menu system without retracing back to the top level of the hierarchy.

## BACKGROUND OF THE INVENTION

Hierarchical systems are used to organize items by function or theme in order to facilitate efficient locating of functions or locations. Hierarchical systems are used to organize documents into directories or folders and to organize functions into pull-down menus.

Conventionally one of two navigation systems are used to navigate through the various levels of a menu tree. By far the most popular menu navigation system is the so-called collapsing menu system which, for example, is used by many traditional personal computer applications. The distinguishing characteristics of this system are that the navigation always commences from the initial or root level and that the menu collapses or disappears after a selection is made.

Computer software frequently includes dozens of functions. The sheer number of features makes it desirable to organize the functions into a hierarchy of categories to facilitate efficient searching. In a collapsing menu system each level in the hierarchy is presented as a level in the pull-down menu.

FIG. 1A shows a top or root level 10 of a hypothetical menu. Each level 10 of the menu provides a list of menu choices 12. Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead (point) to another level 10 providing a further list of menu choices 12. Selection of an end node will cause the pull-down menu to collapse back to the root level.

FIG. 1B shows the pull-down menu of FIG. 1A with several levels of the hierarchical menu expanded. The menu structure of FIG. 1B collapses back to the root level shown in FIG. 1A once an end node is selected. The defining characteristic of such a conventional navigation system is that navigation is one-way, and always starts from the root level to an end node. This method of navigation becomes cumbersome if the desired function or destination is buried several levels down from the root directory.

To address this shortcoming, conventional operating systems such as Microsoft Windows® provide short-cuts in the form of pre-defined function keys or icons. Such short-cuts enable the user to directly access the desired function associated with the short-cut.

In the absence of a pre-defined short-cut, the user must resort to navigating the menu structure. The problem with the collapsing menu system is that navigation must always commence from the root level. Consequently more experienced users are unable to take advantage of their knowledge of the hierarchical structure to directly access a given level.

FIG. 2A shows a conventional path menu system 20 used to navigate through the directory structure of a disk. Similarly, FIG. 2B shows a conventional universal resource locator (URL) command which operates similarly to the DOS path command of FIG. 2A. The conventional disk operating system (DOS) uses a path menu system 20 to navigate between various folders. Each folder represents a different level in the hierarchy. A given folder may contain one or more sub-folders. To access a target or destination level the user must know the path, i.e., the names of the each of the folders from the root folder to the target folder. A system of displaying the contents of each folder is provided to guide the user through the hierarchy. Namely, by typing a command such as DIRECTORY (DIR) the user is provided with the contents of the present folder and the path leading to the present folder. The user may proceed to a sub-level in the hierarchy or may retrace his/her steps to a preceding level by knowing the path.

Navigation using the path menu system requires the user to memorize and enter complex hierarchical sequences. This method of navigation is time consuming not suitable for users who have not memorized the path. Moreover, this method becomes extremely cumbersome as the number of levels increases. Accordingly, one object of the present invention is to provide a more efficient way of navigating hierarchical menu systems.

## SUMMARY OF THE INVENTION

A method for navigating within a multi-level hierarchical collapsing menu structure is 15 disclosed. Each level in the menu structure contains plural items, each item being at least one of a function, a pointer to a location, and a pointer to another level.

The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the 20 hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

According to a further aspect of the invention, pre-defined short-cuts are provided which enable direct access to a given menu item. The Active Path is dynamically constructed when one of the pre-defined short-cuts are executed, with one active link corresponding to each of the menu items necessary to access the given menu item using the graphical user menu system.

Navigation using the Active Path is accomplished by at least of one of rolling over and selecting an active link using a pointing device. Rolling over a given active link triggers the display of sibling menu items on the level associated with the given active link. Selecting a given active link triggers the execution of a function associated with the given active link.

These and other aspects of the present invention will be explained with reference to the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B are view of a conventional collapsing menu system;

FIG. 2A is a view of a conventional path menu system;

FIG. 2B is a view of a conventional universal resource locator address;

**Appx0023**

US 7,640,517 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

FIG. **3** is a block diagram of a conventional computer architecture;

FIG. **4** is a view of the Active Path menu system of the present invention;

FIGS. **5A** and **5B** are views showing how the Active Path is assembled as the user navigates the collapsing menu system; and

FIGS. **5C-5F** are views showing how the Active Path is used to navigate.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **3** is a block diagram of a computer **32** on which the software of the present invention operates. In the preferred embodiment, the main logic of the computer **32** is embodied by a general-purpose, programmable microprocessor **34**, which in conventional practice will have an on-board memory cache (not shown) and which may be associated with one or more mathematics or other special-purpose coprocessors (not shown).

The processing logic generally represented by processor **34** is connected by a bus structure **36** to the various other components of the computer **32**. The schematic representation of bus **36** is shown in FIG. **3** as a simple and unitary structure, but in conventional practice, as is known to those in the art, there usually are several buses and communication pathways **36**, operating at different speeds and having different purposes. Further, bus **36** may be segmented and controlled by respective bus controllers, as is also known in the art.

Computer **32** will also have a random access memory unit or units **38** connected to the bus **36**. RAM **38** (which may be DRAM, SDRAM or other known types) typically has loaded into it the operating system of the computer **32** and executable instructions for one or more special applications designed to carry out the invention. Computer **32** also has electronic read-only memory **40** for storing those programs such as the BIOS which are non-volatile and persist after the computer **32** is shut down.

In alternative embodiments of the invention, one or more components of the invention's logic may be "hard-wired" into the ROM **40** instead of loaded as software instructions into RAM **38**. ROM **40** can consist of or comprise electrically programmable read-only memory (EPROM), electrically erasable and programmable read-only memory (EEPROM) of either flash or nonflash varieties, or other sorts of read-only memory such as programmable fuse or antifuse arrays.

In a typical architecture, a computer program suitable for carrying out the invention will be stored on a mass storage device **42**, such as an optical disk or magnetic hard drive. Bus **36** connects mass storage device **42** to RAM **38**. The computer **32** is connected to various peripheral devices used to communicate with an operator, such as display **44**, keyboard **46**, and pointing device (mouse) **48**.

In operation, operating system software such as Microsoft Windows® executes on the computer **32**, and the user interacts with the operating system using the display **44**, keyboard **46**, and pointing device (mouse) **48**.

FIG. **4** shows the Active Path menu system **100** of the present invention which is visually similar to the conventional (DOS) path menu system of FIG. **2**. However, whereas the conventional DOS path is merely a passive display of the hierarchical levels, the Active Path **100** is a graphical user interface enabling the user to directly access any of the hierarchical levels in a given path. Moreover, the Active Path **100** enables the user to directly re-execute the last function with-

out the need to navigate to the function through the menu system, and without the need for a pre-defined short-cut.

As will be explained below, the Active Path **100** may be used in conjunction with a conventional navigation system such as the above-described collapsing menu system or path **20** menu system.

The Active Path **100** consists of a sequential listing of active links **102**, each active link **102** providing direct access to a corresponding level in the hierarchical path and to all of the menu items on the level (sibling menu items). The last active link **102** in the Active Path **100** is termed an end link **103**. The Active Path **100** is dynamically assembled and displayed as the user navigates using the conventional menu screens. The Active Path **100** is assembled automatically without the need for any additional user interaction as the user navigates using the collapsing menu system.

In contrast, a conventional short-cut such as a function key, icon, or the like is static in that it only provides access to a single pre-defined item (function allocation) within a given level and does not provide the user with the full range of items available within a given level. Moreover, the definition of a short-cut requires user interaction. The Active Path **100** is automatically constructed as the user navigates between the various levels **10** of the conventional collapsing menu system. The first active link **102** corresponds to the root level, and each subsequent active link **102** corresponds to a user selected menu item **12** which may be a location or a classification (sublevel) of functions. As will be explained below, the end link **103** points either to a function or a location. The Active Path **100** of the present invention may be used in place of the menu system **10** to navigate through classes of functions and execute a selected function. Moreover, the Active Path **100** may also be used to navigate to a desired location such as a web address or directory folder.

FIGS. **5A-5E** show how the Active Path **100** may be used to navigate to classes of functions. In the embodiment depicted in FIGS. **5A-5D** the Active Path **100** is used in conjunction with a conventional collapsing menu system. One of ordinary skill in the art will appreciate that the location of the Active Path **100** in relation to the collapsing menu system **10** and its graphical representation are not critical to the operation of the Active Path **100**.

By manner of illustration, FIG. **5A** shows how the Active Path **100** is sequentially assembled as menu items **12-***a*, **12-***b*, and **12-***c* are selected from the collapsing menu system. Active link **102-***a* corresponds to menu item **12-***a* selected from the initial or root level **10-***a*. Likewise, active link **102-***b* corresponds to menu item **12-***b* selected from level **10-***b*, and active link **102-***c* corresponds to menu item **12-***c* selected from level **10-***c*. Construction of the Active Path **100** occurs automatically as the user navigates through the menu system **10**. It should be noted that active link **102-***c* is the end link **103** in the Active Path **100**.

Turning now to FIG. **5B**, the menu system (pull-down menu tree) **10** collapses when the user selects end node **12-***c* whereas the Active Path **100** persists. As will be described, the active links **102** enable the user to directly access levels **10-***b* and **10-***c*, without having to navigate from the root level **10-***a*. Moreover, end link **103** enables the user to re-execute the function associated with **12-***c* directly without the need for a pre-defined short-cut.

In operation, the active links **102** of Active Path **100** are accessed using the mouse **48** and mouse buttons **48***a*, **48***b* (FIG. **3**).

Each of the active links **102** in the Active Path **100** may be accessed by either rolling over the active link **102** with the pointer of the pointing device **38**, or by immediately selecting

US 7,640,517 B2

5

the active link 102. As shown in FIG. 5C rolling over the active 102 simply entails manipulating the mouse 48 to position the software pointer 50 over the active link 102. Rolling over an active link 102-b causes the sibling menu items on the level corresponding the active link 102-b to be displayed. It should be noted that simply rolling over an active link 102 does not alter the Active Path 100, it merely causes the sibling menu items to be displayed.

Selection of an active link 102 is accomplished by, for example, positioning the software pointer 50 over the active link 102 and actuating (and releasing) one of the mouse buttons 48-a, 48-b. Selection of an active link 102 causes different results depending on whether or not the selected active link 102 is the end link 103 in the Active Path 100. If the selected active link 102 is not the end link 103, then selection will cause the sibling menu items 12 on the associated level 10 to be displayed and will trigger the construction of a new Active Path 100. For example, selection of menu item 12-b in FIG. 5C will result in the generation of the Active Path 100 shown in FIG. 5D.

Selection of an end link 103 will cause the immediate execution of the associated function (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link 103 in the Active Path 100 (FIG. 5C).

As described above, the Active Path 100 is dynamically constructed as the user navigates the collapsing menu system, and is subsequently retained after the menu tree collapses back to the root level. In addition, the Active Path 100 may optionally be constructed each time a short-cut such as a function key or the like is used. This requires the use of a look-up table 38a (FIG. 3) stored in RAM 38. The look-up table 38a stores each of the pre-defined shortcuts and the associated data necessary to create the active path 100. According to a presently preferred embodiment, the Active Path 100 constructed is the same as would be constructed by accessing the function through the collapsing menu system.

In operation, the look-up table 38a would originally be created by the software developer during initial definition of each of the pre-defined short-cuts (function keys). Moreover, as will be explained, the look-up table 38a may be updated by the user to reference newly created short-cuts.

According to a further aspect of the present invention, the Active Path 100 may be used to define a short-cut on-the-fly. Once the Active Path 100 has been constructed, for example, by navigating the conventional collapsing menu system, the user may store the end link 103 as a shortcut within the lookup table 38a. According to a presently preferred embodiment, this is accomplished by a combination of commands. Thus, for example, the user could be prompted to define a short-cut identifier by clicking mouse button 48-b over end link 103. The Active Path 100 then stores the association between the function (or location) and the user-selected shortcut in the rewriteable table 38a.

As noted previously, the Active Path 100 of the present invention may similarly be used to navigate to a location. Notably, the Active Path 100 is created in the same manner regardless of whether the menu items 12 are functions or locations. The difference in using the Active Path 100 to navigate to locations arises after the Active Path 100 has been generated when the user selects an active link 102. More particularly, the difference is only manifested if the selected active link 102 is not the end link 103.

Notably, in the case of navigating to a location, selecting an active link 102 (other than the end link 103) triggers the access of the associated location. In contrast, when navigating to a class of functions, selection of an active link 102 (other

6

than the end link 103) merely triggers the display of the sibling menu items on the associated level. See, FIG. 5C.

By manner of illustration, FIG. 5E shows a user selecting a location 102b1 by manipulating the pointing device 48 to position the pointer 50 over 102b1 and actuating the mouse key 48a (or 48b). As shown, the selection of a location results in the creation of a new active path 100.

FIG. 5F shows a user selecting an active link 102b2 where the active link 102 points to a classification of items, i.e., to a sublevel in the hierarchy. Notably, in FIG. 5E 102b1 was a location, and its selection within the active path 100 results in the direct navigation to the associated location. In contrast, in FIG. 5F 102b2 is a classification of functions, and its selection results in the display of the sibling menu items. Again, the selection of active link 102b2 is accomplished by selecting a location 102b2 by manipulating the pointing device 48 to position the pointer 50 over 102b2 and actuating the mouse key 48a (or 48b).

One of ordinary skill in the art will appreciate that the Active Path 100 of the present invention may be used in standalone applications such as operating systems, word processors, spreadsheets or the like. Moreover, the Active Path may also be used in a client-server environment. Notably, the Active Path 100 may be used to navigate functions provided on a web site or to navigate between different web addresses.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path 100 and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path 100. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the referred embodiment foresees a replacement of the address bar with the Active Path 100 to avoid redundancy, allow the user to focus on the content and make browsing more efficient. For Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Windows Explorer may replace the Address Bar with the Active Path. This could make the display of the folder window redundant. The user may better take advantage of the screen real-estate by rolling over and "browsing" through the levels of the collapsing menu system.

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the preferred embodiment foresees a

US 7,640,517 B2

7

replacement of the address bar with the Active Path to avoid redundancy, allow the user to focus on the content and to make browsing more efficient. For Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

The Active Path of the present invention may also be used to navigate audio interfaces. A preferred embodiment for audio interfaces would allow users to navigate to the end point of a path. A certain input command, such as pressing a certain key, would read the sequence and level of the selected path. Users can then select any level of the path and navigate to a new endpoint.

Although a preferred embodiment of the Active Path navigation system of the present invention has been specifically described and illustrated, it is to be understood that variations or alternative embodiments apparent to those skilled in the art are within the scope of this invention. Since many such variations may be made, it is to be understood that within the scope of the following claims, this invention may be practiced otherwise than specifically described.

The invention claimed is:

1. A method for navigating within a hierarchical menu structure where each level in the menu contains plural items, said method comprising the steps of:

provided a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy;

constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system, with one said active link corresponding to each of the items selected, each said active link providing direct access to the hierarchical level from which the corresponding item was selected without using said graphical user menu system; and

8

displaying the Active Path as an alternative to the graphical user menu system for navigating the menu structure after the user has finished selecting items using the graphical user system such that the Active Path is displayed;

wherein rolling over a given active link with the pointer of a pointing device triggers the display of menu items on the hierarchical level associated with said given active link without disturbing the displayed Active Path.

2. The method for navigating according to claim 1, further comprising:

providing pre-defined short-cuts enabling direct access to a given menu item; and

automatically constructing the Active Path when a pre-defined short-cut is executed, with one said active link corresponding to each of the menu items necessary to access said given menu item using said graphical user menu system.

3. The method for navigating according to claim 1, wherein a given active link is browsed by rolling over the given active link with a pointing device to trigger the display of sibling menu items on the level associated with said given active link.

4. The method for navigating according to claim 3, wherein browsing a given active menu item triggers the display of subordinate menu items.

5. The method for navigating according to claim 1, wherein selecting a given active link triggers the execution of a function associated with said given active link.

6. The method for navigating according to claim 1, wherein selecting a given active link triggers display of information associated with said given active link.

7. The method according to claim 1, wherein a user-defined short-cut is defined on the-fly by storing a short-cut identifier and an associated plurality of active links in a look-up table.

* * * * *



US008352880B2

(12) **United States Patent**
Moehrle

(10) **Patent No.:**     **US 8,352,880 B2**
(45) **Date of Patent:**     ***Jan. 8, 2013**

(54) **ACTIVE PATH NAVIGATION SYSTEM**

(76) Inventor: **Armin Moehrle**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 528 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/538,151**

(22) Filed: **Aug. 9, 2009**

(65) **Prior Publication Data**

US 2010/0037181 A1     Feb. 11, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/687,646, filed on Mar. 17, 2007, now Pat. No. 7,725,836, and a continuation of application No. 10/444,359, filed on May 23, 2003, now Pat. No. 7,216,301, and a continuation-in-part of application No. 10/164,520, filed on Jun. 6, 2002, now Pat. No. 7,191,411.

(51) **Int. Cl.**
*G06F 3/048*     (2006.01)
*G06F 17/30*     (2006.01)

(52) **U.S. Cl.** ........................................ **715/811**; 715/843

(58) **Field of Classification Search** .................. 715/829, 715/847, 851–855, 738–739, 843, 811, 841
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,801,702 A | | 9/1998 | Dolan |
| 6,236,400 B1 * | | 5/2001 | Guerrero ....................... 715/841 |
| 6,240,410 B1 | | 5/2001 | Wical |
| 6,256,028 B1 | | 7/2001 | Sanford |
| 6,462,762 B1 | | 10/2002 | Ku |
| 6,597,377 B1 * | | 7/2003 | MacPhail ...................... 715/738 |
| 6,621,532 B1 * | | 9/2003 | Mandt ........................... 348/841 |
| 6,633,316 B1 | | 10/2003 | Maddalozzo |
| 6,832,350 B1 | | 12/2004 | Bates |
| 6,990,638 B2 | | 1/2006 | Barksdale |
| 2004/0075693 A1 * | | 4/2004 | Moyer et al. .................. 345/810 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0947921 A | 10/1999 | |
| WO | 0116842 A | 3/2001 | |

OTHER PUBLICATIONS

Bowler D et al, Navigation Bars for Hierarchical Web Sites, Student HCI Online Research Experiments, Onine! 2001, pp. 1-23 XP002286023 University of Maryland, US.
RFC 1738 Dec. 1994, Internet RFC/STD/FYI/BCP Archives pp. 1 and 4.
Sun Microsystems Inc: "Quick Start to Using OpenStep Desktop", Online! Sep. 1996, XP00228624 pp. 51 to 5-9.
IBM: Fully Navigatable Breadcrumb Trails Research Disclosure, Keeth Mason Publications, Hampshire GB, vol. 46', No. 130, Sep. 2002, XP007131244, ISSN:0374-4353.

* cited by examiner

*Primary Examiner* — Cao "Kevin" Nguyen
(74) *Attorney, Agent, or Firm* — Jonathan D Feuchtwang

(57) **ABSTRACT**

Disclosed is a method of navigating an information structure comprising: providing a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof; dynamically constructing an active path as a sequence of active links after an item of the information structure has been selected; said active links allowing the display of one or more items on a given level of the information structure; and said active links allowing a user to access an item in the information structure by selecting from the one or more items displayed by one of the active links on the active path.

**22 Claims, 8 Drawing Sheets**



Appx0027



FIG. 1A  Prior  Art



FIG. 1B  Prior  Art

20

c:\windows\applications\temp\help.doc

FIG. 2A  Prior  Art

22

http://www.uspto.gov/patents/applications

FIG. 2B  Prior  Art



FIG. 3

101, 102, 103



| 1.0 |
| --- |

FIG. 4A



FIG. 4B



FIG. 4C



FIG. 5A



FIG. 5B



FIG. 5C



FIG.  5D



FIG.  5E



FIG. 6A



FIG. 6B



FIG. 7A

FIG. 7B

FIG. 7C

Case: 25-1764    Document: 28    Page: 38    Filed: 10/21/2025



| http://www.uspto.gov/Patents/Patenting | v |
|---|---|

## FIG. 8A

| uspto.gov | > |
|---|---|

## FIG. 8B



## FIG. 8C



## FIG. 8D

US 8,352,880 B2

1

# ACTIVE PATH NAVIGATION SYSTEM

This application is a continuation of U.S. application Ser. No. 11/687,646 filed Mar. 17, 2007 which is a continuation of U.S. application Ser. No. 10/444,359 filed May 23, 2003 which is a continuation-in-part (CIP) of U.S. application Ser. No. 10/164,520 entitled Active Path Menu Navigation System, filed Jun. 6, 2002.

## FIELD OF THE INVENTION

The present invention generally relates to a navigation system used to find, enter, or edit data or launch an application within a hierarchical information system. The navigation system of the present invention may be implemented in software executing on a standalone software program or on a client server application. More particularly, the navigation system of the present invention allows a user to access different levels in a hierarchical information system without retracing back to the top level of the hierarchy.

## BACKGROUND OF THE INVENTION

Hierarchical information systems are used to organize items by function or theme in order to facilitate efficient locating of functions or locations. Hierarchical systems are used to organize documents into directories or folders and to organize functions into pull-down menus.

Conventionally one of two navigation systems are used to navigate through the various levels of a menu tree. By far the most popular menu navigation system is the so-called collapsing menu system which, for example, is used by many traditional personal computer applications. The distinguishing characteristics of this system are that the navigation always commences from the initial or root level and that the menu collapses back to the root level after a selection is made.

Computer software frequently includes dozens of functions. The sheer number of features makes it desirable to organize the functions into a hierarchy of categories to facilitate efficient searching. In a collapsing menu system each level in the hierarchy is presented as a level in the pull-down menu.

FIG. 1A shows a top or root level 10 of a hypothetical menu. Each level 10 of the menu provides a list of menu choices 12. Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead (point) to another level 10 providing a further list of menu choices 12. Selection of an end node will cause the pull-down menu to collapse back to the root level.

FIG. IB shows the pull-down menu of FIG. 1A with several levels of the hierarchical menu expanded. The menu structure of FIG. IB collapses back to the root level shown in FIG. 1A once an end node is selected. The defining characteristic of such a conventional navigation system is that navigation is one-way, and always starts from the root level to an end node. This method of navigation becomes cumbersome if the desired function or destination is buried several levels down from the root directory.

To address this shortcoming, conventional operating systems such as Microsoft Windows® provide short-cuts in the form of pre-defined function keys or icons. Such short-cuts enable the user to directly access the desired function associated with the short-cut.

In the absence of a pre-defined short-cut, the user must resort to navigating the menu structure. The problem with the collapsing menu system is that navigation must always commence from the root level. Consequently more experienced users are unable to take advantage of their knowledge of the hierarchical structure to directly access a given level.

FIG. 2A shows a conventional path menu system 20 used to navigate through the directory structure of a disk. Similarly, FIG. 2B shows a conventional universal resource locator (URL) command 22 which operates similarly to the DOS path command of FIG. 2A. The conventional disk operating system (DOS) uses a path menu system 20 to navigate between various folders. Each folder represents a different level in the hierarchy. A given folder may contain one or more sub-folders. To access a target or destination level the user must know the path, i.e., the names of the each of the folders from the root folder to the target folder. A system 10 of displaying the contents of each folder is provided to guide the user through the hierarchy. Namely, by typing a command such as DIRECTORY (DIR) the user is provided with the contents of the present folder and the path leading to the present folder. The user may proceed to a sub-level in the hierarchy or may retrace his/her steps to a preceding level by knowing the path.

Navigation using the path menu system requires the user to memorize and enter complex hierarchical sequences. This method of navigation is time consuming not suitable for users who have not memorized the path. Moreover, this method becomes extremely cumbersome as the number of levels increases.

Accordingly, one object of the present invention is to provide a more efficient way of navigating hierarchical menu systems.

## SUMMARY OF THE INVENTION

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item representing a function such as the function of launching an application, accessing a database location, or pointing to a subordinate level.

The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

According to a further aspect of the invention, pre-defined short-cuts are provided which enable direct access to a given menu item. The Active Path is dynamically constructed and displayed when one of the pre-defined short-cuts are executed, with one active link corresponding to each of the menu items necessary to access the given menu item using the graphical user menu system.

Navigation using the Active Path is accomplished by rolling over an active link with a pointing device or selecting an active link using a pointing device. Rolling over a given active link triggers the display of sibling menu items on the level associated with the given active link. Selecting a given active link triggers the execution of a function associated with the given active link.

These and other aspects of the present invention will be explained with reference to the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B are views of a conventional collapsing menu system;

US 8,352,880 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

FIG. 2A is a view of a conventional path menu system;

FIG. 2B is a view of a conventional universal resource locator address;

FIG. 3 is a block diagram of a conventional computer architecture;

FIGS. 4A-4C are views showing how the Active Path of the present invention is assembled as the user browses and selects a menu item;

FIGS. 5A-5E are views showing how an active link is used to redirect the path;

FIGS. 6A-6B are views showing the Active Path in combination with a traditional menu system to support the user's sense for orientation;

FIGS. 7A-7C are views showing the Active Path with search functionality for subordinate layers and content; and

FIGS. 8A-8D are views showing the Active Path replacing the address bar in a browser.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 3 is a block diagram of a computer 32 on which the software of the present invention operates. In the preferred embodiment, the main logic of the computer 32 is embodied by a general-purpose, programmable microprocessor 34, which in conventional practice will have an on-board memory cache (not shown) and which may be associated with one or more mathematics or other special-purpose coprocessors (not shown).

The processing logic generally represented by processor 34 is connected by a bus 20 structure 36 to the various other components of the computer 32. The schematic representation of bus 36 is shown in FIG. 3 as a simple and unitary structure, but in conventional practice, as is known to those in the art, there usually are several buses and communication pathways 36, operating at different speeds and having different purposes. Further, bus 36 may be segmented and controlled by respective bus controllers, as is also known in the art.

Computer 32 will also have a random access memory unit or units 38 connected to the bus 36. RAM 38 (which may be DRAM, SDRAM or other known types) typically has loaded into it the operating system of the computer 32 and executable instructions for one or more special applications designed to carry out the invention. Computer 32 also has electronic read-only memory 40 for storing those programs such as the BIOS which are non-volatile and persist after the computer 32 is shut down.

In alternative embodiments of the invention, one or more components of the invention's logic may be "hard-wired" into the ROM 40 instead of loaded as software instructions into RAM 38. ROM 40 can consist of or comprise electrically programmable read-only memory (EPROM), electrically erasable and programmable read-only memory (EEPROM) of either flash or nonflash varieties, or other sorts of read-only memory such as programmable fuse or antifuse arrays.

In a typical architecture, a computer program suitable for carrying out the invention will be stored on a mass storage device 42, such as an optical disk or magnetic hard drive. Bus 36 connects mass storage device 42 to RAM 38. The computer 32 is connected to various peripheral devices used to communicate with an operator, such as display 44, keyboard 46, and pointing device (mouse) 48.

In operation, operating system software such as Microsoft Windows® executes on the computer 32, and the user interacts with the operating system using the display 44, keyboard 46, and pointing device (mouse) 48.

FIG. 4A shows the initial view of the Active Path menu system 100 of the present invention. In the initial view (FIG. 4A), the Active Path Active Path 100 comprises a single active link 102 termed a root link 101. Since the initial view includes only one active link 102, it is both the root link 101 and the end link 103.

FIG. 4B shows how the user browses the hierarchical structure from the initial view (FIG. 10 4A) in order to arrive at an expanded view the Active Path 100 (FIG. 4C). Multiple hierarchical levels are displayed in FIG. 4B. Menu items 1.1, 1.2, 1.3 and 1.4 are termed siblings because they all fall within the same hierarchical level 10b. Moreover, menu items 1.1, 1.2, 1.3 and 1.4 are all hierarchically subordinate to root menu item 1.0. Similarly, menu item 1.2 is hierarchically superior to menu items 1.2.4.1, 1.2.4.2. Still further, menu item 1.0 is the parent 15 of menu items 1.1, 1.2, 1.3 and 1.4.

FIG. 4C is a view of an expanded Active Path Active Path 100 including active links 1.0, 1.2, 1.2.3, and 1.2.3.4.

The Active Path 100 consists of a sequential listing of active links 102, each active link 102 providing direct access to a corresponding level in the hierarchical structure and to all of the menu items on the same hierarchical level (sibling menu items).

It should be noted that whereas the conventional DOS path is merely a passive display of the hierarchical levels, the Active Path 100 is an interactive graphical user interface. As will become evident the Active Path 100 has several significant advantages over conventional menu trees used to navigate hierarchical information structures.

The Active Path 100 has distinct browsing and selection processes. The user browses by "rolling-over" (provisionally selecting) an element with a pointing device such as a mouse, causing the children to be displayed without hiding the siblings of the parent (and siblings of the grandparents etc). This quality of navigation supports the user's sense of orientation and is maintained until the user makes a selection.

As used herein, the term "selecting" IS distinguished from the term "browsing". Selecting means actively choosing a menu item. Using a conventional pointing device 48 such as a mouse, selection of a menu item (or active link) is accomplished when the user depresses and releases the mouse key (mouse-up operation).

Browsing means that the user has "rolled over" a menu item or active link 102 in order to view the siblings of the menu item or active link, i.e., all of the menu items on the same hierarchical level as the browsed link. The user may continue browsing the hierarchical data structure by browsing (rolling over) the sibling menu items. The Active Path 100 is not affected by the user's browsing. The displayed Active Path 102 changes only when the user selects a menu item or active link 102.

The present invention is not limited to any particular pointing device, and may be implemented in various ways without affecting the functionality of the invention. For example, separate mouse keys could be used for browsing and navigating.

The user may directly access any hierarchically superior level in the hierarchical data structure by selecting the corresponding active link 102. In other words, the user directly jumps to a given hierarchical level, and is not forced to sequentially navigate through each of the hierarchical levels of data structure to reach a desired level.

Referring to FIG. 4C, the user may directly access different hierarchical levels by selecting 101, 102a, 102b.

When the user selects any active link 102, the Active Path 100 responds by executing a function. Functions may include

US 8,352,880 B2

5

the launch of a software application or the display of the subordinate links with a detailed description.

The user may alternatively browse the Active Path **100** and any of the sibling menu items along a given branch in the data hierarchy. Browsing does not affect the active patch **100**, which continues to be displayed until the user selects an active link **102** or one of the sibling menu items of an active link.

Moreover, the Active Path **100** enables the user to directly re-execute the last function without the need to navigate to the function through the menu system, and without the need for a pre-defined short-cut. This is accomplished by selecting the last active link (end link) **103**.

In operation, the Active Path **102** starts with a special active link termed a root link **101** displayed (FIG. **4A**). No other elements on the same or subordinate hierarchical level are displayed until the root link **101** is browsed (rolling over) or the expert user enters a shortcut to any point in the hierarchy.

FIG. **4B** shows a user browsing the Active Path **100** shown in FIG. **4A**. More particularly, FIG. **4B** shows the user browsing by rolling over the active link 1.2.3 resulting in the display of the siblings of 1.2.3.1, 1.2.3.2, 1.2.3.3, 1.2.3.6. Rolling over (browsing) an active link **102** results in the display of the siblings and children of the active link.

According to a preferred embodiment, there is a slight distinction between browsing an active link **102** and browsing a menu item. In browsing an active link **102**, it is desirable to initially display only the siblings of the active link (FIG. **5A**), and display the children after a slight time delay (FIG. **5B**). The time delay in displaying the children of the browsed active link facilitates the user's sense of orientation.

FIG. **5C** shows the Active Path **100** created after the user selected 1.2.4.4 in FIG. **5B**.

Another aspect of the invention relates to the user's ability to immediately re-execute the last executed function by selecting the end link **103**. In this manner, the Active Path **100** defines on-the-fly a short-cut to the last function.

In contrast, conventional short-cuts such as a function keys, icons, or the like are static in that it only provides access to a single pre-defined item (function/database location).

In operation, the active links **102** of Active Path **100** are accessed using the mouse **48** and mouse buttons **48a**, **48-b** (FIG. **3**).

As described above, each of the active links **102** in the Active Path **100** may be browsed by rolling over the active link **102** with the pointer **50** of the pointing device **48**, or accessed by selecting the active link **102**. As shown in FIG. **5B** rolling over the active link **102** simply entails manipulating the mouse **48** to position the software pointer **50** over the active link **102**. Rolling over an active link **102-b** causes the sibling menu items on the level corresponding the active link **102-b** to be displayed. It should be noted that simply rolling over an active link **102** does not alter the Active Path **100**; it merely causes the sibling menu items to be displayed.

Selection of an active link **102** is accomplished by, for example, positioning the software pointer **50** over the active link **102** and actuating (and releasing) one of the mouse buttons **48-a**, **48-b**. Selection of an active link **102** causes different results depending on whether or not the selected active link **102** is the end link **103** in the Active Path **100**. If the selected active link **102** is not the end link **103**, then selection will cause a folder with subordinate levels and content to be displayed. For example, the folder may contain a list of the sibling menu items **12** (subordinate levels or links) on a given level of the hierarchical data structure, and a brief description (content) of each of the menu items. Moreover, if the selected active link **102** is not the end link **103**, then selection will

6

trigger the construction of a new Active Path **100**. FIG. **5D** shows a user selecting active link **102b** (1.2.3). As shown, the last executed function (end link **103**) was 1.2.3.4. After selecting **102b** the Active Path is truncated, and 1.2.3 becomes the end link **103**.

Selection of an end link **103** will cause the immediate re-execution of the associated function (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link **103** in the Active Path **100**. Moreover, selection of an end link **103** will not affect the Active Path **100**.

According to a further aspect of the present invention, the Active Path **100** may be used to define a short-cut on-the-fly. Once the Active Path **100** has been constructed the user may store the end link **103** as a shortcut within a lookup table **38a** (FIG. **3**). According to a presently preferred embodiment, this is accomplished by a combination of commands. Thus, for example, the user could be prompted to define a short-cut identifier by clicking mouse button **48-b** over end link **103**. The Active Path **100** then stores the association between the function (or location) **20** and the user-selected shortcut in the rewriteable table **38a**.

The Active Path **100** of the present invention may similarly be used to navigate to a location such as a location in a database or a web page. Notably, the Active Path **100** is created in the same manner regardless of whether the menu items **12** represent functions or locations. In the case of navigating to a location, selecting an active link: **102** (other than the end link: **103**) triggers the access of the associated database location. In contrast, when navigating to a class of functions, selection of an active link: **102** (other than the end link: **103**) merely triggers the display of the sibling menu items on the associated level. One of ordinary skill in the art will appreciate that the Active Path **100** of the present invention may be used in standalone applications such as operating systems, word processors, spreadsheets or the like. Moreover, the Active Path **100** may also be used in a client-server environment. Notably, the Active Path **100** may be used to navigate functions provided on a web site or to navigate between different web addresses.

In standalone applications, a range of Microsoft® Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path **100** and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path **100**. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the preferred embodiment foresees a replacement of the address bar with the Active Path **100** to avoid redundancy, allow the user to focus on the content and make browsing more efficient. For Microsoft® Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as

US 8,352,880 B2

7

Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Windows Explorer may replace the Address Bar with the Active Path **100**. This could make the display of the folder window redundant. The user may better take advantage of the screen real-estate by rolling over and "browsing" through the levels of the collapsing menu system.

The Active Path **100** of the present invention may also be used to navigate audio interfaces. A preferred embodiment for audio interfaces would allow users to navigate to the end point of a path. A certain input command, such as pressing a certain key, would read the sequence and level of the selected path. Users can then select any level of the path and navigate to a new endpoint.

The Active Path **100** may also be used in conjunction with a conventional navigation system such as the above-described collapsing menu system or path menu system.

The Active Path **100** is dynamically assembled and displayed as the user navigates using the conventional menu screens. The Active Path **100** is assembled automatically without the need for any additional user interaction as the user navigates using the collapsing menu system.

FIGS. **6A-6B** show how the Active Path **100** may be used to navigate to classes of functions. In the embodiment depicted in FIGS. **6A-6B** the Active Path **100** is used in conjunction with a conventional collapsing menu system **10**. One of ordinary skill in the art will appreciate that the location of the Active Path **100** in relation to the collapsing menu system **10** and its graphical representation are not critical to the operation of the Active Path **100**.

FIG. **6A** shows an initial view of the conventional collapsing menu system **10**. The Active path **100** is absent from FIG. **6A** because no menu item has been selected. As the user rolls over a given menu item, the children of the menu item are displayed. In FIG. **6A** the user has successively rolled over 1.2, 1.2.3, and 1.2.3.4. Again, the Active path **100** is absent from FIG. **6A** because no menu item has yet been selected.

FIG. **6B** shows the Active Path **100** after the user selected menu item 1.2.3.4. As shown, the conventional collapsing menu system collapses once the user has selected a menu item. Each active link **102** in the Active Path **100** represents the sequence of implicit selections by an explicit selection of the menu item. More particularly, the Active Path **100** shown in FIG. **6A** includes active links **101**, **102a**, **102b**, and **103** corresponding to menu items FILE, 1.2, 1.2.3, and 1.2.3.4. Active link **101** corresponds to menu item FILE selected from the initial or root level. Likewise, active link **102-a** corresponds to menu item 1.2 selected, and active link **102-b 15** corresponds to menu item 1.2.3. Construction of the Active Path **100** occurs automatically as the user navigates through the menu system **10**. It should be noted that active link **102-c** is the end link **103** in the Active Path **100**.

It should be noted that the menu system (pull-down menu tree) **10** collapses when the user selects end node 1.2.3.4 whereupon the Active Path **100** appears. The user may directly access different hierarchical levels simply by selecting different active links **102**.

As described above, the Active Path **100** is dynamically constructed as the user navigates the collapsing menu system, and is subsequently retained after the menu tree collapses back to the root level. In addition, the Active Path **100** may optionally be constructed each time a short-cut such as a function key or the like is used. It should be noted that a shortcut may be defined for any point in the hierarchical structure. This requires the use of a look-up table **38a** (FIG. **3**) stored in RAM **38**. The look-up table **38a** stores each of the pre-defined shortcuts and the associated data necessary to

8

create the Active Path **100**. According to a presently preferred embodiment, the Active Path **100** constructed is the same as would be constructed by accessing the function through the collapsing menu system.

In operation, the look-up table **38a** would originally be created by the software developer during initial definition of each of the pre-defined short-cuts (function keys). Moreover, as will be explained, the look-up table **38a** may be updated by the user to reference newly created short-cuts.

Additional Pointers on Menu Item

A further aspect of the invention will now be described with reference to FIGS. **7A-7C**. Each menu item may contain additional pointers to functions such as a search entry field **200** used for searching folders, files or content of the subordinate information hierarchy.

FIG. **7A** shows an initial (root level) view of the Active Path **100** with root link **101**, and the search field **200**. Selecting search field **200** in FIG. **7A** will enable the user to search the entire hierarchical structure from the highest (root) level to the lowest level.

FIG. **7B** shows an expanded view of the Active Path **100**. Selecting search field **200** in FIG. **7B** will enable the user to search the hierarchical structure from 1.2.3 and all hierarchically subordinate levels (along the same branch).

FIG. **7C** shows a sample of the search entry interface displayed when the user selects the search field **200**.

The functionality of the search entry field **200** may also be implemented by, for example, using a special button on the pointing device **48** or special key stroke on the keyboard.

As noted above, the Active Path **100** of the present invention may be used to navigate directories, with the internet being just one example of a directory.

Moreover, the Active Path may be used to enhance the functionality of the address bar in an internet browser such as Internet Explorer or Mozilla.

FIG. **8A** shows a conventional address bar of an internet browser.

FIG. **8B** shows the root level **101** of the Active Path **100** as a text entry field. Once a user has entered a location (destination) the Active Path **100** will search for a data file representing the information hierarchy of the location. This data file will enable the user to browse the entire information hierarchy of the location without fetching additional information from the server each time a new hierarchical level is browsed. This enables a user to quickly locate and directly access the desired (content) level with the hierarchy without having to sequentially access the various levels of the hierarchy.

FIG. **8C** shows a user browsing an information hierarchy. This aspect of the Active Path does not require the user to memorize the entire URL to access a location. Moreover, the data file merely contains a representation of the structure of the information hierarchy and does not contain the actual contents of the location. For this reason, the data file is relatively small. Once the user has accessed a given location (FIG. **8D**), the Active Path **100** includes a series of active links **101**, **102**, **103** each active link pointing to a different level in the hierarchical structure. The user may then directly access any level along the path without having to resort to pressing the "go back" button on the browser.

If a data file representing the information hierarchy of the location is not located, the Active Path Menu Navigation System will dynamically create the file from the directory structure and the hypertext markup language (HTML) available on the server and client files.

According to another aspect of the invention, the Active Path **100** may be used to as a method for navigating web sites including a plurality of hierarchically organized web pages.

US 8,352,880 B2

9

The method of the present invention eliminates the need for providing hyperlinks and navigational elements on the individual web pages.

According to the present invention, a data file representing the hierarchical structure of the multi-level hierarchical website is either constructed or retrieved from the server. As noted above, the data file representing the information hierarchy of the location may be dynamically created from the directory structure and the hypertext markup language (HTML) available on the server and client files.

Using the Active Path, the user browses the data file representing the information hierarchy of the location, and selects a desired location. This eliminates the need to provide hyperlinks and navigational elements on the individual web pages.

A new Active Path is dynamically constructed each time the user navigates to a new location (web page) within the hierarchical website. Again, each active link corresponds to a level in the hierarchical structure, and a user may directly access any given level of the hierarchical structure by selecting a given active link. Moreover, the active links provide the user the ability to directly browse all items on any given level of the hierarchical menu structure including all hierarchically subordinate items without affecting the Active Path.

Although a preferred embodiment of the Active Path navigation system of the present invention has been specifically described and illustrated, it is to be understood that variations or alternative embodiments apparent to those skilled in the art are within the scope of this invention. Since many such variations may be made, it is to be understood that within the scope of the following claims, this invention may be practiced otherwise than specifically described.

The invention claimed is:

1. A method of navigating an information structure comprising:

providing a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof;

dynamically constructing an active path as a sequence of active links after an item of the information structure has been selected;

upon provisional selection of any said active link, displaying one or more items on a given level of the information structure without affecting the active path; and

said active links allowing a user to access an item in the information structure by selecting from the one or more items displayed by one of the active links on the active path.

2. The method of claim 1, wherein the one or more items allow the display of one or more additional items on a given level of the information structure.

3. The method of claim 1, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a pointer is rolled over one of the active links.

4. The method of claim 1, wherein the one or more active links allow the display of one or more items on a given level of the information structure when one of the active links is selected.

5. The method of claim 1, wherein the one or more active links allow the display of one or more items on a given level

10

of the information structure when a visual icon associated with one of the active links is selected.

6. The method of claim 1, wherein the active links in the active path allow the display of one or more items on a given level of the information structure without changing the active path.

7. The method of claim 1, wherein a user may directly access one or more active links in the active path by selecting the active link.

8. The method of claim 7, wherein the selection of an active link causes the active path to truncate to the selected active link.

9. The method of claim 1, further providing pre-defined shortcuts that enable direct access to a given item in the information structure, wherein selection of a predefined shortcut dynamically constructs an active path including one active link corresponding to each item necessary to navigate to the given item in the information structure.

10. An apparatus for navigating an information structure, the apparatus including a processor configured to:

provide a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof;

dynamically construct an active path as a sequence of active links after an item of the information structure has been selected;

upon provisional selection of a given one of said active links, display one or more items on a given level of the information structure associated with said provisionally selected active link without affecting the active path; and

allow a user to access an item in the information structure by selecting the item from the one or more items displayed by one of the active links on the active path.

11. The apparatus of claim 10, further configured to allow provisional selection of the one or more items to display one or more additional items on a given level of the information structure.

12. The apparatus of claim 10, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a pointer is rolled over one of the active links.

13. The apparatus of claim 10, wherein the one or more active links allow the display of one or more items on a given level of the information structure when one of the active links is selected.

14. The apparatus of claim 10, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a visual icon associated with one of the active links is selected.

15. The apparatus of claim 10, wherein the active links in the active path allow the display of one or more items on a given level of the information structure without changing the active path.

16. The apparatus of claim 10, wherein a user may directly access one or more active links in the active path by selecting the active link.

17. The apparatus of claim 16, wherein the selection of an active link causes the active path to truncate to the selected active link.

18. The apparatus of claim 10 further configured to provide pre-defined shortcuts to enable access to a given item in the information structure, wherein selection of a pre-defined shortcut dynamically constructs an active path including one active link corresponding to each item necessary to navigate to the given item in the information structure.

Appx0040

US 8,352,880 B2

11

19. The apparatus of claim 10, wherein two functions are associated with at least one of said active links.

20. The apparatus of claim 19, wherein execution of said functions is initiated by selecting different portions of said at least one of active link.

12

21. The apparatus of claim 19 wherein one said function is a search function.

22. The apparatus of claim 10, wherein at least two functions are associated with at least one of said active links.

\*    \*    \*    \*    \*

US010037127B2

(12) **United States Patent**
Moehrle

(10) **Patent No.:** **US 10,037,127 B2**
(45) **Date of Patent:** ***Jul. 31, 2018**

(54) **ACTIVE PATH MENU NAVIGATION SYSTEM**

(71) Applicant: **CADDO SYSTEMS INC**, Marshall, TX (US)

(72) Inventor: **Armin Moehrle**, Chicago, IL (US)

(73) Assignee: **CADDO SYSTEMS, INC.**, Marshall, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/822,173**

(22) Filed: **Nov. 26, 2017**

(65) **Prior Publication Data**

US 2018/0088755 A1      Mar. 29, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 11/687,646, filed on Mar. 17, 2007, now Pat. No. 7,725,836, and a continuation of application No. 10/444,359, filed on May 23, 2003, now Pat. No. 7,216,301, and a continuation-in-part of application No. 10/164,520, filed on Jun. 6, 2002, now Pat. No. 7,191,411, and a continuation of application No. 13/725,681, filed on Dec. 21, 2012, now abandoned, and a continuation of

(Continued)

(51) **Int. Cl.**
*G06F 3/048* (2013.01)
*G06F 3/0482* (2013.01)
*G06F 17/30* (2006.01)

(52) **U.S. Cl.**
CPC ...... *G06F 3/0482* (2013.01); *G06F 17/30126* (2013.01)

(58) **Field of Classification Search**
CPC ............. G06F 3/0482; G06F 17/30126; G06F 17/30876; G06F 3/0481; G06F 9/543
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,801,702 A | 9/1998 | Dolan | |
| 6,236,400 B1 | 5/2001 | Guerrero | |
| | (Continued) | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0947921 A | 10/1999 |
| WO | 0116482 A1 | 3/2001 |

OTHER PUBLICATIONS

Bowler D et al, Navigation Bars for Hierarchical Web Sites, Student HCI Online Research Experiments, Onine! 2001, pp. 1-23 XP002286023 University of Maryland, US.

(Continued)

*Primary Examiner* — Namitha Pillai
(74) *Attorney, Agent, or Firm* — Jonathan D Feuchtwang

(57) **ABSTRACT**

Disclosed is a method of navigating an information structure comprising: providing a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof; dynamically constructing an active path as a sequence of active links after an item of the information structure has been selected; said active links allowing the display of one or more items on a given level of the information structure; and said active links allowing a user to access an item in the information structure by selecting from the one or more items displayed by one of the active links on the active path.

**26 Claims, 8 Drawing Sheets**



**Appx0042**

US 10,037,127 B2

Page 2

**Related U.S. Application Data**

application No. 12/538,151, filed on Aug. 9, 2009, now Pat. No. 8,352,880, and a continuation of application No. 15/434,052, filed on Feb. 15, 2017.

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,240,410 B1 | 5/2001 | Wical |
| 6,256,028 B1 | 7/2001 | Sanford |
| 6,462,762 B1 | 10/2002 | Ku |
| 6,597,377 B1 | 7/2003 | MacPhail |
| 6,621,532 B1 | 9/2003 | Mandt |
| 6,633,316 B1 | 10/2003 | Maddalozzo |
| 6,832,350 B1 | 12/2004 | Bates |
| 6,990,638 B2 | 1/2006 | Barksdale |
| 8,438,487 B1 | 5/2013 | Hendel |
| 2004/0075693 A1 | 4/2004 | Moyer |

OTHER PUBLICATIONS

RFC 1738 Dec. 1994, Internet RFC/STD/FYI/BCP Archives pp. 1-23.
Sun Microsystems Inc: "Quick Start to Using OpenStep Desktop", Online! Sep. 1996, XP00228624 pp. 5-1 to 5-9.
IBM: Fully Navigatable Breadcrumb Trails Research Disclosure, Keeth Mason Publications, Hampshire GB, vol. 46, No. 130, Sep. 2002, XP007131244, ISSN:0374-4353.
Website http://home.lu.lv/~mihails/tt1/P4_DynamicWeb/24-WebSiteNav/BreadCrumbs/(implementation of the code disclosed in Teague Book Jason Cranford Teague, DHTML and CSS for World Wide Web at 344 (2d ed.) published 2001 Chapter 24).

**U.S. Patent**    Jul. 31, 2018    Sheet 1 of 8    US 10,037,127 B2



FIG. 1A  Prior  Art



FIG.  1B  Prior  Art

Case: 25-1764      Document: 28      Page: 48      Filed: 10/21/2025

20

c:\windows\applications\temp\help.doc

FIG. 2A  Prior  Art

22

http://www.uspto.gov/patents/applications

FIG. 2B  Prior  Art



FIG. 3



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 5A



FIG. 5B



FIG. 5C



FIG.  5D



FIG.  5E



FIG. 6A



FIG. 6B

Case: 25-1764    Document: 28    Page: 53    Filed: 10/21/2025



FIG. 7A



FIG. 7B

search 1.2.3.x

text entry search term    >

FIG. 7C



http://www.uspto.gov/Patents/Patenting  |V|

FIG. 8A

uspto.gov  |>|

FIG. 8B



| uspto.gov |>| About | |
| | | How to... | Services |
| | | Patents | Guides |
| | | Trademarks | Patenting |
| | | Check Status | International — 50 |
| | | | Resources |
| | | | Help |

FIG. 8C



101      102a      103

| uspto.gov |>| Patents | Patenting |

100

FIG. 8D

# ACTIVE PATH MENU NAVIGATION SYSTEM

This application is a continuation of U.S. application Ser. No. 13/725,681 filed Dec. 21, 2012 which is a continuation of U.S. application Ser. No. 12/538,151 filed Aug. 9, 2009 (now U.S. Pat. No. 8,352,880) which is a continuation of U.S. application Ser. No. 11/687,646 filed Mar. 17, 2007 (now U.S. Pat. No. 7,725,83 6) which is a continuation of U.S. application Ser. No. 10/444,359 filed May 23, 2003 (now U.S. Pat. No. 7,216,301) which is a continuation-in-part (CIP) of U.S. application Ser. No. 10/164,520 entitled Active Path Menu Navigation System, filed Jun. 6, 2002 (now U.S. Pat. No. 7,191,411).

## FIELD OF THE INVENTION

The present invention generally relates to a navigation system used to find, enter, or edit data or launch an application within a hierarchical information system. The navigation system of the present invention may be implemented in software executing on a standalone software program or on a client server application. More particularly, the navigation system of the present invention allows a user to access different levels in a hierarchical information system without retracing back to the top level of the hierarchy.

## BACKGROUND OF THE INVENTION

Hierarchical information systems are used to organize items by function or theme in order to facilitate efficient locating of functions or locations. Hierarchical systems are used to organize documents into directories or folders and to organize functions into pull-down menus.

Conventionally one of two navigation systems are used to navigate through the various levels of a menu tree. By far the most popular menu navigation system is the so-called collapsing menu system which, for example, is used by many traditional personal computer applications. The distinguishing characteristics of this system are that the navigation always commences from the initial or root level and that the menu collapses back to the root level after a selection is made.

Computer software frequently includes dozens of functions. The sheer number of features makes it desirable to organize the functions into a hierarchy of categories to facilitate efficient searching. In a collapsing menu system each level in the hierarchy is presented as a level in the pull-down menu.

FIG. 1A shows a top or root level 10 of a hypothetical menu. Each level 10 of the menu provides a list of menu choices 12. Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead (point) to another level 10 providing a further list of menu choices 12. Selection of an end node will cause the pull-down menu to collapse back to the root level.

FIG. 1B shows the pull-down menu of FIG. 1A with several levels of the hierarchical menu expanded. The menu structure of FIG. 1B collapses back to the root level shown in FIG. 1A once an end node is selected. The defining characteristic of such a conventional navigation system is that navigation is one-way, and always starts from the root level to an end node. This method of navigation becomes cumbersome if the desired function or destination is buried several levels down from the root directory.

To address this shortcoming, conventional operating systems such as Microsoft Windows® provide short-cuts in the form of pre-defined function keys or icons. Such short-cuts enable the user to directly access the desired function associated with the short-cut.

In the absence of a pre-defined short-cut, the user must resort to navigating the menu structure. The problem with the collapsing menu system is that navigation must always commence from the root level. Consequently more experienced users are unable to take advantage of their knowledge of the hierarchical structure to directly access a given level.

FIG. 2A shows a conventional path menu system 20 used to navigate through the directory structure of a disk. Similarly, FIG. 2B shows a conventional universal resource locator (URL) command 22 which operates similarly to the DOS path command of FIG. 2A. The conventional disk operating system (DOS) uses a path menu system 20 to navigate between various folders. Each folder represents a different level in the hierarchy. A given folder may contain one or more sub-folders. To access a target or destination level the user must know the path, i.e., the names of the each of the folders from the root folder to the target folder. A system 10 of displaying the contents of each folder is provided to guide the user through the hierarchy. Namely, by typing a command such as DIRECTORY (DIR) the user is provided with the contents of the present folder and the path leading to the present folder. The user may proceed to a sub-level in the hierarchy or may retrace his/her steps to a preceding level by knowing the path.

Navigation using the path menu system requires the user to memorize and enter complex hierarchical sequences. This method of navigation is time consuming not suitable for users who have not memorized the path. Moreover, this method becomes extremely cumbersome as the number of levels increases.

Accordingly, one object of the present invention is to provide a more efficient way of navigating hierarchical menu systems.

## SUMMARY OF THE INVENTION

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item representing a function such as the function of launching an application, accessing a database location, or pointing to a subordinate level.

The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

According to a further aspect of the invention, pre-defined short-cuts are provided which enable direct access to a given menu item. The Active Path is dynamically constructed and displayed when one of the pre-defined short-cuts are executed, with one active link corresponding to each of the menu items necessary to access the given menu item using the graphical user menu system.

Navigation using the Active Path is accomplished by rolling over an active link with a pointing device or selecting

US 10,037,127 B2

3

an active link using a pointing device. Rolling over a given active link triggers the display of sibling menu items on the level associated with the given active link. Selecting a given active link triggers the execution of a function associated with the given active link.

These and other aspects of the present invention will be explained with reference to the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B are views of a conventional collapsing menu system;

FIG. 2A is a view of a conventional path menu system;

FIG. 2B is a view of a conventional universal resource locator address;

FIG. 3 is a block diagram of a conventional computer architecture;

FIGS. 4A-4C are views showing how the Active Path of the present invention is assembled as the user browses and selects a menu item;

FIGS. 5A-5E are views showing how an active link is used to redirect the path;

FIGS. 6A-6B are views showing the Active Path in combination with a traditional menu system to support the user's sense for orientation;

FIGS. 7A-7C are views showing the Active Path with search functionality for subordinate layers and content; and

FIGS. 8A-8D are views showing the Active Path replacing the address bar in a browser.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

FIG. 3 is a block diagram of a computer 32 on which the software of the present invention operates. In the preferred embodiment, the main logic of the computer 32 is embodied by a general-purpose, programmable microprocessor 34, which in conventional practice will have an on-board memory cache (not shown) and which may be associated with one or more mathematics or other special-purpose coprocessors (not shown).

The processing logic generally represented by processor 34 is connected by a bus 20 structure 36 to the various other components of the computer 32. The schematic representation of bus 36 is shown in FIG. 3 as a simple and unitary structure, but in conventional practice, as is known to those in the art, there usually are several buses and communication pathways 36, operating at different speeds and having different purposes. Further, bus 36 may be segmented and controlled by respective bus controllers, as is also known in the art.

Computer 32 will also have a random access memory unit or units 38 connected to the bus 36. RAM 38 (which may be DRAM, SDRAM or other known types) typically has loaded into it the operating system of the computer 32 and executable instructions for one or more special applications designed to carry out the invention. Computer 32 also has electronic read-only memory 40 for storing those programs such as the BIOS which are non-volatile and persist after the computer 32 is shut down.

In alternative embodiments of the invention, one or more components of the invention's logic may be "hard-wired" into the ROM 40 instead of loaded as software instructions into RAM 38. ROM 40 can consist of or comprise electrically programmable read-only memory (EPROM), electrically erasable and programmable read-only memory (EE-

4

PROM) of either flash or nonflash varieties, or other sorts of read-only memory such as programmable fuse or antifuse arrays.

In a typical architecture, a computer program suitable for carrying out the invention will be stored on a mass storage device 42, such as an optical disk or magnetic hard drive. Bus 36 connects mass storage device 42 to RAM 38. The computer 32 is connected to various peripheral devices used to communicate with an operator, such as display 44, keyboard 46, and pointing device (mouse) 48.

In operation, operating system software such as Microsoft Windows ® executes on the computer 32, and the user interacts with the operating system using the display 44, keyboard 46, and pointing device (mouse) 48.

FIG. 4A shows the initial view of the Active Path menu system 100 of the present invention. In the initial view (FIG. 4A), the Active Path Active Path 100 comprises a single active link 102 termed a root link 101. Since the initial view includes only one active link 102, it is both the root link 101 and the end link 103.

FIG. 4B shows how the user browses the hierarchical structure from the initial view (FIG. 10 4A) in order to arrive at an expanded view the Active Path 100 (FIG. 4C). Multiple hierarchical levels are displayed in FIG. 4B. Menu items 1.1, 1.2, 1.3 and 1.4 are termed siblings because they all fall within the same hierarchical level 10b. Moreover, menu items 1.1, 1.2, 1.3 and 1.4 are all hierarchically subordinate to root menu item 1.0. Similarly, menu item 1.2 is hierarchically superior to menu items 1.2.4.1, 1.2.4.2. Still further, menu item 1.0 is the parent 15 of menu items 1.1, 1.2, 1.3 and 1.4.

FIG. 4C is a view of an expanded Active Path Active Path 100 including active links 1.0, 1.2, 1.2.3, and 1.2.3.4.

The Active Path 100 consists of a sequential listing of active links 102, each active link 102 providing direct access to a corresponding level in the hierarchical structure and to all of the menu items on the same hierarchical level (sibling menu items).

It should be noted that whereas the conventional DOS path is merely a passive display of the hierarchical levels, the Active Path 100 is an interactive graphical user interface. As will become evident the Active Path 100 has several significant advantages over conventional menu trees used to navigate hierarchical information structures.

The Active Path 100 has distinct browsing and selection processes. The user browses by "rolling-over" (provisionally selecting) an element with a pointing device such as a mouse, causing the children to be displayed without hiding the siblings of the parent (and siblings of the grandparents etc). This quality of navigation supports the user's sense of orientation and is maintained until the user makes a selection.

As used herein, the term "selecting" IS distinguished from the term "browsing". Selecting means actively choosing a menu item. Using a conventional pointing device 48 such as a mouse, selection of a menu item (or active link) is accomplished when the user depresses and releases the mouse key (mouse-up operation).

Browsing means that the user has "rolled over" a menu item or active link 102 in order to view the siblings of the menu item or active link, i.e., all of the menu items on the same hierarchical level as the browsed link. The user may continue browsing the hierarchical data structure by browsing (rolling over) the sibling menu items. The Active Path 100 is not affected by the user's browsing. The displayed Active Path 102 changes only when the user selects a menu item or active link 102.

US 10,037,127 B2

5

The present invention is not limited to any particular pointing device, and may be implemented in various ways without affecting the functionality of the invention. For example, separate mouse keys could be used for browsing and navigating.

The user may directly access any hierarchically superior level in the hierarchical data structure by selecting the corresponding active link **102**. In other words, the user directly jumps to a given hierarchical level, and is not forced to sequentially navigate through each of the hierarchical levels of data structure to reach a desired level.

Referring to FIG. **4**C, the user may directly access different hierarchical levels by selecting **101, 102***a,* **102***b.*

When the user selects any active link **102**, the Active Path **100** responds by executing a function. Functions may include the launch of a software application or the display of the subordinate links with a detailed description.

The user may alternatively browse the Active Path **100** and any of the sibling menu items along a given branch in the data hierarchy. Browsing does not affect the active patch **100**, which continues to be displayed until the user selects an active link **102** or one of the sibling menu items of an active link.

Moreover, the Active Path **100** enables the user to directly re-execute the last function without the need to navigate to the function through the menu system, and without the need for a pre-defined short-cut. This is accomplished by selecting the last active link (end link) **103**.

In operation, the Active Path **102** starts with a special active link termed a root link **101** displayed (FIG. **4**A). No other elements on the same or subordinate hierarchical level are displayed until the root link **101** is browsed (rolling over) or the expert user enters a shortcut to any point in the hierarchy.

FIG. **4**B shows a user browsing the Active Path **100** shown in FIG. **4**A. More particularly, FIG. **4**B shows the user browsing by rolling over the active link **1.2.3** resulting in the display of the siblings of **1.2.3.1, 1.2.3.2, 1.2.3.3, 1.2.3.6**. Rolling over (browsing) an active link **102** results in the display of the siblings and children of the active link.

According to a preferred embodiment, there is a slight distinction between browsing an active link **102** and browsing a menu item. In browsing an active link **102**, it is desirable to initially display only the siblings of the active link (FIG. **5**A), and display the children after a slight time delay (FIG. **5**B). The time delay in displaying the children of the browsed active link facilitates the user's sense of orientation.

FIG. **5**C shows the Active Path **100** created after the user selected **1.2.4.4** in FIG. **5**B.

Another aspect of the invention relates to the user's ability to immediately re-execute the last executed function by selecting the end link **103**. In this manner, the Active Path **100** defines on-the-fly a short-cut to the last function.

In contrast, conventional short-cuts such as a function keys, icons, or the like are static in that it only provides access to a single pre-defined item (function/database location).

In operation, the active links **102** of Active Path **100** are accessed using the mouse **48** and mouse buttons **48***a,* **48-***b* (FIG. **3**).

As described above, each of the active links **102** in the Active Path **100** may be browsed by rolling over the active link **102** with the pointer **50** of the pointing device **48**, or accessed by selecting the active link **102**. As shown in FIG. **5**B rolling over the active link **102** simply entails manipulating the mouse **48** to position the software pointer

6

**50** over the active link **102**. Rolling over an active link **102-***b* causes the sibling menu items on the level corresponding the active link **102-***b* to be displayed. It should be noted that simply rolling over an active link **102** does not alter the Active Path **100**; it merely causes the sibling menu items to be displayed.

Selection of an active link **102** is accomplished by, for example, positioning the software pointer **50** over the active link **102** and actuating (and releasing) one of the mouse buttons **48-***a,* **48-***b.* Selection of an active link **102** causes different results depending on whether or not the selected active link **102** is the end link **103** in the Active Path **100**. If the selected active link **102** is not the end link **103**, then selection will cause a folder with subordinate levels and content to be displayed. For example, the folder may contain a list of the sibling menu items **12** (subordinate levels or links) on a given level of the hierarchical data structure, and a brief description (content) of each of the menu items. Moreover, if the selected active link **102** is not the end link **103**, then selection will trigger the construction of a new Active Path **100**. FIG. **5**D shows a user selecting active link **102***b* (**1.2.3**). As shown, the last executed function (end link **103**) was **1.2.3.4**. After selecting **102***b* the Active Path is truncated, and **1.2.3** becomes the end link **103**.

Selection of an end link **103** will cause the immediate re-execution of the associated function (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link **103** in the Active Path **100**. Moreover, selection of an end link **103** will not affect the Active Path **100**.

According to a further aspect of the present invention, the Active Path **100** may be used to define a short-cut on-the-fly. Once the Active Path **100** has been constructed the user may store the end link **103** as a shortcut within a lookup table **38***a* (FIG. **3**). According to a presently preferred embodiment, this is accomplished by a combination of commands. Thus, for example, the user could be prompted to define a short-cut identifier by clicking mouse button **48-***b* over end link **103**. The Active Path **100** then stores the association between the function (or location) **20** and the user-selected shortcut in the rewriteable table **38***a.*

The Active Path **100** of the present invention may similarly be used to navigate to a location such as a location in a database or a web page. Notably, the Active Path **100** is created in the same manner regardless of whether the menu items **12** represent functions or locations. In the case of navigating to a location, selecting an active link: **102** (other than the end link: **103**) triggers the access of the associated database location. In contrast, when navigating to a class of functions, selection of an active link: **102** (other than the end link: **103**) merely triggers the display of the sibling menu items on the associated level. One of ordinary skill in the art will appreciate that the Active Path **100** of the present invention may be used in standalone applications such as operating systems, word processors, spreadsheets or the like. Moreover, the Active Path **100** may also be used in a client-server environment. Notably, the Active Path **100** may be used to navigate functions provided on a web site or to navigate between different web addresses.

In standalone applications, a range of Microsoft® Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Appx0054

US 10,037,127 B2

7                                                                                              8

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/ DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path 100 and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path 100. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the preferred embodiment foresees a replacement of the address bar with the Active Path 100 to avoid redundancy, allow the user to focus on the content and make browsing more efficient. For Microsoft® Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Windows Explorer may replace the Address Bar with the Active Path 100. This could make the display of the folder window redundant. The user may better take advantage of the screen real-estate by rolling over and "browsing" through the levels of the collapsing menu system.

The Active Path 100 of the present invention may also be used to navigate audio interfaces. A preferred embodiment for audio interfaces would allow users to navigate to the end point of a path. A certain input command, such as pressing a certain key, would read the sequence and level of the selected path. Users can then select any level of the path and navigate to a new endpoint.

The Active Path 100 may also be used in conjunction with a conventional navigation system such as the above-described collapsing menu system or path menu system.

The Active Path 100 is dynamically assembled and displayed as the user navigates using the conventional menu screens. The Active Path 100 is assembled automatically without the need for any additional user interaction as the user navigates using the collapsing menu system.

FIGS. 6A-6B show how the Active Path 100 may be used to navigate to classes of functions. In the embodiment depicted in FIGS. 6A-6B the Active Path 100 is used in conjunction with a conventional collapsing menu system 10. One of ordinary skill in the art will appreciate that the location of the Active Path 100 in relation to the collapsing menu system 10 and its graphical representation are not critical to the operation of the Active Path 100.

FIG. 6A shows an initial view of the conventional collapsing menu system 10. The Active path 100 is absent from FIG. 6A because no menu item has been selected. As the user rolls over a given menu item, the children of the menu item are displayed. In FIG. 6A the user has successively rolled over 1.2, 1.2.3, and 1.2.3.4. Again, the Active path 100 is absent from FIG. 6A because no menu item has yet been selected.

FIG. 6B shows the Active Path 100 after the user selected menu item 1.2.3.4. As shown, the conventional collapsing menu system collapses once the user has selected a menu item. Each active link 102 in the Active Path 100 represents the sequence of implicit selections by an explicit selection of the menu item. More particularly, the Active Path 100 shown in FIG. 6A includes active links 101, 102a, 102b, and 103 corresponding to menu items FILE, 1.2, 1.2.3, and 1.2.3.4. Active link 101 corresponds to menu item FILE selected from the initial or root level. Likewise, active link 102-a

corresponds to menu item 1.2 selected, and active link 102-b corresponds to menu item 1.2.3. Construction of the Active Path 100 occurs automatically as the user navigates through the menu system 10. It should be noted that active link 102-c is the end link 103 in the Active Path 100.

It should be noted that the menu system (pull-down menu tree) 10 collapses when the user selects end node 1.2.3.4 whereupon the Active Path 100 appears. The user may directly access different hierarchical levels simply by selecting different active links 102.

As described above, the Active Path 100 is dynamically constructed as the user navigates the collapsing menu system, and is subsequently retained after the menu tree collapses back to the root level. In addition, the Active Path 100 may optionally be constructed each time a short-cut such as a function key or the like is used. It should be noted that a shortcut may be defined for any point in the hierarchical structure. This requires the use of a look-up table 38a (FIG. 3) stored in RAM 38. The look-up table 38a stores each of the pre-defined shortcuts and the associated data necessary to create the Active Path 100. According to a presently preferred embodiment, the Active Path 100 constructed is the same as would be constructed by accessing the function through the collapsing menu system.

In operation, the look-up table 38a would originally be created by the software developer during initial definition of each of the pre-defined short-cuts (function keys). Moreover, as will be explained, the look-up table 38a may be updated by the user to reference newly created short-cuts.

Additional Pointers on Menu Item

A further aspect of the invention will now be described with reference to FIGS. 7A-7C. Each menu item may contain additional pointers to functions such as a search entry field 200 used for searching folders, files or content of the subordinate information hierarchy.

FIG. 7A shows an initial (root level) view of the Active Path 100 with root link 101, and the search field 200. Selecting search field 200 in FIG. 7 A will enable the user to search the entire hierarchical structure from the highest (root) level to the lowest level.

FIG. 7B shows an expanded view of the Active Path 100. Selecting search field 200 in FIG. 7B will enable the user to search the hierarchical structure from 1.2.3 and all hierarchically subordinate levels (along the same branch).

FIG. 7C shows a sample of the search entry interface displayed when the user selects the search field 200.

The functionality of the search entry field 200 may also be implemented by, for example, using a special button on the pointing device 48 or special key stroke on the keyboard.

As noted above, the Active Path 100 of the present invention may be used to navigate directories, with the internet being just one example of a directory.

Moreover, the Active Path may be used to enhance the functionality of the address bar in an internet browser such as Internet Explorer or Mozilla.

FIG. 8A shows a conventional address bar of an internet browser.

FIG. 8B shows the root level 101 of the Active Path 100 as a text entry field. Once a user has entered a location (destination) the Active Path 100 will search for a data file representing the information hierarchy of the location. This data file will enable the user to browse the entire information hierarchy of the location without fetching additional information from the server each time a new hierarchical level is browsed. This enables a user to quickly locate and directly

US 10,037,127 B2

9                                          10

access the desired (content) level with the hierarchy without having to sequentially access the various levels of the hierarchy.

FIG. **8**C shows a user browsing an information hierarchy. This aspect of the Active Path does not require the user to memorize the entire URL to access a location. Moreover, the data file merely contains a representation of the structure of the information hierarchy and does not contain the actual contents of the location. For this reason, the data file is relatively small. Once the user has accessed a given location (FIG. **8**D), the Active Path **100** includes a series of active links **101**, **102**, **103** each active link pointing to a different level in the hierarchical structure. The user may then directly access any level along the path without having to resort to pressing the "go back" button on the browser.

If a data file representing the information hierarchy of the location is not located, the Active Path Menu Navigation System will dynamically create the file from the directory structure and the hypertext markup language (HTML) available on the server and client files.

According to another aspect of the invention, the Active Path **100** may be used to as a method for navigating web sites including a plurality of hierarchically organized web pages. The method of the present invention eliminates the need for providing hyperlinks and navigational elements on the individual web pages.

According to the present invention, a data file representing the hierarchical structure of the multi-level hierarchical website is either constructed or retrieved from the server. As noted above, the data file representing the information hierarchy of the location may be dynamically created from the directory structure and the hypertext markup language (HTML) available on the server and client files.

Using the Active Path, the user browses the data file representing the information hierarchy of the location, and selects a desired location. This eliminates the need to provide hyperlinks and navigational elements on the individual web pages.

A new Active Path is dynamically constructed each time the user navigates to a new location (web page) within the hierarchical website. Again, each active link corresponds to a level in the hierarchical structure, and a user may directly access any given level of the hierarchical structure by selecting a given active link. Moreover, the active links provide the user the ability to directly browse all items on any given level of the hierarchical menu structure including all hierarchically subordinate items without affecting the Active Path.

Although a preferred embodiment of the Active Path navigation system of the present invention has been specifically described and illustrated, it is to be understood that variations or alternative embodiments apparent to those skilled in the art are within the scope of this invention. Since many such variations may be made, it is to be understood that within the scope of the following claims, this invention may be practiced otherwise than specifically described.

The invention claimed is:

**1**. An apparatus for navigating an information structure, the apparatus including a processor configured to:

provide a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof;

dynamically construct an active path as a sequence of active links after an item of the information structure has been selected;

upon provisional selection of a given one of said active links, display one or more items on a given level of the information structure associated with said provisionally selected active link without affecting the active path; and

allow a user to access an item in the information structure by selecting the item from the one or more items displayed by one of the active links on the active path; wherein a function is associated with at least one of said active links.

**2**. The apparatus of claim **1**, further configured to allow provisional selection of the one or more items to display one or more additional items on a given level of the information structure.

**3**. The apparatus of claim **1**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a pointer is rolled over one of the active links.

**4**. The apparatus of claim **1**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when one of the active links is selected.

**5**. The apparatus of claim **1**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a visual icon associated with one of the active links is selected.

**6**. The apparatus of claim **1**, wherein the active links in the active path allow the display of one or more items on a given level of the information structure without changing the active path.

**7**. The apparatus of claim **1**, wherein a user may directly access one or more active links in the active path by selecting the active link.

**8**. The apparatus of claim **7**, wherein the selection of an active link causes the active path to truncate to the selected active link.

**9**. The apparatus of claim **1** further configured to provide pre-defined shortcuts to enable access to a given item in the information structure, wherein selection of a pre-defined shortcut dynamically constructs an active path including one active link corresponding to each item necessary to navigate to the given item in the information structure.

**10**. The apparatus of claim **1**, wherein two functions are associated with at least one of said active links.

**11**. The apparatus of claim **10**, wherein execution of said functions is initiated by selecting different portions of said at least one of active link.

**12**. The apparatus of claim **1** wherein said function is a search function.

**13**. The apparatus of claim **1**, wherein at least two functions are associated with at least one of said active links.

**14**. A method for navigating an information structure, comprising:

providing a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof;

dynamically constructing an active path as a sequence of active links after an item of the information structure has been selected;

upon provisional selection of a given one of said active links, displaying one or more items on a given level of the information structure associated with said provisionally selected active link without affecting the active path; and

allowing a user to access an item in the information structure by selecting the item from the one or more items displayed by one of the active links on the active path;

**Appx0056**

US 10,037,127 B2

**11**

wherein a function is associated with at least one of said active links.

15. The method of claim **14**, wherein the active path is further configured to allow provisional selection of the one or more active links to display one or more additional items on a given level of the information structure.

16. The method of claim **14**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a pointer is rolled over one of the active links.

17. The method of claim **14**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when one of the active links is selected.

18. The method of claim **14**, wherein the one or more active links allow the display of one or more items on a given level of the information structure when a visual icon associated with one of the active links is selected.

19. The method of claim **14**, wherein the active links in the active path allow the display of one or more items on a given level of the information structure without changing the active path.

**12**

20. The method of claim **14**, wherein a user may directly access one or more active links in the active path by selecting the active link.

21. The method of claim **20**, wherein the selection of an active link causes the active path to truncate to the selected active link.

22. The method of claim **14** further configured to provide pre-defined shortcuts to enable access to a given item in the information structure, wherein selection of a pre-defined shortcut dynamically constructs an active path including one active link corresponding to each item necessary to navigate to the given item in the information structure.

23. The method of claim **14**, wherein two functions are associated with at least one of said active links.

24. The method of claim **23**, wherein execution of said functions is initiated by selecting different portions of said at least one of active link.

25. The method of claim **14** wherein said function is a search function.

26. The apparatus of claim **14**, wherein at least two functions are associated with at least one of said active links.

* * * * *



US011182053B2

(12) **United States Patent**
Moehrle

(10) **Patent No.:** **US 11,182,053 B2**
(45) **Date of Patent:** **\*Nov. 23, 2021**

(54) **ACTIVE PATH MENU NAVIGATION SYSTEM**

(71) Applicant: **CADDO SYSTEMS, INC**, Marshall, TX (US)

(72) Inventor: **Armin Moehrle**, Chicago, IL (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/741,356**

(22) Filed: **Jan. 13, 2020**

(65) **Prior Publication Data**

US 2020/0150834 A1      May 14, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/434,052, filed on Feb. 15, 2017, now Pat. No. 10,969,934, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 3/0482* | (2013.01) |
| *G06F 16/16* | (2019.01) |
| *G06F 16/954* | (2019.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/0482* (2013.01); *G06F 16/168* (2019.01); *G06F 16/954* (2019.01)

(58) **Field of Classification Search**
CPC .... G06F 3/0482; G06F 16/168; G06F 16/954; G06F 17/30126
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,297,253 A \* 3/1994 Meisel .................... G06F 16/34
715/854
5,801,702 A 9/1998 Dolan
(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0947921 A | 10/1999 |
|---|---|---|
| WO | 0116482 A1 | 3/2001 |

OTHER PUBLICATIONS

Jason Cranford Teague, DHTML and CSS for the World Wide Web (2nd ed)., published 2001, Chapter 24, pp. 394, 399, 401. (Year: 2001).\*
(Continued)

*Primary Examiner* — Eric J Yoon
(74) *Attorney, Agent, or Firm* — Jonathan D Feuchtwang

(57) **ABSTRACT**

A method for generating a plurality of graphical menu items for user selection, each graphical menu item having one or more sibling menu items, the one or more sibling menu items being on a first hierarchical level, at least one of the sibling menu items having one or more children menu items, the one or more children menu items being on a second hierarchical level different from the first hierarchical level; receiving user input selecting one or more graphical, sibling, or children menu items, wherein receiving user input includes receiving user input selecting one or more graphical, sibling, or children menu items in a sequence, and includes receiving user input selecting a graphical menu item followed by a sibling menu item and subsequently a children menu item; and constructing a graphical user interface that includes one or more selectable links arranged in accordance with the sequence, wherein constructing a selectable link for the graphical menu item followed by a selectable link for the sibling menu item and subsequently a selectable link for the children menu item, each selectable link corresponding to a selected graphical, sibling, or chil-
(Continued)



**Appx0058**

**US 11,182,053 B2**

Page 2

dren menu item and configured to: provide, in the graphical user interface, the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level.

**17 Claims, 8 Drawing Sheets**

### Related U.S. Application Data

continuation of application No. 13/725,681, filed on Dec. 21, 2012, now abandoned, which is a continuation of application No. 12/538,151, filed on Aug. 9, 2009, now Pat. No. 8,352,880, which is a continuation of application No. 11/687,646, filed on Mar. 17, 2007, now Pat. No. 7,725,836, which is a continuation of application No. 10/444,359, filed on May 23, 2003, now Pat. No. 7,216,301, which is a continuation-in-part of application No. 10/164,520, filed on Jun. 6, 2002, now Pat. No. 7,191,411.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,236,400 B1 | 5/2001 | Guerrero | |
| 6,240,410 B1 | 5/2001 | Wical | |
| 6,256,028 B1 | 7/2001 | Sanford | |
| 6,462,762 B1 | 10/2002 | Ku | |
| 6,597,377 B1 | 7/2003 | MacPhail | |
| 6,606,654 B1* | 8/2003 | Borman | H04L 29/06 |
| | | | 707/999.101 |
| 6,621,532 B1 | 9/2003 | Mandt | |
| 6,633,316 B1 | 10/2003 | Maddalozzo | |
| 6,832,350 B1 | 12/2004 | Bates | |
| 6,990,638 B2 | 1/2006 | Barksdale | |
| 7,363,593 B1 | 4/2008 | Loyens | |
| 8,438,487 B1 | 5/2013 | Hendel | |
| 2003/0187912 A1* | 10/2003 | Kenyon | G06F 9/451 |
| | | | 709/200 |
| 2004/0075693 A1 | 4/2004 | Moyer | |

### OTHER PUBLICATIONS

Bowler D et al, Navigation Bars for Hierarchical Web Sites, Student HCI Online Research Experiments, Onine! 2001, pp. 1-23 XP002286023 University of Maryland, US.

RFC 1738 Dec. 1994, Internet RFC/STD/FYI/BCP Archives pp. 1-23.

Sun Microsystems Inc: "Quick Start to Using OpenStep Desktop", Online! Sep. 1996, XP00228624 pp. 5-1 to 5-9.

IBM: Fully Navigatable Breadcrumb Trails Research Disclosure, Keeth Mason Publications, Hampshire GB, vol. 46', No. 130, Sep. 2002, XP007131244, ISSN:0374-4353.

Website http://home.lu.lv/~mihails/tt1/P4_DynamicWeb/24-WebSiteNav/BreadCrumbs/ (implementation of the code disclosed in Teague Book Jason Cranford Teague, DHTML and CSS for the World Wide Web at 344 (2d ed.) published 2001 Chapter 24).

* cited by examiner



FIG. 1A  Prior Art



FIG. 1B  Prior Art

**Appx0060**

20

c:\windows\applications\temp\help.doc

# FIG. 2A  Prior  Art

22

http://www.uspto.gov/patents/applications

# FIG. 2B  Prior  Art



# FIG.  3



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 5A



FIG. 5B



FIG. 5C



FIG. 5D



FIG. 5E

**Appx0064**



FIG. 6A



FIG. 6B

**Appx0065**



FIG. 7A



FIG. 7B

FIG. 7C

http://www.uspto.gov/Patents/Patenting    |V|

FIG. 8A



uspto.gov    |>|

FIG. 8B



FIG. 8C



FIG. 8D

Appx0067

US 11,182,053 B2

# ACTIVE PATH MENU NAVIGATION SYSTEM

This application is a continuation of U.S. application Ser. No. 15/434,052 filed Feb. 15, 2017 which is a continuation of U.S. application Ser. No. 13/725,681 filed Dec. 21, 2012 which is a continuation of U.S. application Ser. No. 12/538,151 filed Aug. 9, 2009 (now U.S. Pat. No. 8,352,880) which is a continuation of U.S. application Ser. No. 11/687,646 filed Mar. 17, 2007 (now U.S. Pat. No. 7,725,836) which is a continuation of U.S. application Ser. No. 10/444,359 filed May 23, 2003 (now U.S. Pat. No. 7,216,301) which is a continuation-in-part (CIP) of U.S. application Ser. No. 10/164,520 entitled Active Path Menu Navigation System, filed Jun. 6, 2002 (now U.S. Pat. No. 7,191,411).

## FIELD OF THE INVENTION

The present invention generally relates to a navigation system used to find, enter, or edit data or launch an application within a hierarchical information system. The navigation system of the present invention may be implemented in software executing on a standalone software program or on a client server application. More particularly, the navigation system of the present invention allows a user to access different levels in a hierarchical information system without retracing back to the top level of the hierarchy.

## BACKGROUND OF THE INVENTION

Hierarchical information systems are used to organize items by function or theme in order to facilitate efficient locating of functions or locations. Hierarchical systems are used to organize documents into directories or folders and to organize functions into pull-down menus.

Conventionally one of two navigation systems are used to navigate through the various levels of a menu tree. By far the most popular menu navigation system is the so-called collapsing menu system which, for example, is used by many traditional personal computer applications. The distinguishing characteristics of this system are that the navigation always commences from the initial or root level and that the menu collapses back to the root level after a selection is made.

Computer software frequently includes dozens of functions. The sheer number of features makes it desirable to organize the functions into a hierarchy of categories to facilitate efficient searching. In a collapsing menu system, each level in the hierarchy is presented as a level in the pull-down menu.

FIG. 1A shows a top or root level 10 of a hypothetical menu. Each level 10 of the menu provides a list of menu choices 12. Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead (point) to another level 10 providing a further list of menu choices 12. Selection of an end node will cause the pull-down menu to collapse back to the root level.

FIG. IB shows the pull-down menu of FIG. 1A with several levels of the hierarchical menu expanded. The menu structure of FIG. 1B collapses back to the root level shown in FIG. 1A once an end node is selected. The defining characteristic of such a conventional navigation system is that navigation is one-way, and always starts from the root level to an end node. This method of navigation becomes cumbersome if the desired function or destination is buried several levels down from the root directory.

To address this shortcoming, conventional operating systems such as Microsoft Windows® provide short-cuts in the form of pre-defined function keys or icons. Such short-cuts enable the user to directly access the desired function associated with the short-cut.

In the absence of a pre-defined short-cut, the user must resort to navigating the menu structure. The problem with the collapsing menu system is that navigation must always commence from the root level. Consequently, more experienced users are unable to take advantage of their knowledge of the hierarchical structure to directly access a given level.

FIG. 2A shows a conventional path menu system 20 used to navigate through the directory structure of a disk. Similarly, FIG. 2B shows a conventional universal resource locator (URL) command 22 which operates similarly to the DOS path command of FIG. 2A. The conventional disk operating system (DOS) uses a path menu system 20 to navigate between various folders. Each folder represents a different level in the hierarchy. A given folder may contain one or more sub-folders. To access a target or destination level the user must know the path, i.e., the names of the each of the folders from the root folder to the target folder. A system 10 of displaying the contents of each folder is provided to guide the user through the hierarchy. Namely, by typing a command such as DIRECTORY (DIR) the user is provided with the contents of the present folder and the path leading to the present folder. The user may proceed to a sub-level in the hierarchy or may retrace his/her steps to a preceding level by knowing the path.

Navigation using the path menu system requires the user to memorize and enter complex hierarchical sequences. This method of navigation is time consuming not suitable for users who have not memorized the path. Moreover, this method becomes extremely cumbersome as the number of levels increases.

Accordingly, one object of the present invention is to provide a more efficient way of navigating hierarchical menu systems.

## SUMMARY OF THE INVENTION

A method for navigating within a multi-level hierarchical collapsing menu structure is disclosed. Each level in the menu structure contains plural items, each item representing a function such as the function of launching an application, accessing a database location, or pointing to a subordinate level.

The method of the present invention includes a step of providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of the given level requires sequential access of each of the levels preceding the given level in the hierarchy. An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected. The active links provide direct access to a function corresponding level or menu item without the need to navigate using the graphical user menu system.

According to a further aspect of the invention, pre-defined short-cuts are provided which enable direct access to a given menu item. The Active Path is dynamically constructed and displayed when one of the pre-defined short-cuts are executed, with one active link corresponding to each of the menu items necessary to access the given menu item using the graphical user menu system.

Navigation using the Active Path is accomplished by rolling over an active link with a pointing device or selecting

US 11,182,053 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

an active link using a pointing device. Rolling over a given active link triggers the display of sibling menu items on the level associated with the given active link. Selecting a given active link triggers the execution of a function associated with the given active link.

These and other aspects of the present invention will be explained with reference to the drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A and IB are views of a conventional collapsing menu system;

FIG. **2**A is a view of a conventional path menu system;

FIG. **2**B is a view of a conventional universal resource locator address;

FIG. **3** is a block diagram of a conventional computer architecture;

FIGS. **4**A-**4**C are views showing how the Active Path of the present invention is assembled as the user browses and selects a menu item;

FIGS. **5**A-**5**E are views showing how an active link is used to redirect the path;

FIGS. **6**A-**6**B are views showing the Active Path in combination with a traditional menu system to support the user's sense for orientation;

FIGS. **7** A-**7**C are views showing the Active Path with search functionality for subordinate layers and content; and

FIGS. **8**A-**8**D are views showing the Active Path replacing the address bar in a browser.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **3** is a block diagram of a computer **32** on which the software of the present invention operates. In the preferred embodiment, the main logic of the computer **32** is embodied by a general-purpose, programmable microprocessor **34**, which in conventional practice will have an on-board memory cache (not shown) and which may be associated with one or more mathematics or other special-purpose coprocessors (not shown).

The processing logic generally represented by processor **34** is connected by a bus **20** structure **36** to the various other components of the computer **32**. The schematic representation of bus **36** is shown in FIG. **3** as a simple and unitary structure, but in conventional practice, as is known to those in the art, there usually are several buses and communication pathways **36**, operating at different speeds and having different purposes. Further, bus **36** may be segmented and controlled by respective bus controllers, as is also known in the art.

Computer **32** will also have a random access memory unit or units **38** connected to the bus **36**. RAM **38** (which may be DRAM, SDRAM or other known types) typically has loaded into it the operating system of the computer **32** and executable instructions for one or more special applications designed to carry out the invention. Computer **32** also has electronic read-only memory **40** for storing those programs such as the BIOS which are non-volatile and persist after the computer **32** is shut down.

In alternative embodiments of the invention, one or more components of the invention's logic may be "hard-wired" into the ROM **40** instead of loaded as software instructions into RAM **38**. ROM **40** can consist of or comprise electrically programmable read-only memory (EPROM), electrically erasable and programmable read-only memory (EE-

PROM) of either flash or nonflash varieties, or other sorts of read-only memory such as programmable fuse or antifuse arrays.

In a typical architecture, a computer program suitable for carrying out the invention will be stored on a mass storage device **42**, such as an optical disk or magnetic hard drive. Bus **36** connects mass storage device **42** to RAM **38**. The computer **32** is connected to various peripheral devices used to communicate with an operator, such as display **44**, keyboard **46**, and pointing device (mouse) **48**.

In operation, operating system software such as Microsoft Windows® executes on the computer **32**, and the user interacts with the operating system using the display **44**, keyboard **46**, and pointing device (mouse) **48**.

FIG. **4**A shows the initial view of the Active Path menu system **100** of the present invention. In the initial view (FIG. **4**A), the Active Path Active Path **100** comprises a single active link **102** termed a root link **101**. Since the initial view includes only one active link **102**, it is both the root link **101** and the end link **103**.

FIG. **4**B shows how the user browses the hierarchical structure from the initial view (FIG. **10** **4**A) in order to arrive at an expanded view the Active Path **100** (FIG. **4**C). Multiple hierarchical levels are displayed in FIG. **4**B. Menu items **1.1**, **1.2**, **1.3** and **1.4** are termed siblings because they all fall within the same hierarchical level **10***b*. Moreover, menu items **1.1**, **1.2**, **1.3** and **1.4** are all hierarchically subordinate to root menu item **1.0**. Similarly, menu item **1.2** is hierarchically superior to menu items **1.2.4.1**, **1.2.4.2**. Still further, menu item **1.0** is the parent **15** of menu items **1.1**, **1.2**, **1.3** and **1.4**.

FIG. **4**C is a view of an expanded Active Path Active Path **100** including active links **1.0**, **1.2**, **1.2.3**, and **1.2.3.4**.

The Active Path **100** consists of a sequential listing of active links **102**, each active link **102** providing direct access to a corresponding level in the hierarchical structure and to all of the menu items on the same hierarchical level (sibling menu items).

It should be noted that whereas the conventional DOS path is merely a passive display of the hierarchical levels, the Active Path **100** is an interactive graphical user interface. As will become evident the Active Path **100** has several significant advantages over conventional menu trees used to navigate hierarchical information structures.

The Active Path **100** has distinct browsing and selection processes. The user browses by "rolling-over" (provisionally selecting) an element with a pointing device such as a mouse, causing the children to be displayed without hiding the siblings of the parent (and siblings of the grandparents etc). This quality of navigation supports the user's sense of orientation and is maintained until the user makes a selection.

As used herein, the term "selecting" IS distinguished from the term "browsing". Selecting means actively choosing a menu item. Using a conventional pointing device **48** such as a mouse, selection of a menu item (or active link) is accomplished when the user depresses and releases the mouse key (mouse-up operation).

Browsing means that the user has "rolled over" a menu item or active link **102** in order to view the siblings of the menu item or active link, i.e., all of the menu items on the same hierarchical level as the browsed link. The user may continue browsing the hierarchical data structure by browsing (rolling over) the sibling menu items. The Active Path **100** is not affected by the user's browsing. The displayed Active Path **102** changes only when the user selects a menu item or active link **102**.

US 11,182,053 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

The present invention is not limited to any particular pointing device, and may be implemented in various ways without affecting the functionality of the invention. For example, separate mouse keys could be used for browsing and navigating.

The user may directly access any hierarchically superior level in the hierarchical data structure by selecting the corresponding active link **102**. In other words, the user directly jumps to a given hierarchical level, and is not forced to sequentially navigate through each of the hierarchical levels of data structure to reach a desired level.

Referring to FIG. **4C**, the user may directly access different hierarchical levels by selecting **101**, **102***a*, **102***b*.

When the user selects any active link **102**, the Active Path **100** responds by executing a function. Functions may include the launch of a software application or the display of the subordinate links with a detailed description.

The user may alternatively browse the Active Path **100** and any of the sibling menu items along a given branch in the data hierarchy. Browsing does not affect the active patch **100**, which continues to be displayed until the user selects an active link **102** or one of the sibling menu items of an active link.

Moreover, the Active Path **100** enables the user to directly re-execute the last function without the need to navigate to the function through the menu system, and without the need for a pre-defined short-cut. This is accomplished by selecting the last active link (end link) **103**.

In operation, the Active Path **102** starts with a special active link termed a root link **101** displayed (FIG. **4A**). No other elements on the same or subordinate hierarchical level are displayed until the root link **101** is browsed (rolling over) or the expert user enters a shortcut to any point in the hierarchy.

FIG. **4B** shows a user browsing the Active Path **100** shown in FIG. **4A**. More particularly, FIG. **4B** shows the user browsing by rolling over the active link **1.2.3** resulting in the display of the siblings of **1.2.3.1**, **1.2.3.2**, **1.2.3.3**, **1.2.3.6**. Rolling over (browsing) an active link **102** results in the display of the siblings and children of the active link.

According to a preferred embodiment, there is a slight distinction between browsing an active link **102** and browsing a menu item. In browsing an active link **102**, it is desirable to initially display only the siblings of the active link (FIG. **5A**), and display the children after a slight time delay (FIG. **5B**). The time delay in displaying the children of the browsed active link facilitates the user's sense of orientation.

FIG. **5C** shows the Active Path **100** created after the user selected **1.2.4.4** in FIG. **5B**.

Another aspect of the invention relates to the user's ability to immediately re-execute the last executed function by selecting the end link **103**. In this manner, the Active Path **100** defines on-the-fly a short-cut to the last function.

In contrast, conventional short-cuts such as a function keys, icons, or the like are static in that it only provides access to a single pre-defined item (function/database location).

In operation, the active links **102** of Active Path **100** are accessed using the mouse **48** and mouse buttons **48***a*, **48**-*b* (FIG. **3**).

As described above, each of the active links **102** in the Active Path **100** may be browsed by rolling over the active link **102** with the pointer **50** of the pointing device **48**, or accessed by selecting the active link **102**. As shown in FIG. **5B** rolling over the active link **102** simply entails manipulating the mouse **48** to position the software pointer **50** over the active link **102**. Rolling over an active link **102**-*b* causes the sibling menu items on the level corresponding the active link **102**-*b* to be displayed. It should be noted that simply rolling over an active link **102** does not alter the Active Path **100**; it merely causes the sibling menu items to be displayed.

Selection of an active link **102** is accomplished by, for example, positioning the software pointer **50** over the active link **102** and actuating (and releasing) one of the mouse buttons **48**-*a*, **48**-*b*. Selection of an active link **102** causes different results depending on whether or not the selected active link **102** is the end link **103** in the Active Path **100**. If the selected active link **102** is not the end link **103**, then selection will cause a folder with subordinate levels and content to be displayed. For example, the folder may contain a list of the sibling menu items **12** (subordinate levels or links) on a given level of the hierarchical data structure, and a brief description (content) of each of the menu items. Moreover, if the selected active link **102** is not the end link **103**, then selection will trigger the construction of a new Active Path **100**. FIG. **5D** shows a user selecting active link **102***b* (**1.2.3**). As shown, the last executed function (end link **103**) was **1.2.3.4**. After selecting **102***b* the Active Path is truncated, and **1.2.3** becomes the end link **103**.

Selection of an end link **103** will cause the immediate re-execution of the associated function (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link **103** in the Active Path **100**. Moreover, selection of an end link **103** will not affect the Active Path **100**.

According to a further aspect of the present invention, the Active Path **100** may be used to define a short-cut on-the-fly. Once the Active Path **100** has been constructed the user may store the end link **103** as a shortcut within a lookup table **38***a* (FIG. **3**). According to a presently preferred embodiment, this is accomplished by a combination of commands. Thus, for example, the user could be prompted to define a short-cut identifier by clicking mouse button **48**-*b* over end link **103**. The Active Path **100** then stores the association between the function (or location) **20** and the user-selected shortcut in the rewriteable table **38***a*.

The Active Path **100** of the present invention may similarly be used to navigate to a location such as a location in a database or a web page. Notably, the Active Path **100** is created in the same manner regardless of whether the menu items **12** represent functions or locations. In the case of navigating to a location, selecting an active link: **102** (other than the end link: **103**) triggers the access of the associated database location. In contrast, when navigating to a class of functions, selection of an active link: **102** (other than the end link: **103**) merely triggers the display of the sibling menu items on the associated level. One of ordinary skill in the art will appreciate that the Active Path **100** of the present invention may be used in standalone applications such as operating systems, word processors, spreadsheets or the like. Moreover, the Active Path **100** may also be used in a client-server environment. Notably, the Active Path **100** may be used to navigate functions provided on a web site or to navigate between different web addresses.

In standalone applications, a range of Microsoft® Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

**Appx0070**

US 11,182,053 B2

7

In client server applications, the code for the Active Path may be part of the initial HTML file in form of a JavaScript/DHTML combination or separate JavaScript files (.js) containing the arrays describing the Active Path 100 and Cascading Style Sheets files (.css) containing the graphic attributes of the Active Path 100. This data may be cached locally after the initial server call.

For internet browser applications, such as Internet Explorer or Mozilla the preferred embodiment foresees a replacement of the address bar with the Active Path 100 to avoid redundancy, allow the user to focus on the content and make browsing more efficient. For Microsoft® Internet Explorer, this would involve utilizing its custom Explorer Bars integration feature.

In standalone applications, a range of Windows Application Programming Interface functions such as "CreateWindow" and other graphics library function calls may be used to create the graphic components of the Active Path. Any combination of mainstream programming languages such as Visual Basic, Java, C, or Delphi may be used to create the dynamic components and rollover effects.

Windows Explorer may replace the Address Bar with the Active Path 100. This could make the display of the folder window redundant. The user may better take advantage of the screen real-estate by rolling over and "browsing" through the levels of the collapsing menu system.

The Active Path 100 of the present invention may also be used to navigate audio interfaces. A preferred embodiment for audio interfaces would allow users to navigate to the end point of a path. A certain input command, such as pressing a certain key, would read the sequence and level of the selected path. Users can then select any level of the path and navigate to a new endpoint.

The Active Path 100 may also be used in conjunction with a conventional navigation system such as the above-described collapsing menu system or path menu system.

The Active Path 100 is dynamically assembled and displayed as the user navigates using the conventional menu screens. The Active Path 100 is assembled automatically without the need for any additional user interaction as the user navigates using the collapsing menu system.

FIGS. 6A-6B show how the Active Path 100 may be used to navigate to classes of functions. In the embodiment depicted in FIGS. 6A-6B the Active Path 100 is used in conjunction with a conventional collapsing menu system 10. One of ordinary skill in the art will appreciate that the location of the Active Path 100 in relation to the collapsing menu system 10 and its graphical representation are not critical to the operation of the Active Path 100.

FIG. 6A shows an initial view of the conventional collapsing menu system 10. The Active path 100 is absent from FIG. 6A because no menu item has been selected. As the user rolls over a given menu item, the children of the menu item are displayed. In FIG. 6A the user has successively rolled over 1.2, 1.2.3, and 1.2.3.4. Again, the Active path 100 is absent from FIG. 6A because no menu item has yet been selected.

FIG. 6B shows the Active Path 100 after the user selected menu item 1.2.3.4. As shown, the conventional collapsing menu system collapses once the user has selected a menu item. Each active link 102 in the Active Path 100 represents the sequence of implicit selections by an explicit selection of the menu item. More particularly, the Active Path 100 shown in FIG. 6A includes active links 101, 102a, 102b, and 103 corresponding to menu items FILE, 1.2, 1.2.3, and 1.2.3.4. Active link 101 corresponds to menu item FILE selected from the initial or root level. Likewise, active link 102-a

8

corresponds to menu item 1.2 selected, and active link 102-b corresponds to menu item 1.2.3. Construction of the Active Path 100 occurs automatically as the user navigates through the menu system 10. It should be noted that active link 102-c is the end link 103 in the Active Path 100.

It should be noted that the menu system (pull-down menu tree) 10 collapses when the user selects end node 1.2.3.4 whereupon the Active Path 100 appears. The user may directly access different hierarchical levels simply by selecting different active links 102.

As described above, the Active Path 100 is dynamically constructed as the user navigates the collapsing menu system, and is subsequently retained after the menu tree collapses back to the root level. In addition, the Active Path 100 may optionally be constructed each time a short-cut such as a function key or the like is used. It should be noted that a shortcut may be defined for any point in the hierarchical structure. This requires the use of a look-up table 38a (FIG. 3) stored in RAM 38. The look-up table 38a stores each of the pre-defined shortcuts and the associated data necessary to create the Active Path 100. According to a presently preferred embodiment, the Active Path 100 constructed is the same as would be constructed by accessing the function through the collapsing menu system.

In operation, the look-up table 38a would originally be created by the software developer during initial definition of each of the pre-defined short-cuts (function keys). Moreover, as will be explained, the look-up table 38a may be updated by the user to reference newly created short-cuts.

Additional Pointers on Menu Item

A further aspect of the invention will now be described with reference to FIGS. 7A-7C. Each menu item may contain additional pointers to functions such as a search entry field 200 used for searching folders, files or content of the subordinate information hierarchy.

FIG. 7A shows an initial (root level) view of the Active Path 100 with root link 101, and the search field 200. Selecting search field 200 in FIG. 7 A will enable the user to search the entire hierarchical structure from the highest (root) level to the lowest level.

FIG. 7B shows an expanded view of the Active Path 100. Selecting search field 200 in FIG. 7B will enable the user to search the hierarchical structure from 1.2.3 and all hierarchically subordinate levels (along the same branch).

FIG. 7C shows a sample of the search entry interface displayed when the user selects the search field 200.

The functionality of the search entry field 200 may also be implemented by, for example, using a special button on the pointing device 48 or special key stroke on the keyboard.

As noted above, the Active Path 100 of the present invention may be used to navigate directories, with the internet being just one example of a directory.

Moreover, the Active Path may be used to enhance the functionality of the address bar in an internet browser such as Internet Explorer or Mozilla.

FIG. 8A shows a conventional address bar of an internet browser.

FIG. 8B shows the root level 101 of the Active Path 100 as a text entry field. Once a user has entered a location (destination) the Active Path 100 will search for a data file representing the information hierarchy of the location. This data file will enable the user to browse the entire information hierarchy of the location without fetching additional information from the server each time a new hierarchical level is browsed. This enables a user to quickly locate and directly

US 11,182,053 B2

9

access the desired (content) level with the hierarchy without having to sequentially access the various levels of the hierarchy.

FIG. 8C shows a user browsing an information hierarchy. This aspect of the Active Path does not require the user to memorize the entire URL to access a location. Moreover, the data file merely contains a representation of the structure of the information hierarchy and does not contain the actual contents of the location. For this reason, the data file is relatively small. Once the user has accessed a given location (FIG. 8D), the Active Path 100 includes a series of active links 101, 102, 103 each active link pointing to a different level in the hierarchical structure. The user may then directly access any level along the path without having to resort to pressing the "go back" button on the browser.

If a data file representing the information hierarchy of the location is not located, the Active Path Menu Navigation System will dynamically create the file from the directory structure and the hypertext markup language (HTML) available on the server and client files.

According to another aspect of the invention, the Active Path 100 may be used to as a method for navigating web sites including a plurality of hierarchically organized web pages. The method of the present invention eliminates the need for providing hyperlinks and navigational elements on the individual web pages.

According to the present invention, a data file representing the hierarchical structure of the multi-level hierarchical website is either constructed or retrieved from the server. As noted above, the data file representing the information hierarchy of the location may be dynamically created from the directory structure and the hypertext markup language (HTML) available on the server and client files.

Using the Active Path, the user browses the data file representing the information hierarchy of the location, and selects a desired location. This eliminates the need to provide hyperlinks and navigational elements on the individual web pages.

A new Active Path is dynamically constructed each time the user navigates to a new location (web page) within the hierarchical website. Again, each active link corresponds to a level in the hierarchical structure, and a user may directly access any given level of the hierarchical structure by selecting a given active link. Moreover, the active links provide the user the ability to directly browse all items on any given level of the hierarchical menu structure including all hierarchically subordinate items without affecting the Active Path.

Although a preferred embodiment of the Active Path navigation system of the present invention has been specifically described and illustrated, it is to be understood that variations or alternative embodiments apparent to those skilled in the art are within the scope of this invention. Since many such variations may be made, it is to be understood that within the scope of the following claims, this invention may be practiced otherwise than specifically described.

The invention claimed is:

1. A method comprising:

generating a plurality of graphical menu items for user selection, each graphical menu item having one or more sibling menu items, the one or more sibling menu items being on a first hierarchical level, at least one of the sibling menu items having one or more children menu items, the one or more children menu items being on a second hierarchical level different from the first hierarchical level;

10

receiving user input selecting one or more of the graphical, sibling, or children menu items, wherein receiving user input includes receiving user input selecting one or more of the graphical, sibling, or children menu items in a sequence, and includes receiving user input selecting a graphical menu item of the one or more graphical menu items followed by a sibling menu item of the one or more sibling menu items and subsequently a children menu item of the one or more sibling menu items; and

in response to receiving the user input, constructing a graphical user interface that includes one or more selectable links arranged in accordance with the sequence, the one or more selectable links including a first, second and third selectable link, wherein constructing the graphical user interface comprises constructing the first selectable link for the selected graphical menu item followed by constructing the second selectable link for the selected sibling menu item and subsequently constructing the third selectable link for the selected children menu item, each of the one or more selectable links representing one of the selected graphical, sibling, or children menu item and configured to:

in response to selection of the selectable link, display at least one menu item of the plurality of graphical menu items, the one or more sibling menu items, or the one or more children menu items, wherein the at least one displayed menu item is in the same hierarchical level as the selected graphical, sibling or children menu item represented by the selectable link;

provide, in the graphical user interface, the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level, and

enable selection, via the graphical user interface, of the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level.

2. The method of claim 1, wherein constructing the graphical user interface includes:

constructing the one or more selectable links each providing a navigational shortcut to a corresponding graphical, sibling, or children menu item; and

enabling selection, via the graphical user interface, of the navigational shortcut to the corresponding graphical, sibling, or children menu item.

3. The method of claim 1, wherein constructing the graphical user interface includes constructing each selectable link of the one or more selectable links as user inputs selecting a graphical, sibling, or children menu item are received.

4. The method of claim 1, further comprising:

determining a sibling menu item corresponding to the selected children menu item,

wherein constructing the graphical user interface includes constructing a selectable link for each of the selected graphical menu item, the determined sibling menu item, and the selected children menu item.

5. The method of claim 1, further comprising:

receiving user input selecting the selectable link associated with the selected graphical menu item; and

updating the sequence of selectable links by removing the selectable links sequentially following the selected selectable link in response to receiving the user input selecting the selectable link associated with the selected graphical menu item.

US 11,182,053 B2

11

6. The method of claim **1**, further comprising:

receiving user input selecting the second selectable link; and

updating a sequence of the one or more selectable links by removing selectable links sequentially following the selected second selectable link in response to receiving the user input selecting the second selectable link.

7. The method of claim **1**, wherein:

receiving user input includes receiving user input selecting a first graphical menu item followed by a first sibling menu item, the first graphical menu item having a hierarchical structure containing the first sibling menu item; and

constructing the graphical user interface includes constructing a fourth selectable link associated with the selected first graphical menu item and a fifth selectable link associated with the selected first sibling menu item, the fourth selectable link configured to display the selected first sibling menu item within a hierarchical structure associated with the selected first graphical menu item and the fifth selectable link configured to display one or more corresponding children menu items within a hierarchical structure associated with the selected first sibling menu item.

8. A method comprising:

generating a first menu item for user selection via an interface, the first menu item having a first set of menu items, the first set of menu items being on a first hierarchical level of a hierarchical structure, at least a menu item in the first set of menu items having a second set of one or more menu items, the second set of one or more menu items being on a second hierarchical level of the hierarchical structure, the second hierarchical level being different from the first hierarchical level;

receiving user input selecting the first menu item, a menu item in the first set, and a menu item in the second set, wherein receiving user input includes receiving user input selecting one or more graphical, sibling, or children menu items in a sequence,

wherein selecting one or more graphical, sibling, or children menu items in the sequence includes receiving user input selecting a graphical menu item followed by a sibling menu item and subsequently a children menu item;

in response to receiving the user input selecting the first menu item, the menu item in the first set, and the menu item in the second set, constructing a graphical user interface that includes a first selectable link providing a first navigational shortcut to the selected first menu item, a second selectable link providing a second navigational shortcut to the selected menu item in the first set, and a third selectable link providing a third navigational shortcut to the selected menu item in the second set; and

in response to selecting one of the second and third selectable links, display at least one menu item of the first set of menu items or the second set of menu items wherein the second and third selectable links respectively represent the selected menu item in the first set and the selected menu item in the second set and wherein the at least one menu item is in the same hierarchical level as the menu item represented by the selected one of the selectable links;

wherein constructing the graphical user interface includes constructing the graphical user interface such that the graphical user interface includes one or more of the

12

first, second and third selectable links arranged in accordance with the sequence; and

wherein constructing the graphical user interface includes constructing a selectable link for the graphical menu item followed by a selectable link for the sibling menu item and subsequently a selectable link for the children menu item.

9. The method of claim **8**, wherein constructing the graphical user interface includes:

constructing the second selectable link providing the second navigational shortcut to one or more menu items in the first set in addition to the selected menu item in the first set; and

constructing the third selectable link providing the third navigational shortcut to one or more menu items in the second set in addition to the selected menu item in the second set.

10. The method of claim **9**, wherein the second selectable link is configured to display the first set of menu items including the selected menu item in the first set when a pointer is positioned over the second selectable link.

11. The method of claim **9**, wherein the third selectable link is configured to display the second set of one or more menu items including the selected menu item in the second set when a pointer is positioned over the third selectable link.

12. The method of claim **8**, wherein:

receiving user input includes receiving user input selecting the first menu item, the menu item in the first set, and the menu item in the second set in a sequence; and

constructing the graphical user interface includes constructing the first selectable link, the second selectable link and the third selectable link in accordance with the sequence in which the first menu item, the menu item in the first set, and the menu item in the second set are selected.

13. The method of claim **8**, further comprising:

receiving user input selecting the second selectable link providing the second navigational shortcut to the selected menu item in the first set; and

updating a sequence of selectable links by removing the third selectable link from the graphical user interface in response to receiving user input selecting the second selectable link.

14. The method of claim **8**, further comprising:

receiving user input selecting the first selectable link providing the first navigational shortcut to the selected first menu item; and

updating a sequence of selectable links by removing the second selectable link and the third selectable link in response to receiving user input selecting the first selectable link.

15. The method of claim **8**, wherein at least one of the first menu item, the first set of menu items, or the second set of one or more menu items, when selected, is configured to execute a function comprising one of launching an application, accessing a database location, or pointing to a menu item within the hierarchical structure.

16. A method comprising:

generating a plurality of graphical menu items for user selection, each graphical menu item having one or more sibling menu items, the one or more sibling menu items being on a first hierarchical level, at least one of the sibling menu items having one or more children menu items, the one or more children menu items being on a second hierarchical level different from the first hierarchical level;

**Appx0073**

US 11,182,053 B2

**13**

receiving user input selecting one or more of the graphical, sibling, or children menu items, wherein receiving the user input includes receiving user input selecting a graphical menu item of the plurality of graphical menu items followed by a sibling menu item of the one or more sibling menu items followed by a children menu item of the one or more children menu items; and

in response to the receiving the user input, constructing a graphical user interface that includes one or more selectable links, each of the selectable links representing one of the selected graphical, sibling, or children menu item and configured to:

provide, in the graphical user interface, the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level,

enable selection, via the graphical user interface, of the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level;

in response to selection of the selectable link, display at least one menu item of the plurality of graphical menu items, the one or more sibling menu items, or the one or more children menu items, wherein the at least one displayed menu item is in the same hierarchical level as the selected graphical, sibling or children menu item represented by the selectable link;

determining a sibling menu item corresponding to the selected children menu item;

wherein constructing the graphical user interface includes constructing a selectable link for each of the selected graphical menu item, the determined sibling menu item, and the selected children menu item.

17. A method comprising:

generating a plurality of graphical menu items for user selection, each graphical menu item having one or more sibling menu items, the one or more sibling menu items being on a first hierarchical level, at least one of the sibling menu items having one or more children menu items, the one or more children menu items being on a second hierarchical level different from the first hierarchical level;

receiving user input selecting one or more graphical, sibling, or children menu items of the plurality of graphical menu items, the one or more sibling menu

**14**

items and the one or more children menu items, respectively, the receiving user input including receiving user input selecting a first graphical menu item of the plurality of graphical items followed by a first sibling menu item of the one or more sibling menu items, the first graphical menu item having a hierarchical structure containing the first sibling menu item; and

in response to the receiving user input selecting the one or more graphical, sibling or children menu items, constructing a graphical user interface that includes one or more selectable links including first and second selectable links, each selectable link representing a selected graphical, sibling, or children menu item of the plurality of graphical menu items, the one or more sibling menu items and the one or more children menu items, respectively, wherein the constructing further comprises constructing the first selectable link representing the selected first graphical menu item and the second selectable link representing the selected first sibling menu item, the first selectable link configured to display the selected first sibling menu item within a hierarchical structure associated with the selected first graphical menu item and the second selectable link configured to display at least one corresponding children menu item of the one or more children menu items within a hierarchical structure associated with the selected first sibling menu item,

wherein each of the one or more selectable links is configured to display at least one menu item of the plurality of graphical menu items, the one or more sibling menu items, or the one or more children menu items, wherein the at least one displayed menu item is in the same hierarchical level as the selected graphical, sibling or children menu item represented by the selectable link and

wherein the graphical user interface is configured to:

provide, in the graphical user interface, the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level, and

enable selection, via the graphical user interface, of the one or more sibling menu items within the first hierarchical level or the one or more children menu items within the second hierarchical level.

* * * * *

14. Additionally, Jetbrains—directly or through intermediaries (including distributors, retailers, and others), subsidiaries, alter egos, and/or agents—ships, distributes, offers for sale, and/or sells its products and services in the United States and this District. Jetbrains has purposefully and voluntarily placed one or more of its products into the stream of commerce through the accused instrumentalities that infringe the patents asserted in this action with the awareness and/or intent that they will be purchased by consumers in this District. Jetbrains knowingly and purposefully ships infringing products into, and within, this District. These infringing products have been, and continue to be, purchased by consumers and businesses in this District.

## THE ASSERTED PATENTS

15. On March 13, 2007, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 7,191,411 ("the '411 Patent"), entitled "Active Path Menu Navigation System." A copy of the '411 Patent is attached hereto as Exhibit 1.

16. Plaintiffs own all substantial right, title, and interest in the '411 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

17. On December 29, 2009, the USPTO duly and legally issued U.S. Patent No. 7,640,517 ("the '517 Patent"), entitled "Active Path Menu Navigation System." A copy of the '517 Patent is attached hereto as Exhibit 2.

18. Plaintiffs own all substantial right, title, and interest in the '517 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

19. On January 8, 2013, the USPTO duly and legally issued U.S. Patent No. 8,352,880 ("the '880 Patent"), entitled "Active Path Menu Navigation System." A copy of the '880 Patent is attached hereto as Exhibit 3.

- 4 -

**Appx0078**

20.     Plaintiffs own all substantial right, title, and interest in the '880 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

21.     On July 31, 2018, the USPTO duly and legally issued U.S. Patent No. 10,037,127 ("the '127 Patent"), entitled "Active Path Menu Navigation System."  A copy of the '127 Patent is attached hereto as Exhibit 4.

22.     Plaintiffs own all substantial right, title, and interest in the '127 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

23.     On November 23, 2021, the USPTO duly and legally issued U.S. Patent No. 11,182,053 ("the '053 patent"), entitled "Active Path Menu Navigation System."  A copy of the '053 Patent is attached hereto as Exhibit 5.

24.     Plaintiffs own all substantial right, title, and interest in the '053 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

## COUNT I - INFRINGEMENT OF U.S. PATENT NO. 7,191,411

25.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

26.     The '411 Patent is directed to systems and methods for navigating within a multi-level hierarchical collapsing menu structure, as described and claimed in the '411 Patent.

27.     Defendant has and continues to directly infringe at least Claim 1 of the '411 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things, by making, using, selling, offering to sell, and/or importing in or into the United States, without authority: (i) applications designed to assist in and enhance the writing, editing, and debugging of code, including, without limitation, Integrated Development Environments ("IDEs") and content

27.     On July 31, 2018, the USPTO duly and legally issued U.S. Patent No. 10,037,127 ("the '127 Patent"), entitled "Active Path Menu Navigation System."  A copy of the '127 Patent is attached hereto as Exhibit 4.

28.     Plaintiffs own all substantial right, title, and interest in the '127 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

29.     On November 23, 2021, the USPTO duly and legally issued U.S. Patent No. 11,182,053 ("the '053 patent"), entitled "Active Path Menu Navigation System."  A copy of the '053 Patent is attached hereto as Exhibit 5.

30.     Plaintiffs own all substantial right, title, and interest in the '053 Patent, and hold the right to sue and recover damages for infringement thereof, including past infringement.

**<u>COUNT I - INFRINGEMENT OF U.S. PATENT NO. 7,191,411</u>**

31.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

32.     The '411 Patent is directed to systems and methods for navigating within a multi-level hierarchical collapsing menu structure, as described and claimed in the '411 Patent.

33.     Defendants JBA, JBSRO, and JBI, individually or in concert with each other, directly infringed at least Claims 1-4 and 6 of the '411 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things, using in the United States products that incorporate the accused breadcrumb and navigational functionality, including NavBar and Project Tree/Tool as demonstrated below, without authority, in: (i) applications designed to assist in and enhance the writing, editing, and debugging of code, including, without limitation, Integrated Development Environments ("IDEs") and content offered for sale and use via https://www.Jetbrains.com/

51.     Plaintiffs reserve the right to modify its infringement theories as discovery progresses in this case.  Plaintiffs shall not be estopped for purposes of its infringement contentions or its claim constructions by the foregoing discussions on how the '411 Accused Instrumentalities infringe the '411 Patent.  Plaintiffs intend only that the foregoing discussions satisfy the notice requirements of Rule 8(a)(2) of the Federal Rule of Civil Procedure, and that they should not be construed as Plaintiffs' preliminary or final infringement contentions or preliminary or final claim construction positions.

### COUNT II–- INFRINGEMENT OF U.S. PATENT NO. 7,640,517

52.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

53.     The '517 Patent is directed to systems and methods for navigating within a hierarchical menu structure, as described and claimed in the '517 Patent.

54.      Defendants JBA, JBSRO, and JBI, individually or in concert with each other, directly infringed at least Claims 1-6 of the '517 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things, using, in the United States, the accused breadcrumb and navigational functionality, including NavBar and Project Tree/Tool demonstrated below, without authority, in: (i) applications designed to assist in and enhance the writing, editing, and debugging of code, including, without limitation, Integrated Development Environments ("IDEs") and content offered for sale and use via https://www.Jetbrains.com/ (including all sub-web pages) and maintained on servers located in or accessible from the United States under the control of Defendants; (ii) software, including, without limitation, software that allows content to be interactively presented in or served to users through a desktop, in-cloud, or standalone

- 21 -
**Appx0152**

their direct and indirect infringement or while remaining willfully blind to the fact of their direct and indirect infringement. As a result of at least this conduct, Plaintiffs are entitled to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

71. Plaintiffs reserve the right to modify its infringement theories as discovery progresses in this case. Plaintiffs shall not be estopped for purposes of its infringement contentions or its claim constructions by the foregoing discussions on how the '517 Accused Instrumentalities infringe the '517 Patent. Plaintiffs intend only that the foregoing discussions satisfy the notice requirements of Rule 8(a)(2) of the Federal Rule of Civil Procedure, and that they should not be construed as Plaintiffs' preliminary or final infringement contentions or preliminary or final claim construction positions.

## COUNT III - INFRINGEMENT OF U.S. PATENT NO. 8,352,880

72. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

73. The '880 Patent is directed to systems and methods for navigating an information structure, as described and claimed in the '880 Patent.

74. The '880 Patent is directed to systems and methods for navigating within a hierarchical menu structure where each level in the menu contains plural items, as described and claimed in the '880 Patent.

75. Defendants JBA, JBSRO, and JBI, individually or in concert with each other, directly infringed at least Claims 1-10 and 12-22 of the '880 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things, using, selling, offering to sell, and importing into the United States the accused breadcrumb and navigational functionality, including NavBar and Project

their direct and indirect infringement or while remaining willfully blind to the fact of their direct and indirect infringement. As a result of at least this conduct, Plaintiffs are entitled to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

92. Plaintiffs reserve the right to modify its infringement theories as discovery progresses in this case. Plaintiffs shall not be estopped for purposes of its infringement contentions or its claim constructions by the foregoing discussions on how the '880 Accused Instrumentalities infringe the '880 Patent. Plaintiffs intend only that the foregoing discussions satisfy the notice requirements of Rule 8(a)(2) of the Federal Rule of Civil Procedure, and that they should not be construed as Plaintiffs' preliminary or final infringement contentions or preliminary or final claim construction positions.

## COUNT IV - INFRINGEMENT OF U.S. PATENT NO. 10,037,127

93. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

94. The '127 Patent is directed to systems and methods for navigating an information structure, as described and claimed in the '127 Patent.

95. The '127 Patent is directed to systems and methods for navigating an information structure, as described and claimed in the '127 Patent.

96. Defendants JBA, JBSRO, and JBI, individually or in concert with each other, directly infringed at least Claims 1-25 of the '127 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by, among other things, using, in the United States, the accused breadcrumb and navigational functionality, including NavBar and Project Tree/Tool as demonstrated below, without authority, in: (i) applications designed to assist in and enhance the writing, editing, and debugging of code,

112.    Defendants continued to infringed the '127 Patent since at least June 28, 2021 (the date on which Defendants received Plaintiffs' June 28, 2021, notice letter) and until the expiration of the '127 patent despite being on notice of the '127 Patent and its infringement. Defendants therefore infringed the '127 Patent knowingly, willfully, deliberately, and in disregard of Plaintiffs' patent rights since at least June 28, 2021 (the date on which Defendants received Plaintiffs' June 28, 2021, notice letter), at least by infringing with actual knowledge of its direct and indirect infringement or while remaining willfully blind to the fact of its direct and indirect infringement.  As a result of at least this conduct, Plaintiffs are entitled to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

113.    Plaintiffs reserve the right to modify its infringement theories as discovery progresses in this case.  Plaintiffs shall not be estopped for purposes of its infringement contentions or its claim constructions by the foregoing discussions on how the '127 Accused Instrumentalities infringe the '127 Patent.  Plaintiffs intend only that the foregoing discussions satisfy the notice requirements of Rule 8(a)(2) of the Federal Rule of Civil Procedure, and that they should not be construed as Plaintiffs' preliminary or final infringement contentions or preliminary or final claim construction positions.

<u>**COUNT V - INFRINGEMENT OF U.S. PATENT NO. 11,182,053**</u>

114.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

115.    The '053 Patent is directed to a method for generating a plurality of graphical menu items for user selection, as described and claimed in the '053 Patent.

116.    Defendants JBA, JBSRO, and JBI, individually or in concert with each other, directly infringed at least Claims 1-6, 8-10, and 12-17 of the '053 Patent, in this judicial District and elsewhere in the United States, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and 511
TECHNOLOGIES, INC.,

Plaintiffs,

v.

JETBRAINS AMERICAS INC.,
JETBRAINS S.R.O, and
JETBRAINS INCORPORATED,

Defendants.

Civil Action No. 1:22-cv-01033-JLH-LDH

**JURY TRIAL DEMANDED**

## <u>DEFENDANT JETBRAINS AMERICAS INC.'S MOTIONS FOR SUMMARY JUDGMENT</u>

Defendant JetBrains Americas Inc. ("Defendant") respectfully moves pursuant to Fed. R. Civ. P. 56 for summary judgment that claim 6 of the '411 patent (D.I. 1-1), claims 1 and 4 of the '517 patent (D.I. 1-2), claims 3, 4, 8, and 21 of the '880 patent (D.I. 1-3), claims 12, 16-17, 21, and 24-25 of the '127 patent (D.I. 1-4), and claims 1 and 14 of the '053 patent (D.I. 1-5), are invalid under 35 USC § 101 for claiming ineligible subject matter.

Defendant also respectfully moves pursuant to Fed. R. Civ. P. 56 for summary judgment of noninfringement of claim 21 of the '880 patent and claim 12 of the '127 patent under 35 U.S.C. § 271(g) for the reasons set forth in JBA's pending Motion to Dismiss With Prejudice Pursuant to Fed. R. Civ. P. 12(b)(6) (*see* D.I. 177 (motion), 178 (brief in support of motion), and 186 (reply brief in support of motion)).

Defendant also respectfully moves pursuant to Fed. R. Civ. P. 56 for summary judgment of noninfringement of claims claim 6 of the '411 patent (D.I. 1-1), claims 1 and 4 of the '517 patent (D.I. 1-2), claims 3, 4, 8, and 21 of the '880 patent (D.I. 1-3), claims 12, 16-17, 21, and

1

**Appx0206**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CADDO SYSTEMS, INC. and 511 TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JETBRAINS AMERICAS INC., JETBRAINS S.R.O., and JETBRAINS INCORPORATED, <br><br> Defendants. | Civil Action No. 1:22-cv-01033-JLH-LDH <br><br> **JURY TRIAL DEMANDED** <br><br> <span style="color:red">**FILED UNDER SEAL**</span> |

<u>**OPENING BRIEF IN SUPPORT OF DEFENDANT JETBRAINS AMERICAS INC.'S MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS**</u>

Of Counsel:

BUTZEL LONG P.C.
Daniel G. Vivarelli, Jr.
Aaron S. Kamlay
Priya S. Dalal
1909 K Street, NW, Suite 860
Washington, DC 2006
(202) 454-2800
vivarelli@butzel.com
kamlay@butzel.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(392) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant
Jetbrains Americas Inc.*

Dated: October 25, 2024

**Appx0210**

shown).”); *see also* D.I. 1-5 ('053 patent) at 3:35-42.

Each of the Asserted Claims includes three common elements:

| Claim Element | Claim Recitations |
|---|---|
| Providing a menu or similar hierarchical structure | "providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy" D.I. 1-1 ('411 patent) claim 1; D.I. 1-2 ('517 patent) claim 1<br><br>"provid[e/ing] a graphical menu interface displaying the items of a given level of the information structure and enabling selection thereof" D.I. 1-3 ('880 patent) claims 1, 10; D.I. 1-4 ('127 patent) claims 1, 14<br><br>"generating a plurality of graphical menu items for user selection, each graphical menu item having one or more sibling menu items . . .[and] receiving user input selecting one or more of the graphical, sibling, or children menu items…" D.I. 1-5 ('053 patent) claims 1, 16, 17<br><br>"The '411 and '517 Patents generally relate to technology that allows users to navigate information structures, databases, files, folders, or web pages … and the construction of an active path. The active path can be constructed with a sequence of active links as menu items are, for example, selected within the graphical menu interface/graphical user menu system.…. the '880, '127, and '053 Patents… cover subject matter that allows for, at a high level, an active path with unique search functionality… the claims of the '053 Patent cover the generation of graphic menu items and construction of an active path…" Ex. 2 (Sherwood Opening Expert Report) ¶¶ 60-63. |
| Constructing a sequence of links (the "Active Path") that duplicate selections from the menu | "[automatically] constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system . . ." D.I. 1-1 ('411 patent) claim 1; D.I. 1-2 ('517 patent) claim 1<br><br>"dynamically construct[ing] an active path as a sequence of active links after an item of the information structure has been selected" D.I. 1-3 ('880 patent) claims 1, 10; D.I. 1-4 ('127 patent) claims 1, 14<br><br>"in response to receiving the user input . . . constructing a graphical |

| Claim Element | Claim Recitations |
|---|---|
| | user interface that includes one or more selectable links arranged in accordance with the sequence . . ." D.I. 1-5 ('053 patent) claims 1, 16, 17<br><br>"The '411 and '517 Patents generally relate to technology that allows users to navigate information structures, databases, files, folders, or web pages … and the construction of an active path. The active path can be constructed with a sequence of active links as menu items are, for example, selected within the graphical menu interface/graphical user menu system.…. the '880, '127, and '053 Patents… cover subject matter that allows for, at a high level, an active path with unique search functionality… the claims of the '053 Patent cover the generation of graphic menu items and construction of an active path…" Ex. 2 (Sherwood Opening Expert Report) at ¶¶60-63. |
| Displaying the sequence of links in a second menu, where interacting with a link provides access to related items in the original menu | "displaying the Active Path as an alternative to the graphical user menu system for navigating the [multi-level hierarchical collapsing] menu structure after the user has finished selecting items using the graphical user system . . ." D.I. 1-1 ('411 patent) claim 1; D.I. 1-2 ('517 patent) claim 1<br><br>"[said active links] allow[ing] a user to access an item in the information structure by selecting [the item] from the one or more items displayed by one of the active links on the active path." D.I. 1-3 ('880 patent) claims 1, 10; D.I. 1-4 ('127 patent) claims 1, 14<br><br>"in response to selection of the selectable link, display at least one menu item of the plurality of graphical menu items . . ." D.I. 1-5 ('053 patent) claims 1, 16<br><br>"wherein each of the one or more selectable links is configured to display at least one menu item of the plurality of graphical menu items." D.I. 1-5 ('053 patent) claim 1, 17<br><br>"The '411 and '517 Patents generally relate to technology that allows users to navigate information structures, databases, files, folders, or web pages … and the construction of an active path. The active path can be constructed with a sequence of active links as menu items are, for example, selected within the graphical menu interface/graphical user menu system.…. the '880, '127, and '053 Patents… cover subject matter that allows for, at a high level, an active path with unique search functionality… the claims of the '053 Patent cover the generation of graphic menu items and construction |

| Claim Element | Claim Recitations |
|---|---|
| | of an active path…" Ex. 2 (Sherwood Opening Expert Report) ¶¶60-63. |

As shown by the examples provided above, Mr. Sherwood used the same framework in analyzing the Asserted Patents. *See* Ex. 2 (Sherwood Opening Expert Report) at ¶¶59-64.

The features described in the specification are recited in the Asserted Claims only as routine, conventional, well-understood hardware and software components:

| Asserted Claims | Recited Hardware | Recited Software |
|---|---|---|
| '411 claim 6 | None | "menu item" (8:37) ; "active link" (8:39) <br> via claim 1: <br> "multi-level hierarchical menu system" (7:27) <br> "graphical user menu system" (7:32) <br> "Active Path" (7:37) ; "active links" (7:38) |
| '517 claims 1 and 4 | None | "hierarchical menu structure" (7:22) <br> "graphical user menu system" (7:25) <br> "Active Path" (7:30) ; "active links" (7:31) |
| '880 claim 3, 4, 8 | None | via claim 1: <br> "graphical menu interface" (9:39) <br> "active path" (9:43) ; "active links" (9:44) <br> "pointer" (9:59) |
| '880 claim 21 | via claim 10: <br> "a processor" (10:21) | Same as claims 3, 4, 8 |
| '127 claim 12 | via claim 1: <br> "a processor" (9:59) | via claim 1: <br> "graphical menu interface" (9:60) <br> "active path" (9:63) ; "active links" (9:64) |
| '127 claims 16, 17, 21, 24, 25 | None | Same as claim 12 |
| '053 claims 1, 14 | None | "plurality of graphical menu items" (9:60) <br> "graphical user interface" (10:11) <br> "selectable links" (10:12) |

**b)      The Specifications of the Asserted Patents**

The Asserted Patents involve two sub-families, each of which contains a common specification with the other patents within each family. The '411 and '517 patents' common specification is the "parent" specification, and the '880, '127, and '053 patents' common specification is the continuation-in-part disclosure which includes additional disclosures. *See* D.I.

9

**Appx0225**

1-3, 1-4, 1-5 ('880, '127, '053 patents) at Fig. 6A, 6B, 7A, 7B, 7C, 8A, 8B, 8C, 8D, 7:50-9:15 ('053 and '127 Patents), 7:31-8:59 ('880 Patent). However, none of the Asserted Claims rely on the material added in the continuation-in-part applications, as explained by Plaintiffs' technical expert. Ex. 3 (Sherwood Rebuttal Report on Validity) at ¶¶173-474 (explaining how every limitation of every Asserted Claim corresponds to features in the '411 patent). Accordingly, the Court need not consider the additional material when determining whether the Asserted Claims recite patentable subject matter.

**c)      Claim 6 of the '411 Patent is Representative**

When there are multiple asserted claims, a court does not need to assess each claim individually where "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *Realtime Data LLC v. Array Networks Inc.*, 537 F. Supp. 3d 591, 610 (D. Del. May 4, 2021) ("When the only difference between claims is the form in which they are drafted, it is appropriate to treat them as equivalent for purposes of patent eligibility under § 101."). Instead, a court can analyze a single representative claim. *Content Extraction*, 776 F.3d at 1348. The patentee has the burden of persuading a court that any other claims should be reviewed independently. *Berkheimer v. HP Inc.*, 881 F.3d 1360,1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative … if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim ….").

Because the independent claims of the Asserted Patents recite substantially the same limitations, claim 6 of the '411 patent (which depends upon claim 1) is a representative example

10

**Appx0226**

of the Asserted Claims.[4] Claim 6 of the '411 patent recites the following limitations:

| Preamble | A method for navigating within a multi-level hierarchical collapsing menu structure where each level in the menu contains plural items, each said item being at least one of a function, a pointer to a location, and a pointer to another level, said method comprising the steps of: |
|---|---|
| 1(a) | providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy; |
| 1(b) | automatically constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system without the need for any additional interaction with the graphical user system, with one said active link corresponding to each of the items selected, each said active link being independently selectable thereby providing direct access to the hierarchical level from which the corresponding item was selected without the need to navigate using said graphical user menu system; and |
| 1(c) | displaying the Active Path as an alternative to the graphical user menu system for navigating the multi-level hierarchical collapsing menu structure after the user has finished selecting items using the graphical user system such that the Active Path is displayed after the multilevel hierarchical collapsing menu structure has collapsed; |
| 1(d) | wherein pre-selecting a given active link triggers the display of sibling menu items on the level associated with said given active link without disturbing the displayed Active Path. |
| 6 | [The method for navigating according to claim 1,] wherein pre-selecting a given menu item displayed while pre-selecting the given active link triggers the display of subordinate menu items. |

Claim 6 does not recite specialized hardware or software elements for performing the methods of providing a menu, constructing a sequence of links that duplicates selections from that menu, and then providing those links in a second menu, nor do the shared specifications of the Asserted Patents describe any such specialized hardware or software elements. The claimed

---

[4] Plaintiffs' own expert uses the claims of the '411 patent as representative. Mr. Sherwood incorporates his analysis of claim 1 of the '411 Patent by reference 68 times in his analysis of the other Asserted Patents, 62 times in his Rebuttal Invalidity Report, and in many cases relies upon identical evidence and analysis to allege infringement of corresponding claim terms in other Asserted Patents. *See* Sherwood Opening Report and Rebuttal Invalidity Report. *Compare, e.g.,* Ex. 2 (Sherwood Opening Expert Report) at ¶¶ 208-63 and 565-609, 316-69 and 612-51 (relying on the same screenshots and verbatim or very similar infringement analysis for corresponding limitations in the '411 and '880 patents); *see also* ¶¶ 734-57 (relying on incorporation of '411 and '880 patent claim analysis to allege infringement of the '127 patent claims).

method can be carried out on almost any platform and "would be applicable to almost any situation, where you had quite a bit of content and you wanted to -- wanted to use the patents to develop a better way to navigate around that content." *See* Ex. 4 (9/24 Sherwood Dep. Tr.) at 61:12-20.

The dependent Asserted Claims do not include any features that would require them to be considered separately from representative claim 6, because they only describe options for which menu items are displayed when a user interacts with the Active Path, or specific functions that are activated upon selection of items in the Active Path. The display of various menu items, and the functions described in the dependent Asserted Claims, are all conventional, well-known software elements. Accordingly, considering those claims separately under §101 cannot lead to a different result, nor can those features convert any abstract idea recited in the representative claim into anything other than an abstract idea.

### 2.      The Asserted Claims are Ineligible under § 101.

As explained above, the Asserted Claims are directed to "well-understood, routine and conventional" elements, as shown by the specifications of the Asserted Patents and Plaintiffs' own technical expert. *See Whitserve*, 854 F. App'x at 373; *see supra*. The Asserted Claims also do not include any features that transform the abstract idea into a patent-eligible application. Furthermore, the Asserted Claims are drawn to a concept that "can be performed in the human mind, or by a human using a pen and paper;" as a result, the claims are directed to an "unpatentable mental process[]" and are therefore not patent eligible. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

To determine whether a patent is invalid under § 101, courts apply the framework from *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012) and applied in *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. 208, 217-18 (2014). First, the

12

performed by a human. The idea in the Asserted Claims of tracking previous navigation choices and allowing a user to return to them as a "shortcut" to accessing the entire menu is no different than the classic "Choose Your Own Adventure" books, in which a reader can select choices along the course of a chronological story which affect the subsequent chronology of the story, and may go back to earlier points in the story to explore other potential chronologies based on different choices.  The claimed "Active Path" is nothing more than a recording of the choices made while navigating such a book, which allows the user to return to a specific page number and make a different selection.  Thus, the Asserted Claims are also abstract for the additional reason that they are directed to a mental process that can be performed using pen and paper or other conventional, well-known techniques.

>    **b)**      **The Asserted Claims do not include significantly more than the abstract idea.**

Step two of the *Alice* analysis attempts to identify an element or combination of elements in the claim that is sufficient to ensure that the patent amounts to "significantly more" than a patent upon the abstract idea itself. *See Alice*, 573 U.S. at 217 (quoting *Mayo*).

There is nothing in the claims of the '411 patent or any other Asserted Claim, either individually or as an ordered combination, that adds a meaningful limitation to the underlying abstract idea of providing a menu and replicating selections made while navigating that menu in a second menu. All the elements of the Asserted Claims are generic and conventional elements that were well-known in the art at the time of the alleged invention. *See* Section V.A.1.a *supra.* Likewise, even when combined in the manner recited in the claims, the resulting combination would be standard and conventional. The '411 patent specification itself provides ample evidence as to the conventionality of the elements that were previously well-known in the art.

>    **(1)**      **Step 1(a): Providing a graphical user menu system**

Representative claim 6 first recites "providing a graphical user menu system," which is nothing more than displaying a pull-down menu that was widely used in software at the time of the alleged invention. As described in the background of the '411 patent, such menus were well-known and conventional at the time of the alleged invention. *See, e.g.,* D.I. 1-1 at 1:45-53 (describing a "conventional navigation system"). The mere presentation of a menu to a user is a conventional software element, and does not provide "something more" than the abstract idea.

### (2)    Step 1(b): Automatically constructing an Active Path as a sequence of hierarchical active links

Claim 6 then recites "automatically constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system." This is merely the creation of a sequence of links that duplicate items selected from the menu in step 1(a). The creation of links based on selections of navigation items was a conventional and well-understood computer function. For example, breadcrumb trails include active links that replicate a selection of navigation items. *See* Ex. 2 (Sherwood Opening Expert Report) at ¶¶74-75 (describing breadcrumbs in the prior art that provide "a consistent way to do two of the things you need to do most often: back up a level or go Home" and other prior art breadcrumbs that "show[] all the levels," which allow access of "deeply nested" items in the hierarchy (internal quotations omitted)); *see also* Ex. 1 (Moehrle Dep. Tr.) at 57:19-22 (the inventor of the Asserted Patents testified that he did not invent breadcrumbs); *see also* Section V.A.1.a *supra*. Further, the concept of tracking of selections from a hierarchical menu system and then displaying of those selections in a menu is well-known, including from the "History" feature of web browsers as far back as the Mosaic browser from 1994, as well as conventional breadcrumb trails. *Id.* The claim makes no improvement to the functioning of the computer or to any other technology or technical field, as nothing in the claims would either make a computer or any component thereof

more efficient or improve any other technology. As such, this feature also fails to provide something more than the abstract idea.

### (3) Step 1(c): Displaying the Active Path as an alternative to the graphical user menu system

This step displays the selected items tracked in the previous step as its own menu, the "Active Path," which is merely the sequence of links created in step 1(b). *See* D.I. 248 at 2. Thus, the Active Path merely displays the selections made while navigating the "graphical user menu system" in a second menu system. Merely presenting data in a different location or arrangement is insufficient to provide "significantly more" than an abstract idea. *See Evolutionary Intelligence LLC v. Sprint Nextel Corp.*, 677 F. App'x 679, 680 (Fed. Cir. 2017) (finding "claims [] directed to selecting and sorting information by user interest or subject matter, a longstanding activity of libraries and other human enterprises" ineligible).

The '411 patent also indicates that the Active Path functions in the same manner as the conventional pull-down menu, but simply allows access to menu items without requiring navigation through the entire menu. *See, e.g.* D.I. 1-1 at 5:1-28 (explaining operation of the Active Path via mouse selection). Accordingly, this feature does not provide significantly more than the abstract idea.

### (4) Step 1(d): Wherein pre-selecting a given active link triggers the display of sibling menu items

The final clause of claim 1 in the '411 patent merely specifies what is shown when "pre-selecting" an active link in the Active Path. Although the '411 patent does not define "pre-selecting," Plaintiffs have argued that it means, among other things, "hovering" with a mouse or "selecting" an item. *See* Ex. 5 (9/26 Sherwood Dep. Tr.) at 51:19-53:1 (Sherwood confirming that the concept of "show[ing] users exactly where they will be taken to upon hovering a particular link or menu—offering a preview of meaningful information to the end users and

allowing content to be located visually all without first accessing or being directed to the content" is "covered in the claims."); *see also* Ex. 2 (Sherwood Opening Infringement Report) at ¶ 370 (Sherwood stating that "pre-selecting an active link is equivalent to selecting the active link using a mouse or highlighting the active link using the keyboard or keyboard shortcut because the latter performs the same function in the same way to provide the same result."). Regardless of meaning, the process of displaying information in response to a user interaction with an "active link" is a conventional process used extensively in user interfaces since well before the alleged invention of the '411 patent. Furthermore, the data being displayed merely replicates existing data (the choices made while navigating the graphical user menu system), which is insufficient to provide "something more" than the abstract idea. *See, e.g., Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014) (finding that generating data using mathematical techniques and then combining data into a profile was ineligible).

(5)    **Step 6: wherein pre-selecting a given menu item displayed while pre-selecting the given active link triggers the display of subordinate menu items**

This final clause from claim 6 merely specifies which menu items are displayed if a user pre-selects an item displayed during the pre-selection in step 1(e). As with step 1(e), it merely displays data obtained during the initial menu navigation and does not recite any additional technical element that would provide something more than the abstract idea.

3.    **The claims considered as an ordered combination do not include significantly more than the abstract idea.**

Claim 6 of the '411 patent fails to include any "inventive concept" that would transform the abstract idea described above into a patent-eligible application of that idea. *Alice*, 573 U.S. at 217-18. Considering the elements of representative claim 6 as an ordered combination adds

22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and
511 TECHNOLOGIES, INC.,

        Plaintiffs,

    v.

JETBRAINS AMERICAS, INC.,
JETBRAINS INCORPORATED, and
JETBRAINS S.R.O.,

        Defendants.

C.A. No. 1:22-cv-01033-JLH-LDH

JURY TRIAL DEMANDED

**<u>FILED UNDER SEAL</u>**

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TO *DAUBERT* MOTIONS AS TO CERTAIN OPINIONS OF MR. SHERWOOD AND MR. HOLZEN,**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

III.  SUMMARY OF THE ARGUMENT ................................................................. 1

IV.  LEGAL STANDARDS ...................................................................................... 3

V.   ARGUMENT ..................................................................................................... 4

      **1.**   Mr. Sherwood's Opinions Are Reliable Because the *Finjan* Court Never Endorsed Defendants' "Foundational Facts" Requirement ................................................ 26

      **2.**   Mr. Holzen's Opinions Should Not Be Excluded ...................................... 36

      **3.**   Cases Cited by Defendants are Inapposite ............................................... 39

      **1.**   The Court Should Not Exclude Mr. Holzen's Opinions Related to the Eleven Settlement Agreements Because Defendants' Arguments are Directed to Evidence Exclusion, Which is Procedurally Improper ..................................................... 40

      **2.**   The Court Should Not Exclude Mr. Holzen's Opinions Related to the Microsoft Agreement Because that Agreement is Comparable ......................................... 43

      **3.**   Mr. Holzen's Opinions Regarding the Risk Utility Factor are Reliable ................... 46

VI.  CONCLUSION .................................................................................................. 50

**TABLE OF AUTHORITIES**

**Cases**

*A/S v. Coolit Sys. Inc.*,
No. 19-cv-00410-EMC,
2022 U.S. Dist. LEXIS 246284 (N.D. Cal. Sep. 11, 2022) ....................................................... 41

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .................................................................................................. 41

*Affinity Labs of Tex., LLC v. Directv, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) .................................................................................................. 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ................................................................................................................ 3

*Apple Inc. v. Ameranth*, *Inc.*,
842 F.3d 1229 (Fed. Cir. 2016) .................................................................................................. 19

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) .................................................................................................... 4

*CardSoft, Inc. v. VeriFone Sys.*,
No. 2:08-CV-98-RSP,
2012 U.S. Dist. LEXIS 76983 (E.D. Tex. June 4, 2012) ........................................................... 43

*Contour IP Holding, LLC v. GoPro, Inc.*,
No. 3:17-cv-04738-WHO,
2020 U.S. Dist. LEXIS 158184 (N.D. Cal. Aug. 31, 2020) ...................................................... 43

*Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc.,
880 F.3d 1356 (Fed. Cir. 2018) .................................................................................................. 13

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ............................................................................................... 15, 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...................................................................................................................... 3

*Diogenes Limited v. DraftKings, Inc.*,
No. 21-1695-MN-CJB,
623 F.Supp.3d 423 (D. Del. July 18, 2022) ................................................................................. 7

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .................................................................................................... 4

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299  (Fed. Cir. 2018) ............................................................................................. 11, 41

*Good Tech. Corp. v. MobileIron, Inc.*,
No. 5:12-cv-05826-PSG,
2015 U.S. Dist. LEXIS 87347 (N.D. Cal. July 5, 2015) ........................................................... 39

*i4i Ltd. Pt'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2014) ...................................................................................................... 3

ii
**Appx3374**

*IBM v. Zillow Grp., Inc.*,
   50 F.4th 1371 (Fed. Cir. 2022) ........................................................................ 19

*Intellectual Venture I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ........................................................................ 18

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ........................................................................ 37

*Mobility Workx, LLC v. Cellco P'ship*,
   No. 4:17-cv-00872- ALM,
   2019 U.S. Dist. LEXIS 191345 (E.D. Tex. Nov. 5, 2019) ................................. 4

*Nat'l Prods. v. Arkon Res.*,
   No. 18-cv-02936 AB (SSx),
   2019 U.S. Dist. LEXIS 238979 (C.D. Cal. Mar. 25, 2019) ............................. 43

*Semiconductor Energy Lab'y Co., Ltd. v. TCL China Star Optoelectronics Tech. Co., Ltd.*,
   No. 8:21-cv-00554 JAK (KESx),
   2023 U.S. Dist. LEXIS 242865 (C.D. Cal. Mar. 21, 2023) ............................. 37

*Simio, LLC v. Flexsim Software Prods.*,
   983 F.3d 1353 (Fed. Cir. 2020) ........................................................................ 19

*Smart Path Connections, LLC v. Nokia of Am. Corp.*,
   No. 2:22-cv-0296-JRG-RSP,
   2024 U.S. Dist. LEXIS 44213 (E.D. Tex. Mar. 13, 2024) ............................... 29

*Stratgent, LLC v. Intel Corp.*,
   No. 6:11-cv-421,
   2014 U.S. Dist. LEXIS 106167 (E.D. Tex. Mar. 6, 2014) ............................... 39

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
   675 F. App'x 1001 (Fed. Cir. 2017) ................................................................. 14

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .......................................................................... 3

*Viatech Techs., Inc. v. Adobe, Inc.*,
   No. 20-358-RGA,
   2023 U.S. Dist. LEXIS 163870 (D. Del. Sep. 14, 2023) ................................. 42

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ........................................................................ 43

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) .............................................................................. 4

*Wrinkl, Inc. v. Facebook, Inc.*,
   No. 20-cv-1345-RGA,
   2021 U.S. Dist. LEXIS 188085 (D. Del. Sept. 30, 2021) ........................... 17, 18

**Statutes**

35 U.S.C. § 101 ................................................................................................................ 1

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................ 3

Fed. R. Evid. 702 ............................................................................................................ 3

## I.    INTRODUCTION

Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively "Caddo" or "Plaintiffs") submit this Memorandum in Response to the "Opening Brief in Support of Defendant Jetbrains Americas Inc.'s Motions for Summary Judgment and Daubert Motions" (D.I. 270). However, Plaintiffs' Response applies to all Defendants, including Jetbrains Americas, Inc. ("JBA"), Jetbrains s.r.o. ("JBSRO") and Jetbrains, Inc. ("JBI").

## II.    NATURE AND STAGE OF PROCEEDINGS

Caddo filed this patent infringement lawsuit against Defendant Jetbrains Americas, Inc. on August 4, 2022. (D.I. 1.) Defendants Jetbrains S.R.O. and Jetbrains Inc. were subsequently joined to this case (D.I. 169) after the Court granted Plaintiffs' Motion for Leave to Amend the First Amended Complaint (D.I. 161). The parties completed fact discovery on October 31, 2023. (D.I. 24, 105.)  Magistrate Judge Hatcher issued a Report and Recommendations construing several disputed limitations on September 6, 2024 (D.I. 248), and the parties completed expert discovery on October 11, 2024 (D.I. 24, 105, 232). Trial is set for April 14, 2025. (D.I. 232.) On October 25, 2024, Defendant JBA filed its "Opening Brief in Support of Defendant Jetbrains Americas Inc.'s Motions for Summary Judgment and Daubert Motions."  (D.I. 270).

## III.    SUMMARY OF THE ARGUMENT

Defendants' argument that the Asserted Claims are purportedly invalid under 35 U.S.C. § 101 fails to consider the character of all 15 Asserted Claims as a whole.  Also, not only has the Federal Circuit repeatedly recognized patent eligibility of improved user interfaces, such as the claimed inventions, under *Alice* Step 1, both parties' technical experts also recognize that the Asserted Claims provide an inventive concept under *Alice* Step 2 because they provide specific methods of creating user interfaces allowing for improved navigation—an improvement in computer functionality.

**Appx3377**

Second, Defendants' Motion for Summary Judgment of Non-infringement under Section 271(g) ignores documentary and testimonial evidence from both parties' experts showing the Accused products were made by the asserted methods, and that Defendants import such products into the U.S. from abroad via their U.S. servers, data centers, and website.

Third, in the context of Mr. Sherwood's infringement opinions, Defendants ignore that Mr. Sherwood has provided detailed analysis of all Accused Products (and not just the "representative" PyCharm) as well as their corporate witness' uncontroverted testimony that the Accused Products all use the same accused features and functionalities.  As such, Mr. Sherwood's infringement opinions are reliable and should not be excluded.

Fourth, Mr. Sherwood's opinions in the context of apportionment, including his opinions regarding the first and second feature counts, are reliable because he properly relied on Defendants' technical documents and diagrams advertised to their customers and explained his bases for his opinion as to why those infringing features are equally valuable—an approach explicitly endorsed by the Federal Circuit in *Finjan*.  By extension, Mr. Holzen's apportionment opinion is also reliable because he properly discounted the value attributed to the non-infringing features and interfaces based on Mr. Sherwood's technical analysis.

Fifth, Mr. Holzen's opinions based on the license agreements should not be excluded because: (1) Defendants' arguments are directed to evidence exclusion; (2) the Microsoft Agreement is comparable as it covers the same patents and products that directly compete with the Accused Products; and (3) the risk utility factor is based on sound methodology, which Defendants do not even address.

Finally, Mr. Sherwood's opinions regarding TkDesk should not be excluded because he identified the versions of TkDesk that he reviewed, and that Defendants have inspected his

laptop on which TkDesk was installed.  Also, his opinions should not be excluded because they direct rebut Mr. Myers' expert opinion, which improperly relied on multiple versions of TkDesk for invalidity.

## IV.    LEGAL STANDARDS

Summary Judgement should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A genuine material fact dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 428.

Fed. R. Evid. 702 recites the standard for expert testimony, and in particular requires that such testimony be "the product of reliable principles and methods" and that "the expert has reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702(c)-(d).  "Unlike an ordinary witness, Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).  When evaluating *Daubert* challenges, the court's focus must be on the expert's "principles and methodology, not the conclusions that [the experts] generate." *Id.* at 595.  "[The Federal Circuit] has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317-1318 (Fed. Cir. 2011); *see also i4i Ltd. Pt'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2014) ("[w]e have consistently upheld experts' use

of a hypothetical negotiation and Georgia-Pacific factors for estimating a reasonable royalty.").

"The Court need not take time discussing whether the *Georgia-Pacific* Factors survive *Daubert*: the *Georgia-Pacific* Factors have already passed muster."  *See Mobility Workx, LLC v. Cellco P'ship*, No. 4:17-cv-00872- ALM, 2019 U.S. Dist. LEXIS 191345 at *47-48 (E.D. Tex. Nov. 5, 2019) (citing *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014).  All that an expert is "required to provide" at the *Daubert* stage is "an explanation for why each [Georgia-Pacific] factor [the expert] has utilized has been considered and how it impacts his royalty calculation."  *Mobility Workx*, 2019 U.S. Dist. LEXIS 191345 at *49-50.

There is no requirement for a "rigid, exact certainty in the determination of a royalty rate" because "[a] reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty."  *Mobility Workx*, 2019 U.S. Dist. LEXIS 191345 at *47-48.  "At the *Daubert* stage, all that is required is that the expert explain 'why and generally to what extent the particular factor impacts the royalty calculation."  *Mobility Workx*, 2019 U.S. Dist. LEXIS 191345 at *48 (citing *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012)).  Also, damages experts are permitted to rely upon opinions of technical experts, especially in patent cases where the value of the infringing technology is "often intertwined with highly technical issues."  *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014).

V.    ARGUMENT

A.    The Asserted Patents Are Patent Eligible Under 35 U.S.C. § 101

This is the second time that the subject matter recited in the Asserted Patents is challenged under Section 101.  In *511 Technologies Inc. and Caddo Systems, Inc. v. Microchip Technology Inc.*, No. 6:20-cv-00245-ADA (W.D. Tex.), the defendant challenged the same subject matter recited in these patents as purportedly being directed to an abstract idea (*see id.* at Dkt. 103), which the court summarily rejected (*see id.* at Dkt. 109).

Here, like the defendant in *Microchip*, Defendants grossly oversimplify the Asserted Patents as merely "directed to the abstract idea of providing a menu, constructing a sequence of links that replicate selections made while navigating the menu, and displaying those links as a second, duplicative navigation interface" and proceeds to argue that each is a known, conventional method of navigation.  (D.I. 270 at 4.)

Unsurprisingly, Defendants conveniently gloss over the disclosures of the Asserted Patents which are directed to the provision of a novel graphical menu interface and the construction of an active path for navigating information structures more usefully, efficiently, and intuitively—whether that structure is a file system, a database, a folder, a web page, or other information structures—and which the Federal Circuit has repeatedly found to be patent eligible because they are not abstract ideas or merely something that can be done with a "pen and paper" as Jetbrains blithely suggests.  (D.I. 270 at 12.)

### 1.    *Alice* Step 1: The Asserted Patents Are Directed To More Than An Abstract Idea Of Combining Menus As Jetbrains Suggests

Defendants correctly argue that *Alice* step one requires a court to examine if the claim's "character as a whole" is directed to" an abstract idea (D.I. 270 at 13) but ignore their own admonition by first improperly declaring dependent Claim 6 of the '411 patent to be "representative" of all 15 Asserted Claims, and then wandering into mischaracterization of those Asserted Claims' "character as a whole" as simplistically combining and displaying two conventionally known menus.  (*Id.*)  But a fair reading of the Asserted Claims, and the disclosure supporting them, demonstrates they are patent eligible.

### a.    Claim 6 of the '411 Patent Is Not Representative

Defendants declare claim 6 of the '411 patent, which is a dependent claim, as representative of all claims (D.I. 270 at 10-12) but fail to consider key differences among the

5

**Appx3381**

claims across the five Asserted Patents.  For example, claim 6 of the '411 patent is directed to a *method* of navigating specific *hierarchical collapsing* menu structures, whereas the asserted methods claims of the '127 and '880 patents are directed more broadly to methods of navigating other "information structures"  Similarly, asserted claim 12 of the '127 patent is not even directed to a method but rather an *apparatus* for navigating information structures.  Further, the claims of the asserted '053 patent *do not recite many of the claimed features* in claim 6 of the '411 patent, including the provision of a "graphical user menu system" or construction of *any* "active path."  Rather, the '053 patent claims are directed to methods of generating graphical menu items, which may be selected in order to create a graphical user interface that further displays, and enables access to, associated menu items within a hierarchy.  Defendants' attempt to characterize claim 6 of the '411 patent as representative of all 15 Asserted Claims ignores these critical differences in claimed scope, methodologies, and features.

Critically, claim 6 of the '411 patent recite "subordinate menu items," which is not recited in the '880, '127, or '053 patent.  In that same vein, the claims of these patents recite subject matter not covered by claim 6 of the '411 patent, such as search functions (claim 21 of '880 patent and claims 12 and 25 of '127 patent) and truncation (claim 8 of '880 patent and claim 21 of '127 patent).  Because these claims impart distinctive significance, they cannot be lumped with claim 6 for the purpose of determining whether they are directed to an abstract idea.

Indeed, the varying scope of these claims can be ascertained based on their different benefits afforded to the users.  For example, as Mr. Sherwood has opined in his report, the claimed subordinate menu items provide users with "unique insights as they traverse through a code base . . . to more easily see where they can and may go without the need[] to make a firm decision (and not until they have seen all the options available to them)."  (Ex. 1 (Sherwood Inf.

6

Rpt.) at ¶ 108.)  By contrast, the claimed search function "enabl[es] users to find, enter, edit, or launch applications, files, folders, databases or web pages quickly without having to sequentially access various levels of an information hierarchy," including "searching of the entire hierarchical structure including subordinate levels."  (*Id.* at ¶¶ 62-63.)  *See Diogenes Limited v. DraftKings, Inc.*, No. 21-1695-MN-CJB, 623 F.Supp.3d 423, Dkt. 46 at 9-10 (D. Del. July 18, 2022) (cautioning that "one could not use one claim as a cudgel to eliminate 27 asserted claims across seven patents in the absence of any real substantive arguments in support.")

> **b.** **The Asserted Patents Describe Problems With Conventional Navigation Methods and Systems**

Defendants overgeneralize the claimed navigation methods and systems as "conventionally known," but here again, fail to address the claims' character as a whole, which captures the unconventional and improved combination of interface features, like the "Project Tool" and "Nav Bar" features that Defendants include by default in their Accused Products because they provide a useful combination of navigation features that their customers use and desire, which is why Defendants had twice refused to remove these features when they redesigned the Accused Products (namely, one in 2011 and the other in 2012).  (Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 979, 1024; *see also* Ex. 2 (Noll 10/19/24 Dep. Tr.) at 120:9-121:22; Ex. 3 (Myers 10/09/24 Dep. Tr.) at 227:6-228:13.)

As the Asserted Patents explain extensively in their Background sections, there were generally two types of navigation systems used to navigate a website prior to the claimed inventions.  One of them was a menu tree.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:23-24; D.I. 170-2 ('517 Patent) at 1:26-27.)  In a menu tree, each row displayed by the tree contains one item of data called a node.  Every tree has an initial or root node or level from which all nodes or levels depend.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:37-62.)  The tree starts with the root node

and provides access to other sub-nodes.  (Ex. 1 (Sherwood Inf. Rpt.) at ¶ 55.)

The other option was a collapsing menu system.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:24-27; D.I. 170-2 ('517 Patent) at 1:27-30.)  This type of navigation system required users to always start from the initial or root level. (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:27-30; D.I. 170-2 ('517 Patent) at 1:30-33.)  But given the sheer amount of content, materials, and features available on any given website, these options were not feasible as they did not provide a meaningful way to organize such content into a hierarchy of categories to facilitate, for example, efficient navigation or location of content.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:31-36.)

Accordingly, the inventor described, in Fig. 1A of the '411 patent, a top or root level 10 of a menu.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:37-38.)  Each level 10 of the menu provides a pull-down menu of menu choices 12. (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:38-39.)  Each menu choice 12 could be an end node such as a function whose selection initiates some action, or the menu choice 12 could lead or point to another level providing additional menu choices 12.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:39-42).  Selection of an end node causes the pull-down menu to collapse back to the root level. (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:42-44.)

Similarly, in Fig. 1B, the inventor described how this pull-down menu works with several levels of the hierarchical menu expanded. (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:45-53; D.I. 170-2 ('517 Patent) at 1:48-56.)  The inventor described the menu structure as collapsing back to the root level once an end node is selected. (*Id.*)  As the inventor indicated, this type of a collapsing navigation system was a "one-way" system, which required users to always starts from the root level to an end node.  (*See, e.g.*, D.I. 170-1 ('411 Patent) at 1:48-51; D.I. 170-2 ('517 Patent) at 1:51-53; *see also* Ex. 1 (Sherwood Inf. Rpt.) at ¶ 56.)  This method of navigation is cumbersome where the desired destination is buried several levels down from the root.  (*See,*

8
**Appx3384**

*e.g.*, D.I. 170-1 ('411 Patent) at 1:51-53; D.I. 170-2 ('517 Patent) at 1:53-56.)

As a workaround to these deficiencies, the inventor described that Microsoft Windows provided short-cuts in the form of pre-defined function keys or icons that enabled users to directly access the function associated with the short-cut. (*See, e.g.*, D.I. 180-1 ('411 Patent) at 1:54-58; D.I. 170-2 ('517 Patent) at 1:57-61.) These short-cuts, however, "do[] not provide the user with the full range of items available within a given level" and "require[] user interaction." (*See, e.g.*, D.I. 170-1 ('411 Patent) at 4:19-24; D.I. 170-2 ('517 Patent) at 4:17-22.)

The inventor also described other conventional solutions at the time of the inventions. For example, the inventor described, in connection with Fig. 2A, a conventional path menu system 20 used to navigate through the directory structure of a disk, and in connection with Fig. 2B below, a conventional universal resource locator (URL) command which operates similarly to the disk operating system (DOS) path command shown in Fig. 2A. (D.I. 170-1 ('411 Patent) at 1:65-2:2; D.I. 170-2 ('517 Patent) at 2:1-5.)

This conventional DOS used a path menu system 20 to navigate between various folders where each folder represents a different level in the hierarchy. (D.I. 170-1 ('411 Patent) at 2:2-5; D.I. 170-2 ('517 Patent) at 2:5-8.) A given folder may contain one or more sub-folders. (D.I. 170-1 ('411 Patent) at 2:5-6; D.I. 170-2 ('517 Patent) at 2:8-9.) To access a target or destination level, users were required to know the exact path, *i.e.*, the names of each folder from the root to the target. (D.I. 170-1 ('411 Patent) at 2:6-9; D.I. 170-2 ('517 Patent) at 2:9-11.) For example, by typing a command such as DIRECTORY (DIR), users were provided with the contents of the current folder and the path leading to the current folder. (D.I. 170-1 ('411 Patent) at 2:10-13.) Users then could proceed to a sub-level in the hierarchy or may retrace their steps to a preceding level by knowing the path. (D.I. 170-1 ('411 Patent) at 2:13-15.)

Navigating a website using this type of conventional system, however, required users to memorize and enter complex URL sequences. (D.I. 170-1 ('411 Patent) at 2:16-17; D.I. 170-2 ('517 Patent) at 2:18-19.) As the number of levels increased, the path also became more complex and long, rendering it nearly impossible for users to memorize the entire sequence of the path. (D.I. 170-1 ('411 Patent) at 2:17-21; D.I. 170-2 ('517 Patent) at 2:21-23.)

Thus, the Asserted Patents describe real-world, non-abstract problems associated with conventional navigation-based interfaces, and provide similarly non-abstract methods and systems for improving navigation of a broad array of information structures, regardless of their size and complexity, and without requiring memorization of complex information structures.

> **2.**      ***Alice* Step 2: The Asserted Patents Disclose and Claim Inventive Concepts That Solve Known Usability, Accessibility, and Screen Real-Estate Limitations of Conventional Systems**

Defendants further argue, again relying on claim 6 of the '411 patent alone, that the Asserted Claims do not provide an inventive concept, even as an ordered combination. (D.I. 270 at 22-26.) However, when the character of the Asserted Claims *as a whole* is considered—particularly the specific combinations of claim elements and features as disclosed in the patent specifications as discussed above—there are clear inventive concepts across the varied scope of the 15 Asserted Claims that solve recognized usability, accessibility, and other deficiencies in conventional navigation systems and methods.

As noted above, the Asserted Patents (and Asserted Claims) are directed to significant improvements over the "one way" access of conventional interfaces for navigation by providing a novel dual-interface system (e.g., graphical user menu or graphical menu interface working in tandem with an ***active path*** and its ***active links***) that facilitates the exploration of menus, items, and locations without the need to revisit the root or top node or level or the need to memorize and enter complex hierarchical sequences. (D.I. 170-1 ('411 Patent) at 4:9-18.)

Moreover, certain dependent claims further elaborate on the inventive concept of the "active links," including truncated paths that increase screen real estate (e.g., claim 8 of the '880 patent and claim 21 of the '127 patent).  Defendants do not address these inventive concepts, much less demonstrate that they were well-understood, routine, or conventional in the industry. The claimed active path and its active links are not "functional in nature" because they "recite specific steps" that "accomplish the desired result."  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018) (holding patent eligibility because the "claims recite more than a mere result . . . they recite specific steps . . . that accomplish the desired result.").

These unconventional elements and inventive concepts were also emphasized by the USPTO in the Notice of Allowance that led to the issuance of the '411 patent.  (Ex. 21 (Prosecution History for the '411 Patent), Office Action dated Sept. 29, 2006, at ¶ 4 ("Prior arts in the field do not teach pre-selecting active links within a structure representing Active Path, with the selection of the active link resulting in displaying of sibling menu items on the level associated with the given active link, and further ensuring that the Active Path is not changed or disturbed in any way as a result of selection of the active link from within the Active Path.").)

Further, the unconventional combinations of features do more than simply allow for faster use of the system.  The claimed combinations resolve a long-standing issue with prior art navigation methods and systems, and provide numerous improvements to navigation of complex information structures.  Indeed, as Mr. Sherwood opines in his report, the claimed inventions offer numerous benefits to users, including users of the Accused Products, and "addresses an issue in the prior art by providing the 'best way' to avoid having a user confused and not being able to find what they are looking for," including by way of example:

- providing users with "wayfinding 'orientation cues in the same way that a ship requires light beacons (e.g., from nearby light houses) to guide its way in a thick

cloud of heavy fog'" so that users can avoid "los[ing] track of their location within a complex structure of a code base, website, document, folder, structure, or database" (Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 78, 80);

o    allowing users "to find what they need easily and quickly" similar to the use of "You Are Here" that is typically printed in maps" (*id.* at ¶ 79);

o    providing "higher user retention and engagement with the code base . . . which is of enormous benefit to any code base seeking to achieve a complex or sophisticated software application . . . " (*id.* at ¶¶ 80, 103)

o    "allowing] software developers to view a project from various vantage points within a code base and perform different tasks such as adding or modifying source code files (e.g., directories and classes) or accessing or incorporating other source code files (e.g., through the graphical user menu systems/graphical menu items or graphical menu interface), or finding, searching or locating a specific code fragment within the code base (e.g., through the graphical user menu systems/graphical menu items/graphical menu interface or active paths/graphical user interface), or accessing previously known resources (e.g., tools, libraries, and files through the active paths/graphical user interface), all with maximum efficiency and minimal distraction" (*id.* at ¶ 83)

o    "minimiz[ing] complex interactions, which cuts down on the time required for developing, modifying or debugging source code" (*id.* at ¶ 85)

o    "increasing the value of the source code (which also facilitates easy future update or upgrade)" by making it "easier for end users to locate content of interest" (*id.* at ¶ 92)

o    "reduc[ing] unnecessary actions or clicks required to go or return to other code fragments" thus allowing users to stay in the flow" (*id.* at ¶¶ 93-94)

o    allowing "more screen real estate [to] be preserved than conventional menu systems" (*id.* at ¶ 100)

o    "minimize[ing] user frustration, stress, and anxiety caused by, for example, navigation disorientation, inability to find relevant or desired content, functions and resources quickly, and backtracking issues (my opinion on this issue is further discussed below), which in turn improve user retention as they are being guided throughout their journey" (*id.* at ¶ 104); and

o    "reduc[ing] unintended code fragment . . . that could skew the determination of what the end users are interested in, how well the fragment . . . is optimized for search, and what the user behavior trends are" (*id.* at ¶ 110).

In addition, as described in the specification, because the claimed active path "is subsequently retained" as the user traverse through various places within a given information structure, they need not navigate back to the initial or root level in order to access the same content, nor do they need to navigate through the menu structure in order to re-execute the same or last function. (D.I. 170-1 ('411 Patent) at 3:67-4:4 and 5:29-32; D.I. 170-2 ('517 Patent) at 3:66-4:2 and 5:26-29.) The end-result is that the claimed active path provides significant savings

12

in "screen real-estate" and allows browsing of various levels of menus and items without jeopardizing usability—space that could be used for valuable content. (as Mr. Sherwood has opined above).  (D.I. 170-1 ('411 Patent) at 6:61-63; D.I. 170-2 ('517 Patent) at 6:57-59.)

Citing *Core Wireless*, Defendants argue that the asserted claims do not include language that goes beyond "using conventional user interface methods to display a generic index on a computer."  (D.I. 270 at 23.)  But the Asserted Claims cover far more than using conventional user interfaces to display an index, as discussed previously.

### 3. The Federal Circuit Has Consistently Recognized Such Improved Interfaces As Patent Eligible

The claimed user interfaces are also patent eligible, as evident in *Core Wireless*, *Trading Techs.*, and *Data Engine*.

#### a. The Asserted Claims Are Similar to those Claims in *Core Wireless* Found Not to be Directed to an Abstract Idea

In *Core Wireless*, the patents at issue provided "improved display interfaces, particularly for electronic devices with small screens like mobile telephones . . . [that] allow a user to more quickly access desired data stored in, and functions of applications included in, the electronic devices."  *Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc., 880 F.3d 1356, 1359 (Fed. Cir. 2018).  The Federal Circuit focused on the patent specification which highlighted the issues with prior art user interfaces and specific improvements in computer functionality by improving the accessibility and efficiency of the GUI.  *Id.* at 1363.

Similar to the  claims in *Core Wireless*, the Asserted Claims cover "improved user interfaces for electronics devices, particularly those with small screens."  (*Id.*)  Like the users interfaces in *Core Wireless*, the claimed user interfaces help solve the difficulty with prior art user interfaces (which required navigation to always start from the top or root node) and "had many deficits relating to the efficient functioning of the computer, requiring a user 'to scroll

around and switch views many times to find the right data/functionality'" (e.g., "scroll around" and through the menu structure tirelessly every time until the desired level was reached).  The claimed user interfaces thus help save valuable screen real-estate in space-limited environment, such as mobile devices and websites.  (*Id.*; Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 100-102 ("Benefit of Saving Screen Space or Screen 'Real Estate'").  Indeed, Defendants' witness, Mr. Everitt, who prepares training videos for the Accused Products, acknowledged that screen space savings is an important consideration.  (Ex. 4 (Everitt Dep. Tr.) at 89:8-90:5 ("Q: In your videos have you advocated the use of the navigation bar to help customers reduce screen estates[sic]? A: Yes. Q: Why do you recommend that? A: It is for some users or some people a trade-off between horizontal versus vertical real estate. . . . Q: So would it be fair to say by saving screen space, that they have more space to write and display the code? A: That is correct.").)

### b.     The Asserted Claims Are Similar to those Claims in *Trading Techs*. Found Not to be Directed to an Abstract Idea

The Asserted Claims here are also analogous to those found to be patent eligible in the *Trading Techs.* case.  The claims at-issue in *Trading Techs.* described "a trading system in which a [GUI] 'display[s] the market depth of a commodity traded in a market, including a dynamic display for a plurality of bids and for a plurality of asks in the market for the commodity and a static display of prices corresponding to the plurality of bids and asks.'"  *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1003 (Fed. Cir. 2017).  In analyzing *Alice* Step 1, the court in *Trading Techs.* found the claims aggregated different types of information on a GUI to facilitate complex web navigation or navigation within a complex database or folder structure.  Agreeing with the district court, the Federal Circuit concluded that "the claimed GUI method imparts a specific functionality to a trading system" and was directed to a specific problem in the art. (*Id.* at 1006.)  "While those inventors did not invent static pricing, dynamic quantities, bid

14

**Appx3390**

prices, or ask prices," "the interface that was claimed was an improvement upon prior art modes, where, on prior interfaces, a price could change based on changing market conditions while the trade was being executed." (*Id.*).

In the same way, the claimed interfaces (e.g., graphical user menu and active path) aggregates information that is accessible through different menus, items, and levels alongside a navigable information structure just as the claims in *Trading Techs* aggregated "bid and asked prices" dynamically for display alongside a "static display." Like the improvements that allowed traders to more efficiently place trades in *Trading Techs.*, the Asserted Claims "allow[] [users] to more efficiently and accurately" find the content they need by allowing them to use the claimed interfaces to "browse[] the data file representing the information hierarchy of the location, and select[] a desire location" in order to "eliminate[] the need to provide hyperlinks and navigational elements on the individual web pages." (*See, e.g.*, Dkt. 170-3 ('880 Patent) at 9:11-15; *see also* Ex. 1 (Sherwood Inf. Rpt.) at ¶ 86.) That is, the Asserted Claims go beyond merely displaying information on a graphical user interface. Because "[t]he claims require a specific, structured graphical user interface paired with a prescribed functionality" that "is addressed to and resolves a specifically identified problem in the prior state of the art," the Asserted Claims "meet[] the eligibility standards of *Alice*" under *Trading Techs*. *Trading Techs.*, 675 F. App'x at 1004.

### c.     The Asserted Claims Are Similar to those Claims in *Data Engine* Found Not to be Directed to an Abstract Idea

In that same vein, the Asserted Claims are no different from those found to be patentable improvement to user interface technology in *Data Engine*. There, a subset of the claims concerned "a method of implementing a notebook-tabbed interface, which allows users to easily navigate through three dimensional electronic spreadsheets." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1003 (Fed. Cir. 2018). The Federal Circuit found that the claims

15

**Appx3391**

were "directed to a specific method for navigating through three-dimensional electronic spreadsheets" and "provided a specific solution to then-existing technological problems in computers and prior art spreadsheets," even though three-dimensional spreadsheets preexisted and "humans [had] long used tabs to organize information." *Id.* at 1008. The Court likened these structural improvements to those it upheld in *Core Wireless* and *Trading Techs*. *Id.*

Here, like the patent in *Data Engine*, the Asserted Patents solve problems in preexisting interface technology by providing an "improved method of [web] navigation" through a "highly intuitive, user-friendly interface with familiar [features] for navigating [an information structure] environment." *Id.* Like the *Data Engine* claims that "include user-familiar objects, i.e., paradigms of real-world objects which the user already knows," the Asserted Claims recite familiar interface elements, such as menus, items, levels, and links—all of which are "real-world objects" familiar to users. (Ex. 1 (Sherwood Inf. Rpt.) at ¶ 74) ("[O]ne of the benefits of the claimed invention is that it incorporates a simple and already familiar navigational tool users are familiar with . . . The claimed inventions thus improve upon a known method of navigation by allowing users to . . . have an increased ease of use and greater sense of navigation.")

Similar to the GUIs in *Data Engine*, the Asserted Claims "allow the user to simply and conveniently 'flip through' [numerous web] pages of [a website or complex information structure] to rapidly locate information of interest" and removed the need to memorize "complex commands" for navigation. *Id.* at 1004, 1009. The improvement of the claimed inventions thus "allow[s] computers, for the first time, to provide rapid access to and processing of information in different [web pages or folder or database structures], as well as easy navigation in [complex information structure] . . . .". *Id.* at 1008-09.

      **d.**      **The Asserted Claims Are Similar to those Claims in *Wrinkl v. Facebook* Found Not to be Directed to an Abstract Idea**

At least one court in this District has similarly considered claims, like the Asserted Claims here, that provide an improved interface that references prior related information, and held they were patent eligible based on the above Federal Circuit cases. *See Wrinkl, Inc. v. Facebook, Inc.*, No. 20-cv-1345-RGA, 2021 U.S. Dist. LEXIS 188085, *8-15 (D. Del. Sept. 30, 2021). There, the court held "the specification identifies a problem that exists in prior art electronic messaging systems and provides a solution that improves the capability of a generic user interface in a particular way. A user may select a prior message to reference and view at least a portion of the contents of this message while selecting it." *Id*. at *13.

Here, as in *Wrinkl*, the claimed methods—which, *inter alia*, allow a complex information structure to be traversed and navigated by providing a GUMS (a first graphical user interface or "GUI") for selecting hierarchical menus, items, and levels; and constructing an active path (a second GUI) for subsequent navigation of those hierarchical menus, items, and levels—is analogous to the subject matter at issue in *Core Wireless*, *Data Engine*, and *Trading Techs.*, all of which, as noted above, found such GUI interfaces to be patent eligible under Step 1 of *Alice*.

### 4.    The Cases Cited By Defendants Actually Support Plaintiffs

The cases cited by Defendants each considered claims that are factually distinguishable from the Asserted Claims here and, in contrast, further support Caddo's position that the Asserted Claims are patent eligible. For example, the *Affinity* case cited by Defendants notes that "in addressing computer-implemented patents, the *TLI* court contrasted claims that are directed to an improvement in the functioning of a computer with claims that 'simply add[] conventional computer components to well-known business practices' or consist only of 'generalized steps to be performed on a computer using conventional computer activity.'" *See Affinity Labs of Tex., LLC v. Directv, LLC*, 838 F.3d 1253, 1260 (Fed. Cir. 2016). Notably, in *Affinity*, unlike here, the patent was not directed to the solution of a "technological problem" or

17

**Appx3393**

"an improvement in computer functionality" but rather was a general concept of out-of-region delivery of broadcast content through the use of conventional devices, without offering any technological means of effecting that concept and for that reason was held patent ineligible. *Id.* at 1263. Indeed, the *Affinity* court held the patent there was "devoid of any teaching or blueprint explaining how the device can do what it purports to do." *Id*. at 1257.

Here, the Asserted Patents are specifically directed to resolving technological problems associated with prior navigation systems, and improve the functionality of systems by providing better navigation of the information within the given system's structure—whether a file system, a database, or a web-page. Moreover, the Asserted Patents recite limitations directed to "constructing" an active path, and then using that active path to display, browse, and select links to other menu items rather than having to memorize or reconstruct prior navigation paths. This is the "specific, structured graphical user interface paired with a prescribed functionality" that is outside the realm of an abstract idea. *Data Engine*, 906 F.3d at 1009-10.

Similarly, in the *Intellectual Ventures* case, also cited by Jetbrains, the patent claims were directed to the abstract idea of using a computer for tracking financial transactions to determine whether they exceed a pre-set spending limit (i.e., budgeting). *Intellectual Venture I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). Here, the Asserted Claims are directed to the provision and construction of unique user interfaces with particular functionalities aimed at improving content search, access and navigation.

Notably, the court in *Wrinkl* also considered the *Affinity* and *Intellectual Venture* cases, and rejected them based on the same distinctions in finding the claims at issue in that case to be patent eligible. *Wrinkl*, 2021 U.S. Dist. LEXIS 188085 at *14.

With respect to the *Apple* case, also cited by Jetbrains, the claims considered there were

18

**Appx3394**

directed to the storage, transmission, and display of restaurant menus on a handheld device. *See Apple Inc. v. Ameranth*, *Inc*., 842 F.3d 1229, 1234 (Fed. Cir. 2016). As the court held, "[t]he patents claim systems including menus with particular features." *Id*. at 1241. But importantly, the court distinguished those claims from patent-eligible claims because they "do not claim a particular way of programming or designing the software to create menus that have these features. *Id.* By contrast, the Asserted Claims here go beyond merely displaying stored menus—they are directed to methods for actual provision and construction of user interfaces, such as the claimed "active path," based on where a user has traversed within an information structure, which hierarchical levels have been accessed, and/or which menu item have been selected. By providing methods for actually constructing and creating these combined user interfaces, as the Asserted Claims require, the system and methods provides an improved ability to more efficiently navigate, browse, and comprehend complex information structures, which is another reason why they are distinguishable from the claims in *Apple*.

In the *Simio* case, also cited by Jetbrains, the patent ineligible claims at issue used a computer simply to improve the speed of an abstract idea, versus "designing software that creates interfaces that improve use of the system" as covered by the Asserted Claim. *Simio, LLC v. Flexsim Software Prods*., 983 F.3d 1353, 1361 (Fed. Cir. 2020). And similarly, in the *IBM* case, the patent ineligible claims there failed to "recite any assertedly inventive technology for improving computers as tools." *IBM v. Zillow Grp., Inc.,* 50 F.4th 1371, 1377-78 (Fed. Cir. 2022). In contrast, the Asserted Patents are directed to improving known navigation technologies and improved use of computers as a tool for software development.

Defendants' technical expert, Mr. Myers, also admitted that the Asserted Patent claims were directed to actual navigation via an interface, and not an abstract idea:

Q.      What is your understanding of claim element 1[e]? What is claim -- claim element 1[e] claiming?

. . .

A.      So it is -- it is a step in the process that is based upon all of the other predicates before it. And so assuming all the steps, you know, A, B, C, D have occurred, then this is a step where the active, an active link can be preselected to provide the display of options on the level associated with that link based on, again, all the predicate steps and without disturbing the displayed active path, the current active path.

Q.      And you said options. You mean, the sibling menu item?

A.      Yes. Just to clarify that *this patent is about navigation, and so this is presenting options for navigating to different locations*.

Q.      And what is your understanding of the term "preselecting"?

. . .

A.      I think a person of ordinary skill in the art would interrupt that as, and certainly in view of the specification here that that would be *hovering over the, one of the active links, and based on that hovering action it would display, it would display the menu options, these other options at the sibling level for the potential of traversing to another location*.

(Ex. 5 (Myers 10/10/24 Dep. Tr.) at 291:10-292:10.)  Thus, Mr. Myers also recognizes that the Asserted Claims are directed to actual, real-world navigation methods, and not abstract ideas.

**B.      The Court Should Deny Summary Judgment of Non-Infringement Under 35 U.S.C. §271(g)**

Defendants' motion for summary judgment of noninfringement under 35 U.S.C. §271(g) incorporates by reference their Rule 12(b)(6) Motion to Dismiss, (D.I. 177), Opening Brief in Support, (D.I. 178, ) and Reply Brief (D.I. 186) as if fully restated therein.  (D.I. 270 at 27.) Accordingly, Plaintiffs incorporate by reference their Opposition to Jetbrains' Rule 12(b)(6) Motion to Dismiss and all materials relied upon in support.  (D.I. 182 (under seal); D.I. 182-1 (under seal); D.I. 183; D.I. 183-1; D.I. 183-2; D.I. 183-3; D.I. 183-4; D.I. 183-5; D.I. 183-6).

However, these pleadings alone do not provide a complete record of the dispute with respect to 35 U.S.C. § 271(g).  In particular, Plaintiffs' letter brief of January 8, 2024 (D.I. 145) provides further context and evidence showing how Defendants are liable under 35 U.S.C. §271(g) for importing their Accused Products into the United States.  As detailed in Plaintiffs'

Motion to file their Second Amended Complaint (D.I. 125 at 2), JBSRO entered into numerous purchase and subscription agreements with U.S. business entities for the sale of the Accused Products and, once executed, JBSRO, in collaboration with JBA, imported the Accused Products into the U.S. by: (a) making the Accused Products available for download and access through their U.S. servers and data centers; and (b) via their website hosting those Accused Products that are accessed through the cloud.  (*See, e.g.*, Ex. 2 (Noll 10/19/23 Dep. Tr.) at 231:17-232:4 (testifying that the Accused Instrumentalities are downloaded from servers in Portland, which is where "[U.S.] customer is closest"); *see also* Ex. 6 (Noll Dep. Ex. 18) (showing "N. California" as the U.S. date center location for the accused product YouTrack).)  (D.I. 145 at 2.)

Plaintiffs' technical expert, Mr. Sherwood, also has reviewed the evidence and opined on how Defendants import the Accused Products made by the asserted method claims into the U.S. (*See* Ex. 12 (Sherwood Inf. Rpt.) at ¶¶ 936-944.)  First, Mr. Sherwood explains that the Accused Products are made by the asserted methods as reflected in the source code for the Accused Products, which provides for the claimed elements such as "graphical menu items," "graphical menu items," "sibling menu items," and "more than one item to be displayed at each level" because they are "readily embedded in the source code at the time when the Accused Instrumentalities are downloaded, installed, and loaded . . . ."  (*Id.* at ¶¶ 231, 792, 798.)

Defendants' own technical expert, Mr. Myers, also opines that the source code for the Accused Products embodies many key claimed features, detailing, for example, how "[he] observed that the source code and operational software for the Accused Products" perform the construction of an active path/Navigation Bar and graphical menu system/Project Tool window. (Ex. 20 (Myers Rebuttal Rpt.) at ¶ 68 (listing a series of his observation of the source code for the Accused Products in relation to the claimed functionalities.)  In the context of the NavBar,

Mr. Myers further opines on the amount of source code files that reference the functionality of "NavBar." (*Id.* at ¶ 359.) Thus, both parties' experts acknowledge that the Accused Products are so made by the patented methods that provide for the Project Tool and Navigation Bar interfaces.

With respect to importation, Mr. Sherwood also opines that Defendants import the Accused Products into the U.S. and store them on their U.S. servers "in Portland, Oregon from Amazon AWS in Ireland" as well as data centers in the Northern California called "US West (N. California) us-west-1." (*See* Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 937, 941.) For example, Mr. Sherwood observes that the Accused Products stored on the U.S. servers and in the data centers are accessed through JBSRO's website at www.jetbrains.com. *(Id.* at ¶ 931 ("JBSRO owns, maintains, or operates the website at www.jetbrains.com used to host the Accused Instrumentalities for download, access, or installation by its customers and end users in the United States" and "JBSRO contracts with third party vendors, including content server and data center vendors, to facilitate the downloading, accessing, or installation of the Accused Instrumentalities by customers and end users in the United States"). By (a) importing the Accused Products designed and developed using the patented methods abroad; (b) hosting them "in the cloud" via their U.S. servers and data centers; and/or (c) selling or offering to sell the Accused Products in the U.S., infringement under Section 271(g) is complete. This is particularly true where, as here, Defendant JBA does not contend that it sold and continues to see the Accused Products that were made abroad by JBSRO.

## C.    Defendants' Motion for Summary Judgment of Noninfringement Should be Denied

Defendants argue that Mr. Sherwood's infringement opinions are purportedly unreliable because he allegedly relied on Pycharm, one of the Accused Products, as representative for purposes of his infringement analysis, thereby shifting the burden to Defendants to prove non-

infringement of the remaining Accused Products.  (D.I. 270 at 27-30.)  This argument is unavailing because Defendants' premise is false—Mr. Sherwood's Report explains in painstaking detail how these remaining Accused Products (i.e., products other than PyCharm) infringe each claim limitation via the Project Tool window and the Navigation Bar, with direct citations to the factual record.  (*See, e.g.,* Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 153-154.)

First, Mr. Sherwood provides a table mapping ***each*** Accused Product to the infringing features, including when each such feature was launched.  *Id.* at ¶ 154.  This table is followed by his infringement opinions on how each Accused Product infringes each claim limitation via those features.  By way of example, for limitation 1.1 of claim 1 of the '411 patent, Mr. Sherwood opines on how PyCharm (¶ 213), IntelliJ (¶¶ 218-226), Rider, Resharper and Resharper C++ (¶¶ 228-230), TeamCity (¶¶ 233, 257), DataGrip (¶ 235), PhPStorm (¶¶ 237, 249), Aqua (¶ 239), Clion (¶ 243), RubyMine (¶ 250), Space (¶ 251), Upsource (¶ 252), plug-ins (¶ 256), YouTrack (¶ 258), Appcode (¶ 258), DataSpell (¶ 260) and Fleet (¶ 260) meet this limitation.  This exact format is adopted for the remaining claim limitations and asserted claims.

Second, there is no dispute that PyCharm is "representative" (nor do Defendants contend that it is not) because Defendants' own discovery responses and own corporate witness confirmed that all of the Accused IDE Products used the ***same*** "Project Tool" and "NavBar" to perform the asserted functionalities.  (*Id.* at ¶154, n.57 (citing to Mr. Noll's corporate testimony that the infringing features are common across all Accused IDEs).)  Specifically, when shown Defendants' interrogatory responses identifying which of accused product includes both the infringing Project Tool window and the Navigation Bar, Defendants' corporate witness, Mr. Noll, testified that all of the Accused IDE products have those same features.  (Ex. 2 (Noll 10/19/23 Dep. Tr.) at 68:23-69:6 ("Q So in response to some of these requests or responses from

JetBrains that certain IDEs have the project window and the navigation bar, so I am just going name them all and let me know if this is accurate. AppCode, Aqua, CLion, DataSpell, GoLand, IntelliJ IDEA, PhPStorm, PyCharm, Rider, RubyMine and WebStorm. Is that list accurate to your knowledge? *A Yes*.") Accordingly, it is reasonable for Mr. Sherwood to treat PyCharm as a representative product because it has the same infringing features as the other Accused IDEs.

As to the Accused non-IDEs Products (e.g., Plug-ins and Team Tools), Mr. Sherwood also points to Defendants' discovery responses and Rule 30(b)(6) witness to confirm that such products also contain the same features that perform the same functionalities as the "Project Tool" and "NavBar" features found in the Accused IDEs, even though Defendants use different naming conventions for these same features and functionalities in the Accused non-IDE Products. (*Id.* at ¶154, nn.104-123.) Importantly, Mr. Sherwood opined that he has analyzed these features and functionalities in the Accused non-IDE Products and explained that there is no difference as to how they operate in the context of infringement compared to those in the Accused IDEs. (Ex. 1 (Sherwood Inf. Rpt.) at ¶120, n.42 ("I note that the Project Tool window and the Navigation Bar at times are referenced with or given different names by Jetbrains. Their different naming conventions do not change the underlying accused functionalities, and as such, my opinion also applies to those same features albeit different name"); *see also id.* at ¶ 203, n.140 ("[I]t should be understand that when I refer to Jetbrains' 'Project Tool window,' it is my opinion, based on my review of Jetbrains' documentations together with relevant testimonial evidence, that the 'Project Tool window' also provides the same accused functionalities as the Repository Directory Tree, which provides the same accused functionalities as the Project Tree, Project View, File Structure View/Window, Explorer Window, File Explorer, Projects Overview, Side Bar/Sidebar, Project Hierarchy, Files View, File/Files Tree, Repository

Directory Tree, Assembly Explorer, Explorer Window, File Explorer and Database Explorer" and "that when I refer to Jetbrains' "Breadcrumb Navigation," it is my opinion, based on my review of Jetbrains' documentations together with relevant testimonial evidence, that "breadcrumbs" and "Breadcrumb Navigation" provide the same accused functionalities as the Navigation Bar".)

Mr. Noll agreed, testifying that the Accused non-IDE Products also contain the same accused features and functionalities—even if they are named differently in those products. For example, as noted in Mr. Sherwood's Report, the Accused non-IDE Products support the same functions that the Project Tool window and the Navigation Bar provide in the Accused IDEs— whether by directly integrating with the IDEs (which would then allow the plug-ins to use the same accused features and functionalities as the Accused IDEs) or by providing the same functionality under a different naming convention. (Ex. 1 (Sherwood Inf. Rpt.) at ¶203 n.140; *see, generally, id.* at ¶¶153-154 nn.98-123.) Accordingly, Mr. Sherwood's infringement analysis is supported by documentary evidence and thus reliable.

Defendants also argue that Mr. Sherwood's opinions on infringement are unreliable because "he did not explain why he selected PyCharm." (D.I. 270 at 29-30.) This is a red-herring. Why PyCharm was selected is immaterial so long as the accused features and functionalities operate the same way as those in the other accused products—which Defendants do not dispute. Notably, a deposition is not a memory test. While Mr. Sherwood may not have recalled at his deposition why he treated PyCharm as representative, his Report clearly sets forth that PyCharm is representative based on Defendants' discovery responses and corporate testimony by Mr. Noll. (*See* Ex. 1 (Sherwood Inf. Rpt.) at ¶¶ 153-154.) That any of the Accused Products contain additional features that are ***unaccused*** is simply irrelevant as to the reliability of

Mr. Sherwood's infringement opinions on the *accused* features.

### D.    The Court Should Not Exclude Mr. Sherwood's and Mr. Holzen's Apportionment Opinions

Defendants do not challenge the validity of Mr. Sherwood's "feature count" analysis; instead, they complain that there are purportedly no "foundational facts" that would "support the assumption that the features are of equal value such that the reasonable royalty is based on the incremental value that the patented invention adds to the end product." (D.I. 270 at 34.)  This argument is flawed for two reasons.

#### 1.    Mr. Sherwood's Opinions Are Reliable Because the *Finjan* Court Never Endorsed Defendants' "Foundational Facts" Requirement

Defendants cite to *Finjan* in support of their arguments that "feature counts are permissible, but only if foundational facts support the assumption that the features are of equal value." (D.I. 270 at 34.)  But this reference to "foundational facts" appears only in the district court's analysis.  On appeal, the Federal Circuit never mentioned nor endorsed this "foundational facts" requirement.  Defendants grasp at straw and resort to conflating the district court's analysis, which was partially overturned, with the Federal Circuit's holding.

In advancing their arguments, Defendants also attempt to cherry-pick different sections of the Federal Circuit's analyses in *Finjan*.  For example, Defendants assert that the Federal Circuit "cautioned that 'the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product" (D.I. 270 at 34) but that quotation was cited as part of the Federal Circuit's analysis relating to the '844 patent where the plaintiff's expert had completely "failed to apportion damages to the infringing functionality." *Finjan*, 879 F.3d at 1309.  The issue related to the "assumption of value" appears in the later portion of the opinion, which involved completely different patents (i.e., '731 and '633 patents).  There, the circuit panel in *Finjan* analyzed what a damages expert, not a technical expert, did and did not do.

To that end, under *Finjan*, it is proper for Mr. Sherwood to "assume[] equal value for each WebStorm feature" because he relies on Defendants' ***own*** technical documents and diagrams in rendering that portion of his opinion—an approach the *Finjan* court explicitly endorsed.  Specifically, just like the technical expert in *Finjan*, Mr. Sherwood explains "the use of architectural diagrams and identified certain components within the diagram that did and did not infringe."  *Id.* at 1311.  For the first feature count, he also explains that Defendants have delineated, in their ***own*** technical documents, 28 "essential features" that represent the full scope of WebStorm.  (*See* Ex. 1 (Sherwood Inf. Rpt.) at ¶ 146 n.47 ("This page will give you an overview of the ***essential features*** available in WebStorm . . . ."); *see also* Ex. 7 (CAD-JET047189-CAD-JET047201) at CAD-JET047189; *see also* Ex. 8 (Frank-White Decl.) at 9.)

Based on Defendants' own identification of these twenty-eight (28) "features" and their classification of these features as being "essential," Mr. Sherwood opines that five (5) of those twenty-eight (28) "essential features" infringe the Asserted Patents.  (*Id.* at ¶ 147.)[1]  In addition, Mr. Sherwood directly ties these five (5) features to the benefits provided by the claimed inventions, opining that "***these [five] features are highly valuable and critical to the Accused Instrumentalities (and likely more valuable and critical than the other technical features)*** because they directly increase user efficiency and minimize unwanted distraction to 'stay in the flow' (including accessing functions or locating certain content, be it source code or source code

---

[1] According to Mr. Sherwood, these five features are: "**Search Everywhere** (e.g., an accused search functionality provided via the Navigation Bar and will be discussed below in greater detail below), **Code Exploration** (e.g., navigating code or files using the Navigation Bar49 or "breadcrumbs"50 and will be discussed below in greater detail below), **Project Navigation** (e.g., using the Project Tool window and will be discussed below in greater detail below), **Code with Me** (e.g., feature provided via the Navigation Bar and will be discussed below in greater detail below), and **Plugins** (which are some of the Accused Instrumentalities and will be discussed below in greater detail below with respect to each Asserted Patent)."  (*Id.*)

libraries, such as via Code Exploration and Project Navigation), reduce search times (including finding a specific function, file or portions of source code in a complex code base or accessing critical libraries for efficient software coding, such as via Search Everywhere), expand existing capability of the Accused Instrumentalities (e.g., by integrating the Accused Instrumentalities with Plug-ins), and optimize user familiarity of the Accused Instrumentalities (e.g., via Code with Me to [] enhance user engagement and retention)." (*Id.*)

To that end, Mr. Sherwood also explains why these features are equally valuable, opining that these five "infringing features represent 17.9% of the total features available in Webstorm" such that it is reasonable to assume equal value for each WebStorm feature "because it reasonably captures the value of the accused functionalities in proportion to other features available in WebStorm—features that Jetbrains itself identifies on its own as features of Webstorm." (Ex. 9 (Sherwood Reply Rpt.) at ¶ 220.)  Although the determination of the "17.9%" is based on each feature being equal in value, Mr. Sherwood also explains that "this determination is conservative in that [the accused] features [] go beyond those identified above" such that "if those features were to be included, this percentage would have been much greater than 17.9%." (Ex. 9 (Sherwood Reply Rpt.) at ¶ 220.)  Thus, Mr. Sherwood's technical analysis in the context of the first feature count is no different than what the *Finjan* court has endorsed because Mr. Sherwood relied on Defendants' technical document for WebStorm that "shows twenty-[eight essential features] representing different parts of the [WebStorm]" and explains his bases for his opinion as to why "each [feature] is equally valuable." *Finjan*, 879 F.3d at 1313.

> **a.** ***Finjan* Explicitly Rejects Defendants' "Sub-Features" Argument, and Defendants Offered Mere Attorney Arguments Without Any Expert Testimony as to the Presence or Substance of these "Sub-Features" in WebStorm, Reinforcing the Reliability of Mr. Sherwood's First Feature Count Analysis**

With respect to the first feature count, Defendants argue that "many of these 28 WebStorm features include various sub-features" and "Mr. Sherwood provides no explanation as to why he ignores these sub-features and instead arbitrarily assigns equal weight to each of the 28 features." (D.I. 270 at 35.)  *Finjan* explicitly rejects these arguments.

There, in advancing its contention that each of the infringing and non-infringing functions represented by the "twenty-four boxes" in its technical diagram was not "equally valuable," the defendant tendered the testimony of its "Senior VP of Products" that "each box in the diagram can 'have many, many things behind [it] . . . so there's no equal weighing of these [boxes]." *Finjan*, 879 F.3d at 1313.  But the Federal Circuit rejected this argument because "[t]he jury was entitled to believe the patentees' expert," and that the presence of sub-features "does not mean the damages award is unsupported by substantial evidence." (*Id.*; *see also Smart Path Connections, LLC v. Nokia of Am. Corp.*, No. 2:22-cv-0296-JRG-RSP, 2024 U.S. Dist. LEXIS 44213, at *9 (E.D. Tex. Mar. 13, 2024) (finding that the plaintiff's damages expert "provided sufficient apportionment to survive *Daubert*" because the damages expert's "technique of counting entire features that infringe to reach this opinion rather than attempting to further apportion within the feature is sufficient" under Federal Circuit precedent).)

Here, the reasoning in *Finjan* applies in equal force—the presence of any sub-feature has no bearing on Mr. Sherwood's technical analysis because Mr. Sherwood relies on Defendants' ***own*** technical documentations and diagrams in opining that the twenty-eight (28) essential features represent the full scope of WebStorm, and the jury is "entitled to believe" his opinion.

But what makes Defendants' arguments even less compelling than those put forth by the defendant in *Finjan* is that Defendants have offered ***no testimonial evidence*** from any fact or expert witness as to what these sub-features are or the total number of such sub-features, unlike

29
**Appx3405**

the defendant in *Finjan* who had at least proffered the testimony of its "Senior VP of Products." Neither do Defendants' technical and damages experts—Mr. Myers and Mr. Bakewell have **never once** offered any opinion as to the **identity** of **any** such sub-feature.

In their brief, Defendants have identified three (3) of the twenty-eight (28) "essential features" (namely, "Code Quality Analysis," "Editing Boosters," and "Project Settings Sharing") as purportedly containing certain sub-features.  (D.I. 270 at 35.)  But what Defendants have identified are *functionalities* that result from the *use* of those features.  For example, Defendants argue that "'Code Quality Analysis' 'includes hundreds of inspections for all supported languages and a spelling and grammar checker.'"  (*Id.*)  But the purpose of the "Code Quality Analysis" feature is to perform code inspection in order "to detect errors and typos in your code," as reflected in Defendants' own technical document.  (D.I. 274 (Ex. 9) at CAD-JET047191.)  Whether WebStorm performs one or "hundreds" of code inspection, it is nonetheless a functionality of the "Code Quality Analysis" feature as Mr. Sherwood has opined. *See also* Ex. 9 (Sherwood Reply Rpt.) at ¶ 211 ("Mr. Myers is incorrect when he says "WebStorm 'includes hundreds of inspections'" because it is the very feature (i.e., Code Quality Analysis) that provides these inspections (e.g., inspecting code quality). Whether one or hundreds of code base is inspected, this is still a single feature offered via WebStorm's code quality analysis. Inspecting the code base once or hundreds of times to detect errors does not make this feature a 'category of features.'").)  It would be absurd to count each instance of code inspection as a "sub-feature" in the same way that it would be improper to count each instance of user navigation as a "sub-feature."

The same is true for "Editing Boosters" and "Project Settings Sharing."  For example, the "Editing Boosters" feature allows users to "code faster" by using its functionalities such as

30
**Appx3406**

"[m]ultiple carets, line editing actions, and automatic code reformatting." (D.I. 274 (Ex. 9) at CAD-JET047192.) Similarly, the "Project Settings Sharing" allows users to "shar[e] your code style settings" by using "IDE-specific configuration, Prettier, or EditorConfig." (*Id.* at CAD-JET047198.) What Defendants have pointed to are functionalities offered by "Editing Boosters" and "Project Settings Sharing." There is no legitimate reason to construe each of these functionalities as a "sub-feature."

But the Court need not determine whether each such functionality is a sub-feature. Even assuming *arguendo* that sub-features exist (and they do not), they are of no consequence because Mr. Sherwood's opinion that these five (5) infringing features represent "17.9%" of the total number of features available in WebStorm takes into account of ***only those five infringing features*** and no more. Hence, even if the other twenty-three (23) "essential features" include "sub-features" (and so do these five infringing essential features),[2] Mr. Sherwood's technical analysis is still proper, as the Federal Circuit has so held in *Finjan,* because the presence of these sub-features "does not mean the damages award [based on these features] is unsupported by substantial evidence." That Defendants do not dispute that Mr. Sherwood's technical analysis focuses on only the infringing features and does not allocate or attribute the "17.9%" to any non-accused features dooms Defendants' motion to exclude this portion of Mr. Sherwood's opinion.

---

[2] To the extent a functionality of an essential feature could be considered as a "sub-feature," Defendants have completed ignored that these five infringing features also provide sub-features under that view. For example, one of the five essential features identified by Mr. Sherwood is the "Project Navigation." The technical document cited by Defendants describes that this feature allows users to "[l]ook through all project files," "jump only between your recent files or modified parts of code," "remember what you worked with and get you back there quickly," "[u]se tabs for navigation, or turn them off," and "rely on shortcuts instead." (D.I. 274 (Ex. 9) at CAD-JET047196.) Defendants have failed to explain how these "sub-features" could not offset those "sub-features" identified in Defendants' Opening Brief.

        **i.**        **Defendants Erroneously Leaps to the Conclusion that "Hiding" the NavBar Means All User Interfaces Are Optional**

The case against exclusion is even stronger with respect to the second feature count. The crux of Defendants' argument is that "some interfaces are optional while others are not" as their means to downplay the number of interfaces available in WebStorm. (D.I. 270 at 36.) To support this "optional" argument, Defendants offer mere attorney argument that "the user can hide from the screen and need never access to use WebStorm." (*Id.*)

First, Mr. Myers and Mr. Sherwood have opined only that the Navigation Bar can be hidden (i.e., the Project Tool cannot be hidden), and that "hiding" the Navigation Bar temporarily to maximize screen space in and of itself *does not deactivate or remove the NavBar*. (*See* Ex. 10 (Myers Opening Invalidity Rpt.) at ¶ 913 ("It is worth noting that users can already hide the Navigation Bar feature through a built-in user setting, which saves valuable screen space for interacting with source code"); *see also* Ex. 11 (Sherwood Rebuttal Invalidity Rpt.) at ¶ 131 ("Mr. Myers also opines that 'users can already hide the Navigation Bar feature through a built-in user setting, which saves valuable screen space for interacting with source code' . . . but *'hiding' is not removing or deactivating the NavBar. Indeed, neither the NavBar nor the Project Tool Window could be removed or deactivated*"). Defendants' own corporate witnesses, Mr. Noll and Mr. Everitt, also testified to users' inability to deactivate or remove the NavBar. (*See* Ex. 2 (Noll 10/19/23 Dep. Tr.) at 99:6-14; 119:6-20; 120:9-14; 122:11-17; 301:6-302:24; Ex. 4 (Everitt Dep. Tr.) at 105:22-107:13; 180:17- 247:4-248:3.)

Defendants mistakenly characterize a user's ability to hide, if at all, the NavBar interface temporarily to mean that *all user* interfaces, with the exception of the editor interface, are "*optional*." Such an unexplained and illogical leap is insufficient to exclude Mr. Sherwood's opinion. Undeterred, Defendants point to Mr. Sherwood's testimony in support of their

argument but ignore his unequivocal testimony that "hiding" an interface is not equivalent to the interface being "optional."  (*See* Ex. 12 (Sherwood 9/24/24 Dep. Tr.) at 71:6-24 ("Q. If the Project Tool is optional, it's not critical to software development, is it? . . .  A. *I think the two are actually unrelated*. *The fact that I, as a developer, have the option doesn't mean I don't think it's not critical.* I may want to like get a little bigger screen space for a while so I hide that part because it's easier for me to do that. But I have it available to me. So, it's critical, in my mind, for excuse me for a software developer to have that window open. Now, *just because he has the option of closing it to let's say generate more screen space or because he just simply doesn't want that particular feature on his screen, then that doesn't mean it's not critical*. Just means he decided whatever he's doing at that particular point in time, he didn't need it.").)

In fact, Mr. Sherwood was abundantly clear in this deposition that the NavBar is "*not optional*" when users load the accused products, which Defendants have ignored entirely.  *See id.* at 142:8-20 ("Q. So, just so the record is clear, the Nav Bar is optional; is that right? . . .  A. It's -- well, it has to be a limit on that. Because if you invoke if you load the IDE, IntelliJ and the windows and *Nav Bar are not optional*. They're there. Now, once they're there. Right. Then you can say, are they optional at that point. I would say yes. *Are they optional when you load the IDE? I would say no. My understanding, those come with the IDE automatically*.").)

To that end, Mr. Sherwood explains why these user interfaces are equally valuable, opining that "a product with no user interfaces (i.e., none of the seven interfaces identified by Defendants for WebStorm) would have no value to any customers or users because they would have no way of, for example, 'creating new items (directories, files, classes, and so on), opening files in the editor, [and] navigating to the necessary code fragments,' which are so fundamental to any software (and even more so for new or novice users who have never used the accused

33

products)." (Ex. 9 (Sherwood Reply Rpt.) at ¶ 221.) Because Defendants specifically designed the NavBar as an alternative to the Project Tool window, Mr. Sherwood opines that "Jetbrains has long expected customers and users to use one or both of these interfaces at any time," and "[t]hus, it is reasonable to determine the value of the patented features by examining the percentage of these interfaces in proportion to all other interfaces available in WebStorm." (*Id.*)

Like his analysis for the first feature count, Mr. Sherwood's analysis for the second feature count is conservative because some of the accused products only use six (6) of the seven (7) user interfaces available in WebStorm, including Defendants' two flagship products; namely, IntelliJ and PyCharm. (*See id.* at ¶¶ 217, 248 (showing PyCharm and IntelliJ using only six of the seven user interfaces (i.e., all but the "Run Tool Window").) Under *Finjan*, Mr. Sherwood's opinion on the second feature count should not be excluded because "[t]he jury [is] entitled to believe the patentees' expert" and because his analysis is supported by "substantial evidence." *Finjan*, 879 F.3d at 1313.

> **b.    Defendants Ignore Opinions by Mr. Sherwood and Mr. Holzen that in the Context of a Hypothetical Negotiation, WebStorm is the Small Saleable Patent Practicing Product Whose Features and Interfaces are Available in Other Accused Products**

Defendants lament that Mr. Sherwood has provided "no support for why the feature counts for WebStorm apply to each of the other Accused Instrumentalities," and more specifically, to all twenty-six Accused Instrumentalities where "each IDE, Team Tool, Cloud and On-Premise Solution, and Plug-in have unique features." (D.I. 270 at 34-36.) First, Defendants point to the presence of some "unique features" (*id.* at 36) but do not otherwise identify what these features are, which is improper. Second, as alluded to above, Defendants' own technical documentations identify these same features and interfaces as being used and implemented in other Accused Instrumentalities. In fact, Defendants' own website states that all of the features

of WebStorm are available in the other IDEs (e.g., Ex. 22 (WebStorm vs IntelliJ IDEA Ultimate); Ex. 23 (PyCharm Professional vs WebStorm); and Ex. 24 (PhpStorm vs WebStorm).)

Critically, Mr. Holzen opines in his report, in connection with his interview with Mr. Sherwood, that "WebStorm is smallest saleable patent practicing" unit ("SSPPU") whose "features and functions" are included in other accused products, and that "the parties would agree to assess the portion of profits earned from the use made of WebStorm when negotiating the hypothetical royalty to determine Jetbrains' maximum willingness to pay for a license to the Asserted Patents" at the time of the hypothetical negotiation.  (Ex. 13 (Holzen Affirmative Report) at ¶ 174; *see also* Ex. 14 (Holzen Dep. Tr.) at 91:13-20 ("Q. *And that's because Mr. Sherwood told you that all of the features in WebStorm are included in all of the other IDEs or all the other JetBrains' products; is that right*? A. The features -- *he told me that WebStorm is the smallest saleable patent practicing product. He indicated that the features are -- in WebStorm are in the other IDEs*.").).  Because WebStorm is the SSPPU, it is proper for Mr. Sherwood to apply his first and second feature counts for WebStorm to other Accused Instrumentalities as apportioned by Mr. Holzen for the purpose of determining the appropriate value attributable to the infringing features and interfaces.

Tellingly, Defendants *never once* asked Mr. Sherwood in his deposition regarding the SSPPU or how/why his feature counts apply to other Accused Instrumentalities, and for good reasons—Mr. Sherwood's technical report points to additional technical documents by Defendants that explicitly reflect the implementations of these same features and interfaces.  For example, Mr. Sherwood's report expressly identifies the same seven (7) user interfaces (i.e., same number and same interfaces; *see* Ex. 1 (Sherwood Inf. Rpt.) at ¶ 148) in WebStorm that are also implemented in other Accused Instrumentalities.  (*See id.* at ¶ 237 (PhPStorm), ¶ 238

35

**Appx3411**

(Rider), ¶ 235 (DataGrip), and ¶ 250 (RubyMine).)

Curiously, like Defendants themselves, *their experts did not address* the substance of these technical documents identified in Mr. Sherwood's report. Nor did Defendants' experts separately identify any *additional* user interfaces in other Accused Instrumentalities that would impact Mr. Sherwood's feature counts analysis. For example, neither Mr. Myers nor Mr. Bakewell opined that there are more than twenty-eight (28) features or seven (7) user interfaces in WebStorm or other Accused Instrumentalities. Without any such opinion from their experts, Defendants could only rely on attorney argument, which is not evidence, and is insufficient to exclude Mr. Sherwood's feature count analysis.

By discounting the other twenty-three (23) essential features (in the first feature count) and five (5) user interfaces (in the second feature count), Mr. Holzen's and Mr. Sherwood's analyses are reliable, particularly where, as here, they are consistent with Defendants' *own feature counts* advertised to their customers. *See Smart Path*, 2024 U.S. Dist. LEXIS 44213, at *9 (finding that "[t]here is no perfect apportionment and [the plaintiff's damages expert] has *apportioned to individual features at the level [Defendant] advertises*" and "this is sufficient and any concern [Defendant] has is best addressed on cross-examination").

### 2.    Mr. Holzen's Opinions Should Not Be Excluded

Defendants complain that Mr. Holzen relies on "Mr. Sherwood's assumption of equal value" (D.I. 270 at 38) but for reasons discussed above, Mr. Sherwood's "equal value" opinion is informed by Defendants' own technical diagrams delineating these twenty-eight (28) features and seven (7) user interfaces. Coupled with Mr. Sherwood's opinion as to which "components within the[se] diagram[s] that did and did not infringe," Mr. Holzen's apportionment analysis is sufficiently reliable because it only considers those five (5) infringing features and two (2) interfaces that Mr. Sherwood has identified to be infringing and *does not include* any damages

attributed to the non-infringing features and interfaces. This is the exact type of methodology affirmed by the Federal Circuit in *Finjan*. *See also Semiconductor Energy Lab'y Co., Ltd. v. TCL China Star Optoelectronics Tech. Co., Ltd.*, No. 8:21-cv-00554 JAK (KESx), 2023 U.S. Dist. LEXIS 242865, at *21 (C.D. Cal. Mar. 21, 2023) (denying the defendants' *daubert* motion to exclude damages opinions of the plaintiff's damages expert, finding that his "feature counting methodology is not unreliable" particularly where his "decision to count each feature equally was conservative and supported by a detailed technical analysis").

In addition, Defendants argue that because the "allegedly infringing features are included in both free and paid versions of the products," Defendants conclude that "the revenues are generated from customers paying for other features and functionalities instead of the allegedly infringing features identified by Mr. Sherwood." (D.I. 270 at 38.) This is again mere attorney argument and Defendants have cited no documentary evidence for this proposition. *See Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.").

Defendants' lack of evidence is not surprising because the factual record directly contradicts Defendants' argument. As discussed in Mr. Sherwood's report and buttressed by the testimony of Defendants' corporate representative, that the NavBar and the Project Tool window are available in two "free" (or so called "Community") products actually make them ***even more valuable***. (*See* Ex. 1 (Sherwood Inf. Rpt.) at ¶ 1003 ("In my opinion, the infringing Navigation Bar and Project Tool Window features are clearly important enough to customers and users that they are willing to pay Jetbrains for them . . . ."). This is because, according to Defendants' corporate representative, Defendants operate in an "non-traditional" industry where product

conversion is based on "removing friction" and "roadblocks" to using the products such that "*people discover features and fall in love with the product and buy it*." (Ex. 15 (Noll 10/20/23 Dep. Tr.) at 398:4-14 ("Q. On that basis, has the sales process been successful in converting customers or -- free customers to paid customers, in your opinion? A. So that whole conversion is product-led, not sales-led. So our sales process, as I just mentioned, is simply removing friction. It's very much a *product-led sales process*. *So people discover features and fall in love with the product and buy it*. So our sales process is download, try, buy, right. And it's been that way for 20 plus years"); *see also* Ex. 2 (Noll 10/19/23 Dep. Tr.) at 341:4-342:8 ("A. . . . *So it's not your traditional software business*. . . . So *the more roadblocks you put before the developers to use your product, the less they'll use it*. The more you market to them, the less they'll use it."). Thus, Defendants place significant value on making the accused features available in the two "free" products so that users would "fall in love" with them and subsequently buy the accused products.

At his deposition, Mr. Noll was unequivocally clear—the accused features "are crucial" because "*we care about them using the product more than we care about producing roadblocks to use the product*" because "if you put up roadblocks for people to try the product, in three clicks they have a crack," which would force them to leave and not buy the product. (Ex. 2 (Noll 10/19/23 Dep. Tr.) at 341:4-342:8.) The "goal," according to Mr. Noll, is to "make [the product] as free as possible and . . . *provide things of value* to where you can convert them to paid." (*Id.*) As such, that the accused features are offered in two "free" products do not undermine their intrinsic value. Quite the contrary, they serve as the reason why customers ultimately buy the accused products. (*Id.*)

Thus, Mr. Noll's testimony that the accused features are "crucial" only reinforces that

38

**Appx3414**

Mr. Sherwood's feature count analysis assigning equal value to the accused features is reliable because this analysis underestimates the actual value that should have been allocated to these crucial accused features (i.e., which should have been higher than "equal value" because they drive product sales). In doing so, Mr. Sherwood's analysis is also reliable because his "equal value" analysis is inevitably "conservative." (Ex. 9 (Sherwood Reply Rpt.) at ¶ 220.)

### 3. Cases Cited by Defendants are Inapposite

Citing *Good Tech* and *Stratgent*, Defendants argue that "[o]ther courts have rejected feature counts where experts arbitrarily assign equal value to each product feature." (D.I. 270 at 34.) Neither case is applicable here. *Good Tech.* involved a damages expert who "relie[d] on ***no analysis*** of what weight to assign to what feature," "conduct[ed] no survey and ***consult[ed] no technical expert***," and "could not explain how he made the determination or whether any of the inclusion criteria were implicated by a specific patent." *Good Tech. Corp. v. MobileIron, Inc.*, No. 5:12-cv-05826-PSG, 2015 U.S. Dist. LEXIS 87347, at *22 (N.D. Cal. July 5, 2015). Similarly, *Stratgent* involved a damages expert who calculated the value of the accused feature based on a hedonic regression analysis. *Stratgent, LLC v. Intel Corp.*, No. 6:11-cv-421, 2014 U.S. Dist. LEXIS 106167, at *16 (E.D. Tex. Mar. 6, 2014). Devoid of any support by a technical expert, the damages expert used "guesswork" to determine "the value of the accused feature in connection with his hedonic analysis." (*Id.*)

None of the facts in *Good Tech.* and *Stratgent* are present here—Mr. Holzen's reasonable royalty analysis is informed by Mr. Sherwood's technical analysis, which points to Defendants' own technical architectural diagrams and documentations for identifying the total number of accused features (in the first feature count) and interfaces (in the second feature count). Since Mr. Sherwood's report has provided his technical analysis as to how the five (5) of the 28 features (for the first feature count) and two (2) of the seven (7) user interfaces (for the second

feature count) infringe, both Mr. Sherwood's feature count analysis and Mr. Holzen's apportionment analysis are therefore reliable because they reflect only the value added by the patented features/interfaces and do not include any value added by non-patented components.

E.     **The Court Should Not Exclude Mr. Holzen's Opinions Because Defendants' Arguments are Directed to Excluding the License Agreements, Which is Procedurally Improper**

1.     **The Court Should Not Exclude Mr. Holzen's Opinions Related to the Eleven Settlement Agreements Because Defendants' Arguments are Directed to Evidence Exclusion, Which is Procedurally Improper**

With respect to the Eleven Settlement Agreements, Defendants seek to exclude them on the basis that "they involve websites instead of the technology of the accused products in this case (e.g. IDEs and remote collaboration tools)." (D.I. 270 at 40.) As a preliminary matter, ***Defendants never once identified*** which aspect of Mr. Holzen's opinions rely on these Eleven Settlement Agreements and simply expect this Court and Plaintiffs to comb through Mr. Holzen's report and determine what exactly Defendants are seeking exclude. This issue is particularly pronounced where, as here, Mr. Holzen never relied on these Eleven Settlement Agreements in his apportionment analysis. As noted in his report, Mr. Holzen analyzed these agreements as part of his analysis under the *Georgia-Pacific* Factor 1 and carefully explained why "the financial terms of these agreements would not reflect the value that would be negotiated in the hypothetical negotiation for use of the Asserted Patents." (Ex. 13 (Holzen Affirmative Rpt.) at ¶ 124.)

Because Mr. Holzen's apportionment analysis does not rely on these Eleven Settlement Agreements (and Defendants do not contend otherwise), Defendants' motion, in effect, is a motion *in limine* seeking to exclude these agreements from being presented at trial. Defendants admit that much, contending that these Eleven Settlement Agreements have "less-than-minimal probative value" and would "allow Plaintiffs to feign a licensing program at trial." (D.I. 270 at

40-41.)  But this is not a legitimate reason to exclude these Eleven Settlement Agreements, nor is it procedurally proper to do so via a *Daubert* motion.  *See Finjan Inc. v. Cisco Sys. Inc.*, No. 17-cv-00072-BLF, at *23 (N.D. Cal. Apr. 17, 2020) (finding that "[l]ooking at [the plaintiff's] licensing history to determine what the parties would have agreed to, on its own, does not make [the damages expert's] method unreliable or arbitrary" even when "he 'acknowledged that all of the offers he relied on were within two to six years after the hypothetical negotiation but claimed that those dates did not impact his opinion.'").

Even if these agreements are not comparable or have "less-than-minimal probative value," Mr. Holzen's opinion (and his underlying methodology) is not any less reliable, and that the jury is permitted to hear such opinion from Mr. Holzen.  *See A/S v. Coolit Sys. Inc.*, No. 19-cv-00410-EMC, 2022 U.S. Dist. LEXIS 246284, at *109 (N.D. Cal. Sep. 11, 2022) (citing *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376-77 (Fed. Cir. 2020)) ("As for the argument that the prior license relied on is not comparable or the most comparable one, ***the jury is free to hear evidence that the license is not comparable***.").

Nor could these agreements be excluded at trial.  The Federal Circuit has repeatedly held that "the issue of comparability is often one of sufficiency of the evidence, ***not admissibility***." *See Bio-Rad*, 967 F.3d at 1373; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally ***goes to the weight of the evidence, not its admissibility***"); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) (same); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (affirming that the district court did not abuse its discretion by failing to exclude the testimony of the damages expert because the "degree of comparability" of the license agreements is a "factual issue[ ] best addressed by cross

41
**Appx3417**

examination and not by exclusion."). Thus, under Federal Circuit precedent, these Eleven Settlement Agreements cannot be excluded, particularly where, as here, Mr. Holzen has rendered an opinion as to their applicability in the context of the parties' hypothetical negotiation.

In this regard, the facts of this case are no different than those in *BioRad.* There, the Federal Circuit affirmed the damages award even though the plaintiff's expert had "opined that this license, from a university to a licensor in the nascent period of the droplet technology, ***is not comparable to the hypothetical negotiation***" and rejected the defendants' argument that he improperly "relied on licenses that were not comparable to the hypothetical negotiation." *See Bio-Rad*, 967 F.3d at 1372, 1375.

Defendants cite to *Viatech Techs.* but in that case, the court excluded the settlement agreement involving the plaintiff and a third party because "the agreement was highly influenced by the [plaintiff's] threat of bankruptcy," and as such, it would be "highly prejudicial to Plaintiff" to "be forced to explain why the circumstances surrounding this agreement are not comparable to a hypothetical negotiation." *Viatech Techs., Inc. v. Adobe, Inc.*, No. 20-358-RGA, 2023 U.S. Dist. LEXIS 163870, at *3 (D. Del. Sep. 14, 2023). These facts are not present here— Defendants would not be forced to disclose any materials that would be prejudicial to them.

Tellingly, Defendants' own damages expert, Mr. Bakewell, has similarly opined on the applicability of these Eleven Settlement Agreements. (*See* Ex. 16 (Bakewell Rpt.) at ¶¶ 119-214.) That is, both parties' respective damages expert has looked to Plaintiffs' long history of license agreements and opined on whether those agreements would be relevant for the purpose of determining what the parties would have agreed to at the hypothetical negotiation. Thus, it would be unduly prejudicial to allow Mr. Bakewell, but not Mr. Holzen, to render the same opinions on these Eleven Settlement Agreements.

**2.    The Court Should Not Exclude Mr. Holzen's Opinions Related to the Microsoft Agreement Because that Agreement is Comparable**

Defendants seek to exclude Mr. Holzen's opinions on the Microsoft Agreement because "(1) it was executed ten years after the hypothetical negotiation date and (2) Microsoft denied liability and denied infringement and validity of the patents."  (D.I. 270 at 42.)  Like the Eleven Settlement Agreements, these issues go to the weight, not admissibility, of the Microsoft Agreement.  *See Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-cv-04738-WHO, 2020 U.S. Dist. LEXIS 158184, at *32, 34 (N.D. Cal. Aug. 31, 2020) (finding that the damages expert's opinion on a settlement agreement entered into "four years after the [] hypothetical negotiation" was reliable and "sound," noting that [t]he[se] challenges [] ***go to the weight, not the admissibility*** of their reports"); *see also Nat'l Prods. v. Arkon Res.*, No. 18-cv-02936 AB (SSx), 2019 U.S. Dist. LEXIS 238979, at *32, 36-37 (C.D. Cal. Mar. 25, 2019) (citing *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)) (finding that "Defendants' arguments related to the timing" of a license agreement "entered in 2016 as part of a litigation settlement . . . [that] did not exist until six years after the hypothetical negotiation" and "as a result of litigation" "***go to its weight, not admissibility***" as the damages expert's opinions "about the impact of the timing of [that a]greement to the hypothetical negotiation can be explored through cross examination"); *see also CardSoft, Inc. v. VeriFone Sys.*, No. 2:08-CV-98-RSP, 2012 U.S. Dist. LEXIS 76983, at *8-9 (E.D. Tex. June 4, 2012) (rejecting *daubert* challenge where the plaintiff's damages expert relied on "agreements [that] were reached six years after the hypothetical negotiation date," reasoning that "***this issue goes more to the weight the jury should assign the licenses***, and can be best addressed through cross-examination . . . .").

Defendants also claim that "the Microsoft Agreement is not technically comparable" because "Plaintiffs granted Microsoft a broad license to more patents than the Asserted Patents,

which applies to all of Microsoft's past, present, and future products, not only the specific products that Plaintiffs alleged infringed certain patents at the time of its complaint against Microsoft." (D.I. 270 at 43-44.)  This attorney argument is unavailing.

As Mr. Holzen opines in his report, he interviewed Mr. Sherwood who evaluated all Microsoft products and determined that the Microsoft Agreement applied only to "Windows explorer products (e.g., Windows 7, Windows 8, Windows Vista) and Visual Studio and Visual Studio Code" because only these products used the patented features.  (*See* Ex. 13 (Holzen Affirmative Rpt.) at ¶¶ 93-94; *see also* Ex. 14 (Holzen Dep. Tr.) at 51:4-14 ("Q. And what do you mean by that? A. That the Windows product is -- how should I say? -- embodying or using the patented invention -- plural -- patented inventions as with Visual Studio and Visual Studio Code. Q. Did Mr. Sherwood tell you whether he evaluated all of the other products to determine whether those other products are covered by the Microsoft license agreement? A. ***I asked him if he was aware of any. He was not***. Q. And did you verify that no other Microsoft products include the patented technology? A. Well, that is the purpose of why I interviewed Mr. Sherwood.").)

Notably, Defendants ***do not once question*** the soundness of Mr. Holzen's methodology applied to the Microsoft Agreement in which he applied ***six apportionment adjustments*** that "the parties would account for in order to convert the price paid by Microsoft into a value to be considered by the parties to the hypothetical negotiation, including:" "An adjustment to account for[: (1)] differences in licensed products"; (2) "the risk associated with ongoing litigation"; (3) "the term of the license"; (4) "the licensed territory"; (5) "the parties relative market share"; and (6) "the avoidance of litigation costs."  (Ex. 13 (Holzen Affirmative Rpt.) at ¶ 125.)

Defendants also claim that Mr. Sherwood purportedly "does not explain how 'windows

explorers' purportedly implement the claimed inventions or what inventions it implements."[3]

(D.I. 270 at 45.)  This is false—Mr. Sherwood discussed extensively in his report how "window explorers" used the patented inventions, which is also reflected in Mr. Holzen's report.  (Ex. 9 (Sherwood Reply Rpt.) at ¶¶ 225-227 ("[B]oth Windows Explorer and the licensed websites use the patented technology to access data, files, and information. For example, both provide access to content – the licensed websites offer information, products, and services online (and offline) while Windows Explorer provides access to local files and applications. As another example, both use structures and tools to organize and navigate content. For example, websites use menus, links, and search bars whereas the Windows Explorer uses menus, links, and a search bar"); *see also* Ex. 13 (Holzen Affirmative Rpt.) at ¶¶ 127-129 (citing to his interview with Mr. Sherwood, noting: "In general, Mr. Sherwood informed me that Microsoft's use of its licensed patents in its Windows product is ***analogous and technically comparable*** to the use made by others in in website navigation); *see also* Ex. 17 (Holzen Reply Rpt.) at ¶¶ 26-29 (describing how "a user interacts with the patented features that are included in Windows Explorer to access local content, information, and data while a user interacts with the patented features included in the licensed websites to access third party content, information, and data).)  This discussion is further bolstered by Mr. Holzen's interview of Mr. Alan Loudermilk (the corporate representative for Plaintiff 511 Technologies) who is expected to "testify that Microsoft used the

---

[3] Defendants also claim that Mr. Sherwood does not "identify the 'licensed websites' or the prior defendants to which he refers, nor does he analyze any websites in his Reply Report."  (D.I. 270 at 45.)  This is false, as Mr. Sherwood explicitly identified these defendants via their agreements with Plaintiffs (Ex 1 (Sherwood Inf. Rpt.) at ¶992 n.147-149) and defined their websites as "websites operated, designed or developed by prior defendants" (Ex. 9 (Sherwood Reply Rpt.) at ¶ 225).  That Mr. Holzen has also identified those "licensed websites" in his report (Ex. 13 (Holzen Affirmative Rpt.) at ¶¶87-123) and cited to his interview with Mr. Sherwood regarding Mr. Sherwood's analysis of these websites (*id.* at ¶¶127-129; *see also* Ex. 17 (Holzen Reply Rpt.) at ¶¶26-29) in his reports further demonstrates the falsity of Defendants' claim.

Asserted Patents in the Visual Studio and Visual Studio Code products as well as in Windows Explorer." (*Id.* at ¶ 25.)

Based on his interview with Mr. Loudermilk and Mr. Sherwood (and his report), Mr. Holzen applied an adjustment to the Microsoft license payment to "account for differences in [the] licensed products" (i.e., adjustment #1 above). (*See* Ex. 13 (Holzen Affirmative Rpt.) at ¶¶ 127-129 ("Considering Mr. Sherwood's opinion that the technical features of a website are technically comparable to those of Windows Explorer, I account for the value of Microsoft's use of the plaintiff's patents in Windows Explorer by adjusting the price paid by Microsoft").) Thus, this is not an instance where Mr. Holzen relied on a license that covers technologies beyond the Patents-in-Suit nor one where he did not account for such differences in his calculations, particularly where, as here, Defendants have admitted that they compete directly with Microsoft's Visual Studio/Studio Code products, which makes the Microsoft Agreement even more comparable. (*See* Ex. 15 (Noll 10/20/23 Dep. Tr.) at 399:3-8 ("Q Who are the direct competitors of JetBrains, in your opinion? A *Its direct competitor lately is VS Code. That's the top competitor, and that is free. We also in some ways compete against Visual Studio. They have both free and paid versions*").)

### 3. Mr. Holzen's Opinions Regarding the Risk Utility Factor are Reliable

Defendants seek to exclude Mr. Holzen's opinions regarding the Risk Utility Factor. First, Defendants argue that this Risk Utility Factor of 2.1% is applied to "the residual amount of $640,000, which Mr. Holzen calculated using certain of the Eleven Settlement Agreements that he admits are not comparable." (D.I. 270 at 46.) This is factually false—Mr. Holzen does not rely on the Eleven Settlement Agreements to determine the "residual amount of $640,000," which, as Defendants' damage expert recognizes, represents the amount "attributable to Microsoft's 'use of its licensed patents for inclusion in Visual Studio and Visual Studio Code.'"

(Ex. 16 (Bakewell Rpt.) at ¶ 330.)  Instead, the agreements are referenced to determine the $160,000 figure, which is the value attributed to "Microsoft's use of its licensed patents in its Windows product"—an adjustment that is then subtracted from the Microsoft payment in order "to account for the differences in licensed products."  (*Id.* at ¶ 125.)  The net Microsoft payment (i.e., $640,000), which is the "residual consideration," reflects only the value attributed to Microsoft's Visual Studio and Visual Studio Code that compete directly with the Accused Products—the value that only matters in Mr. Holzen's market approach analysis.

Defendants also argue that Mr. Holzen purportedly "is unaware how Mr. Loudermilk determined the specific 2.1% risk adjustment factor" (D.I. 270 at 46) but this does not make Mr. Holzen's opinion unreliable because this is only one of several factors applied to Mr. Holzen's market approach analysis and he is entitled to base his opinion on what had occurred in the Microsoft litigation.  As. Mr. Holzen opines in his report, "[a]ccording to Mr. Loudermilk, Plaintiff risk-adjusted its expectations as to the value gained by Microsoft to accelerate and incentive Microsoft to take a license and in doing so to avoid the above-mentioned risks—and that this adjustment led Plaintiff to accept a lower fee in settlement than it would have if it had persisted in the ongoing litigation," which "Mr. Loudermilk informed me that Plaintiff's risk adjustment factor was 2.1% of Plaintiff's expected outcome of the litigation with Microsoft." (Ex. 13 (Holzen Affirmative Rpt.) at ¶ 133.)  In addition, Mr. Holzen separately confirmed the reliability of this "2.1%" adjustment factor by comparing it against industry statistics and determining it to be consistent and reasonable.  (*Id.* ("Such a risk adjustment is consistent with my experience, which is that patent litigation carries inherent risks for plaintiffs . . . Mr. Loudermilk's assessment of a 2.1% risk adjustment appears reasonable and consistent . . . .").)

Defendants do not attack Mr. Holzen's methodology for the market approach as

unreliable; instead, they complain only that this risk adjustment figure, which is one of several adjustments made by Mr. Holzen, is not supported—notwithstanding the fact that the adjustment Mr. Holzen made is supported by information provided to him by Mr. Loudermilk. But this is a matter for cross-examination, not evidentiary exclusion (i.e., that Defendants do not agree with this figure does not make Mr. Holzen's market approach methodology less reliable). Indeed, because Defendants do not challenge the reliability of Mr. Holzen's market approach analysis, the use of the risk adjustment factor as part of that analysis is, by extension, reliable. *See Intel Corp. v. Tela Innovations, Inc.,* No. 3:18-cv-02848-WHO, 2020 U.S. Dist. LEXIS 241022, at *102-103 (N.D. Cal. Dec. 22, 2020) (rejecting the defendant's motion to exclude the testimony of the plaintiff's damages expert regarding the "litigation risk adjustment" because "[the accused infringer] may ***probe this issue on cross-examination***, but it does not show that [the plaintiff's damages expert] used method that is unreliable within the meaning of FRE 702.").

Lastly, Defendants argue that "Mr. Holzen does not tie the Risk Utility Factor to the facts of this case" even though Mr. Holzen provided "industry data, including from PwC, Gibson Dunn, and Lex Machina reports" that are "'consistent with' Mr. Loudermilk's 2.1% risk adjustment factor" because "Mr. Holzen makes no attempt to tie that general industry data to the facts of this case." (D.I. 270 at 47.) But Mr. Holzen does not rely on the industry data to assess the litigation risk in this case. Instead, Mr. Holzen uses the industry data to show that the litigation risk in Plaintiffs' litigation against Microsoft would have been reasonable. (Ex. 13 (Holzen Affirmative Report) at ¶ 133 ("Mr. Loudermilk informed me that Plaintiff's risk adjustment factor was 2.1% of ***Plaintiff's expected outcome of the litigation with Microsoft***").) *See Intel*, 2020 U.S. Dist. LEXIS 241022, at *104 (rejecting the accused infringer's *Daubert* challenge to the patentee's damages expert's "comparison of the litigation risk discount to

48
**Appx3424**

overall litigation success statistics found in a report by PwC" because he "use[d] this case's particular facts to determine the risk adjustment and uses the PwC study to illustrate that the adjustment would have been reasonable to the parties.").)  That Mr. Holzen has also tied the risk adjustment factor to this case by pointing to record evidence showing that both *Microsoft and Defendants offer comparable products in the same industry* to similar customers undermines Defendants' argument that Mr. Holzen's opinion in this aspect is not tethered to this case.

### F.        Mr. Sherwood Should Not Be Precluded From Testifying Regarding TkDesk

As discussed in Plaintiffs' co-pending Motion to Exclude Certain Opinions and testimony of Mr. Myers Regarding Invalidity (D.I. 284), Defendants' technical expert, Mr. Myers, opined on patent invalidity based on Version 1.1 of TkDesk, which Defendants never disclosed during discovery—instead, Defendants had only disclosed Version 1.2 of TkDesk in their final contentions using *different* theories.  Faced with Plaintiffs' *Daubert* Motion and Motion for Partial Summary Judgment of No Invalidity for failing to authenticate the evidence it relies on regarding TkDesk (D.I. 280 (under seal), Defendants attempt to exclude Mr. Sherwood's opinions on TkDesk Version 2.0.  His opinions should not be excluded because: (1) they do not rely on TkDesk Version 2.0; (2) they simply rebut Mr. Myers' reliance on multiple, undisclosed versions of TkDesk and any supporting documentation; and (3) even if Mr. Sherwood's review of Version 2.0 is excluded, Mr. Sherwood should not be precluded from discussing, at trial, those portions of his opinions in his Responsive Report which did not consider Version 2.0.

Defendants accuse Mr. Sherwood's failure to cite Version 2.0 of TkDesk of being "fatal" to his opinions on TkDesk set forth in his Responsive Expert Report.  (D.I. 270 at 48.)  But Mr. Sherwood's opinions there are not based on Version 2.0 of TkDesk as Defendants lead this Court to believe.  Mr. Sherwood did not cite or address Version 2.0 of TkDesk in his Responsive Report—instead, he expressly confined his opinions to rebutting the prior art "TkDesk" cited by

Mr. Myers.  (Ex. 18 (Sherwood Responsive Rpt.) at ¶¶ 582-585.)  Mr. Sherwood confirmed at his deposition that he did not rely on Version 2.0 of TkDesk in preparing his Responsive Report, but did review it prior to his deposition.  (Ex. 19 (Sherwood 9/26/24 Dep. Tr.) at 142:3-144:17.)

Mr. Sherwood's Responsive Report focuses instead on Mr. Myers' improper reliance in his Opening Invalidity Report on multiple versions of TkDesk (i.e., TkDesk Versions 1.1 and 1.2) as well as various supporting literature, such as User Manuals, having apparent publication dates of 1996, 1998, 1999, 2001, and 2002 (Ex. 10 (Myers Opening Invalidity Rpt.) at ¶¶ 66, 67, 109), suggesting that the TkDesk software and literature he relied upon is not referring to a single version of TkDesk.  (Ex. 18 (Sherwood Responsive Rpt.) ¶584).  Notably, Mr. Myers acknowledged that he reviewed both Versions 1.1 and 1.2 of TkDesk, as set forth in his Opening Expert Report, (Ex. 3 (Myers 10/9/24 Dep. Tr.) at 67:13-71:12), with Version 1.1 having never been disclosed in Defendants' Final Invalidity Contentions.  (D.I. 284 at 3-4.)  Mr. Sherwood's review of Version 2.0 of TkDesk has no bearing on his opinions set forth in his Responsive Report.  To be sure, Mr. Sherwood testified that the day before his deposition, he reviewed a copy of TkDesk that was downloaded onto a laptop.  (Ex. 19 (Sherwood 9/26/24 Dep. Tr.) at 142:3-144:17.)  As he further testified, he did not rely on Version 2.0 in forming his opinions in his Responsive Expert Report, nor did he render such opinions on Version 2.0.  Indeed, he does not even list it as having been considered, let alone relied upon.  Rather, as noted previously, Mr. Sherwood responded to Mr. Myers's improper reliance on multiple versions of TkDesk in Mr. Myers's Opening Report.  There is no prejudice as Defendants have inspected his laptop containing TkDesk that he reviewed, and as discussed in Mr. Myers' Declaration.  (D.I. 276.)

## VI.    CONCLUSION

**For all of the foregoing reasons, Defendants' Motion (D.I. 270) should be denied.**

Dated:  November 8, 2024                    **DEVLIN LAW FIRM LLC**

                                           ***/s/ Andrew DeMarco***
                                           **Alex Chan (*pro hac vice*)**
                                           **achan@devlinlawfirm.com**
                                           **Alan Wright (*pro hac vice*)**
                                           **awright@devlinlawfirm.com**
                                           **Andrew DeMarco (No. 6736)**
                                           **ademarco@devlinlawfirm.com**
                                           **1526 Gilpin Avenue**
                                           **Wilmington, DE 19806**
                                           **Telephone: (302) 449-9010**

                                           ***Attorneys for Plaintiffs Caddo Systems***
                                           ***Inc. and 511 Technologies, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, I caused the copies of the foregoing to be served via electronic mail to all counsel of record.

*/s/ Andrew DeMarco*
**Andrew DeMarco**

52
**Appx3428**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

- China Patent No. CN1672122.

- China Patent No. CN101882052B

- China Patent No. CN1672122B

- German Patent No. DE10392790T5

- Spain Patent No. ES2265267B1

### C.    Benefits and Importance of the Asserted Patents

66.    In my opinion, the claimed inventions are designed to allow intuitive, efficient and effective navigation in order to optimize, for example, user retention and engagement, ease of use, ease of learning, search time, and the like.  Also, the subject matter disclosed in each of these patents is similar and offers comparable benefits. Specifically, each addresses limitations associated with conventional navigation and navigation systems, providing a more efficient, user-friendly, quicker and productive solution while minimizing screen real estate (*see* Everitt Dep. Tr. at 200:19:201-1 ("Q And when you say "UI clutter," can you please expound on that? Strike that. What do you mean by UI clutter? A In PyCharm you have an amount of information that can be visible on the screen and you want to give that space to the things that are valuable. And things that don't have enough value"))—real estate that is valuable for displaying critical content (more below). The patented technologies also benefit both software developers, end-users and the like by improving the overall coding experience and reducing costs associated with training and support. My understanding of these conventional technologies, their drawbacks, and the way the patented inventions overcome these drawbacks is detailed below.  As further explained below, the method of providing graphical user menu systems (or generating graphical menu items or graphical menu interface) and constructing active paths and active links (or a graphical user interface that includes one or more selectable links), as disclosed in the claimed inventions, provide many important benefits, particularly in field of software user interfaces and

21

**Appx3449**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

code base navigation.  As discussed above, while I discuss these benefits by category below, many of these benefits are intertwined and all ultimately serve similar purposes: providing an easier, better, more understandable method of creating unique interfaces to facilitate the ease of navigating complex information structures, which in turn addresses known issues in the prior art, increases user efficiency (including accessing functions or locating certain content, be it source code or source code libraries), and reduces search times (including finding a specific portion or portions of source code in a complex code base or accessing critical libraries for efficient software coding).  *See* Everitt Dep. Tr. at 207:14-16 ("Q If you have to press down arrows a bunch of times, would it impact your work efficiency? A It would have an impact"); *see also id.* at 105:17-21 ("Q What are you trying to achieve in giving audience tips on how to navigate -- or how to activate the navigation bar on demand? A To perform a set of goals efficiently without distraction."); *id.* at 139:11-19 ("Q What other operations are available through the navigation bar? A The next sentence is an illustration in PyCharm, at least. Refactor This is another operation. Delete is another operation. Q Do you recall one of the features we talked about is refactoring. Is this what you were referring to? A Yes.").

67.    As discussed in the specification, prior to the claimed inventions, users performed navigation using collapsing menus and path menus. Collapsing menus start at the root level and collapse after each selection. Path menu systems require users to manually input the precise path to a file or directory.  These conventional navigation methods were time-consuming because they required a user to repeatedly navigate from the root level. These conventional navigation methods were also error-prone because users had to memorize and manually enter complex hierarchical sequences

22

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

68.     The Asserted Patents overcome these drawbacks using an "active path." The "active path" creates a sequence of "active links" that provide users with direct access back to a previously selected menu item without returning to the root.  Additionally, the Asserted Patents offer pre-defined shortcuts that enable users to directly access specific menu items and by automatically constructing an "active path."

69.     In sum, the Asserted Patents offer a user-friendly and efficient method of navigating a hierarchical structure. The "active path" allows quick access to frequently used or deeply nested items, eliminating the need to start from the root each time. The patented invention is also more intuitive than conventional technologies because they permit users to employ their existing knowledge of the menu structure to make navigation less prone to errors.

### i.     Known Issues in the Prior Art Addressed By the Benefits of the Asserted Patents

70.     As I have already opined above, conventional operating systems employed solutions with usability issues, among other things.  With the "collapsing" method, the "navigation always commences from the initial or root level," and the menu collapses back to the root level after a selection is made."  (*See, e.g.,* '411 patent at 1:27-30; '880 Patent at 1:29-36.) As a result, users were required to start from scratch before arriving at the same folder, database, structure, web page, or destination that could be many nodes below the root level.  Other conventional solutions also suffer from similar usability issues because they required users to memorize and enter complex hierarchical sequences—they must trace and retrace each step in the hierarchical menu or folder structure to reach the same destination.

71.     Another key disadvantage of the conventional solutions is that they keep important content, data, items, libraries, or features hidden, making them less discoverable (that is, if they were discoverable at all).  In order to see the options available to them, end users have

23

**Appx3451**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

to click or tap different parts of the tree menu or collapsing menu system. The nature of a collapsible tree menu or system is to hide or conceal the content or topics so as to, for example, save real estate or screen space. In doing so, these conventional solutions are actually counterintuitive to allowing end users to search and locate the desired content.

72. For example, Jakob Nielsen provides that the "main problem" with conventional menu systems that are able to show many levels of navigational hierarchy (depth) while listing all alternative options for each level (breadth) is that "it takes up a lot of space on the screen." *See* Designing Web Usability (Nielsen, 2000) at 206-207. Thus, in my opinion, a key issue in the prior art was creating a method of navigation for menu systems that demonstrated the depth and breadth of, for example, a folder structure or website, without taking up too much screen space.

73. Additionally, in my opinion, conventional solutions, such as the tree menu, unnecessarily increase user interaction cost as they require users to make extra effort to find the content they are looking for or navigate to where they want to go. These conventional solutions are also difficult to use on mobile devices because of the limited display real estate, adding to the difficulty of interaction. This leads to, for example, poor usability and increased user frustration. Because menu items are generally hidden in these conventional solutions, such solutions also offer lower usage and engagement rates compared to visible navigational paths.

74. These benefits of being able to traverse and view all hierarchical levels of, for example, a folder structure, a code base, or website, address further issues identified, but not resolved, by the conventional systems of the time until the claimed inventions. For example, one of the identified disadvantages of using a breadcrumb for navigation purposes is that "[b]readcrumbs *alone* were not a sufficient navigation scheme." *See* Don't Make Me Think

24

**Appx3452**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

(Krug 2000) at 77. Prior to the claimed inventions, breadcrumbs were insufficient because breadcrumbs did not show at least the top two layers of the hierarchy and because they did not "reveal enough" about navigation. (*Id.* at 77.) As Krug states, breadcrumbs "give you a view, but it's like a view with blinders." (*Id.* at 77.) Krug further limits the use of breadcrumbs as only providing a "consistent way to do two of the things you need to do most often: back up a level or go Home." (*Id.* at 77.) As discussed below, the claimed inventions improve upon this conventional use of the breadcrumb.

75.   This sentiment is echoed by Jakob Nielsen, who gave the following example of a breadcrumb trail with "the advantage of showing all the levels (particularly good for a deeply nested article like the one in the figure) but has the disadvantage of not showing the neighboring alternatives." *See* Designing Web Usability (Nielsen, 2000) at 213.

76.   As discussed below, the aforementioned "disadvantage of not showing the neighboring alternatives" (*id.* at 213) is ***precisely*** one of the benefits provided by the claimed inventions. The claimed inventions allow a user to provide a graphical user menu system (or generating graphical menu items or graphical menu interface) and constructing active paths and active links (or a graphical user interface with one or more selectable links), and browse active links up and down the active path, including "neighboring alternatives" in the form of sibling and children menu items, as the user navigates the active path and without the need for additional user interaction or "clicks," and are able to do so far more easily than in conventional solutions. This is due, in part, because the claimed inventions allow the end user to display one or more items of a given item of an information structure on hierarchically sibling or subordinate levels without affecting the active path, thereby allowing the end user to continue browsing through a code base's, a website's, a document's, a folder's, an information structure's, or a database's

25

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

content and showing the "neighboring alternatives" without forcing the end user to leave the active path.

### ii. Known Issues in the Prior Art Addressed By the Benefits of the Asserted Patents

77.    One benefit of practicing the claimed inventions is that users are provided with the ability to easily traverse and view all hierarchical levels of a code base, website, document, folder, structure, or database with the active path visibly displayed throughout their trackable journey to various parts of the code base, website, document, folder, structure, or database.  This differs significantly from conventional solutions, including those discussed above, which typically only provide a passive display of a path menu system.  By offering an active path for accessing source code (*e.g.*, a source code file, a library,  data structure, a framework, or a coding structure such as algorithm, argument, array, class, event, and syntax), web pages, documents, folders, structure, or databases, end users are now able to navigate to other parts or areas of the code base, website, document, database, or complex folder system, including previously-visited places and new places where users might not have known or visited before, with far greater ease and convenience than conventional solutions.  For example, the claimed inventions allow end users to effortlessly create new items (including directories, files, classes, and menu items), open files (*e.g.*, either through the graphical user menu system/graphical menu items/information structure or active path/link/graphical user interface), navigate between different source code libraries, files or code fragments, reset their navigation path and start over when desired, or locate other useful resources not previously known or visited (*e.g.*, source code libraries, new models, extensions not previously known or visited to end users).

78.    Navigation in general, however, requires orientation cues in the same way that a ship requires light beacons (*e.g.,* from nearby light houses) to guide its way in a thick cloud of

26

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

heavy fog. For end users, following a few link paths can cause them to quickly lose track of their location within a complex structure of a code base, website, document, folder, structure, or database. This problem is particularly pronounced in large code bases containing hundreds of components (e.g., definitions, calls, methods, descriptions or functions), tens of thousands or hundreds of thousands of lines of source code, large documents, websites, or folders with hundreds or even thousands of items, or a sophisticated database. Thus, another benefit of practicing the claimed inventions is that end users are provided with clear orientation cues to minimize confusion and maximize efficiency. When end users get interrupted or lost or when their work is interrupted (a point to which Mr. Everitt testified; Everitt Dep. Tr. at 104:12-19 ("Q And what is the purpose of turning off unnecessary space elements? A To have no UI distractions and hands on the keyboard. Q And what does it have to do with not wasting screen UI space? A To have no UI distractions and to keep your hands on the keyboard.")), the claimed inventions help set the boundaries and remind end users where they are within a complex code base, website, document, folder, structure, or database.

79.     As stated in my opinion above, end users want to find what they need easily and quickly. This is especially true for those with visual, mobility, or cognitive impairments or challenges who may find it more difficult to determine where they are within a code base, website, document, folder, structure, or database and how to get to where they want to go or what they want to find. As they explore further into a complex code base, website, document, folder, structure, or database, orientation becomes increasing important in order to help end users stay on track by telling them where they are at any given moment within the code base, website, document, folder, structure, or database. Practicing the claimed inventions provides benefits similar to those provided through the use of "You Are Here" that is typically printed in maps for

27

**Appx3455**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

shopping malls, zoos, museums, or amusement parks (and also locate other areas of interest not previously known such as certain stores within a mall, certain new animals within a zoo, certain new exhibits within a museum, or certain amusement rides within an amusement park).  A map without orientation cues requires users to identify their location on a map by looking for nearby landmarks, which is not always achievable, and even harder in the context of menu navigation because those landmarks are not always discernable or visible.  Practicing the claimed inventions helps end users stay on track by using wayfinding orientation cues to tell users where they are in the overall context of that code base, website, document, folder, structure, or database without any prior knowledge or familiarity of the code base, website, document, folder, structure, or database.

80.     By providing end users with these wayfinding orientation cues, the claimed inventions allow end users to "accommodate and support user-controlled navigation."  *See* Designing Web Usability (Nielsen, 2000) at 214.  As a user cannot find the content they need without navigation, the claimed inventions thus provide users with a greater ability to navigate through a given code base, website, document, folder, structure, or database.  (*See* Site-Seeing: A Visual Approach to Web Usability (Wroblewski, 2002) at 46.)  In my opinion, this in turn leads to higher user retention and engagement with the code base, website, document, folder, structure, or database, which is of enormous benefit to any code base seeking to achieve a complex or sophisticated software application, website seeking to increase its web traffic (including for e-commerce purposes), database seeking to increase usage and user engagement, or document, folder, or structure seeking to improve content access or searching, for example.

81.     Thus, the claimed inventions provide the benefit of being a powerful element to improving the three E's (namely, efficiency, experience and engagement), as the user navigates

28

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

the graphical user menu system/graphical menu items/information structure and the active path/graphical user interface, including by providing a graphical user menu system/graphical menu items/information structure and constructing an active path/graphical user interface with one or more selectable links that tether to the graphical user menu system/graphical menu items/information structure, and creates an increase in user interaction and engagement while simultaneously providing a greater understanding of the complex code base, website, document, folder, structure, or database.

### iii.    Benefit of the Ease of Use and Ease of Learning

82.    Another benefit of practicing the claimed inventions is that graphical user menu systems/graphical menu items/information structures and active paths support code base, websites, documents, folders, structures, or database with complex information architecture, such as that of a large code base with large amount of source code, an e-commerce website in which a large variety of products and/or services are offered and/or grouped into logical categories, or a large database in which a large amount of structural or non-structural data is stored.  Active paths can be used to support a variety of user tasks and modes of information seeking, including known-content seeking, new content exploration, and re-locating existing content.

83.    Using a code base as an example, the claimed inventions offer the unique benefit of allowing software developers to view a project from various vantage points within a code base and perform different tasks such as adding or modifying source code files (*e.g.*, directories and classes) or accessing or incorporating other source code files (*e.g.*, through the graphical user menu systems/graphical menu items or graphical menu interface), or finding, searching or locating a specific code fragment within the code base (*e.g.*, through the graphical user menu systems/graphical menu items/graphical menu interface or active paths/graphical user interface),

29

**Appx3457**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

or accessing previously known resources (*e.g.*, tools, libraries, and files through the active paths/graphical user interface), all with maximum efficiency and minimal distraction.

84.    Using an e-commerce website as another example, the claimed inventions offer the unique benefit of allowing end users to access within and between different product or service categories, including finding existing products/services, learning about new product or service offerings, and discovering other products or services not previously known to those end users, and doing so with greater ease and control.

85.    The claimed inventions can further be used to minimize complex interactions, which cuts down on the time required for developing, modifying or debugging source code (Everitt Dep. Tr. at 205:25-206:2 ("Q: Why don't developers want to press down arrow a bunch of times? A: It takes a long time."); *see also id.* at 206:14-18 ("Q: Do you prefer to press the down button a bunch of times? A: No. Q: Why not? A: It's extra work."); *see also id.* at 207:14-16 ("Q: If you have to press down arrows a bunch of times, would it impact your work efficiency? A: It would have an impact.")), or web users who are not willing to take the time to learn something new and would prefer to use methods they already know.  *See* Site-Seeing: A Visual Approach to Web Usability (Wroblewski, 2002) at 87, 91.  Thus, one of the benefits of the claimed invention is that it incorporates a simple and already familiar navigational tool users are familiar with.  The claimed inventions thus improve upon a known method of navigation by providing graphical user menu systems (or generating graphical menu items or graphical menu interface) and constructing active paths and active links (or a graphical user interface that includes one or more selectable links) that allow end users to navigate, while simultaneously viewing hierarchically siblings and/or subordinate items so that users may have an increased ease of use and greater sense of navigation.  *See* Designing Web Usability (Nielsen, 2000) at 206.

30

**Appx3458**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

86.    Another benefit of the claimed inventions is that graphical user menu systems (or generating graphical menu items or graphical menu interface) and active paths/links/graphical user interfaces are easily understood and discernable by end users.  This is because of the relatively consistent way they are rendered in code base, websites, folders, structures, databases, and the like.  This consistency means that people know one when they see one, and immediately know how to use it.  *See, e.g.*, Everitt Dep. Ex. 24 ("It's an indisputable (alternative) fact that, since Before the Dawn of Time™, or at least since GU ls became in vogue, file explorers are an essential part of any programming tool. Gotta browse them trees. It's impossible to imagine not having your directory browser open in something like PyCharm's Project Tool.")

87.    As expounded above, consistency breeds familiarity and predictability, which leads to improved usability and allows users to complete tasks more accurately and pleasantly, such as finding existing code fragments, learning about new source code development tools, and discovering other source code files, extensions or libraries not previously known to those end users as discussed above.  Their familiarity of certain components of the claimed inventions thus only increases the ease of use and learning for utilizing the claimed inventions of the Asserted Patents.  Practicing the claimed invention also helps improve usability because the claimed inventions show users exactly where they will be taken to upon hovering a particular link or menu—offering a preview of meaningful information to the end users and allowing uninterested content to be filtered and interested content to be located visually all without first accessing or being directed to the content, which maximizes efficiency and minimizes distractions.

88.    For example, practicing the claimed inventions allows end users to roll over an active link with a pointing device or selecting an active link using a pointing device to generate a preview of similar categories of information on the same level or code/product/service relating to

31

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

the same category. As an example, under an active link in the Navigation Bar labeled "examples" (in the video

https://www.youtube.com/watch?v=h6s20RMLIXk&ab_channel=PyCharm%2CaJetBrainsIDE),

end users can preview all types of available python folders and files) by simply putting the mouse over the link. By allowing users to roll over an active link, their quality of navigation is also improved as their sense of orientation is maintained until after a selection of a displayed menu or sub-menu has been made. Whether rolling over or making a selection, the Navigation Bar is not affected by the users' browsing. This is another benefit of practicing the claimed inventions as user's browsing is not interrupted until they are ready to be directed to other file, extension or content.

89.    The above-mentioned benefits and embodiment of the claimed inventions thus addresses an issue in the prior art and provides the "best way" to avoid having a user confused and not being able to find what they are looking for—by having an approachable navigation system that "tells" the audience how to get around. *See* Site-Seeing: A Visual Approach to Web Usability (Wroblewski, 2002) at 47. Because the claimed inventions show users exactly where they will be taken to upon hovering a particular link or menu—offering a preview of meaningful information to the end users and allowing content to be located visually all without first accessing or being directed to the content— the claimed inventions "tell" the audience how to get around or navigate in a manner that is "understood at a glance," all while being consistent the notion that any navigation approach must be "clearly labeled and easy to navigate." (*Id.* at 119.)

90.    This ease of use or making sure information within a code base, website, document, folder, structure, or database is self-evident, is yet another benefit of the claimed inventions. As Jetbrains' witness, Mr. Noll, acknowledges, it is important that users are

32

**Appx3460**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

provided methods of navigation, such as the ones in the claimed inventions, that are easy for the user to use and understand. (*See, e.g.*, Noll 10/19/23 Dep. Tr. at 120:19-121:8 ("Q: Okay. Why does JetBrains enable the project tool window by default, given that there are other features that are not enabled by defaults? A: Well, so in most -- I think traditionally in most IDEs, most software developers are really comfortable with a view like that. So, you know, just goes back years and years and years. Customers, users being able to navigate a project and look at inheritance, look at a project view, look at the files associated with things in a very easy way. . . . ."); *see also* Everitt Dep. Tr. at 79:23-80:17 ("Q: Actually, we will go through some of those videos, by the way, but let me just ask you a different question. To your knowledge, is user interface important? A: Yes. Q: Why is it important? A: It is important because it's the means that the user engages the functionality of the software. Q: Is UI important to JetBrains customers? A: I can't answer. Q: Have any customers informed you that user interfaces are not important? A: No. Q: Is it important to have user-friendly user interfaces? A: Yes. Q: Why? A: Users need to find and discover the functionality.")

91.     This is one of the benefits of the claimed inventions, as users may easily understand the structure of a code base, website, document, folder, structure, or database and the navigation within the code base, website, document, folder, structure, or database. It is important to make sure the code base's, website's, document's, folder's, structure's, or database's information hierarchy is intuitive and the navigation structure is simple in order to achieve the important function of ease of use.

92.     A natural extension of, and additional benefit of the claimed inventions, is that by providing an easier method for users to navigate and understand the taxonomy of a code base, website, document, folder, structure, or database, it is easier for end users to locate content of

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

interest—thereby increasing the value of the source code (which also facilitates easy future update or upgrade), website, document, folder, structure, or database.

### iv.    Unnecessary Action or Click Reduction

93.    This leads to another benefit of the claimed inventions, which is the reduction of unnecessary actions or clicks required to go or return to other code fragments, websites, documents, folders, structures, or databases.

94.    As an example, in an example involving source code, software developers want to minimize unnecessary actions (*e.g.*, actions unrelated to code writing) in order to "stay in the flow" during coding.  Everitt Dep. Tr. 104:20-105:11 ("Q: Two sentences down it says, "Sometimes you need to work with files and directories. How can you stay in the flow when navigating your files." Do you see that? A: I do see that. Q: What do you mean by that? A: When you want to operate on files and directories, there are lots of different kinds of operations you might want to do and PyCharm and WebStorm provide many different facilities for different kinds of operations. For one particular kind of operation I was showing this technique for performing it. Q: And when you say "stay in the flow," what do you mean by that? A: To have -- to reduce distractions. The matters that we covered previously."); *id.* at 174:3-14 ("Q: Now right below, it says, "Need a fast way to find files in a path without disrupting your flow." A: Uh-huh. Q: I'm sorry for being repetitive but what do you mean by a statement about disrupting a flow? A: If you're in the middle of a programming task and you have some secondary thing to do, you want to go off and do it and come back, you want that to be as short and least destructive as possible so you don't lose focus on the problem you're solving.").

95.    This concept of staying in the flow is consistent with Jetbrains' "developer ergonomics" design principle that the accused products should be designed "with ergonomics in mind": "Every aspect of lntelliJ IDEA is designed with ergonomics in mind. lntelliJ IDEA is

34

**Appx3462**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

built on a principle that *every minute a developer spends in the flow is a good minute, and things that break developers out of that flow are bad and should be avoided*. Most of the time the editor (and the code) is the only thing visible on the screen, and the developer doesn't need to leave it to do something that isn't coding-related. lntelliJ IDEA offers dedicated keyboard shortcuts for nearly everything." CAD_JET041212.

96.    In the example of a website, traditionally, the "back" button is used to achieve page revisitation.  The "back" button, however, does not always maintain the true temporal ordering.  Consider a user has visited the following web pages in this order: A, B, C, D, E, D, C, and F.  The order of pages as seen by a web browser is: A, B, E, D, C, and F.   The history list, however, reflects only A, B, D, E, C, and F.  The longer the navigational paths traversed by the end users, the bigger inconsistencies between the content of the history list and the order in which those web pages were visited by those end users.  Using the "back" button does not reflect the true time-based sequence of pages seen.  Additionally, using the "back" button means that extra navigation, or revisiting, through intervening children is required *(i.e.*, not "ergonomics").  Instead of using a browser's or database system's "back" button to sift through pages or documents already visited or return to a previously visited web page, folder, document, or database, practicing the claimed inventions allows users to get to retrace or backtrack their website journey with fewer numbers of clicks by toggling between different dropdown menus or active links along the path.

97.    As written by Luke Wroblewski, the "biggest disadvantage to most drop-down, dynamic, or cascading menus is that they require user action to 'tell' you what they have to *offer*.  A user must roll over the appropriate menu item in a cascading menu or click to activate a drop-down menu.  This extra step can be a particular disadvantage when you're trying to provide your

35

**Appx3463**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

audience with an understanding of your site's contents or when you're trying to draw them into certain areas. Breadcrumbs, on the other hand, while providing an account of the path a user followed, do little to provide an awareness of the rest of the site." *See* Site-Seeing: A Visual Approach to Web Usability (Wroblewski, 2002) at 55-57.

98.     Thus, one of the benefits of the claimed invention is that it goes against the known prior art and conventions by, for example, combining the rolling over of a menu item in a cascading menu and/or the activation of a drop-down menu through a click in the active path, which in turn reduces the number of clicks for a user in order to successfully navigate and understand the full complex information hierarchy.  This in turn reduces the number of unnecessary actions or clicks.

99.     As Jetbrains' witness, Mr. Everitt, acknowledges, this is an important benefit of the claimed inventions because by reducing the number of actions taken by end users.  (*See* Everitt Dep. Tr. at 107:14-23 ("Q: How would customers -- strike that. How would developers be kept out of flow if they don't know how to activate the navigation bar? Strike that. What is the intent here by giving instructions on how to activate the navigation bar? A: The intent is when you need to do a certain set of things, here is a choice to do it and then go back to what you were doing."); *id.* at 124:24-125:7 ("Q: Right underneath, it says, "Need a fast, no-distraction way to open a file in your project tree." Do you see that? A: Yes, I do. Q: Earlier you testified about keeping them in the flow. Is this consistent with what you mean by no distraction? A: This is one of those techniques, correct."); *id.* at 200:7-18 ("Q: And right below, it says, "We've discussed getting into the flow by reducing UI clutter and being keyboard focused. We're using the navigation bar on demand to get to targets in our project tree." Again not to be repetitive but here it says "getting into the flow." Is that consistent with your prior testimony about keeping the

36

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

developers focused? A: Yes. Q: And not distracted? A: Yes."); *id.* at 209:23-210:15 ("Q: Got it. The top of page two it says, "This becomes a very fast workflow for speeding through the navigation bar, all without using the mouse. Moreover, speed search is a pervasive pattern in the IDE." Let's just start with the first part of that sentence. Why would it be a very fast workflow for speeding through the navigation bar? A: I will just say anecdotally most developers likely will encounter directories with a lot of items in it, and when you're faced with a lot of items and something is further down the list, it felt like a pattern common enough to instruct. You're going to encounter long listings, and the thing you want is going to be further away than you want it to be, and that is the bull's eye for this tip.")  Hence, reducing the number of unnecessary actions while getting to the content of interest allow end users to get the desired information quickly, efficiently, and effortlessly.

### v.    Benefit of Saving Screen Space Or Screen "Real Estate"

100.    Another benefit of practicing the claimed inventions is that more screen real estate can be preserved than conventional menu systems.  General design principles advocate the need to conserve screen real estate for valuable content.  According to Jakob Neilson of the Nielsen Norman Group, page content should account for at least 50% of a page and ideally 80%.  (*See* Designing Web Usability (Nielson, 2000).)  For example, in the case of an active path, because an active link and its active link(s) are horizontally oriented and plainly styled, they occupy the least space in a code base, website, document, folder, structure, or database with their inconspicuous font size.  As such, the claimed inventions yield more real estate space for use in displaying valuable content (be it source code fragment, product, service, and the like) all the while providing end users the efficient navigational means to review, find, or re-visit such content.  Because the claimed inventions do not require extensive or sophisticated styles (and because the graphical user menu systems/graphical menu items/graphical menu interface work in

37

**Appx3465**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

tandem with active paths/links/graphical user interface), they improve loading times in comparison with conventional solutions with complex backend infrastructure that contribute to slow load times.

101.    According to Luke Wroblewski, while the internet lacks any real "physical space," consistent navigation elements are still required to provide "you are here" indicators for users to find their way around a website, and must be included in all web pages.  (*See* Site-Seeing: A Visual Approach to Web Usability (Wroblewski, 2002) at 50.)  Conventional methods using breadcrumbs provide this required navigation, with the benefit of "taking up minimal space on the page, leaving the most of the precious pixels for conduct."  (*See* Designing Web Usability (Nielsen, 2000) at 206.)

102.    In contrast, the claimed inventions improve upon the conventional use of breadcrumbs by disclosing a method of providing graphical user menu systems/graphical menu items/graphical menu interfaces and constructing active paths/links/graphical user interfaces to facilitate navigation of menu structures as the active links are being navigated.  This allows end users to navigate up and down an active path trail, without the need to go back to the graphical user menu systems/graphical menu items/graphical menu interfaces.  This provides the additional benefit of expanding the active path to provide a sense of context and scale, without taking up "precious screen space" or very little space on the page, while still allowing end users a greater sense of navigation and orientation of the code base, website, document, folder, structure, or database.  This is inconsistent with Mr. Noll's and Mr. Everitt's testimony.  *See, e.g.*, Noll 10/19/23 Dep. Tr. at 109:16-110:12 ("Q: The next paragraph, it says, "The main motivation for this feature was to reduce the necessity of using project view which takes quite a lot of screen space. We have found out that in most cases we access the project view not to browse but rather

38

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

to invoke some action, Find in Path Inspect Code and so on, on one of the packages containing the currently open file." And it goes on and concludes it and says that, "The navigation bar provides a much quicker access to such actions, and allows the left sidebar to be occupied by a different tool window." Same question. To your understanding, does this motivation apply to at least the navigation bar in 2022 or prior? A: So our customers are always looking for alternative ways to be more effective, so that includes customizing the environment. And yes, that includes if they want to save their real estate, eliminating the project view so it's still indoors, yes."); Everitt Dep. Tr. at 88:3-5 ("Q: Have you ever mentioned about saving screen estate[sic] in any of your videos? A: I have."); *id.* at 89:8-11 ("Q: In your videos have you advocated the use of the navigation bar to help customers reduce screen estates[sic]? A: Yes."); *id.* at 181:15-19 ("Q: Can you give me several-use cases where developers want to hide the project tool window and use the navigation bar as an alternative? A: Screen real estate and keyboard focus. So the two that I discuss in these tips."); *id.* at 183:10-24 ("Q: In the very last paragraph on the same page you mentioned, "Just like you would in the project tool except no permanent real estate lost and the navigation bar appears/disappears on command." What does that mean? A: That is a sequence of things that I can't answer all in one. Q: Well, let's start with no permanent real estate lost and navigation bar appears/disappears on command. What do you mean by that? A: It's repeating points from the previous tips that you reduce clutter by hiding the project tool window and hiding the navigation bar because neither of them are valuable enough to have on the screen all the time.").

### vi.    Benefit of Reducing User Search Time

103.    From users' perspective, navigation plays a critical role in determining the extent and scope of use of a code base, website, document, folder, structure, or database by end users. From the design standpoint, good navigation should address important questions end users may

39

**Appx3467**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

have when first coming to a complex code base, website, document, folder, structure, or database, such as "does it have what I need or what I'm looking for?" or "how or where can I find what I need?" If users are unable to find the content they seek or locate signals within the code base, website, document, folder, structure, or database that the desired content could be found with ease, they are more likely to leave, abandon, or exercise little to no interaction with the code base, website, document, folder, structure, or database. Thus, another benefit of practicing the claimed inventions is that end users are given unique insights as they traverse through a complex code base, website, document, folder, structure, or database or one with a large information structure. In doing so, the claimed inventions help improve user engagement and user retention, and reduce bounce rates (*e.g.*, in the case of a website). A bounce rate, as is commonly known, represents the percentage of users or visitors who visit a website and then leave rather than continuing to view other pages or engage in other activities within the website. The benefit of practicing the claimed inventions is that it entices, retains, and/or engages users after they have visited the landing page by allowing them to browse, select, and review a wide spectrum of, for example, topics, products, services, or content of interest without requiring them to search or go through deep links or pages.

104.    According to Jakob Nielsen of Nielsen Normal Group, the average web page visit lasts less than a minute, and in order to increase that, companies "must clearly communicate your value proposition within 10 seconds." In other words, valuable proposition must be readily ascertainable as soon as end users arrive on a web page. This proposition equally applies to a code base, document, folder, structure, or database in order to help users identify what is available and where to access resources to complete their tasks. Thus, allowing end users to find suitable content, functions and resources, for example, quickly and easily through the practice of

40

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

the claimed inventions achieve this objective. In addition, the claimed inventions minimize user frustration, stress, and anxiety caused by, for example, navigation disorientation, inability to find relevant or desired content, functions and resources quickly, and backtracking issues (my opinion on this issue is further discussed below), which in turn improve user retention as they are being guided throughout their journey. User frustration, stress, and anxiety associated with time taken to navigate a code base, website, document, folder, structure, or database was a well-known concern at the time of the invention. For example, many commercial vendors offered products (*e.g.,* WebTrends) to track the time users took to navigate an organization's website, the path they took through the website, and the point at which those users left the website to measure the user engagement and drive user-specific adoption metrics.

105. For example, software developers are working on a code base where they can't readily find or access available libraries or the appropriate libraries from which they could add specific functionalities to their code or programs. In that case, they will go through each folder or library to find the exact function(s) or object(s) that they need for their code, which is extremely time consuming and labor intensive, which frustrates developers and increase the likelihood of abandoning the code or seeking assistance elsewhere. The claimed inventions allow these users to look at the entire code base with a bird's eye view without diverting from the current path or going through each folder in the project tree, as they are able to view all the available libraries or functions contained in these libraries through the active links.

106. As another example, if users have reached a web page that they are not interested in, they will either bounce or go back to the previous page to start their search over again. The claimed inventions allow a user to being their search over again without affecting the active path, as they are able to browse the other menu items on the active paths through the active links, and

41

**Appx3469**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

will thus not bounce. This is just one example of the additional benefit of reducing the bounce rates of a website's users.

107.    Thus, another benefit of the claimed invention is to reduce anxiety about what to expect when navigating a code base, website, document, folder, structure, or database, as end users are able to tell exactly where they are going or may go, how many steps are involved in the process, and simultaneously allow these users to go back to any of the previous, for example, file, location, extension, directory, subdirectory, web page, document, folder, structure, or database through the graphical user menu system/graphical menu items/information structure and/or active path/graphical user interface. This in turn provides the users with a sense about the commitment, time, and effort required from the users to navigate through the code base, website, document, folder, structure, or database, while simultaneously providing content and context to the users' journey.

108.    By giving users these unique insights as they traverse through a code base, website, document, folder, structure, or database or one with a large information structure and allowing users to easily see sibling and subordinate menu items in advance or as they navigate, the claimed inventions allow users to more easily see where they can and may go without the needing to make a firm decision (and not until they have seen all the options available to them). In doing so, the claimed inventions help improve user engagement by reducing search times required to search for the desired content, location, file, directory, web page, document, folder, structure, or database as well as bounce rates (and frustration, stress, and anxiety that come with long search times and high bounce rates).

### vii.    Benefit of Providing Actionable Intelligence

109.    In the same vein of reducing user search times and bounce rates, the claimed inventions offer the additional benefit to users of actionable intelligence on the likely

42

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

commitment (time and effort) required to go through the code base, website, document, folder, structure, or database by displaying a trackable trail of places visited or not-yet visited before making an informed decision as to whether and where to proceed upon arriving at a particular code fragment, directory, subdirectory, file, web page, document, folder, structure, database and the like.

110.    Practicing the claimed inventions also helps reduce unintended code fragment, directory, subdirectory, file, web page, document, folder, structure, or database views that could skew the determination of what the end users are interested in, how well the fragment, directory, subdirectory, file, web page, document, folder, structure, or database is optimized for search, and what the user behavior trends are.  With the claimed inventions, end users are less likely to visit unintended or uninterested fragment, directory, subdirectory, file, web page, document, folder, structure, or database in between the origin and the final destination, which in turns make traffic analytics (*e.g.,* web traffic analytics in the context of websites) more accurate for measuring the performance of a particular website or database (e.g., usage statistics).

111.    Also, in the context of web, as written by Steve Krug, the ability to cut-down on the "mental chatter" a user must expend to understand a website, even if it "takes place in a fraction of a second," should be taken whenever possible.  *See* Don't Make Me Think (Krug 2000) at 16-17.  In my opinion, the active path of the claimed inventions helps counteract this "mental chatter" of the "lost in space" feeling a user may have on a website, as the active path demonstrates to users where the user is located in the active path without the need for additional "clicks" or navigation apart from the active path.  (*Id.* at 74-75.)  This opinion also applies to software coding development environment as well as navigation within a document, folder, structure, or database.

**Appx3471**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

112.    This actionable intelligence, as provided by the claimed inventions, allows users to spend less time and effort committing to understanding and navigating a code base, website, document, folder, structure, or database, as the hierarchical display of information is readily visible and available as they navigate using the claimed inventions.  This is an important benefit of the claimed inventions, as both Jetbrains's documents and corporate witness testimony reflect that it is important for users to be able to find the information they are looking for quickly and efficiently.

### D.    The Project Tool Window and the Navigation Bar

113.    The Project Tool Window displays the "tree" of a software project or application along with its dependencies.  It also allows users to create new classes, files, and folders, add frameworks, rename and relocate items, for example. In layman terms, the Project Tool Window provides end users with a unique ability to look at the structure of the entire code base from various viewpoints and allows them to perform different tasks such as creating new items (directories, files, classes, and so on), opening files in the editor, navigating to the necessary code fragments, and more.  The Project Tool Window is critical to software development because it "shows you all its components including modules, directories, packages, classes, libraries, SKDs and so on." (*See* Noll Dep. Ex. 4 at CAD-JET040979.)  In essence, the Project Tool Window displays all files, folders, modules, libraries and other resources within a code base or software development project in a "tree like" manner.  The Project Tool Window also provides unique and quick access to other features critical to software development, which helps maximize user efficiency and minimize unnecessary distraction that could disrupt code development.  For example, the Project Tool Window allows end users to quickly navigate through their codebase, manage software files or directories, access and search for unique resources, and visualize the

**Donna Allaband**

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Thursday, January 30, 2025 4:11 PM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-01033-JLH-LDH Caddo Systems, Inc. et al v. Jetbrains Americas, Inc. Oral Order |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Delaware**

**Notice of Electronic Filing**

The following transaction was entered on 1/30/2025 at 4:11 PM EST and filed on 1/30/2025

| | |
|---|---|
| **Case Name:** | Caddo Systems, Inc. et al v. Jetbrains Americas, Inc. |
| **Case Number:** | 1:22-cv-01033-JLH-LDH |
| **Filer:** | |
| **Document Number:** | 341(No document attached) |

**Docket Text:**
**ORAL ORDER: Having reviewed the pending motion regarding validity of the asserted patents under 35 U.S.C. § 101 (D.I. 269, 270, 312, 323) and the Notice of Plaintiffs' Third Reduction of Asserted Claims (D.I. 340) that dropped the patent containing the claim allegedly representative of the asserted patents; it appearing that there are six pending motions and that the case is set to proceed to trial on April 14, 2025; the Court having conducted a preliminary review of the § 101 motion; and it further appearing to the Court that its concerns about the asserted patents validity under § 101 may be entirely case dispositive; IT IS HEREBY ORDERED AS FOLLOWS: (1) the parties must promptly meet and confer on the issue of representativeness and identify whether other claim(s) of the remaining patents is/are representative for purposes of resolving the § 101 motion; if the parties cannot agree on a representative claim, then on or before February 4, 2025, Defendants shall identify what claim(s) is/are representative and the bases therefore in a brief not to exceed 10 pages; and Plaintiffs may respond with a brief not to exceed 10 pages by February 6, 2025. In those submissions, the parties should also address: (a) whether the asserted patents are invalid under § 101 by incorporating argument on the foregoing representative claim(s) issue; and (b) what Supreme Court or Federal Circuit case is most similar to the challenged claim(s). That is, if the Court is to analogize the claims at issue in the motion to claims that have previously**

**been found to be patent (in)eligible by a higher court, which case provides the best analogy? (2) The parties must complete a mandatory in-person mediation by February 12, 2025. (3) The parties must file a joint status letter update regarding settlement by February 14, 2025. ORDERED by Judge Laura D. Hatcher on 1/30/25. (kjk)**

**1:22-cv-01033-JLH-LDH Notice has been electronically mailed to:**

Kenneth Laurence Dorsney    kdorsney@morrisjames.com, CHitch@morrisjames.com, ippara@morrisjames.com

Timothy Devlin    tdevlin@devlinlawfirm.com, achan@devlinlawfirm.com, amanaloor@devlinlawfirm.com, awoodward@devlinlawfirm.com, dlflitparas@devlinlawfirm.com, mmcclain@devlinlawfirm.com, vmccarty@devlinlawfirm.com

James Michael Lennon    jlennon@devlinlawfirm.com, dlflitparas@devlinlawfirm.com, mmcclain@devlinlawfirm.com

Daniel G. Vivarelli, Jr    vivarelli@butzel.com, adamsk@butzel.com, gillis@butzel.com

Joel William Glazer    jglazer@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

Cortlan S. Hitch    chitch@morrisjames.com

Peter Akawie Mazur    pmazur@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

Andrew Peter DeMarco    ademarco@devlinlawfirm.com, dlflitparas@devlinlawfirm.com

Aaron S. Kamlay    kamlay@butzel.com, beech@butzel.com

**1:22-cv-01033-JLH-LDH Filer will deliver document by other means to:**

2

**Appx3878**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and 511
TECHNOLOGIES, INC.,

      Plaintiffs,

      v.

JETBRAINS AMERICAS INC.,

      Defendant.

1:22-cv-01033-JLH - LDH

**JURY TRIAL DEMANDED**

## DEFENDANT JETBRAINS AMERICAS INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS ARGUMENTS FOR INVALIDITY OF THE ASSERTED PATENTS UNDER 35 U.S.C. § 101

OF COUNSEL:

BUTZEL LONG P.C.
Daniel G. Vivarelli, Jr.
Aaron S. Kamlay
Priya S. Dalal
1909 K Street, NW, Suite 860
Washington, DC 2006
(202) 454-2800
vivarelli@butzel.com
kamlay@butzel.com

Dated: February 4, 2025

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant*
*Jetbrains Americas Inc.*

**Appx3879**

# TABLE OF CONTENTS

Page(s)

I.  Claim 4 of the '517 Patent is Representative. ............................................................ 1

II. The Asserted Claims are Ineligible under *IBM v. Zillow*. ......................................... 6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.,*
880 F.3d 1356 (Fed. Cir. 2018)................................................................................10

*IBM v. Zillow Grp., Inc.,*
50 F.4th 1371 (Fed. Cir. 2022) ......................................................................... 6-10

*Mobile Acuity Ltd. v. Blippar Ltd.,*
110 F.4th 1280 (Fed. Cir. 2024)......................................................................... 5

**Statutes**

35 U.S.C. § 101.......................................................................................... passim

Defendant JetBrains Americas Inc. ("JBA" or "Defendant") submits this Brief per the Court's Oral Order of January 30, 2025. Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively "Plaintiffs" or "Caddo") and JBA met and conferred on February 2, 2025. Plaintiffs refused to agree that any claim is representative.

Although Caddo no longer includes any claims of the '411 patent in the Asserted Claims, Caddo has not amended its complaint to remove the '411 patent from the present suit. Further, JBA has not yet filed an answer and/or counterclaims pending the Court's resolution of its Motions to Dismiss (D.I. 177, 200). If this case proceeds, JBA intends to include counterclaims of invalidity of at least claims 1 and 6 of the '411 patent. For both these reasons, either claim 1 or claim 6 of the '411 patent is still an appropriate representative claim for purposes of resolving JBA's Motion for Summary Judgement under §101 (D.I. 270, "Opening MSJ Brief").

## I. Claim 4 of the '517 Patent is Representative.

Of the Asserted Claims remaining, claim 4 of the '517 patent ("claim 4") is representative. All Asserted Claims recite the same or equivalent features as claim 4:

| | '517 Patent Claim 4 | Equivalent Limitations |
|---|---|---|
| | A method for navigating within a hierarchical menu structure where each level in the menu contains plural items, said method comprising the steps of: | |
| A | providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy: | providing a graphical menu interface… ('880 claims 3, 8, 21)<br><br>provide a graphical menu interface… ('127 claims 12, 17, 21, 25)<br><br>generating a plurality of graphical menu items ... ('053 claims 1, 14) |
| B | constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical | dynamically construct[ing] an active path as a sequence of active links… ('880 claims 3, 8, 21; '127 claims 12, 17, 21, 25) |

| | user menu system, with one said active link corresponding to each of the items selected, | in response to receiving the user input[…], constructing a graphical user interface that includes [one or more selectable links]… ('053, claims 1, 14) |
|---|---|---|
| | each said active link providing direct access to the hierarchical level from which the corresponding item was selected without using said graphical user menu system; and | [said active links] allow[ing] a user to access an item in the information structure… ('880 claims 3, 8, 21)<br><br>allow[ing] a user to access an item in the information structure by selecting the item from…the active path ('127 claims 12, 17, 21, 25)<br><br>enable selection, via the graphical user interface, of the one or more sibling menu items… ('053 claim 1)<br><br>wherein a user may directly access one or more active links in the active path by selecting the active link ('880 claim 8 via claim 7; '127 claim 21 via claim 20) |
| C | displaying the Active Path as an alternative to the graphical user menu system for navigating the menu structure after the user has finished selecting items using the graphical user system such that the Active Path is displayed; | None (inherent) |
| D | wherein rolling over a given active link with the pointer of a pointing device triggers the display of menu items on the hierarchical level associated with said given active link without disturbing the displayed Active Path. | upon provisional selection of any said active link, displaying one or more items on a given level of the information structure without affecting the active path ('880 claims 3, 8)<br><br>upon provisional selection of a given one of said active links, display[ing] one or more items on a given level of the information structure associated with said provisionally selected active |

| | 3. The method for navigating according to claim 1, wherein a given active link is browsed by rolling over the given active link with a pointing device to trigger the display of sibling menu items on the level associated with said given active link.<br><br>4. The method for navigating according to claim 3, wherein browsing a given active menu item triggers the display of subordinate menu items. | link without affecting the active path ('880 claim 21; '127 claims 12, 17, 21, 25)<br><br>in response to selection/selecting [a selectable link], display at least one menu item ('053 claims 1, 14)<br><br>wherein the one or more active links allow the display of one or more items on a given level of the information structure when a pointer is rolled over one of the active links ('880 claim 3)<br><br>wherein the one or more active links allow the display of one or more items on a given level of the information structure when one of the active links is selected ('127 claim 17) |
| --- | --- | --- |

As explained in JBA's Opening MSJ Brief and shown above, all Asserted Claims follow this same structure: (A) providing a graphical menu or equivalent user interface; (B) constructing an "active path" that duplicates items selected from that menu; and (C) displaying the active path in which (D) menu items in the active path are displayed when an active link is pre-selected, rolled over, or the like. *See also* Opening MSJ Brief (D.I. 270) at 7-9. Even where an Asserted Claim includes limitations that are written with different language than in claim 4, the limitations are conceptually equivalent such that any analysis under §101 would necessarily reach the same result. For example, claims 12, 17, and 21 of the '127 patent recite the limitation "allow[ing] a user to access an item in the information structure by selecting the item from the one or more items displayed by one of the active links on the active path." Claim 4 includes the equivalent limitation, "each said active link providing direct access to the hierarchical level from which the corresponding item was selected." The same is true for every feature recited in each Asserted

3

**Appx3884**

Claim. Plaintiffs' technical expert, Mr. Sherwood, also treated the claims as equivalent variations of one another. *See* D.I. 270 at 11. Caddo cannot treat the claims as interchangeable for purposes of its infringement analysis but insist that they must be treated as distinct and unique for purposes of §101.

Some Asserted Claims recite various alternative user actions instead of "rolling over" (via '517 claim 3) or "browsing" (claim 4). For example, the '880 and '127 Asserted Claims refer to "provisional selection" instead of "rolling over." However, these terms all refer to particular mechanisms by which a user interacts with the active path; this makes no difference to the §101 analysis. That is, the particular mechanism by which a user activates, selects, or otherwise interacts with an active link in the active path makes no difference as to whether the Asserted Claims are directed to an abstract idea without something more and, therefore, do not render claim 4 non-representative. Plaintiffs' technical expert also indicated that terms such as "rolling over," "browsing" and "pre-selection" can be equated. *See* Ex. 1 (Sherwood Opening Infringement Report) at ¶ 370 (stating that "pre-selecting an active link is equivalent to selecting the active link using a mouse or highlighting the active link using the keyboard or keyboard shortcut because the latter performs the same function in the same way to provide the same result."), ¶¶ 379, 389, 550, 559, 659 (stating JetBrains' proposed construction of the terms, which equates them, does not change his opinion); Ex. 2 (9/26 Sherwood Dep. Tr.) At 51:19-53:1 (Sherwood confirming that the concept of "show[ing] users exactly where they will be taken to upon hovering a particular link or menu…is "covered in the claims."). There is no substantive difference between these claims for the §101 and claim 4 is representative.

The Asserted Claims remaining after Plaintiffs' Third Reduction (D.I. 340) include only two minor features that are not present in claim 4: truncation and search. For example, claim 8 of

4

**Appx3885**

the '880 patent recites that "the selection of an active link causes the active path to truncate to the selected active link."[1] This feature is insufficient to render claim 4 non-representative because it does not provide a "distinctive difference" that would have a "material impact" on the claims. *See* D.I. 323 at 2 (citing *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024)). Truncating the active path to a selected link merely changes the links displayed in the active path; there is nothing in this feature that would affect an analysis of the claim under §101. Plaintiffs have attempted to argue that this feature provides additional "screen real estate" or ties the claimed "active path" to a mobile display. *See* D.I. 312 at 10-13. However, this is a *post hoc* argument made to shoehorn the Asserted Claims into the framework of *Core Wireless*.  Neither the Asserted Claims nor the specification of the patents claim or describe any such connection to mobile displays. In fact, the only mention of the "truncation" feature is a single sentence in the common specification of the '880, '127, and '053 patents, which states without explanation that "[a]fter selecting [an active link] the Active Path is truncated." *See* D.I. 1-3 ('880 patent) at 6:4-5; D.I. 1-4 ('127 patent) at 6:24-25; D.I. 1-5 ('053 patent) at 6:24-25.  There is no explanation of the technical process used to perform any such truncation, or any alleged improvement to the computer system. Furthermore, any argument that the recited "truncation" ties the alleged invention to small or mobile displays is nonsensical. The link to which the active path is truncated necessarily would need to be available for the user to select, i.e., visible on the screen. Even if the resulting truncated active path was smaller, the original Active Path would still require enough space to display the un-truncated path. The "truncation" feature is unconnected to the size of the display and does not render claim 4 non-representative of those claims. Regarding the search feature, the Asserted Claims only recite a generic, indistinct "search

---

[1] A "truncation" feature is also recited in '880 claim 8, '127 claim 21, and '053 claim 14.

function", *e.g.*, "wherein said function is a search function" in Asserted Claim 12 of the '127

patent.[2] However, the Asserted Patents show that "search" was a well-known, conventional

feature. *See* Opening MSJ Brief (D.I. 270) at 6, n.2. Plaintiffs cannot to show that the claim

limitations provide any "distinctive significance" or "material impact" such that the feature

would cause claim 4 not to be representative of those claims. D.I. 323 at 2. The "search" feature,

therefore, also does not render claim 4 non-representative of those claims that recite it.

## II.   The Asserted Claims are Ineligible under *IBM v. Zillow*.

If the Court is to analogize the Asserted Claims to claims previously addressed under

§101, *IBM v. Zillow Grp., Inc*., 50 F.4th 1371, 1381 (Fed. Cir. 2022) ("*IBM*") provides the best

analogy.  In *IBM*, the Federal Circuit considered the claims of U.S. Patent No. 9,158,789, which

it summarized as "[a] user draws a shape on a map to select that area of the map, and the claimed

system then filters and displays data limited to that area of the map. It synchronizes which

elements are shown as "selected" on the map and its associated list." *Id* at 1374-75. The claim

recited limitations of "presenting a map…; presenting a list display compris[ing] the elements

from the map display; receiving a user input drawing a selection area in…the map display; …

and synchronizing the map display and the list display to concurrently update [map elements]

according to the user input." *Id.* at 1375. This is the very same structure present in the Asserted

Claims, as shown by claim 4:

| *IBM* '789 Claim 8 (per Fed. Cir.) | '517 Asserted Claim 4 |
|---|---|
| presenting a map | providing a graphical user menu system |
| having a user select a portion of that map and | constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system |
| then synchronizing the map and its corresponding list to display a more limited data set to the user. | displaying the Active Path as an alternative to the graphical user menu system. |

---

[2] A similar or identical "search" feature is recited in '880 claim 21 and '127 claims 12 and 25.

In *IBM*, the Court agreed that the '789 patent claims were directed to an abstract idea:

> We agree that the claims here fail to recite any assertedly inventive technology for improving computers as tools, and are instead directed to an abstract idea for which computers are invoked merely as a tool. The claims are directed to limiting and coordinating the display of information based on a user selection. … Identifying, analyzing, and presenting certain data to a user is not an improvement specific to computing. … We have repeatedly held claims directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner to be abstract. The claims here recite similarly abstract steps: presenting a map, having a user select a portion of that map, and then synchronizing the map and its corresponding list to display a more limited data set to the user. … Furthermore, a claim that merely describes an effect or result dissociated from any method by which it is accomplished is usually not directed to patent-eligible subject matter. We agree with the district court that the '789 patent is result-oriented, describing required functions (presenting, receiving, selecting, synchronizing), without explaining how to accomplish any of the tasks. It is written in result-based functional language that does not sufficiently describe how to achieve these results in a non-abstract way. The claims and specification do not disclose a technical improvement or otherwise suggest that one was achieved. We conclude that the '789 patent is directed to an ineligible abstract idea.

*IBM* at 1379-80 (internal quotes, citations, and modifications omitted; emphasis added).

This analysis applies exactly to the Asserted Claims. In the Asserted Claims, a graphical menu system is presented to the user. When the user selects items from the menu, the "active path" duplicates those selections, just as the system in *IBM* updated the list display to reflect items selected by the user in the map display. As with the claims in *IBM*, the Asserted Claims are "directed to an abstract idea for which computers are invoked merely as a tool," and "are directed to limiting and coordinating the display of information based on a user selection." There is no link to any computer system beyond a conventional "processor," and the Asserted Patents are "result-oriented, describing required functions … without explaining how to accomplish any of the tasks." As a result, similar to the claims in *IBM*, the Asserted Claims are directed to an abstract idea. Plaintiffs cannot show otherwise. The only "improvements" alleged by Plaintiffs

7

**Appx3888**

relate to "user retention and engagement, ease of use, ease of learning, search time, and the like." *See* Ex. 1 (Sherwood Opening Expert Report) at ¶¶ 66-69. However, "merely 'improving a user's experience while using a computer application is not, without more, sufficient to render the claims' patent-eligible at step one." *IBM* at 1377.

Furthermore, as in *IBM*, the Asserted Claims do not contain "something more" that would render them eligible in Step 2 of the *Alice* framework. IBM attempted to identify broad claim features to render the claims in *IBM* eligible in the *Alice* step 2 analysis. The Federal Circuit explained that

> IBM has not made <u>plausible and specific</u> allegations that any aspect of the claims is inventive. The cited 'synchronizing' and 'user determined shape' limitations use <u>functional language, at a high level of generality and divorced from any computer technology</u>, to recite the claimed functions. The limitations simply describe the abstract method without providing more. Even if they did require the use of a computer, <u>claims to an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way do not suffice at step two</u>. We have previously rejected a similar 'synchronization' limitation as insignificant post-solution activity when the claims did not provide any instructions on *how* to perform the synchronization outside the addition of conventional computer components. The same holds true here. And IBM's 'user determined shape' limitation adds nothing more because, as IBM acknowledged, relying on a 'user determined shape' to make selections was already known in the prior art. Taken individually or in combination, the recited limitations neither improve the functions of the computer itself, <u>nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept</u>. None of the claims recite an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application of the abstract idea.

*IBM* at 1379-80 (internal quotes and citations omitted; italics in original; emphasis added).

This analysis also directly applies to the Asserted Claims. All features recited in the Asserted Claims are conventional software features, well-known in the prior art at the time of the alleged invention. *See* Opening MSJ Brief (D.I. 270) at 9 (listing conventional components in the Asserted Claims). To the extent the Asserted Claims require a computer, they are directed to no more than an "abstract idea implemented on generic computer components." *IBM* at 1379. The

8

Asserted Patents also provide no "specific technical solution beyond simply using generic computer concepts in a conventional way," which, as noted in *IBM*, "do[es] not suffice at step two." *Id* at 1380. Plaintiffs cannot show the contrary – the plain claim language includes nothing more than routine software components such as a "graphical menu interface," "active links," "menu item," and the like. *See* Opening MSJ Brief (D.I. 270) at 5-9.

The Asserted Claims also do not include "something more" that would render them patentable when the claim features are considered individually or as an ordered combination. The '517 patent specification itself provides ample evidence as to the conventionality of the elements that were previously well known in the art. For example, claim 1 of the '517 patent (from which claim 4 depends), first recites "providing a graphical user menu system displaying the items of a given level and enabling selection thereof…" This is nothing more than the display of a conventional pull-down menu system. As described in the background of the '517 patent itself, such menus were well-known and conventional at the time of the alleged invention. *See, e.g.,* D.I. 1-2 at 1:40-53. The other features recited in claim 4 and the other Asserted Claims similarly recite nothing more than conventional, well-known software features such as "constructing…a sequence of hierarchical active links" (the Active Path); "displaying the Active path as an alternative to the graphical user menu system for navigating the menu structure" (displaying a series of links or a menu); and "wherein rolling over a given active link with the pointer of a pointing device triggers the display of menu items" (displaying corresponding menu items). None of these features is anything more than a well-known software feature. *See* Opening MSJ Brief (D.I. 270) at 19-26 (mapping each claim limitation to the Asserted Patent specification or prior art described in Plaintiffs' expert report).

**Appx3890**

*IBM v. Zillow* is also probative because it explains why the claims in *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) ("Core Wireless") were patent eligible, whereas those in *IBM* were not. The *Core Wireless* Court found that the claims were directed to "an improvement in the functioning of computers, <u>particularly those with small screens</u>." *Id.* at 1363 (emphasis added). In *IBM*, the Federal Circuit explained that this link to the operability of devices with small screens was key to the finding of eligibility in *Core Wireless:*

> *Core Wireless* involved a patent directed to 'improved display interfaces' of electronic devices that 'allow a user to more quickly access desired data stored in, and functions of applications included in, the electronic devices,' particularly those with small screens like mobile telephones. *See Core Wireless*, 880 F.3d at 1359. We held that asserted claims were directed to 'an improved user interface for computing devices' that was patentable <u>because it addressed problems specific to navigating applications on small screens, as repeatedly emphasized by the patent's specification</u>.

*IBM* at 1381 (emphasis added). The Federal Circuit emphasized that the claims at issue in *Core Wireless* were considered patent-eligible only because they addressed problems specific to a "small screen," which was explained throughout the specification of the asserted patents.

No such link to any specific screen or other computer system or device is present in the Asserted Patents or the Asserted Claims. In fact, Plaintiffs have made it clear throughout this case that the Asserted Claims are untethered from any particular computer system. *See* Ex. 3 (9/24 Sherwood Dep. Tr.) at 61:12-20 (The claimed method can be carried out on almost any platform and "would be applicable to almost any situation, where you had quite a bit of content and you [wanted to] use the patents to develop a better way to navigate around that content.").

Like the claims in *IBM*, the Asserted Claims lack the connection to a specific technical improvement that was present in *Core Wireless* and are directed to an abstract idea. The Court should hold all Asserted Claims invalid as being directed to ineligible subject matter under §101.

Dated: February 4, 2025

                                                               */s/ Kenneth L. Dorsney*

                                                  Kenneth L. Dorsney (#3726)

OF COUNSEL:                                     Cortlan S. Hitch (#6720)

                                                  MORRIS JAMES LLP

BUTZEL LONG P.C.                         500 Delaware Ave., Suite 1500

Daniel G. Vivarelli, Jr.                    Wilmington, DE 19801

Aaron S. Kamlay                          (302) 888-6800

Priya S. Dalal                             kdorsney@morrisjames.com

1909 K Street, NW, Suite 860        chitch@morrisjames.com

Washington, DC 2006

(202) 454-2800

vivarelli@butzel.com                   *Attorneys for Defendant*

kamlay@butzel.com                    *Jetbrains Americas Inc.*

**Appx3892**

# EXHIBIT 1

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CADDO SYSTEMS, INC. and<br>511 TECHNOLOGIES, INC.,<br><br>        Plaintiffs,<br><br>    v.<br><br>JETBRAINS AMERICAS, INC.,<br><br>        Defendants. | Civil Action No. 1:22-cv-01033-MN<br><br><br>**JURY TRIAL DEMANDED** |

**OPENING EXPERT REPORT OF ROBERT SHERWOOD**

**HIGHLY CONFIDENTIAL- OUTSIDE COUNSEL ONLY**
**HIGHLY CONFIDENTIAL- SOURCE CODE**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

## I.    INTRODUCTION

1.    I, Mr. Robert Sherwood, have been retained by counsel for Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively, "Caddo").  I submit this opening expert report regarding the issue of whether Defendants Jetbrains Americas, Inc. ("JBA"), Jetbrains s.r.o. ("JBSRO"), and Jetbrains, Inc. ("JBI") (collectively, "Jetbrains" or "Defendants") infringe and/or have infringed U.S. Patent Nos. 7,191,411 (the "'411 patent"), 7,640,517 (the "'517 patent"), 8,352,880 (the "'880 patent"), and 10,037,127 (the "'127 patent"), and 11,182,053 (the "'053 patent"), (collectively the "Asserted Patents").

## II.    QUALIFICATIONS AND EXPERIENCE

2.    A detailed record of my professional qualifications, including the patents on which I am a named inventor and the academic and professional publications on which I am an author, is set forth in my curriculum vitae attached to this report as Exhibit 1.

3.    I have been professionally involved with computer, Internet and software technology for more than 40 years and specifically with website development, analytics, graphical control elements, graphic user interfaces, and website interface design for more than 25 years.

4.    I am an expert by knowledge, skill, experience, training and education on interface design and its effect on users.  I have personally written thousands of lines of website design code and supervised the writing of hundreds of thousands of lines of website design code.

5.    I have a Bachelor of Science degree in civil engineering and a Master of Science degree in Environmental Engineering, both from the University of Kansas.  I also have a Masters of Business Administration, with a major in operations research, from California State College, Hayward, and an honorary doctorate from DeVry University.  As a professor, I have taught technology management courses, at the University of Kansas and University of Missouri, and as a guest lecturer taught technology management at Stanford University.

**Appx3895**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

- China Patent No. CN1672122.

- China Patent No. CN101882052B

- China Patent No. CN1672122B

- German Patent No. DE10392790T5

- Spain Patent No. ES2265267B1

### C.      Benefits and Importance of the Asserted Patents

66.      In my opinion, the claimed inventions are designed to allow intuitive, efficient and effective navigation in order to optimize, for example, user retention and engagement, ease of use, ease of learning, search time, and the like.  Also, the subject matter disclosed in each of these patents is similar and offers comparable benefits. Specifically, each addresses limitations associated with conventional navigation and navigation systems, providing a more efficient, user-friendly, quicker and productive solution while minimizing screen real estate (*see* Everitt Dep. Tr. at 200:19:201-1 ("Q And when you say "UI clutter," can you please expound on that? Strike that. What do you mean by UI clutter? A In PyCharm you have an amount of information that can be visible on the screen and you want to give that space to the things that are valuable. And things that don't have enough value"))—real estate that is valuable for displaying critical content (more below). The patented technologies also benefit both software developers, end-users and the like by improving the overall coding experience and reducing costs associated with training and support. My understanding of these conventional technologies, their drawbacks, and the way the patented inventions overcome these drawbacks is detailed below.  As further explained below, the method of providing graphical user menu systems (or generating graphical menu items or graphical menu interface) and constructing active paths and active links (or a graphical user interface that includes one or more selectable links), as disclosed in the claimed inventions, provide many important benefits, particularly in field of software user interfaces and

21

**Appx3896**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

code base navigation.  As discussed above, while I discuss these benefits by category below, many of these benefits are intertwined and all ultimately serve similar purposes: providing an easier, better, more understandable method of creating unique interfaces to facilitate the ease of navigating complex information structures, which in turn addresses known issues in the prior art, increases user efficiency (including accessing functions or locating certain content, be it source code or source code libraries), and reduces search times (including finding a specific portion or portions of source code in a complex code base or accessing critical libraries for efficient software coding).  *See* Everitt Dep. Tr. at 207:14-16 ("Q If you have to press down arrows a bunch of times, would it impact your work efficiency? A It would have an impact"); *see also id.* at 105:17-21 ("Q What are you trying to achieve in giving audience tips on how to navigate -- or how to activate the navigation bar on demand? A To perform a set of goals efficiently without distraction."); *id.* at 139:11-19 ("Q What other operations are available through the navigation bar? A The next sentence is an illustration in PyCharm, at least. Refactor This is another operation. Delete is another operation. Q Do you recall one of the features we talked about is refactoring. Is this what you were referring to? A Yes.").

67.     As discussed in the specification, prior to the claimed inventions, users performed navigation using collapsing menus and path menus. Collapsing menus start at the root level and collapse after each selection. Path menu systems require users to manually input the precise path to a file or directory.  These conventional navigation methods were time-consuming because they required a user to repeatedly navigate from the root level. These conventional navigation methods were also error-prone because users had to memorize and manually enter complex hierarchical sequences

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

68.     The Asserted Patents overcome these drawbacks using an "active path." The "active path" creates a sequence of "active links" that provide users with direct access back to a previously selected menu item without returning to the root.  Additionally, the Asserted Patents offer pre-defined shortcuts that enable users to directly access specific menu items and by automatically constructing an "active path."

69.     In sum, the Asserted Patents offer a user-friendly and efficient method of navigating a hierarchical structure. The "active path" allows quick access to frequently used or deeply nested items, eliminating the need to start from the root each time. The patented invention is also more intuitive than conventional technologies because they permit users to employ their existing knowledge of the menu structure to make navigation less prone to errors.

### i.     Known Issues in the Prior Art Addressed By the Benefits of the Asserted Patents

70.     As I have already opined above, conventional operating systems employed solutions with usability issues, among other things.  With the "collapsing" method, the "navigation always commences from the initial or root level," and the menu collapses back to the root level after a selection is made."  (*See, e.g.,* '411 patent at 1:27-30; '880 Patent at 1:29-36.) As a result, users were required to start from scratch before arriving at the same folder, database, structure, web page, or destination that could be many nodes below the root level.  Other conventional solutions also suffer from similar usability issues because they required users to memorize and enter complex hierarchical sequences—they must trace and retrace each step in the hierarchical menu or folder structure to reach the same destination.

71.     Another key disadvantage of the conventional solutions is that they keep important content, data, items, libraries, or features hidden, making them less discoverable (that is, if they were discoverable at all).  In order to see the options available to them, end users have

23

**Appx3898**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

370. To the extent Jetbrains contends that the Accused Instrumentalities do not literally meet this limitation (*e.g.,* because Jetbrains contends that sibling menu items on the level associated with the given active link are not displayed upon pre-selecting the given active link), the limitation is met under the doctrine of equivalents by the Accused Instrumentalities because they perform substantially the same function (displaying the sibling menu items on the level associated with the given active link by clicking or selecting the given active link using the mouse or highlighting the given active link using the keyboard or keyboard shortcut, which is the same function as pre-selecting the given active link using the mouse or keyboard to display the sibling menu items on the level associated with the given active link) in substantially the same way (*e.g.,* placing or positioning the mouse over the active link or using the keyboard or keyboard shortcut to highlight the active link in the same way as pre-selecting the given active link using the mouse or keyboard) to produce substantially the same result (*e.g.,* display the sibling menu items on the level associated with the given active link without disturbing the displayed Active Path, which is the same result as displaying the sibling menu items on the level associated with the given active link by pre-selecting the given active link without disturbing the displayed Active Path). Thus, pre-selecting an active link is equivalent to selecting the active link using a mouse or highlighting the active link using the keyboard or keyboard shortcut because the latter performs the same function in the same way to provide the same result. (*See* CAD-JET040537; *see also* Noll 10/19/23 Dep. Tr. at 96:2-25 ("**. . . Q**: So you said navigation bar and breadcrumbs combined. I've always thought they were one and the same. Can you just clarify for me what you mean by combining the breadcrumbs and the navigation bar? **A**: Yes. So breadcrumbs is generally as a default on the bottom of the IDE, and what it will allow you to do is navigate within a file. ***So when you have a project file open, it will have all the associated***

**Appx3899**

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

*items open at the same time.* So it's a web file. It will have the HTML tag if it's a Java file, it will have all the associated items, and you can easily maneuver around within a file. The navigation bar itself being on the top, *it will allow you to view parents and children and things like that very easily within the GUI.*"). *See also* Noll 10/19/23 Dep. Tr. at 143:3-22 ("**Q**: Exactly. I think that's what I mean. Assuming nothing is expanded, at that level, right, so you would agree with me then that you have to access level 1 first, expand to level 1.1, followed by 1.1.1, 1.1.2, 1.1.3, fair? **A**: Fair. **Q:. . .** Would it be fair to say your testimony about the project tool window and the navigation bar were as described in this document, what we saw in the screen shots? **A:** This is such a singular view, but yes, we do in general. *We have established–-* this is the third time I think–- *that when you click something in the project view, it's reflected in the navbar.*").)[142] *See also* Noll 10/20 Depo Tr. at 389:15-390:9 ("**Q**: Now, these customers and end users can still browse and select any links in the navigation bar or any item in the project tool window using the mouse for example, right? **A:** Yes. **Q:** And so the use of a mouse to navigate works on all of the accused products and not just the keys on the keyboard; is that fair?. . . **A:** So of course we give customers the ability to use mouse or keystrokes, yes. **Q:** And so whether the customers use a mouse or the keyboard, the effect is the same?. . . **A:** Effect is the same. [] **Q:** Selecting items, fair? **A:** It's fair, yes. **Q:** Browsing links?. . . **A:** Yes.").). *See also* Everitt Dep. Tr. at 83:11-19 ("**Q:** To your knowledge, why is the navigation bar used? . . .. **A**: Its purpose is to show a sequence of directories."); *see also id.* at 192:15-19 ("**Q:** Is another purpose [CAD-JET041751 and CAD-JET041752] to help customers *make use of the navigation*

---

[142] My opinion with respect to the Doctrine of Equivalents here also applies to the disputed terms including "pre-selecting" ('411 patent, claim 6), "browsing" and "rolling over" ('517 patent, claims 1 and 4), "provisionally selected" ('127 patent, claims 1 and 14), and "provisional selection" ('880 patent, claim 1).

306

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

*bar as an addition or alternative to the project tool window*? **A: Correct.**"); *see also id.* at 220:5-9 (same, regarding CAD-JET041753 and CAD-JET041754), 241:8-12 (same, regarding CAD-JET041755 and CAD-JET041756); *see also id.* at 97:14-23 ("Q Okay. Awesome. So how is the navigation bar a quick alternative to the project view? A Well, so I think in marketing speak I think just allows people, if you're in a really large project, the project window takes up a lot of space. *And I think that if you are very good with keystrokes and using the navigation bar, it can be just as effective as the project tool window for people*."); *see also id.* at 105:24-109:7 ("Q Here, right in the middle of the page, it says, "The navigation bar is a breadcrumb-like bar which can optionally be displayed above the editor window and which shows the module and packages in which the currently edited file is contained. "For every item in the bar you can invoke the context menu, or you can show a drop-down list containing all classes and packages in the same level as the selected item. Double clicking an item in the navigation bar selects it in the project view. The *navigation bar fully supports keyboard navigation*." And it gives you "*Left, right keys move between levels, and up, down move between items on the same level*." Now, this document was presumably written in 2005, so my question for you is do you have any reason to dispute that this statement does not apply to the navigation bar being used today? A So it's fundamentally different. . . . All right, so the issue here is we have a navigation bar and also a breadcrumbs functionality. So when this was released, I read it as it's a breadcrumb-like bar to get people to understand the concept of what the navbar was when it was released. But fundamentally navigation bar and breadcrumbs are two clearly different things for the longest lineage of our IDEs, so 2005, yes. Q But is there anything that is described in this statement that is not applicable today? A Well, no, what is not applicable is that, you know, that the convolution of the terms, right. So navigation bar and breadcrumbs are fundamentally two

307

**Appx3901**

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

different things. The description of how this is done, the last two or three sentences, is supported and makes relative sense except for I'm unaware about the left, right keys move between levels and the up and down on the same level because, you know, in using the navigation bar, we deal a lot with inherited languages like Java. So there's a lot of parent/child relationships. There is not a lot of peers getting displaced. So the big functionality *I think we have with the navigation bar is kind of viewing those parent/child relationships*. . . . A "For every item in the bar is a drop-down menu containing all the classes on the same level." So our drop-down lists are really about -- again, about parent/child, not necessarily siblings. The navigation bar selects in the project view, reverberates back to the project view. Check, that's fine. The navigation bar fully supports keyboard navigation. Absolutely. Left, right between levels, up, down between levels on the same level. So I think this syncs up with very similar to what we have now. The difference is that it's a lot more customizable and a lot more full featured."); *see also* Everitt Dep. Tr. at 124:16-23 ("Q *Why are you giving instructions on how to open a file in the project tree using the keyboard and navigation bar? A It is a common activity for developers to work with their files and to open them*, and there are many techniques for doing that and the navigation bar is one of those techniques for Python and web developers."); *see also id.* at 136:12-20 ("Q If they are browsing in the item -- strike that. *If I were to browse an item using a keyboard, can I also browse using a mouse? . . . A Yes*. Q Okay. *Would it be fair to say that I can use the keyboard to highlight an item? A Yes.*"), 137:13-20 ("*Q Can I select using a keyboard? A Yes. Q Can I select using a mouse? A Yes. Q Can I open using a keyboard? A Yes. Q Can I also do that using a mouse? A Yes*"). 153:8-17 ("Q Well, first can you explain to me what you were doing at the third-second mark and the fourth-second mark. A I was moving the selection of the current

308

**Appx3902**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

directory using my cursor keys on the keyboard. ***Q And when you say moving using your cursor keys, would a developer be able to use the same using a mouse? A Yes***.")



*See also* CAD-JET041749 and Everitt Dep. Tr. at 153:8-154:22 (referencing CAD-JET041749 above) ("**Q**: Well, first can you explain to me what you were doing at the third-second mark and the fourth-second mark. **A:** I was moving the selection of the current directory using my cursor keys on the keyboard. **Q:** And when you say moving using your cursor keys, would a developer be able to use the same using a mouse? **A:** Yes. **Q:** Now, what did you do at the first-second mark, what happened? **A:** This is when I got to the parent directory that I wanted to get to and I opened that directory. It went from selection to open, and I saw the children of that directory. **Q:** And how do you open the directory? **A:** In the–- with the mouse, you press enter and it gives a listing of the children – **Q:** I think you said with the mouse, you press enter. You mean the keyboard? **A:** Sorry, the keyboard, I pressed enter, yes. **Q:** . . . And with the mouse, can I do the

309

**Appx3903**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

same by clicking on the mouse? **A:** Yes. **Q:** Okay. Thank you for clarifying. And now, can you tell me what you're doing with respect to the drop-down listing at the fifth-second as well as the sixth-second mark? **A:** I am scrolling through the listing using the cursor key. **Q:** And at that point have you opened any file? **A:** No, I'm just moving the selection. **Q:** And does the display of this drop-down listing affect or disturb any of the directories at the very top within the navigation bar? **A:** No."). *See also* Noll 10/19/23 Dep. Ex. 15 at 0:42-0:44 (pre-selecting an active link "jetbrains" triggers the display of sibling menu items such as "controller" and "Service" on the level associated with said active link "jetbrains"; and pre-selecting an active link "view" triggers the display of sibling menu items on the level associated with said active link "view"):



310

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

same?. . . A: Effect is the same. So explain. Q: Selecting items, fair? A: I"s fair, yes. Q: Browsing links?. . . A: Yes.").)

377.  As another example, with respect to Resharper/Resharper C++, pre-selecting an active link also triggers the display of sibling menu items on the level associated with said active link without disturbing the Active Path is performed in the same way Rider does because as Mr. Noll testified that "Rider is Resharper" in essence, and to "creat[e] Rider, all we did was we took Resharper, combined it with the.NET framework and created the stand-alone IDEP." (See Noll 10/19/23 Dep. Tr. at 85:25-86:6; *see also id.* at 88:5-20.) Because Rider incorporates, uses, and/or implements the Project Tool window and the Navigation Bar as discussed above, by extension, Resharper and Resharper C++ also incorporate, use, and/or implement this functionality.

378.  Additionally, as discussed above and below, plugins and tools specific to Rider, Resharper, and Resharper C++, such as dotCover, dotMemory, dotPeek, and dotTrace, as well as plugins and tools that are or can be integrated with any of the accused IDEs, also perform all of the above claim limitations in the same way that these accused instrumentalities perform all of these same limitations because these plugins and tools use the same accused functionalities as those accused instrumentalities with which they are integrated, installed, implemented, and/or executed.

379.  I understand that Jetbrains has construed the term "pre-selecting" to mean "rolling over without actively selecting by the user but with the ability to select." Even applying Jetbrains's proposed construction for this term to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this term under Jetbrains' proposed construction is

322

**Appx3905**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

still satisfied by the Accused Instrumentalities because "rolling over without actively selecting by the user but with the ability to select" a given active link still triggers the display of sibling menu items on the level associated with the given active link without disturbing the displayed Active Path (e.g., "rolling over without actively selecting by the user but with the ability to select" the "example" active link still triggers the display of sibling menu items such as "images" and "performance" and this is so because "rolling over without actively selecting by the user but with the ability to select" the "example" active link do[es] not actively select the "example" active link and that there is the ability to select the "example" active link if so desired regardless of whether the sibling menu items are displayed):



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05; *see also* JET_000386 at 0:05s.)   I also note that Jetbrains has not argued that no other action could be performed (i.e., no action other than "pre-selecting" to effectuate the trigger that displays the sibling menu items).  As such, the Accused Instrumentalities additionally meet this limitation because the "examples" active link can be pre-selected and selected (e.g., by clicking

323

**Appx3906**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

on the mouse or using keystrokes on the keyboard (e.g., the "return" key)) to trigger the display of sibling menu items.

380.    Also, I understand that Jetbrains has construed the term "sibling menu items" to mean "items that are on the same level as the active link corresponding to item selected by the user." Applying Jetbrains's proposed construction for the term "Active Path" to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this term under Jetbrains' proposed construction is satisfied by the Accused Instrumentalities because, for example, the item "compiler" and the item "shared" are on the same level as the active link "compiler":

**IntelliJ IDEA 6.0 "Demetra": Navigation Bar**

I'll start my description of IntelliJ IDEA 6.0 features with a small UI feature added to facilitate project navigation: the Navigation Bar.



The Navigation Bar is a breadcrumb-like bar which can optionally be displayed above the editor window, and which shows the module and packages in which the currently edited file is contained. For every item in the bar, you can invoke the context menu, or you can show a drop-down list containing all classes and packages in the same level as the selected item. Double-clicking an item in the Navigation Bar selects it in the Project View. The Navigation Bar fully supports keyboard navigation: Left/Right keys move between levels, and Up/Down move between items on the same level.

The main motivation for this feature was to reduce the necessity of using Project View, which takes quite a lot of screen space. We have found out that in most cases we access the project view not to browse, but rather to invoke some action (Find in Path, Inspect Code and so on) on one of the packages containing the currently open file. The Navigation Bar provides a much quicker access to such actions, and allows the left sidebar to be occupied by a different tool window (for example, Favorites or Structure View).

324

**Appx3907**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

      c.      **Dependent Claim 6**

388.    I hereby incorporate by reference my opinion with respect to claim 1 above, which covers the subject matter of this claim/claim limitation.  *See also*:



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05 (preselecting a given menu item displayed (e.g., "performance") while pre-selecting the given active link (e.g., examples) triggers the display of subordinate items such as "File," "Cmd script," "New Scratch File," "Directory," "Python Package," and the like); *see also* JET_000386 at 0:05s.)

389.    I understand that Jetbrains has construed the term "pre-selecting" to mean "rolling over without actively selecting by the user but with the ability to select."  Even applying Jetbrains's proposed construction for this term to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this term under Jetbrains' proposed construction is still satisfied by the Accused Instrumentalities because "rolling over without actively selecting

334

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

by the user but with the ability to select" the given menu item while "rolling over without actively selecting by the user but with the ability to select" the given active link still triggers the display of subordinate menu items (e.g., "rolling over without actively selecting by the user but with the ability to select" the "example" active link while "rolling over without actively selecting by the user but with the ability to select" the "performance" item under the "examples" active link still triggers the display of subordinate menu items such as "File" and this is so because "rolling over without actively selecting by the user but with the ability to select" the "example" active link and/or the "performance" item do[es] not actively select the "example" active link and/or the "performance" item and that there is the ability to select them if so desired regardless of whether the subordinate menu items are displayed):



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05; *see also* JET_000386 at 0:05s.)   I also note that Jetbrains has not argued that no other action could be performed (i.e., no action other than "pre-selecting" to effectuate the trigger that displays the subordinate menu items).  As such, the Accused Instrumentalities additionally meet

335

**Appx3909**

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

keystrokes, yes. Q: And so whether the customers use a mouse or the keyboard, the effect is the same?. . . A: Effect is the same. So explain. Q: Selecting items, fair? A: I''s fair, yes. Q: Browsing links?. . . A: Yes.".).)

548.    As another example, with respect to Resharper/Resharper C++, rolling over an active link also triggers the display of menu items on the hierarchical level associated with said active link without disturbing the Active Path is performed in the same way Rider does because as Mr. Noll testified that "Rider is Resharper" in essence, and to "creat[e] Rider, all we did was we took Resharper, combined it with the.NET framework and created the stand-alone IDEP." Noll. 10/19 Dep. Tr. at 85:25-86:6; *see also id.* at 88:5-20. Because Rider incorporates, uses, and/or implements the Project Tool window and the Navigation Bar as discussed above, by extension, Resharper and Resharper C++ also incorporate, use, and/or implement this functionality.

549.    Additionally, as discussed above and below, plugins and tools specific to Rider, Resharper, and Resharper C++, such as dotCover, dotMemory, dotPeek, and dotTrace, as well as plugins and tools that are or can be integrated with any of the accused IDEs, also perform all of the above claim limitations in the same way that these accused instrumentalities perform all of these same limitations because these plugins and tools use the same accused functionalities as those accused instrumentalities with which they are integrated, installed, implemented, and/or executed.

550.    I understand that Jetbrains has construed the term "rolling over" to mean "rolling over without actively selecting by the user but with the ability to select." Even applying Jetbrains's proposed construction for this term to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent),

531

**Appx3911**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

my opinion herein does not change and that this term under Jetbrains' proposed construction is still satisfied by the Accused Instrumentalities because "rolling over without actively selecting by the user but with the ability to select" a given active link with the pointer of a pointing device still triggers the display of menu items on the hierarchical level associated with the given active link without disturbing the displayed Active Path (e.g., "rolling over without actively selecting by the user but with the ability to select" the "example" active link with the pointer of a pointing device still triggers the display of menu items such as "images" and "performance" on the hierarchical level associated with the "example" active link without disturbing the displayed Active Path and this is so because "rolling over without actively selecting by the user but with the ability to select" the "example" active link with the pointer of a pointing device do[es] not actively select the "example" active link and that there is the ability to select the "example" active link if so desired regardless of whether the menu items are displayed):



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05; *see also* JET_000386 at 0:05s.)  I also note that Jetbrains has not argued that no other action

**Appx3912**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

could be performed (i.e., no action other than "rolling over" to effectuate the trigger that displays the menu items). As such, the Accused Instrumentalities additionally meet this limitation because the "examples" active link can be rolled over and selected (e.g., by clicking on the mouse or using keystrokes on the keyboard (e.g., the "return" key)) to trigger the display of menu items.

551. Also, I understand that Jetbrains has construed the phrase "display of menu items on the hierarchical level associated with said given active link" to mean "display [of] menu items that are on the same level as the active link corresponding to item selected by the user." Even applying Jetbrains's proposed construction for this phrase to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this phrase under Jetbrains' proposed construction is satisfied by the Accused Instrumentalities because the Accused Instrumentalities can display menu items (e.g., "compiler" and "lw") that are on the same level as the active link (e.g., active link "compiler") corresponding to item selected by the user ("compiler"), as shown below:



(*See* CAD-JET040938); *see also* JET_000200 at 4:03s. (annotated) (the "polls" selectable link is in the same level as the "polls" menu item represented by that selectable link; similarly, the "polls" selectable link is in the same hierarchical level as the "migrations" menu item that is also

533

**Appx3913**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05 (browsing a given menu item displayed (e.g., "performance") triggers the display of subordinate items such as "File," "Cmd script," "New Scratch File," "Directory," "Python Package," and the like); *see also* JET_000386 at 0:05s.)

559.    I understand that Jetbrains has construed the term "browsing" to mean "rolling over without actively selecting by the user but with the ability to select."  Even applying Jetbrains's proposed construction for this term to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this term under Jetbrains' proposed construction is still satisfied by the Accused Instrumentalities because "rolling over without actively selecting by the user but with the ability to select" the given active menu item still triggers the display of subordinate menu items (e.g., "rolling over without actively selecting by the user but with the ability to select" the "performance" item under the "examples" active link triggers the display of subordinate items such as "File" and this is so because "rolling over without actively selecting by

545

**Appx3914**

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

the user but with the ability to select" the "performance" item does not actively select the "performance" item and that there is the ability to select the "performance" item if so desired regardless of whether the subordinate menu items are displayed):



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05; *see also* JET_000386 at 0:05s.)  I also note that Jetbrains has not argued that no other action could be performed (i.e., no action other than "browsing" to effectuate the trigger that displays the menu items).  As such, the Accused Instrumentalities additionally meet this limitation because the "examples" active link can be browsed and selected (e.g., by clicking on the mouse or using keystrokes on the keyboard (e.g., the "return" key)) to trigger the display of subordinate menu items.

560.    To the extent Jetbrains contends that the Accused Instrumentalities do not literally meet this limitation (*e.g.,* because Jetbrains contends that subordinate menu items are not displayed upon browsing a given active link), the limitation is met under the doctrine of equivalents by the Accused Instrumentalities because they perform substantially the same

546

**Appx3915**

HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY

implements the Project Tool window and the Navigation Bar as discussed above, by extension, Resharper and Resharper C++ also incorporate, use, and/or implement this functionality.

658.    Additionally, as discussed above and below, plugins and tools specific to Rider, Resharper, and Resharper C++, such as dotCover, dotMemory, dotPeek, and dotTrace, as well as plugins and tools that are or can be integrated with any of the accused IDEs, also perform all of the above claim limitations in the same way that these accused instrumentalities perform all of these same limitations because these plugins and tools use the same accused functionalities as those accused instrumentalities with which they are integrated, installed, implemented, and/or executed.

659.    I understand that Jetbrains has construed the term "provisional selection" to mean "rolling over without actively selecting by the user but with the ability to select."  Even applying Jetbrains's proposed construction for this term to all Asserted Claims of all Asserted Patents (including the '411 patent, the '517 patent, the '880 patent, the '127 patent, and the '053 patent), my opinion herein does not change and that this term under Jetbrains' proposed construction is still satisfied by the Accused Instrumentalities because upon "rolling over without actively selecting by the user but with the ability to select" a given active link, one or more items on a given level of the information is still displayed without affecting the active path (e.g., upon "rolling over without actively selecting by the user but with the ability to select" the "example" active link under the "examples" active link, items such as "File" and "Cmd script" on a given level of the information is still displayed without affecting the active path and this is so because "rolling over without actively selecting by the user but with the ability to select" the "example" active link do[es] not actively select the "example" active link and that there is the ability to select it if so desired regardless of whether the one or more items are displayed):

660

**Appx3916**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**



(*See* https://www.youtube.com/watch?v=2cQiP34Xqro&t=5s&ab_channel=PaulEveritt at 0:05; *see also* JET_000386 at 0:05s.)   I also note that Jetbrains has not argued that no other action could be performed (i.e., no action other than "provisional selection" to effectuate the display of one or more items on a given level of the information structure without affecting the active path). As such, the Accused Instrumentalities additionally meet this limitation because the "examples" active link can be provisionally selected and then selected (e.g., by clicking on the mouse or using keystrokes on the keyboard (e.g., the "return" key)) to display one or more items on a given level of the information structure without affecting the active path.

660.    My opinion above also applies to team tools and non-IDEs such as TeamCity, YouTrack, and Space. For example, for Space, provisionally selecting any active link displays one or more items on a given level of the information structure without affecting the active path (*e.g.*, provisionally selecting without affecting the displayed Active Path the link such as "Team" to display items such as "Software Development," "Transportation," and "Administration" on the level associated with said active link "Team" without affecting the Active Path "Team-

661

**Appx3917**

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

Dated: *July 26, 2024*

*Robert J. SHERWOOD*

Robert J. Sherwood

1085

**Appx3918**

Case 25-1764 Document 28 Page 219 Filed: 19/21/2025

# EXHIBIT 2

# CONFIDENTIAL



Transcript of **Robert Sherwood (Vol. II)**

Thursday, September 26, 2024

*Caddo Systems, Inc. and 511 Technologies, Inc.*
*v. JetBrains Americas Inc.*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 146272

Appx3920

Pursuant to the Court's Order of January 30, 2025, (D.I. 341), Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively "Caddo" or "Plaintiffs") submit this response to Defendants' Supplemental Brief regarding 35 U.S.C. §101, of February 4, 2025. (D.I. 343.) For the reasons set forth herein, none of the claims identified by Defendants is representative of the 10 remaining asserted claims, all of which are directed to patent eligible subject matter for the reasons stated in the Federal Circuit's decision in *Core Wireless* and its progeny, and as recognized in decisions of this District, including Judge Hall's decision in *Apple v. Masimo*.

## I. ARGUMENT

### A. Claim 4 of the '517 Patent is not a Representative Claim

The crux of Defendants' argument is that claim 4 of the '517 patent is representative because all other claims purportedly "recite the same or equivalent features as claim 4." (D.I. 343 at 1.) In *Berkheimer v. HP Inc.*, the Federal Circuit cautioned that an independent claim can be unrepresentative of subsequent dependent claims in a patent eligibility analysis when the patent owner "advanced meaningful arguments regarding limitations found only in the dependent claims." 881 F.3d 1360, 1365 (Fed. Cir. 2018). When the patent owner "contests the opposing party's § 101 argument because a claim provides a technological improvement, another claim that lacks such an improvement is not representative of the claim containing the improvement." *Energy Env't Corp. v. City & Cty. of Denver*, No. 21-cv-02235-PAB-SBP, 2024 U.S. Dist. LEXIS 55416, at *26 (D. Colo. Mar. 26, 2024) (citing *Berkheimer*, 881 F.3d at 365).

Here, there is no factual dispute, Defendants do not contend otherwise, that Plaintiffs have never agreed that claim 4 of the '517 patent (or claim 6 of the '411 patent) is representative of the 10 narrowed claims across four patents. Further, as elaborated in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and *Daubert* Motions (D.I. 312), Plaintiffs present several meaningful arguments demonstrating that the asserted claims have distinctive differences

1

**Appx3934**

in language, scope, and functionality, thus precluding treatment of any claim as "representative" of all claims for purposes of evaluating eligibility under §101. (*Id*. at 4-20.)

Critically, Defendants ignore the distinctive significance between the purported representative claim 4 of the '517 patent and other asserted claims. First, claim 4 of the '517 patent is directed to the ***structure*** of a constructed active path. For example, claim 4 recites "[t]he method of navigating . . . wherein browsing a given active menu item triggers the display of subordinate menu items." That is, the focus of this claim is on the framework or composition of a constructed active path, such as subordinate menu items that can be displayed and accessed when a given item displayed by the constructed path is triggered. Hence, this claim further narrows claim 1 by providing an additional structural limitation ("subordinate menu items").

By contrast, the remaining asserted claims, such as claims 8 and 21 of the '880 patent and claims 12, 21, and 25 of the '127 patent, focus on the ***functionalities*** of a constructed active path, such as "truncation" and "search." In the context of truncation, for example, the '880 patent describes, in Fig. 5D, that the active link 1.2.3 provides the functionality whereby it truncates the active path and removes the active link 1.2.3.4 from the path, which results in the active 1.2.3 being an end link. ('880 patent at 6:1-5.) This unique truncation functionality is not recited in any claims, let alone claim 4, of the '517 patent. That the functionality of truncation is not even discussed in the '517 patent is clear evidence that truncation is a distinctively significant concept. Indeed, the novelty of truncation lies in not only its ability to provide a completely different active path (e.g., by selecting a different item for the root link 101 in Fig. 4A; *see also* '880 patent at 4:2-6; '127 patent at 4:16-20 (same)) but its functionality to designate a ***new and different*** link as an end link, which functions differently than an active link:

> For example, "[s]election of an active link 102 causes different results depending on whether or not the selected active link 102 is the end link 103 in the Active

Path 100. If the selected active link 102 is **not the end link** 103, then selection will cause a folder with subordinate levels and **content to be displayed**. . . . Moreover, if the selected active link 102 is **not the end link** 103, then selection will trigger the **construction of a new Active Path** 100. [By contrast, s]election of an end link 103 will cause the **immediate re-execution of the associated function** (last function executed). Thus, the last executed function may be re-executed by simply selecting the end link 103 in the Active Path 10 100. Moreover, selection of an end link 103 **will not affect the Active Path** 100."

('880 patent at 5:58-6:1; '127 patent at 6:10-22 (same).) As described above, an end link offers functionalities that are not available in an active link, such as the function of re-executing the last executed function without affecting the active path (whereas an active link provides the function of displaying content or constructing a new active path). The distinctive significance between an active link (through construction of an active path) and an end link (through truncation of an active path) is also emphasized in other portions of the specification. For example:

In the case of navigating to a location, selecting an active link: 102 (**other than the end link**: 103) triggers the access of the associated database location. In contrast, when navigating to a class of functions, selection of an active link: 102 (**other than the end link**: 103) merely triggers the display of the sibling menu items on the associated level.

(*See* '880 patent at 6:28-33; '127 patent at 6:10-22 (same).) Also, unlike an active link where "pre-defined short-cuts are provided which enable direct access to a given menu item" ('880 patent at 2:47-53), an end link operates "without the need for a pre-defined short-cut" (*id.* at 5:9-13) and allows the last executed function to be re-executed on the fly (*id.* at 5:34-37). Thus, truncating a selected active link is distinctively significant from browsing a given link for the purpose of evaluating these limitations under Section 101.

In that same vein, the "search" function imparts a distinctive significance that is not recited in any claims of the '517 patent. The specification describes the "search" function as "enable[ing] the user to search the entire hierarchical structure from the highest (root) level to the lowest level)" (*id.* at 8:16-20), such as "from 1.2.3 and all hierarchically subordinate levels

3

**Appx3936**

(along the same branch)" (*id.* at 8:21-24). The "search" interface is also different. As shown in Fig. 7C of the '880 patent, when the search field 200 is selected, the search entry interface is displayed. Unlike an active path (which is constructed by menu/structure navigation), [t]he functionality of the search entry field 200 may [] be implemented by, for example, using a special button on the pointing device 48 or special key stroke on the keyboard." (*Id.* at 8:27-29.) Hence, like truncation, the "search" function is distinctively significant in structure and function from "browsing" a given link. The specification makes clear that these functionalities, when implemented with an active path, would "allow the user to focus on the content and make [web] browsing more efficient" (*id.* at 6:56-60) and "take advantage of screen real-estate" savings (*id.* at 7:3-7)—significant improvement to the functioning of any computing device, upon which Plaintiffs' expert, Mr. Sherwood, has opined extensively (in no less than 28 pages of his report). (D.I. 272 at ¶¶ 59-112; *see, e.g., id.* at ¶¶ 100-102 ("Benefit of Saving Screen Space or Screen "Real Estate") and ¶¶ 103-108 ("Benefit of Reducing User Search Time").)

Defendants argue that "the only mention of the 'truncation' feature is a single sentence in the common specification of the '880, '127, and '053 patents." (D.I. 343 at 5.) Such an argument is short-sighted because it ignores the dual functions of truncation (namely, defining a *new* path and designating a *new* end link). Browsing an active link or displaying subordinate menu items (as recited in claim 4 of the '517 patent) offers neither function nor structure that would be imparted when truncation is executed.

As to the search function, Defendants aver that it is "a well-known, conventional feature" and provides no "distinctive difference" or "material impact" (D.I. 343 at 6) but ignore that the claimed search function goes beyond merely a generic search—it offers the unique concept of searching "the entire hierarchical structure from the highest (root) level to the lowest level" (as

4

**Appx3937**

opposed to searching the content of an entire document or website, which would be non-limiting). Defendants cite to their opening MSJ brief (at footnote 2) but that footnote cites to a book (Wroblewski) that is not prior art since it was published *after* the effective filing date of the Asserted Patents (as evident by Defendants' subsequent withdrawal of this "prior art"; D.I. 264). Also, neither that book nor Defendants' footnote offer any evidence that "search" is "a well-known, conventional" concept. Critically, the Federal Circuit has already rejected this line of argument, cautioning that "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369. Whether the remaining claims "perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims." *Id.* at 1370.

Defendants also accuse Mr. Sherwood of treating the claims as equivalent for purposes of infringement (D.I. 343 at 4) but this is a desperate mischaracterization. First, Mr. Sherwood has never treated any claim as representative. Curiously, Defendants' opening brief (D.I. 270 at 11) never points to anywhere in his testimony or expert report that he said/did so.

That Mr. Sherwood incorporates by reference his analysis of claim 1 "68 times" in his infringement report and "62 times in his Rebuttal Invalidity Report" is also of no consequence because to the extent his infringement analysis overlaps between certain asserted claims, Mr. Sherwood is entitled to incorporate the same evidence and analysis by reference. But such incorporation by reference is not an admission that the claims are equivalent as Defendants suggest. For example, it is appropriate for Mr. Sherwood to incorporate by reference subject matter of claim 1 of the '411 patent in its dependent claims since dependent claims necessarily

5

**Appx3938**

include the subject matter of claim 1.  The use of incorporation by reference is immaterial to whether those claims recite the same patent eligible subject matter, particularly where dependent claims, for example, recite additional subject matter not recited in the claim(s) upon which they depend.  *See* M.P.E.P. 1824 (A dependent claim is "any claim which includes all the features of one or more other claims . . . and shall then state the additional features claimed.")

But what dooms Defendants' argument here is that Defendants have never identified the number of claims that incorporate by reference Mr. Sherwood's analysis of and evidence for claim 1 of the '411 patent, and for good reasons—Mr. Sherwood, in addition to incorporating by reference his analysis of and evidence for claim 1 of the '411 patent, also provides ***new and additional*** evidence for those claims, including claim 8 of the '880 patent and claim 21 of the '127 patent (directed to "truncation") and claim 21 of the '880 patent and claims 12 and 25 of the '127 patent (directed to "search").  That is, Mr. Sherwood provides new, different and additional evidence and analysis specific to these dependent claims, which Defendants conveniently ignore to mention to the Court.  (*Compare* D.I. 272 at ¶¶ 743-760, (Sherwood Opening Report) at ¶ 701 (incorporating infringement analysis of independent claim) with ¶¶ 702-711 (new, different and additional infringement analysis and evidence for dependent claim 8 of the '880 patent regarding "truncation") and ¶¶ 730-733 (new, different and additional infringement analysis and evidence for dependent claim 21 of the '880 patent regarding "search").

**B.**     **The Asserted Claims Are Directed to Patent Eligible Subject Matter for the Reasons Set Forth in the Federal Circuit's *Core Wireless* Decision and Judge Hall's Recent Decision in *Apple***

The claims at issue here are most analogous to the claims considered, and found to be patent eligible, in *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018).  There, the patents at issue provided "improved display interfaces, particularly for electronic devices with small screens like mobile telephones . . . . [that] allow a use to more

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and
511 TECHNOLOGIES, INC.,

                Plaintiffs,

      v.

JETBRAINS AMERICAS, INC.,
JETBRAINS INCORPORATED, and
JETBRAINS S.R.O.,

                Defendants.

C.A. No. 1:22-cv-01033-JLH-LDH

JURY TRIAL DEMANDED

**PLAINTIFFS' RULE 72 OBJECTIONS TO MAGISTRATE JUDGE HATCHER'S REPORT AND RECOMMENDATIONS [D.I. 346]**

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.    SUMMARY OF ARGUMENT ........................................................................ 1

III.    LEGAL STANDARDS ................................................................................... 2

IV.    ARGUMENT.................................................................................................. 3

    A.    The R&R Misapplies the Alice Step 1 Analysis by Oversimplifying the Asserted Claims and Discounts Significant Features of the Asserted Claims ....................................................... 3

    B.    Claim 4 Is Not Representative and the R&R Fails to Account for Significant Differences Among the Asserted Claims ..................................................................... 6

    C.    The R&R Fails to Analogize and Afford Proper Weight to the *Core Wireless* Decision and This Court's *Apple v. Masimo* Decision ............................................................ 7

    D.    The R&R Improperly Resolved Factual Disputes Under Alice Step 2 In Favor of Defendant When Defendant and Its Expert Never Rebutted Plaintiffs' Expert Opinions Regarding Inventive Concepts..................................................................... 9

V.    CONCLUSION........................................................................................... 10

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*Apple Inc. v. Masimo Corp.*,
   No. 22-1377 (JLH),
   2024 U.S. Dist. LEXIS 184387 (D. Del. Oct. 9, 2024) ...................................................... 8

*CoolTVNetwork.com, Inc. v. Facebook, Inc.*,
   No. 19-292-LPS-JLH,
   2019 U.S. Dist. LEXIS 157841 (D. Del. Sept. 16, 2019) ........................................... 5

*Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc.,
   880 F.3d 1356 (Fed. Cir. 2018)................................................................................. 7

*Haines v. Liggett Group, Inc.*,
   975 F.2d 81 (1992)...................................................................................................... 2

*Innovative Memory Sys. v. Micron Tech., Inc.*,
   No. 14-1480-RGA-JLH,
    2022 U.S. Dist. LEXIS 177092 (D. Del. Sep. 29, 2022) ........................................... 4

*Rideshare Displays v. Lyft, Inc.*,
   No. 20-1629-RGA-JLH,
   2021 U.S. Dist. LEXIS 129019 (D. Del. July 12, 2021) ......................................... 5, 6

*Trackthings LLC v. Netgear, Inc.*,
   No. 22-981-RGA-JLH,
   2023 U.S. Dist. LEXIS 133862 (D. Del. Aug. 2, 2023) ............................................. 6

*Trident Holdings, Inc. v. HubSpot Inc.*,
   No. 21-401-CFC,
   2022 U.S. Dist. LEXIS 48458 (D. Del. Mar. 18, 2022) ............................................. 7

**Statutes**

28 U.S.C §636.................................................................................................................. 2

**Rules**

Delaware Local Rule 72.................................................................................................... 2

ii<br>
<b>Appx3972</b>

## I.      NATURE AND STAGE OF PROCEEDINGS

With trial scheduled to begin April 14, 2025, and the parties exchanging pre-trial disclosures, Magistrate Judge Hatcher issued a Report and Recommendations on February 25, 2025 (the "R&R") recommending the Court grant Defendants' Motion for Summary Judgment (the "§101 Motion") (D.I. 269), finding all claims to be patent ineligible.  (D.I. 346.)

Pursuant to Federal Rule of Civil Procedure 72, Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively "Plaintiffs") respectfully submit these Objections to the R&R.

## II.      SUMMARY OF ARGUMENT

The R&R should be rejected because of four reversible errors.

First, the R&R oversimplifies the Asserted Claims for purposes of Alice Step 1, contrary to the Federal Circuit's admonition not to read claims at too high a level of abstraction, resulting in the R&R ignoring meaningful claim elements and failing to address what the claims are *directed to*.  Specifically, the R&R misapprehends and overlooks in its entirety the claimed construction of an Active Path, a second interface structure that dynamically changes to allow the display of a "limited set" items based on item selection—the same specific manner covered by those claims found patent eligible in *Apple v. Masimo*.  That R&R has not explained *how* the claimed inventions could be done in "pen and paper" further demonstrates a non-abstract improvement in computer functionality.

Second, the R&R improperly finds claim 4 of the '517 patent to be representative of all claims across the Asserted Patents when some claims focus on the construction and structure of an Active Path and graphical user menu system while others focus on their *functionalities* following construction of the Active Path, including features such as the "truncation" feature and the "search" function—neither of which is disclosed in, nor covered by, the '517 patent.

Third, the R&R misapplies controlling caselaw that distinguishes patent-ineligible

1

**Appx3973**

claims—such as those claimed in purely functional language and which merely use a computer to perform such functions. The Federal Circuit's *Core Wireless* decision speaks to the patent eligibility of the *same* improved interfaces disputed here, and its progeny—including the *Apple v. Masimo* decision of this Court—have repeatedly held similar claims directed to these improved interfaces to be patent eligible. Critically, the R&R did not once address how it arrived at the *opposite* finding of Judge Alan Albright in the Western District of Texas, which confirmed patent eligibility of many of the same claims (including claim 4 of the '517 patent, claims 3 and 8 of the '880 patent, and claims 17 and 21 of the '127 patent) previously challenged by another defendant now found to have infringed these patents by a jury, effectively creating two different decisions in two different jurisdictions for the same claimed inventions.

Fourth, the R&R improperly resolves disputed factual issues under both Alice Step 1 (the presence of unconventional elements or combinations of elements) and Alice Step 2 (improvements to computer functionality) in favor of Defendants despite contrary intrinsic record and Plaintiffs' expert opinions. Also, with respect to Alice Step 2, Defendants never cited to their expert opinion or report of Mr. Monty Myers in their briefing. Because Plaintiffs' expert opinions were never rebutted, the R&R has no factual basis upon which to disagree with his opinions that the claimed inventions are not "well-understood, routine, and conventional."

For at least these reasons, this Court should reject the R&R in its entirety.

## III.     LEGAL STANDARDS

Pursuant to Delaware Local Rule 72(b), because the R&R is dispositive, the standard of review is *de novo* review under 28 U.S.C §636(b)(1)(B) and (C), meaning the district court is permitted to make a *de novo* determination of proposed findings and recommendations, may accept, reject or modify, in whole or in part, the findings and recommendations, and "may also receive further evidence." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (1992).

**Appx3974**

## IV.    ARGUMENT

### A.    The R&R Misapplies the Alice Step 1 Analysis by Oversimplifying the Asserted Claims and Discounts Significant Features of the Asserted Claims

The R&R cites, yet fails to heed, the Federal Circuit's admonition that courts be careful not to oversimplify claims under Alice Step 1. Instead, the R&R views them too generally and fails to account for the requirements of the specific claims, thereby allowing the abstract idea "exception" to swallow the eligibility rule of §101. The R&R gives its first glimpse of such oversimplification when it views the claimed inventions as nothing more than "allow[ing] a user to more easily navigate a file structure that may have many layers and options." (D.I. 346 at 5.)

Critically, such an oversimplification misses the forest for the trees: an existing path to a location is not (re-)traceable if that path is "many layers" deep—a prevalent issue known in the art at the time of the invention. Worse, the R&R completely overlooks a critical aspect of the claimed inventions—the provision and *construction* of a *second interface* (i.e., Active Path) that has its own structure and functionalities separate from the "file structure" and is independently updated that closely tracks item or menu selection. (D.I. 312 at 11-12.) This second interface whose active links are "dynamically" constructed and updated goes beyond a mere abstract idea.

The R&R points to the alleged use of "pen and paper" in finding that "the file path could be created and consulted" (D.I. 346 at 12) but did not once explain how this could be done, even with "sufficient time, or a diagram of sticky notes," and for good reasons—they do not translate into any technical improvement or improvement to computer functionality. Nor did the R&R offer any finding as to how the claimed inventions allegedly "invoke a computer being used merely as a tool to manipulate data or to automate a previously known process"—a pre-requisite to a finding of "abstract ideas" based on "method[s] of organizing human activity—other than it says so. *Innovative Memory Sys. v. Micron Tech., Inc.*, No. 14-1480-RGA-JLH, 2022 U.S. Dist.

3

**Appx3975**

LEXIS 177092, at *29 (D. Del. Sep. 29, 2022).

Nor could the claimed inventions be replicated using "pen and paper" because the claimed Active Path functions to also identify "new places where users might not have known or visited before" (D.I. 314-1 at 13 (¶ 77)) whereas the "pen and paper" methodology presumes such knowledge or visit. Specifically, it is not technologically possible to implement the claimed Active Path simply by jogging down where end users might have navigated or visited because the claimed Active Path encompasses more than just these previously known or visited locations—it offers access to "useful resources not previously known or visited (e.g., source code libraries, new models, extensions not previously known or visited to end users)." (*Id.*)

More fundamentally, the integration of the claimed Active Path (which works in tandem with the claimed graphical user menu system) for providing access to known and unknown items—not the mere use of computers—improves the alleged "pen-and-paper" approach by providing access points to these items while reducing the otherwise required real estate footprint that is finite but crucial to displaying valuable content.

The R&R claims in a footnote that "nothing I reviewed [in the cited portions of Plaintiffs and Defendant's experts] persuades me that the Asserted Claims are patent eligible" (D.I. 346 at 13 n.5) but this only evidences that the R&R is erroneous for failing to credit Plaintiffs' expert opinions regarding these factual disputes. For example, in the context of "valuable real estate"," the R&R discredits Mr. Sherwood's expert report for purportedly lacking "citations, or even references, to specifications or limitations of the Asserted Patents" (D.I. 346 at 13) but he *did* by explicitly pointing to the claimed Active Path as the source of this benefit in the section entitled "Benefit of Saving Screen Space or Screen 'Real Estate'." (*See, e.g.*, D.I. 314-1 at 24 (¶ 100 ("***[I]n the case of an active path, because an active link and its active link(s) are horizontally***

4

**Appx3976**

*oriented and plainly styled, they occupy the least space* . . . As such, the claimed inventions *yield more real estate space for use in displaying valuable content* . . . all the while providing end users the efficient navigational means to review, find, or re-visit such content.").)

The R&R's purported "abstract idea" also fails to account even for the specific claim limitations of allegedly representative claim 4 of the '517 patent, including the use of the Active Path to display its active links, the triggering of which displays "subordinate menu items," thus improving the operation of the interface. The R&R's oversimplification of the claims dooms its finding of patent ineligibility. *Rideshare Displays v. Lyft, Inc.*, No. 20-1629-RGA-JLH, 2021 U.S. Dist. LEXIS 129019 at *9-10 (D. Del. July 12, 2021) ("While there is no dispute that all of the claims are directed to systems and methods for vehicle identification, the claim language does contain some detail about the manner in which those vehicles are identified"); *CoolTVNetwork.com, Inc. v. Facebook, Inc*., No. 19-292-LPS-JLH, 2019 U.S. Dist. LEXIS 157841 at *30-31 (D. Del. Sept. 16, 2019) (finding that the defendant's characterization failed to account for claims requiring user interaction with an "expandable graphical user interface bar").

The R&R relies on *IBM* but the *IBM* court found patent ineligibility only after identifying certain deficiencies with the claims including claims were "result-oriented, describing required functions (presenting, receiving, selecting, synchronizing), without explaining how to accomplish any of the tasks." (*Id*.) Here, the asserted claims are not written in "result-oriented functional language." Instead, they expressly describe and *claim* the *construction* of specific *structures* such as the claimed "graphical user menu system" and "Active Path" (as recited the asserted claims of the '517, '880, and '127 patents) and the "generation" of "graphical-," "sibling-," and "children menu items" (as recited in the asserted claims of the '053 patent).

The R&R's reliance on *Ameranth, Inc. v. Domino's Pizza* and *Apple, Inc. v. Ameranth* is

5

**Appx3977**

also misplaced because the asserted claims here recite claimed steps that demonstrate *how* the

Active Path and the graphical user menu system work in tandem, including *how* to construct the

Active Path and its items (e.g., based on item selection in the graphical user menu system)—far

from those "result-oriented" claims.  That the asserted claims also explicitly recite how an Active

Path can be truncated (e.g., by selecting an active link other than an end link, as disclosed in the

'127 patent) or how hierarchical menu items are generated (as claimed in the '053 patent) further

reinforces that the asserted claims are not drafted in purely functional language.

> **B.** **Claim 4 Is Not Representative and the R&R Fails to Account for Significant Differences Among the Asserted Claims**

The R&R's finding of claim 4 of the '517 patent as representative ignores Plaintiffs'

arguments showing significant differences amongst the claims.  In *Rideshare Displays*, this

Court rejected a claim as representative of 45 claims across five different patents because of their

distinct concepts.  2021 U.S. Dist. LEXIS 129019 at *7-8.  Similarly, in *Trackthings LLC v.

Netgear, Inc.*, No. 22-981-RGA-JLH, 2023 U.S. Dist. LEXIS 133862 (D. Del. Aug. 2, 2023),

this Court rejected a claim as representative of 55 claims across three patents due to different

concepts between independent and dependent claims.

Likewise, claim 4 of the '517 patent focuses on the provision of a "graphical user menu

system" and the *construction* and *structure* of an "Active Path," which is then used to "display"

and access specific "subordinate menu items" when the Active Path is triggered.  Unlike claim 4,

other claims and patents, such as claims 8 and 21 of the '880 patent and claims 12, 21, and 25 of

the '127 patent, focus instead on other features and their *functionalities* following construction

of the Active Path, such as the "search" feature (e.g., claim 21 of '880 patent; claims 12 and 25

of '127 patent) and the "truncation" feature, (e.g., claim 8 of '880 patent; claim 21 of '127

patent), neither of which is covered in claim 4 of the '517 patent.  (D.I. 312 at 6; D.I. 344 at 2-5.)

6
**Appx3978**

Indeed, neither point of novelty is disclosed nor recited in the '517 patent, providing clear evidence that they are distinctively significant concepts. *See Trident Holdings, Inc. v. HubSpot Inc.*, No. 21-401-CFC, 2022 U.S. Dist. LEXIS 48458 at *11 (D. Del. Mar. 18, 2022) (abstract idea too simplified in view of distinct claim limitations directed to patent-eligible concepts). Further, the '053 patent claims do not recite any "construction" or "display" of any "Active Path" structures, and are directed to the different concept of generating "graphical menu items" having a specific hierarchical structure of associated "sibling" and "children" menu items. (D.I. 344 at 2-3.) The R&R acknowledges that the '880, '127, and '053 patents, as continuations-in-part, provide disclosures not found in the '411 or '517 patents (D.I. 346 at 5); yet, it ignores these significant differences in disclosure and claimed concepts among the asserted claims by improperly lumping them all together as one oversimplified abstract idea. (D.I. 346 at 8.)

These significant differences in language, scope, and focus of the ten asserted claims across the four asserted patents precludes designation of claim 4 of the '517 patent as representative. (D.I. 312 at 5-7; D.I. 344 at 1-6.) The R&R's failure to appreciate the significant differences in the claims resulted in mis-designation of claim 4 of the '517 as representative.

> **C. The R&R Fails to Analogize and Afford Proper Weight to the *Core Wireless* Decision and This Court's *Apple v. Masimo* Decision**

Unlike claims in those lines of "do it on a computer cases" that have been found to be patent ineligible, the asserted claims here are analogous to those considered in the Federal Circuit's decision in *Core Wireless Licensing S.A.R.L. v. LG Elecs.*, Inc., 880 F.3d 1356, 1359 (Fed. Cir. 2018) because the claimed inventions are akin to the same types of non-abstract improvements to computer interfaces. There, focusing on the patent specification, which highlighted issues with prior art user interfaces and whose claims provided specific improvements in computer functionality by improving the accessibility and efficiency of the

**Appx3979**

GUI, the Federal Circuit found those claims patent eligible for being directed to "improved display interfaces, particularly for electronic devices with small screens like mobile telephones . . . [that] allow a user to more quickly access desired data stored in, and functions of applications included in, the electronic devices" to be patent eligible. (*Id.*)

Similarly, this Court in *Apple Inc. v. Masimo Corp.*, No. 22-1377 (JLH), 2024 U.S. Dist. LEXIS 184387, at *13 (D. Del. Oct. 9, 2024), found claims to a "wake screen use interface" not to be an abstract idea under §101 because it is "an improved user interface in computing devices," and "directed to 'a particular manner of summarizing and presenting information in electronic devices.'" Likewise, the asserted claims here are directed to specific ways of presenting a "limited set of information"—like the claims in *Apple* requiring the "displaying of a home screen user interface that is different from the wake screen user interface" including "different applications," "icons," and "application content," the claimed Active Path in claim 4 of the '517 patent is directed to the "display of limited set of information" as opposed to information in the ***entire*** hierarchy. Also, unlike the claimed graphical user menu system (which displays "items of a given level"), the constructed Active Path provides different applications, items, and content by displaying only a "limited set" of those items displayed via the claimed graphical user menu system (e.g., only the item selected as well as items at the same level as the selected item) whose content can be viewed "without disturbing the displayed Active Path." Thus, the claimed inventions do not cover "a mere improvement in user experience" (D.I. 346 at 13) but are rooted in a specific and inventive technological improvement. To accept the R&R's "improved user experience" finding here—the ***same*** argument made in *Apple*—would undermine this Court's ruling in that case, even though the claimed inventions also provide the technological improvement of reducing screen real estate, among many others.

**Appx3980**

The R&R attempts to distinguish over *Trading Tech.* and *Data Engine* in a footnote by concluding, without any analysis, that the claims "do not require a specific interface" or "a specific, structured graphical user interface paired with a prescribed functionality." (D.I. 346 at 16 n.9.) The R&R thus has fallen short because, as alluded to above, the claims explain the precise structure of the claimed Active Path and the graphical user menu system (*see, e.g.*, the "providing a graphical user menu system" and "constructing an Active Path" limitations) and their respective functionality (including the "display" and "rolling over" limitations in addition to the "search" and "truncation" limitations that the R&R has completely ignored).

**D.      The R&R Improperly Resolved Factual Disputes Under Alice Step 2 In Favor of Defendant When Defendant and Its Expert Never Rebutted Plaintiffs' Expert Opinions Regarding Inventive Concepts**

The R&R acknowledges that while patent eligibility is a question of law, it rests on underlying facts. (D.I. 346 at 5 citing *Berkheimer,* 881 F.3d at 1368.) The R&R faults Plaintiffs for not "citing to this proposition" in its Opposition (D.I. 346 at 19 n.10), but Plaintiffs' Opposition sets forth both the legal standard that summary judgment is inappropriate in light of disputed issues of fact, (D.I. 312 at 3), and a section entitled "Alice Step 2: The Asserted Patents Disclose and Claim Inventive Concepts That Solve Known Usability, Accessibility and Screen Real-Estate Limitations of Conventional Systems." The Opposition further identifies numerous disclosures in the patent specification and within expert testimony explaining how the combination of structures in the asserted claims provide unconventional, real-world improvements over prior art interfaces. (D.I. 312 at 10-13.) Further, as Plaintiffs expressly noted in their Opposition, "certain dependent claims further elaborate on the inventive concept of the 'active links,' including truncated paths that increase screen real estate (e.g., claim 8 of the '880 patent and claim 21 of the '127 patent)" and that "***Defendants do not address these inventive concepts, much less demonstrate that they were well-understood, routine, or***

9

**Appx3981**

*conventional in the industry*.”  (D.I. 312 at 11.)  Despite these factual citations and arguments, the R&R incorrectly concludes “[n]o party contends that at step 2 of the *Alice* inquiry, factual disputes preclude me from deciding whether the claims include an inventive concept or whether the claim limitations are well understood, routine, and conventional.”  (D.I. 346 at 18.)

The R&R also concludes, without merit, that “the ’517 patent requires nothing more than generic computer technology,” and “its failure to provide implementation details suggests that the ‘active paths’ and ‘active links’ features employ existing computer capabilities.”  (D.I. 346 at 19-20.)  But this is not the standard for eligibility as the R&R recognizes, “an inventive concept can be found in the non-conventional and non-generic arrangement of known conventional pieces.”  (D.I. 346 at 5, citing *Bascom*.)  The inquiry is whether the claimed combination provides unconventional inventive concepts, and Plaintiffs cited extensive evidence, from the patent specifications and Sherwood, showing the claims recite an *unconventional* combination of features that improve computer interfaces.  (D.I. 312 at 11-13, citing Sherwood Report at ¶¶ 78-79, 80, 83, 85, 92-94, 100-101, 103-104, 110, among others.)

But what makes the R&R even more troubling is that it failed to credit *any* of Plaintiffs’ technical expert opinions regarding these inventive concepts, particularly where, as here, *none of these opinions were even rebutted by* Mr. Monty Myers*,* Defendant’s technical expert, which is necessary to resolving any factual disputes.  Indeed, not once did Defendant cite to Mr. Myers’ opinions in its Motion for Summary Judgment (D.I. 270, 323) or supplemental briefing (D.I. 343).  Because Plaintiffs’ expert opinions in this context were never rebutted, the R&R has no factual basis upon which to disagree with his opinions that the claimed inventions are not “well-understood, routine, and conventional.”  (D.I. 312 at 11-13.)

V.      **CONCLUSION**

For at least the foregoing reasons, the R&R should be rejected.

Dated: March 11, 2025

DEVLIN LAW FIRM LLC

*/s/    Timothy Devlin*
Timothy Devlin (No. 4241)
tdevlin@devlinlawfirm.com
Alex Chan (*pro hac vice*)
achan@devlinlawfirm.com
Alan Wright (*pro hac vice*)
awright@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010

*Attorneys for Plaintiffs Caddo Systems
Inc. and 511 Technologies, Inc.*

11
**Appx3983**

## STANDING ORDER CERTIFICATION

Pursuant to the Court's February 25, 2025 Standing Order for Objections Filed Under

Fed. R. Civ. P. 72, Paragraph 5, counsel hereby certifies that Plaintiff's Objections do not raise

any new legal or factual arguments that were not previously presented to the Court in the briefing

or oral argument.

Dated: March 11, 2025      DEVLIN LAW FIRM LLC

             */s/  Timothy Devlin*
             Timothy Devlin (No. 4241)
             tdevlin@devlinlawfirm.com
             Alex Chan (*pro hac vice*)
             achan@devlinlawfirm.com
             Alan Wright (*pro hac vice*)
             awright@devlinlawfirm.com
             1526 Gilpin Avenue
             Wilmington, DE 19806
             Telephone: (302) 449-9010

             *Attorneys for Plaintiffs Caddo Systems*
             *Inc. and 511 Technologies, Inc.*

**Appx3984**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and
511 TECHNOLOGIES, INC.,

      Plaintiffs,

    v.

JETBRAINS AMERICAS, INC.,
JETBRAINS INCORPORATED, and
JETBRAINS S.R.O.,

      Defendants.

C.A. No. 1:22-cv-01033-JLH-LDH

JURY TRIAL DEMANDED

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1.4, Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc.

("Plaintiffs") respectfully request an oral argument regarding Plaintiffs' Rule 72 Objections to

Magistrate Judge Hacher's Report and Recommendations (D.I. 346).

Dated: March 11, 2025

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin (No. 4241)
tdevlin@devlinlawfirm.com
Alan Wright (*pro hac vice*)
awright@devlinlawfirm.com
Alex Chan (*pro hac vice*)
achan@devlinlawfirm.com
Andrew DeMarco (No. 6736)
ademarco@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010

*Attorneys for Plaintiffs Caddo Systems
Inc. and 511 Technologies, Inc.*

**Appx3985**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and
511 TECHNOLOGIES, INC.,

      *Plaintiffs,*

      v.

JETBRAINS AMERICAS, INC.,
JETBRAINS INCORPORATED, and
JETBRAINS S.R.O.,

      *Defendants.*

C.A. No. 1:22-cv-01033-JLH-LDH

JURY TRIAL DEMANDED

**DEFENDANT JBA'S RESPONSE TO PLAINTIFF'S RULE 72 OBJECTIONS TO MAGISTRATE JUDGE HATCHER'S REPORT AND RECOMMENDATIONS [D.I. 346]**

Of Counsel:

BUTZEL LONG P.C.
Daniel G. Vivarelli, Jr.
Aaron S. Kamlay
Barrett R. H. Young
Priya S. Dalal
1901 K Street, NW, Suite 860
Washington, DC 2006
202-454-2800
vivarelli@butzel.com
kamlay@butzel.com
dalal@butzel.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant*
*JetBrains Americas, Inc.*

Dated: March 25, 2025

## TABLE OF CONTENTS

**Page**

I.      Nature and Stage of the Proceedings ..................................................................... 1

II.     Summary of Argument ........................................................................................... 1

III.    Legal Standards ..................................................................................................... 2

IV.     Argument ............................................................................................................... 2

      A.      The R&R's *Alice* Step 1 Analysis is Correct. ......................................... 2

      B.      Claim 4 is Representative and Plaintiffs Failed to Show Otherwise. ...................... 5

      C.      The R&R Properly Considered Precedent. ............................................... 7

      D.      The R&R Properly Weighed Plaintiffs' Technical Expert's Speculation Against
      the Specification and Claims of the Asserted Patents. ............................................ 8

      E.      The Prior "Finding" on Eligibility is Irrelevant and Unsupported. ...................... 10

i

**Appx3987**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ameranth, Inc. v. Domino's Pizza, LLC,*
   792 F. App'x 780 (Fed. Cir. 2019) ........................................................................ 5

*Apple Inc. v. Masimo Corp.,*
   No. 22-1377 (JLH), 2024 U.S. Dist. LEXIS 184387 (D. Del. Oct. 9, 2024) ..................... 1, 7, 8

*Apple, Inc. v. Ameranth, Inc.,*
   842 F.3d 1229 (Fed. Cir. 2016) ........................................................................ 5

*Berkheimer v. HP Inc.,*
   881 F.3d at 1365 (Fed. Cir. 2018) ..................................................................... 6

*CoolTVNetwork.com, Inc. v. Facebook, Inc.,*
   No. 19-292-LPS-JLH, 2019 U.S. Dist. LEXIS 157841 (D. Del. Sept. 16, 2019) ................. 4, 5

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.,*
   880 F.3d 1356 (Fed. Cir. 2018) ................................................................... 1, 7, 8

*IBM v. Zillow Grp., Inc.,*
   50 F.4th 1371 (Fed. Cir. 2022) .................................................................. 1, 5, 10

*Mortgage Grader, Inc. v. First Choice Loan Services.,*
   811 F.3d 1314 (Fed. Cir. 2016) ........................................................................ 9

*Oasis Tooling, Inc. v. Siemens Indus. Software, Inc.,*
   2024 U.S. Dist. LEXIS 116379 ........................................................................ 9

*Rideshare Displays v. Lyft, Inc.,*
   No. 20-1629-RGA-JLH, 2021 U.S. Dist. LEXIS 129019 (D. Del. July 12, 2021) .................... 4

*511 Technologies Inc. and Caddo Systems, Inc. v. Microchip Technology Inc.,*
   No. 6:20-cv-00245-ADA (W.D. Tex.), D.I. 109) ...................................................... 10

**Rules**

Delaware Local Rule 72 ............................................................................... 10

Delaware Local Rule 72(b) .............................................................................. 2

ii

Appx3988

**Statutes**

28 U.S.C §636(b)(1)(B) and (C) ................................................................................ 2

35 U.S.C. § 101 ................................................................................................... *passim*

**Appx3989**

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Magistrate Judge Hatcher issued a Report and Recommendation on February 25, 2025 (the "R&R") recommending the Court grant JBA's Motion for Summary Judgment (D.I. 269) finding all claims to be patent ineligible under 35 U.S.C. §101. Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively "Plaintiffs") submitted Objections to the R&R (D.I. 351). JBA respectfully submits this Response to Plaintiffs' Objections.

## II.     SUMMARY OF ARGUMENT

1.  The R&R properly applies the *Alice* Step 1 analysis. The allegedly inventive features in Plaintiffs' objection were fully addressed and do not provide any inventive concept or unconventional feature to render the Asserted Claims patent eligible, and Plaintiffs fail to tie any such features to the claim language.

2.  The R&R properly finds claim 4 of the '517 patent to be representative. Plaintiffs' "truncation" and "search" features were fully addressed by the R&R.

3.  The R&R properly considered binding precedent. Plaintiffs' arguments regarding *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) or *Apple Inc. v. Masimo Corp.*, No. 22-1377 (JLH), 2024 U.S. Dist. LEXIS 184387 (D. Del. Oct. 9, 2024) were addressed by the R&R. Plaintiffs ignore the R&R's finding that *IBM v. Zillow Grp., Inc.*, 50 F.4th 1371 (Fed. Cir. 2022) shows *Core Wireless* does not apply.

4.  The R&R properly considered Plaintiffs' expert witness report and determined that it fails to overcome the plain language of the Asserted Patents themselves. The Court need not give special weight to conjectural "benefits" of the Asserted Claims that are untethered from the claims themselves, even when presented by an expert.

5.  The Court need not consider the Western District of Texas case mentioned in Plaintiffs' Summary section but not argued. It addressed different claims, identified a representative

1

**Appx3990**

claim from a non-asserted patent, and did not substantively consider validity under §101.

### III.    LEGAL STANDARDS

Pursuant to Delaware Local Rule 72(b), because the R&R is dispositive, the standard of review is *de novo* review under 28 U.S.C §636(b)(1)(B) and (C).

### IV.    ARGUMENT

#### A.    The R&R's *Alice* Step 1 Analysis is Correct.

Plaintiffs re-hash numerous arguments to allege that the R&R (D.I. 346) "views [the Asserted Claims] too generally," first alleging that "the R&R completely overlooks a critical aspect of the claimed inventions – the provision and *construction* of a *second interface* (i.e., Active Path)." Plaintiffs' Rule 72 Objections to Magistrate Judge Hatcher's Report and Recommendations ("P. Obj.", D.I. 351) at 3. This is false. Plaintiffs ignore the fact that the R&R adopted JBA's explanation that the Asserted Claims are "directed to the abstract idea of providing a menu, constructing a sequence of links that duplicate selections from the menu, and displaying the sequence of links as a second menu." D.I. 346 at 11 (citing D.I. 270 at 4, 14). The "sequence of links that duplicate selections from the menu" is exactly the "Active Path" that Plaintiffs rely on to provide the "critical aspect" of the claimed invention. As such, this issue was fully and properly addressed by the R&R.

Plaintiffs next object to the R&R's finding that the invention could be done with pen and paper, alleging that the R&R "did not once explain how this could be done." D.I. 351 at 3. This is also false. The R&R cited to Plaintiffs' own description that prior systems "required users to memorize" complex sequences and notes that, instead of memorizing such a sequence, it could simply be written down on sticky notes. D.I. 346 at 12. Nothing more is required – the R&R takes Plaintiffs at their word that the "path" constructed into the Active Path could have been memorized, and simply notes that it could be written down instead. As the R&R explains,

2

**Appx3991**

automating a pen and paper technique is a "quintessential" abstract idea. *Id*.

Plaintiffs next argue that the R&R fails to consider the opinions of their technical expert, Mr. Sherwood. However, the only example Plaintiffs can provide of this alleged oversight is that Mr. Sherwood opined "because an active path and its active link(s) are horizontally oriented and plainly styled, they occupy the least space" and thus provide "more real estate space for use in displaying valuable content." *Id* at 4-5. However, as Plaintiffs admit, the R&R discredited Mr. Sherwood's report for lacking "citations, or even references, *to specifications or limitations of the Asserted Patents*" D.I. 351 at 4, citing the R&R (D.I. 346) at 13 (emphasis added). That is still the case even in Plaintiffs' single example. Their argument relies on the active links being "horizontally oriented and plainly styled" – features which appear *nowhere* in the Asserted Claims.[1] Thus, Plaintiffs fail to show that the R&R did not fully address this point.

Next, Plaintiffs allege that the abstract idea in the R&R fails to account for the limitations in representative claim 4, again giving only a single example, "the use of the Active Path to display its active links, the triggering of which displays 'subordinate menu items,' thus improving the operation of the interface." D.I. 351 at 5. Plaintiffs do not explain how displaying additional "subordinate" menu items – which is a conventional user interface as admitted in the Background of the Asserted Patents – is not within the abstract idea identified in the R&R. In fact, they cannot do so, because the R&R defines the abstract idea as providing a menu, constructing a sequence of links that duplicate selections from the menu, and displaying the sequence of links *as a second menu*. The Background of the Asserted Patents explains that in

---

[1] Furthermore, in the examples provided in the Asserted Patents, both the original graphical user menu and the Active Path are both displayed horizontally, with menus for each link (in the Active Path) or menu item (in the graphical user menu) displayed vertically. It is hard to imagine how a second menu that exactly duplicates the original menu layout, including horizontal/vertical layout, could rescue the Asserted Claims from invalidity under §101.

3

"menus" existing prior to the alleged invention, "[e]ach level of the menu provides a list of menu choices." *See, e.g.,* '517 patent (D.I. 1-2) at 1:41-42; '880 patent (D.I. 1-3) at 1:44-45; '127 patent and '053 patent (D.I. 1-4; 1-5) at 1:52-53; and Fig. 1a. (D.I. 1-2-5). Accordingly, the R&R accounts for the second menu (the Active Path) and its menu items and properly determines that it is directed to an abstract idea.

Plaintiffs' reliance on *Rideshare Displays v. Lyft, Inc.*, No. 20-1629-RGA-JLH, 2021 U.S. Dist. LEXIS 129019 (D. Del. July 12, 2021), and *CoolTVNetwork.com, Inc. v. Facebook, Inc.*, No. 19-292-LPS-JLH, 2019 U.S. Dist. LEXIS 157841 (D. Del. Sept. 16, 2019), does not save this argument. First, Plaintiffs conveniently omit any details regarding the claims. The *Rideshare* Court found that "most of the claims require the communication of an indicator *by a separate controller to mobile devices* associated with the driver and *the display of that indicator on the exterior of the vehicle* where it can be viewed by the rider so that they can verify they are getting into the correct vehicle…[and] the specification suggests that, prior to the patented invention, there was a need to improve rider and driver security and that the claimed invention, *with a separate controller* that sends a verification signal to the driver and the rider, *is a solution to that problem.*" *Rideshare Displays* 2021 U.S. Dist. LEXIS 129019 at *9-10 (emphasis added). No such features are present in the Asserted Claims, which recite only abstract user interfaces.

Regarding *CoolTVNetwork*, Plaintiffs again misleadingly describe the claims at issue. Contrary to Plaintiffs' suggestion that an "expandable graphical user interface bar" was the determining feature of the claims, in fact the Court noted that the claims required "user interaction with an *allegedly new type of multifunctional hotspot* (hyperlink), where the hotspots activate performance of different functions depending on the user's pre-selected preference ('wherein *a specific mode is selected* by a user through an expandable graphical user interface

4

**Appx3993**

bar') …and/or when they are accessed *during audio/video playback*." *CoolTVNetwork.com, Inc.* 2019 U.S. Dist. LEXIS 157841 at \*30-31 (emphasis added). Again, these claims include new technical features and links to specific hardware in the claims that were not addressed by the abstract idea, which is not remotely the case for the Asserted Claims.

Plaintiffs next criticize the R&R's reliance on *IBM v. Zillow* and allege that the Asserted Claims are not written in "result-oriented functional language" because they allegedly "claim the construction of specific structures." D.I. 351 at 5. Tellingly, Plaintiffs fail to identify any specific claim limitations that show such construction – because there are none. For example, Plaintiffs cite to "the claimed 'graphical user menu system' and 'Active Path'" as recited in the Asserted Claims of the '880 patent. D.I. 351 at 5. The *only* limitation in the '880 claims regarding any supposed "construction" is "dynamically constructing an active path as a sequence of active links after an item of the information structure has been selected."[2] The term "active path" has been construed to mean "a sequence of active links." D.I. 248 at 2. Thus, this limitation requires nothing more than constructing a series of active links based on a user's menu selection. There is no indication of *how* the links are constructed, *how* the active path is constructed "dynamically," or any other details of the "construction" Plaintiffs cite. No phrase better describes this feature than "result-oriented" – the Active Path is simply "constructed," with no further technical details.

Finally, Plaintiffs argument that the R&R incorrectly relied on *Ameranth, Inc. v. Domino's Pizza, LLC*, 792 F. App'x 780 (Fed. Cir. 2019) and *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (Fed. Cir. 2016) again lacks *any* citation to the Asserted Patents to show they involve more than mere user interfaces, which is addressed throughout the R&R. D.I. 346 at 5-6.

      **B.**      **Claim 4 is Representative and Plaintiffs Failed to Show Otherwise.**

---

[2] Asserted Claims 3 and 8 depend from claim 1 and only recite additional features of the active links after they are constructed, and do not show any "construction" as alleged by Plaintiffs.

5

**Appx3994**

The R&R correctly notes that "[c]ourts can treat a claim as representative for purposes of a § 101 analysis if 'the patentee does not present any meaningful argument for distinctive significance of any claim limitations not found in the representative claim.'" D.I. 346 at 7-8 (citing *Berkheimer,* 881 F.3d at 1365). Plaintiffs argue that "other claims and patents… focus instead on other features and their ***functionalities*** following construction of the Active Path." D.I. 352 at 6 (emphasis in original). Once again, Plaintiffs only identify two such features – the "search" and "truncation" features in the '880 and '127 patents. D.I. 351 at 7.

The R&R fully addresses the "search" and "truncation" features. *See* D.I. 346 at 9-10. Plaintiffs present no new arguments to show how these features *meaningfully distinguish* the claims for purposes of analysis under §101. The argument that these features are necessarily "distinctively significant concepts" because they are not disclosed in the '517 patent is misplaced. As JBA has shown, the only "disclosure" of the "truncation" is a single sentence: "After selecting 102b the Active Path is truncated, and 1.2.3 becomes the end link 103" (e.g., '127 patent, col. 6:25). The "search" feature is similarly disclosed only in a general, abstract manner, e.g., "[e]ach menu item may contain additional pointers to functions such as a search entry field 200 used for searching folders, files or content of the subordinate information hierarchy" ('127 patent, col. 8:35-37); "selecting search field 200 in FIG. 7A will enable the user to search the entire hierarchical structure" ('127 patent, col. 8:44-46); and the like. Nowhere do the Asserted Patents disclose *how* the search feature is implemented or operates, meaning that it is no different than a conventional search function as known in the art for decades preceding the alleged invention. It does not *meaningfully distinguish* those claims from representative claim 4.

Plaintiffs attempt to muddy the waters with the more verbose claims of the '053 patent, arguing that they "do not recite any 'construction' or 'display' of any 'Active Path' structures,

6

and are directed to the different concept of generating 'graphical menu items' having a specific hierarchical structure of associated 'sibling' and 'children' menu items." D.I. 351 at 7. JBA has previously shown that these features are equivalent to the abstract idea identified in the R&R. *See* D.I. 343 at 1-3. Plaintiffs' technical expert also confirmed that the '053 patent claims recite construction and use of an Active Path in his report: "As yet another example, the claims of the '053 Patent cover the generation of graphic menu items *and construction of an active path*[.]" Sherwood Opening Infringement Report (D.I. 272) at ¶ 63 (emphasis added). Regardless, the "graphical menu items" with "sibling" and/or "children" menu items are conceptually indistinguishable from the "graphical user interface" and "Active Path" of the '517 patent and representative claim 4. For example, claim 1 of the '053 patent recites "in response to receiving the user input, constructing a graphical user interface that includes one or more selectable links arranged in accordance with the sequence." This is nothing more than receiving a user selection of an item in the graphical user interface and constructing the Active Path accordingly – exactly the same process as in representative claim 4 and the same abstract idea identified in the R&R.

### C.     The R&R Properly Considered Precedent.

Plaintiffs' argument that the R&R didn't "afford proper weight" to the *Core Wireless* and *Apple v. Masimo* decisions is meritless. (D.I. 351 at 7-8) Plaintiffs' rehash their argument that the Asserted Claims are equivalent to the claims in those cases because they allegedly recite a "specific and inventive technological improvement." *Id*. Of course, Plaintiffs fail to identify where the alleged "technological improvement" occurs in the claims, other than to allege vaguely that the Active Path "provides different applications, items, and content by displaying only a 'limited set' of those items displayed via the claimed graphical user menu system" – but tellingly, Plaintiffs do not cite to any claim limitation in support of this proposition.

Regardless, the R&R properly considered these cases and correctly determined that they

7

are inapplicable to the Asserted Claims. The R&R explains that *Core Wireless* was directed to an improvement *to the computer system itself* due to its link to devices with small screens, not just to a slightly different *user interface* as in the Asserted Claims. *See* D.I. 346 at 12-14. Plaintiffs must ignore this feature of *Core Wireless* because the Asserted Claims lack any similar feature.

The R&R also properly considered this Court's decision in *Apple Inc. v. Masimo Corp.,* 2024 U.S. Dist. LEXIS 184387, explaining that "[t]he claims in *Masimo* provided more than a mere improvement in user experience – the claims were directed to 'power-saving benefits' as well. Like *Core Wireless,* and unlike those here, the claims in *Masimo* provided both an improvement in user interface *and* an improvement to computer functioning." D.I. 346 at 17. Plaintiffs continue to ignore this distinction and once again argue that the *Masimo* claims were found eligible based on an "improved user experience," which is simply not the case.

**D.     The R&R Properly Weighed Plaintiffs' Technical Expert's Speculation Against the Specification and Claims of the Asserted Patents.**

Finally, Plaintiffs attempt to manufacture a factual dispute by citing alleged benefits that their technical expert opined could result from use of the alleged invention. Plaintiffs argue that JBA's failure to rebut these allegations specifically through other expert testimony creates a genuine dispute of material fact. D.I. 351 at 9-10. This argument fails for several reasons.

First, Plaintiffs argue as if JBA has never rebutted their expert's speculative opinions. This is false. JBA showed that every limitation in claim 6 of the '411 patent (previously identified as representative) merely recites features described in the Background of the Asserted Patents. *See* D.I. 270 at 19-22. The same applies to representative claim 4, which JBA has shown includes the same structure and abstract idea as claim 6. *Id* at 7-9; *see also* D.I. 343 at 1-3. Thus, any alleged factual dispute is not between Plaintiffs' expert on one side and *nothing* on the other; it is between Plaintiffs' expert and *the specifications and claims of the Asserted Patents*, which

8

**Appx3997**

show that every limitation in the Asserted Claims is a conventional user interface feature. *Id*.

To allege the presence of an inventive concept or unconventional elements, Plaintiffs rely on Mr. Sherwood's laundry list of "benefits," such as "allowing users 'to find what they need easily and quickly' similar to the use of 'You Are Here' that is typically printed in maps." [3] D.I. 312 at 12 (citing Sherwood Report (D.I. 272) at ¶79), cited by D.I. 351 at 10. As noted by the R&R, these benefits do not provide an inventive concept or unconventional element because neither Plaintiffs nor Mr. Sherwood tie them to any claim language other than the Active Path itself or to a vague description of "the invention(s)." However, reliance on an abstract idea itself to allegedly provide an inventive concept does not create a material fact issue at step two, even where the alleged "inventive concept" is offered via expert testimony. *Oasis Tooling, Inc. v. Siemens Indus. Software, Inc.*, 2024 U.S. Dist. LEXIS 116379 at *39-40. Further, no expert testimony is required where the intrinsic evidence of the patents themselves makes it possible to determine eligibility under §101. For example, in *Mortgage Grader, Inc. v. First Choice Loan Services.*, 811 F.3d 1314 (Fed. Cir. 2016), the Federal Circuit found no error where the District Court "looked only to the claims and specifications of the patents-in-suit" *instead of* the expert testimony of record for its §101 analysis. *Id* at 1325. In *Mortgage Grader*, the patent owner's expert identified benefits provided by the asserted claims but did not identify any patent claim terms that provided such benefit. *Id*. That is exactly the case here – Plaintiffs rely on speculative "benefits" offered by the alleged invention but provide no link between those benefits and the claim language. The R&R saw through Plaintiffs' argument and properly rejected such speculation, correctly finding that the "clear inventive concepts" alleged by Plaintiffs amount to

---

[3] Plaintiffs disregard the fact that this, and other "benefits" identified by Mr. Sherwood, further show that the Asserted Claims could be performed on paper, such as by using map indicators.

**Appx3998**

nothing more than either a restatement of the abstract idea itself (which cannot supply the "inventive concept") or are speculative benefits "untethered from the claims." D.I. 346 at 21.

Second, Plaintiffs fail to cite any authority in support of their argument that the Court must give weight to the opinions in Mr. Sherwood's report over the plain language of the Asserted Patents. This Court's Standing Order requires that objections to dispositive motions "shall be supported by legal authority." October 9, 2013 Standing Order for Objections Filed under Fed. R. Civ. P. 72, ¶ 4. Section IV(D) of Plaintiffs' Objections is unsupported by any legal authority and can be disregarded entirely on this basis alone.

### E. The Prior "Finding" on Eligibility is Irrelevant and Unsupported.

Plaintiffs allege in their "Summary" section that "the R&R did not once address how it arrived at the *opposite* finding of Judge Alan Albright in the Western District of Texas" that allegedly "confirmed patent eligibility of many of the same claims." D.I. 351 at 2. Plaintiffs fail to provide any further argument outside of the "Summary" Section or to cite any relevant legal authority. The Court can overrule this objection on that basis alone. It also fails for several other reasons. First, Plaintiffs do not state whether the same representative claim was used (it was not), whether the representative claim was an Asserted Claim (it was not), or whether the prior court substantively addressed §101 invalidity (it did not). Further, the prior litigation took place before *IBM v. Zillow*. Even if the §101 arguments were addressed (they were not), they would have relied on out-of-date precedent that has since been updated by *IBM*, as recognized by the R&R. *See* D.I. 346 at 14. Plaintiffs have also provided no documentation on the "prior finding" other than an almost completely-redacted order showing that a motion under §101 was "denied," without explanation or analysis. D.I. 312 (citing *511 Technologies Inc. and Caddo Systems, Inc. v. Microchip Technology Inc.*, No. 6:20-cv-00245-ADA (W.D. Tex.), D.I. 109). No response to this "finding" is required in the R&R.

10

**Appx3999**

Dated: March 25, 2025

Of Counsel:

BUTZEL LONG P.C.
Daniel G. Vivarelli, Jr.
Aaron S. Kamlay
Barrett R. H. Young
Priya S. Dalal
1901 K Street, NW, Suite 860
Washington, DC 2006
202-454-2800
vivarelli@butzel.com
kamlay@butzel.com
dalal@butzel.com

  */s/ Cortlan S. Hitch*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant
JetBrains Americas, Inc.*

11

**Appx4000**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and )
511 TECHNOLOGIES, INC., )
                                        )
        Plaintiffs, )
                                          )
           v. )           C.A. No. 22-1033-JLH-LDH
                                          )
JETBRAINS AMERICAS INC., )
JETBRAINS INCORPORATED, and )
JETBRAINS S.R.O., )                FILED
                                          )
        Defendants. )           FEB 2 5 2025

**REPORT AND RECOMMENDATION** U.S. DISTRICT COURT DISTRICT OF DELAWARE

Pending before the Court are the following motions:

(i)     Defendant JetBrains Americas Inc.'s ("Defendant" or "JBA") Motion to Dismiss Plaintiff Caddo System, Inc. and 511 Technologies, Inc.'s Second Amended Complaint for Patent Infringement for failure to state a claim (D.I. 177);

(ii)     Defendants JetBrains s.r.o and JetBrains Incorporated's Motion to Dismiss Plaintiffs' Second Amended Complaint for insufficient service of process and for lack of personal jurisdiction (D.I. 200);

(iii)     Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Mr. W. Christopher Bakewell (D.I. 265);

(iv)     JBA's Motion to Exclude Certain Opinions of Mr. Sherwood and Mr. Holzen (D.I. 268);

(v)     JBA's Motion for Summary Judgment (D.I. 269);

(vi)     Plaintiffs' Motion to Exclude Expert Testimony of Monty Myers' Opinions Regarding Noninfringement (D.I. 275);

(vii)     Plaintiffs' Motion for Partial Summary Judgment (D.I. 278); and

(viii)     Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Monty Myers Regarding Invalidity (D.I. 283).

**Appx3948**

As set forth below, I recommend that JBA's Motion for Summary Judgment (D.I. 269) be GRANTED because the Asserted Claims are not directed to patentable subject matter under 35 U.S.C. § 101. I further recommend denying as moot the remaining above-referenced pending motions.

## I.    LEGAL STANDARDS

### A.  Summary Judgment

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Resop v. Deallie*, No. 15-626-LPS, 2017 WL 3586863, at *1 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A), (B)). A factual dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

2

**Appx3949**

## B. Patent Eligibility Under 35 U.S.C. § 101

Section 101 defines the categories of subject matter that are patent eligible. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized three exceptions to the broad statutory categories of patent-eligible subject matter: "laws of nature, natural phenomena, and abstract ideas" are not patent-eligible. *Diamond v. Diehr*, 450 U.S. 175, 185 (1981).

The Supreme Court has established a two-step test for determining whether patent claims are invalid under 35 U.S.C. § 101. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). At step one, the court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 218. This first step requires the court to "examine the 'focus' of the claim, i.e., its 'character as a whole,' in order to determine whether the claim is directed to an abstract idea." *Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 736 (D. Del. 2018) (Bryson, J.) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

Because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 71 (2012), "courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRO Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (quoting *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("[D]escribing the claims at [too] high [a] level of abstraction

3

**Appx3950**

and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule."). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). If the claims are not directed to a patent-ineligible concept, then the claims are patent-eligible under § 101 and the analysis is over. If, however, the claims are directed to a patent-ineligible concept, then the analysis proceeds to step two.

At step two, the court "consider[s] the elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18 (citation and internal quotation marks omitted). "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI Commc'ns*, 823 F.3d at 613. Thus, "[m]erely reciting the use of a generic computer or adding the words 'apply it with a computer'" does not transform a patent-ineligible concept into patent-eligible subject matter. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (quoting *Alice*, 573 U.S. at 223). Nor is there an inventive concept when the claims "[s]imply append [] conventional steps, specified at a high level of generality" to a patent ineligible concept. *Alice*, 573 U.S. at 222. Conversely, claims pass muster at step two when they "involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (citation and internal quotation marks omitted). "The mere fact that something is disclosed in a piece of prior art . . . does not mean it was well-understood, routine, and conventional." *Id.* at

4

**Appx3951**

1369. Moreover, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

"Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368.

At both steps of the *Alice* framework, courts often find it useful "to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101." *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, No. 17-965-LPS-CJB, 2018 WL 4660370, at *5 (D. Del. Sept. 28, 2018) (citing *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016)); *see also Enfish*, 822 F.3d at 1334.

## II.    BACKGROUND

Plaintiffs' Second Amended Complaint alleges, *inter alia*, that Defendant infringes claims 1–4 and 6 of U.S. Pat. No. 7,191,411 ("the '411 patent"), claims 1–6 of U.S. Pat. No. 7,640,517 ("the '517 patent"), claims 1–10 and 12–22 of U.S. Pat. No 8,352,880 ("the '880 patent"), claims 14–25 of U.S. Pat. No. 10,037,127 ("the '127 patent"), and claims 1–6, 8–10, and 12–17 of U.S. Pat. No. 11,182,053 ("the '053 patent") (collectively the "Asserted Patents") (D.I. 169). The '411 and '517 patents' common specification is the "parent" specification, and the '880, '127, and '053 patents' common specification is the continuation-in-part disclosure which includes additional disclosures. (D.I. 270 at 9).

By stipulation, Plaintiffs narrowed the case three times: first reducing the asserted claims to 30; then to 15; and, finally, to 10. (D.I. 230, 233, 263, 340). Plaintiffs' third reduction of the asserted claims, filed on January 24, 2025, dropped the '411 patent and reduced the asserted claims as follows: (1) '517 patent: Claim 4; (2) '880 patent: Claims 3, 8 and 21; (3) '127 patent: Claims

5

**Appx3952**

12, 17, 21 and 25; and (4) '053 patent: Claims 1 and 14 (collectively the "Asserted Claims"). (D.I. 340).

The Asserted Patents claim methods for navigating within a menu or information structure more usefully and efficiently. For example,[1] claim 1 and dependent claims 3 and 4 of the '517 patent state:

1. A method for navigating within a multi-level hierarchical menu structure where each level in the menu contains plural items, said method comprising the steps of:

providing a graphical user menu system displaying the items of a given level and enabling selection thereof, wherein access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy;

constructing an Active Path as a sequence of hierarchical active links as items are selected upon the graphical user menu system, with one said active link corresponding to each of the items selected, each said active link providing direct access to the hierarchical level from which the corresponding item was selected without using said graphical user menu system;

displaying the Active Path as an alternative to the graphical user menu system for navigating the menu structure after the user has finished selecting items using the graphical user system such that the Active Path is displayed;

wherein rolling over a given active link with the pointer of a pointing device triggers the display of menu items on the hierarchical level associated with said given active path link without disturbing the displayed Active Path.

3. The method for navigating according to claim 1, wherein a given active link is browsed by rolling over the given active link with a

---

[1] In the interest of brevity, I have not included the text of every Asserted Claim, and my report and recommendation assumes familiarity with the intrinsic records of the asserted patents, the parties' briefs, and the documents cited therein.

6

pointing device to trigger the display of sibling menu items on the level associated with said given active link.

4. The method for navigating according to claim 3, wherein browsing a given active menu item triggers the display of subordinate menu items.

The Asserted Claims do not cover a complicated concept. In plain English, the Asserted Claims allow a user to more easily navigate a file structure that may have many layers and options.

The parties filed a Joint Claim Construction Brief on March 22, 2024, and the Court held a Markman Hearing on June 5, 2024, issuing its Report and Recommendation on claim construction on September 6, 2024. (D.I. 179, 248). Fact discovery concluded on October 13, 2023, and expert discovery concluded on October 11, 2024. (D.I. 105, 234). Defendant timely moved for summary judgment, arguing that the Asserted Claims were invalid under 35 U.S.C. § 101. Briefing on the summary judgment motion was completed on November 15, 2024. (D.I. 269, 308, 323). In its briefing, Defendant argued that claim 6 of the '411 patent was representative for § 101 purposes. (D.I. 270 at 10–12). Plaintiffs disputed representativeness. (D.I. 312 at 5–7). Thereafter, on January 24, 2025, Plaintiffs dropped the '411 patent from the case. (D.I. 340). I requested supplemental briefing regarding whether Defendant contended that there was still a representative claim in the case for § 101 purposes and, if so, which one. (D.I. 341, 343, 344). Defendant identified claim 4 of the '517 patent as representative. Plaintiffs continue to dispute representativeness.

## III. DISCUSSION

### A. Whether Claim 4 of the '517 Patent Is Representative of the Other Asserted Claims.

Defendant argues, and I agree, that claim 4 of the '517 patent ("claim 4") is representative for § 101 purposes. Courts can treat a claim as representative for purposes of a § 101 analysis if

**Appx3954**

"the patentee does not present any meaningful argument for distinctive significance of any claim limitations not found in the representative claim." *Berkheimer*, 881 F.3d at 1365.

Defendant argues that the Asserted Claims are directed to "the abstract idea of providing a menu, constructing a sequence of links that replicate selections made while navigating the menu, and displaying those links as a second, duplicative navigation interface," (D.I. 343 at 4), and that the remaining Asserted Claims include no features "that would require them to be considered separately from [a] representative [claim]." (D.I. 270 at 12). In asserting that claim 4 is representative, Defendant identifies three common elements present in each of the 10 Asserted Claims: (1) "providing a menu or similar hierarchical structure"; (2) "[c]onstructing a sequence of links (the 'Active Path') that duplicate selections from the menu"; and (3) "[d]isplaying the sequence of links in a second menu, where interacting with a link provides access to related items in the original menu." (*Id.* at 7–9).[2]

Defendant acknowledges that there are differences in the language of the remaining Asserted Claims as compared to claim 4 but argues that such differences do not prevent the Asserted Claims from being conceptually equivalent for purposes of a § 101 analysis. I agree. By way of example, Plaintiffs' expert, Mr. Robert Sherwood, asserts in his Opening Report that, "pre-selecting an active link is equivalent to selecting the active link using a mouse or highlighting the active link using the keyboard or keyboard shortcut because the latter performs the same function

---

[2]    In its supplemental briefing, Defendant identified a fourth common element: "menu items in the active path are displayed when an active link is pre-selected, rolled over, or the like". (D.I. 343 at 3). While pre-selection, rolling over, and other manners of interacting with the Active Path are not interchangeable, they are closely related enough insofar as an action is required for interaction with the Active Path in the Asserted Claims.

8

**Appx3955**

in the same way to provide the same result." (D.I. 272, Ex. 2 ¶ 370).[3] Ultimately, slight differences in language aside, Defendant argues that the differing mechanisms by which a user interacts with the Active Path itself makes no difference to the § 101 analysis; that is, the mechanism by which a user "activates, selects, or otherwise interacts with an active link in the active path makes no difference as to whether the Asserted Claims are directed to an abstract idea without something more." (D.I. 270 at 4).

Plaintiffs dispute that claim 4 is representative but they do not point to any limitation in any Asserted Claim that either by itself or in combination with another limitation *meaningfully distinguishes* claim 4 for § 101 patentability purposes. Instead, they point out that "truncation" and "search function" are terms that exist in the '880 and '127 patents, but not in claim 4 of the '517 patent. Plaintiffs further argue that claim 4 of the '517 patent focuses on the structure of a constructed Active Path, while claims 8 and 21 of the '880 patent and claims 12, 21, and 25 of the '127 patent are focused on the functionalities of a constructed Active Path. (D.I. 312 at 6, 7). But Plaintiffs offer no helpful elaboration of these arguments; and, in any event, the relevant question is whether claim 4 of the '517 patent is representative for purposes of evaluating the Asserted Claims under § 101—that is, whether the claims at issue are "substantially similar" and linked to the same "ineligible concept"—not whether the claims are identical or use identical language. "Limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are 'substantially similar and linked to the same' ineligible concept." *Mobile Acuity Ltd. v.*

---

[3] Defendant also points out that, regarding representativeness, Plaintiffs' own expert incorporates his analysis of claim 1 of the '411 by reference "68 times in his analysis of the other Asserted Patents" and "62 times in his Rebuttal Invalidity Report." (D.I. 270 at 11). While this may be true, Plaintiffs correctly respond that an expert may reference and incorporate certain language in one claim when asserting that a patent is infringed; doing so is not necessarily an admission of representativeness. (D.I. 344 at 5–6).

9

**Appx3956**

*Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) (quoting *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)).

Plaintiffs' reliance on *Diogenes Limited v. DraftKings, Inc.* is, likewise, misplaced. (D.I. 272 at 18–20) (citing No. 21-1695-MN-CJB, D.I. 46 at 9–10 (D. Del. July 18, 2022)). In *DraftKings*, Judge Burke rejected defendant's argument on representativeness because the defendant's motion, which implicated "27 other asserted claims across the seven other patents[—]patents that together include a total of 376 claims," only addressed "a very small number of asserted claims, none with any specificity . . . . [giving] the Court almost no argument or way to meaningfully analyze" defendant's arguments. *DraftKings*, No. 21-1695-JLH-CJB (D.I. 46 at 10). Judge Burke further noted that "[w]hat was plain was that Defendant was straining to cram in argument about a huge smorgasbord of claims that could not responsibly be argued in just one motion like this." *Id.*; *see also Diogenes Limited v. DraftKings, Inc.*, 623 F.Supp.3d 423 (D. Del. Aug. 26, 2022) (overruling objections and adopting Judge Burke's Report and Recommendation). That is not the case here. Defendant provided specific claim language to support its argument that the claims are substantially similar, provided a detailed chart comparing the same along with pages of analysis, and Plaintiffs have failed to provide a showing of distinctive significance between the Asserted Claims.

Accordingly, I perform my analysis of the eligibility of the Asserted Claims under the determination that claim 4 is representative of all Asserted Claims.[4]

---

[4] I have carefully reviewed the other Asserted Claims and they are likewise directed to organizing and displaying information. So, even if I disagreed with Defendant on the issue of representativeness, my analysis and recommendation that the Court grant summary judgment in favor of Defendant would not change.

10

**Appx3957**

**B.** *Alice*, **Step 1**

Defendant contends that claim 4 is directed to the abstract idea of providing a menu, constructing a sequence of links that duplicate selections from the menu, and displaying the sequence of links as a second menu. (D.I. 270, at 4, 14). Plaintiffs complain that Defendant "grossly oversimplify[ies] the Asserted Patents" and that the Asserted Patents are actually "directed to the provision of a novel graphical menu interface and the construction of an Active Path for navigating information structures more usefully, efficiently, and intuitively—whether that structure is a file system, a database, a folder, a web page, or other information structures . . . ." (D.I. 312 at 5).

The Federal Circuit has repeatedly held that many user-interface claims and those directed to collecting and displaying information are abstract. *See, e.g., Ameranth, Inc. v. Domino's Pizza, LLC*, 792 F. App'x 780, 788 (Fed. Cir. 2019) ("synchronous communications and automatic formatting of a programmed handheld menu configuration ('PHMC') that is generated using a master menu and that can displace cascaded sets of . . . . screens" is abstract); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1234 (Fed. Cir. 2016) ("The patent specifications disclose a first menu that has categories and items, and software that can generate a second menu from that first menu by allowing categories and items to be selected"); *IBM v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (finding claims directed to the idea of responding to a user's selection of an area on a map by simultaneously updating the map and displaying a list of items on the map abstract because "[i]dentifying, analyzing, and presenting certain data to a user is not an improvement specific to computing."); *Robocast, Inc. v. Netflix, Inc.*, No. 22-305-JLH, slip op. at

11

**Appx3958**

4 (D. Del. Feb. 21, 2025) (invalidating patents that were directed organizing and displaying playlists of content, and noting that "[c]alling something a technical solution does not make it so").

Defendant argues that claim 4 simply improves user experience, without more, meaning the claims are not patent-eligible. In evaluating Defendant's arguments and determining what the claim is "directed to," I read claim 4 in light of the specification, but my reliance on the specification must always "yield to the claim language" in determining the focus of the claim. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). In so yielding, these steps reveal that the focus of the claim is on an improved user experience that could be replicated by pen and paper drawing out the file navigation options, or a series of sticky notes mapping out a file structure, and not an improvement on technology. Indeed, Plaintiffs tacitly acknowledge as much when arguing that "[n]avigating a website using . . . a conventional system, however, required users to memorize and enter complex URL sequences . . . . As the number of levels increased, the path also became more complex and long, rendering it nearly impossible for users to memorize the entire sequence of the path." (D.I. 312 at 10). But memorization is not necessary. With pen and paper, sufficient time, or a diagram of sticky notes, the file path could be created and consulted. All that claim 4 does, then, is make the human process of navigating a file structure more efficient; the invention is rooted in an idea of improved user experience, not an improvement in technology. This is abstract. A patent that "automate[s] 'pen and paper methodologies' to conserve human resources" is a "quintessential 'do it on a computer' patent" that is directed to abstract idea. *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019).

Plaintiffs rely on *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), in which the Federal Circuit considered the eligibility of "improved display interfaces,

12

particularly for devices with small screens . . . [that] allow a user to more quickly access desired data stored in, and functions and applications included in, the electronic devices." *Id.* at 1359. Plaintiffs argue that the interfaces found patent eligible in *Core Wireless* are like those here because the Asserted Claims disclose specific methods and systems "that display a limited set of information to a user . . . which help make navigation easier and more efficient by solving the problems and drawbacks of navigating such information using conventional prior art interfaces." (D.I. 312 at 11). In particular, Plaintiffs contend that the claims discuss the "valuable real estate in space-limited environment[s]." (*Id.* at 10–14). But most of that argument relates back to the '411 patent, which Plaintiffs dropped, and Mr. Sherwood's expert report, which contains no citations, or even references, to specifications or limitations of the Asserted Patents.[5] (*Id.*). Plaintiffs also cite to claim 8 of the '880 patent and claim 21 of the '127 patent which discuss "truncation." (*Id.* at 6; D.I. 344 at 2–4). But nowhere in the limitations does the claim discuss *how* truncation of the Active Path improves screen real estate, and the specifications of these patents only mention "real-estate" once. ('127 patent at 7:24–26; '880 patent at 7:4–7 (same)).

Defendant further point out that the technology in *Core Wireless* was patent eligible not because of mere improvement in user experience, but because the technology disclosed a "specific manner of displaying a limited set of information to the user" and was directed to "an improvement in the functioning of computers, particularly those with small screens." *Core Wireless*, 880 F.3d at 1363. The Federal Circuit explained that the *Core Wireless* technology was patentable "because it addressed problems specific to navigating applications on small screens, as repeatedly

---

[5]    I have carefully reviewed the cited portions of Plaintiffs and Defendant's experts, and nothing I reviewed persuades me that the Asserted Claims are patent eligible.

emphasized by the patent's specification." *IBM*, 50 F.4th at 1381 (contrasting the technology in *IBM* with the technology in *Core Wireless*).[6]

Defendant has the better argument. As explained by the Federal Circuit in rejecting IBM's contention that its technology was analogous to the patent-eligible technology in *Core Wireless*, just as here, the technology "is not limited to computer screens or any device at all. The method it recites . . . has long been done" by humans, by hand. *IBM*, 50 F.4th at 1381. Here, too, the specification does not discuss improvements to technology; only a user experience. The claims simply take the abstract method and add generic and conventional computer components for navigating information—precisely the "apply it on a computer" directive that *Alice* teaches is insufficient to convert abstract ideas into patentable technology.

Ultimately, there is no limitation in the Asserted Claims for the type of program the technology can be used with, the size of the screen it is implemented upon, nor that the items in the menu exist in any "particular state" as those from *Core Wireless*. 880 F.3d at 1362–63 (finding patent eligibility when there was a specified "particular manner" of accessing the window, "restrain[ing] the type of data . . . displayed", and a "requirement that the device applications exist in a particular state"). Claim 1 of the '517 patent requires "providing a graphical user menu system displaying the items of a given level and enabling selection thereof." However, the claim language provides no particular manner by which the graphical user menu must be accessed. So, at the end of the day, I cannot agree with Plaintiffs' assertion that the patents ought to be eligible because the Active Path "offers significant usability benefit of reducing screen real estate, improving

---

[6]     *See also Rideshare Displays, Inc. v. Lyft, Inc.*, No. 20-1629-RGA-JLH, 2021 WL 2915076, at *4 (D. Del. July 12, 2021), *report and recommendation adopted in part*, No. 20-1629-RGA, 2021 WL 4477242 (D. Del. Sept. 30, 2021) ("A second line of cases, including *Enfish* and *Core Wireless*, draws the distinction between claims that are directed to an improvement in computer technology and claims that use a computer to perform typical computer tasks.").

14

**Appx3961**

navigation efficiency and minimizing search time." (D.I. 344 at 9). That language is not in the claims and, in any event, ease of access for a user cannot, in and of itself, render a patent-ineligible concept patent eligible under § 101. *Simio, LLC v. FlexSim Software Products, Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) (noting that failure to "explain how the computer's functionality is improved beyond inherent improvement of the experience of a user who cannot (or maybe, would rather not) [memorize and enter complex URL sequences]" is fatal, and "'improving a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality.'") (quoting *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (citing *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092–93 (Fed. Cir. 2019))); *see* (D.I. 312 at 10); '517 patent at 2:18–19.[7]

In addition, even if "creating an Active Path" could be construed as something of a novel display environment to bring the claim closer to *Core Wireless*, the Asserted Claims here do not describe how the Active Path is created or how it is displayed; instead, the claims treat the Active Path as a result. *See, e.g., Move, Inc. v. Real Est. All. Ltd.*, 721 F. App'x 950, 955 (Fed. Cir. 2018) ("While the claim limitations provide steps for using the computer to perform the search, they contain no technical details or explanation of how to implement the claimed abstract idea using the computer. Absent such a disclosure, we cannot conclude that claim 1 covers anything more than the use of a computer for conventional business purposes."). And, merely because a claim covers software does not make it a technical solution. *See Broadband iTV, Inc. v. Amazon.com*

---

[7] Plaintiffs admit that "the Asserted Patents are directed to improving known navigation technologies and improved use of *computers as a tool* for software development." (D.I. 312 at 19) (emphasis added); *Enfish*, 822 F.3d at 1336 ("a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool" is not patent-eligible). Moreover, navigating multiple levels as the number of levels increases is not "nearly impossible," as Plaintiffs now argue (D.I 312 at 10); it is merely "extremely cumbersome." '517 patent at 2:21–23.

15

**Appx3962**

*Inc.*, 113 F.4th 1359, 1368–69 (Fed. Cir. 2024) (explaining that reordering content within a user interface "is not a sufficient technological solution to a technological problem, but rather a results-oriented abstract idea").

Moreover, the claims and specification in *Core Wireless* contained an improvement in the functioning of computers, particularly those with small screens; here, the claims do not indicate that they are directed at a specific display environment, and the specification indicates that the invention can be used in standalone applications ('517 patent at 6:21–23, 26–29, 47–50), functions provided on web browsers (*id.* at 6:23–25, 40–44, 66–7:5), client-server applications (*id.* at 6:59–65), operating systems (*id.* at 6:19–22), and audio interfaces (*id.* at 7:6–7), none of which have the display size limitations that the Federal Circuit found persuasive in *Core Wireless*.[8] So, unlike the claims asserted in *Core Wireless*, the '517 patent provides no improvement to computer function nor does it recite claim limitations to a specific computing environment.[9] The Asserted Claims

---

[8] Patents which claim the use of computers must do more than simply apply an abstract idea to the computer as a tool. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018) ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one" of *Alice*.). The fact that a computer can perform such operations more rapidly and efficiently does not make an abstract idea any less abstract or any more patent-eligible. *See, e.g., Simio*, 983 F.3d at 1361 ("[c]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible as an improvement to computer functionality." (internal citation and quotation marks omitted); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

[9] *Data Engine* and *Trading Techs.* are likewise unhelpful to Plaintiffs. In *Data Engine*, the Federal Circuit noted that the claim at issue "recites specific steps detailing the method of navigating . . . [and requires] a specific interface and implementation . . . ." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008–1009 (Fed. Cir. 2018). Here, the Asserted Claims have

16

are more analogous to those in *IBM* where the Federal Circuit found the claims to be "directed to limiting and coordinating the display of information based on a user selection." *IBM*, 50 F.4th at 1378.

Plaintiffs' reliance on Judge Hall's opinion in *Apple Inc. v. Masimo Corp.*, No. 22-1377-JLH, 2024 WL 4452466 (D. Del. Oct. 9, 2024), is similarly misplaced. Plaintiffs argue that in *Masimo*, Judge Hall found claims directed to a "wake screen interface" not abstract because the interface was "an improved user interface in computing devices" and the "claims were nonetheless directed to 'a particular manner of summarizing and presenting information in electronic devices.'" *Masimo*, 2024 WL 4452466, at *3. But Plaintiffs' characterization overlooks a material distinction. The claims in *Masimo* provided more than a mere improvement in user experience—the claims were directed to "power-saving benefits" as well. *Id.* Like *Core Wireless*, and unlike those here, the claims in *Masimo* provided both an improvement in user interface *and* an improvement to computer functioning. *Id.*

Finally, mindful of the Supreme Court's guidance that the machine or transformation test, while not the sole test for patent eligibility, "is a useful and important clue, an investigative tool, for determining whether some claimed inventions" satisfy § 101, *Bilski v. Kappos*, 561 U.S. 593, 604 (2010), I note that the machine or transformation test does not appear to be satisfied here. The abstract idea is not tied to any particular machine, such as the small screens at issue in *Core*

---

no such requirements, lack detail, and do not require a specific interface; instead, the Asserted Claims describe the result. Plaintiffs similarly argue that the asserted claims in *Trading Techs.* are like those here because both provide a more efficient user experience. But the claims in *Trading Techs.* "require[d] a specific, structured graphical user interface paired with a prescribed functionality" and did more than "simply claim displaying information on a graphical user interface," like the Asserted Claims here. *Trading Techs., Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1004 (Fed. Cir. 2017). *Wrinkl, Inc. v. Facebook, Inc.*, No. 20-1345-RGA, 2021 WL 4477022 (D. Del. Sept. 30, 2021), is distinguishable for the same reasons.

17

*Wireless.* Instead, as Defendant points out, "the Asserted Claims may be implemented on any computing device that can display menus." (D.I. 270 at 25).

Accordingly, I determine that at step one of the *Alice* analysis that the patents are directed to patent-ineligible subject matter and thus continue to the required step two.

## C. *Alice*, Step 2

Because I conclude that claim 4 (of the '517 patent), which is representative of all the Asserted Patents, is directed to an abstract idea, I turn to *Alice* step two where I consider "the claim elements individually and as an ordered combination to assess whether they 'transform the nature of the claim into a patent-eligible application of the abstract idea.'" *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379 (Fed. Cir. 2024) (quoting *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017)). "A claim cannot rest on the patent-ineligible concept alone to transform the invention into something significantly more than that concept." *Id.* (citing *BSG Tech*, 899 F.3d at 1290). Instead, the claims must disclose "additional features . . . that constitute an inventive concept" and that are "more than well-understood, routine, conventional activity." *IBM*, 50 F.4th at 1379 (citation omitted). No party contends that at step two of the *Alice* inquiry, factual disputes preclude me from deciding whether the claims include an inventive concept or whether the claim limitations are well-understood, routine, and conventional. *See BSG Tech*, 899 F.3d at 1290 ("Whether a combination of claim limitations supplies an inventive concept that renders a claim 'significantly more' than an abstract idea to which it is directed is a question of law. Underlying factual determinations may inform this legal determination. . . in cases where the only issue at step two is whether claim limitations are well-

18

understood, routine, and conventional, a genuine dispute over that issue will preclude summary judgment that a claim is ineligible under § 101.") (citation omitted).[10]

Plaintiffs contend that "there are clear inventive concepts across the varied scope of the . . . Asserted Claims that solve recognized usability, accessibility, and other deficiencies in conventional navigation systems and methods." (D.I. 312 at 10). Specifically, Plaintiffs appear to emphasize as inventive the concept of an "active path" and "active links" to create a novel user interface and "facilitate[] the exploration of menus, items, and locations without the need to revisit the root or top node or level or the need to memorize and enter complex hierarchical sequences." (*Id.*). But these purportedly inventive concepts simply restate the abstract goals of the invention— that is, providing a menu, constructing a sequence of links that duplicate selections from the menu, and displaying the sequence of links as a second menu. Indeed, the '517 patent requires nothing more than generic computer technology, *e.g.*, '517 patent at 3:14–21, and its failure to provide any implementation details suggests that the "active path" and "active links" features employ existing computer capabilities. Plaintiffs do not contend otherwise.

Further, claim 4 neither teaches how these tasks are accomplished nor provides a new algorithm or method for doing any of those tasks. Instead, claim 4 states, in functional language, that the tasks should be performed. "[C]laims to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using

---

[10]     In their supplemental submission, Plaintiffs cite (without elaboration) the rule that whether claims "perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims." (D.I. 344 at 5 (quoting *Berkheimer*, 881 F.3d at 1370)). Plaintiffs did not cite this proposition in their original Answering Brief opposing summary judgment. (D.I. 312). Nor do Plaintiffs offer any meaningful argument in either their Answering Brief or supplemental submission as to what material facts should preclude me from rendering a § 101 determination at this stage. Thus, to the extent Plaintiffs maintain that they contest summary judgment on the basis of disputed facts, I consider Plaintiffs to have long conceded this issue.

19

generic computer concepts in a conventional way' do not suffice at step two." *IBM*, 50 F.4th at 1379 (quoting *Bascom*, 827 F.3d at 1352). The specification makes clear that the Asserted Claims can be performed using conventional computer technology. (*See, e.g.*, '517 patent at 6:19–32, 47–65). And, although Plaintiffs assert that the "claimed active path and its active links are not functional in nature because they recite specific steps that accomplish the desired result" (D.I. 312 at 11) (citation and internal quotation marks omitted), Plaintiffs offer no analysis to buttress their contention and do not identify any claim that recites any such specific steps.

Relying on their expert, Plaintiffs maintain that the "unconventional combinations of features" in the claimed inventions "resolve a long-standing issue with prior art navigation methods and systems, and provide numerous improvements to navigation of complex information structures." (*Id.*). For example, Plaintiffs contend that the claimed inventions help users "find what they are looking for" by, for example, orienting users to avoid "losing track of their location within a complex structure of a code base, website, document, folder, structure, or database"; "allowing software developers to view a project from various vantage points within a code base and perform different tasks" therein; "minimizing complex interactions" within a system; "increasing the value of the source code" by easing navigation within it, including by reducing "clicks"; maximizing "screen real estate" over "conventional menu systems"; and "minimizing user frustration, stress." (D.I. 312 at 11–12). But the allegedly inventive concept that solves problems identified in the field is the abstract idea itself. "[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *ChargePoint*, 920 F.3d at 774 (quoting *BSG Tech*, 899 F.3d at 1290).

Moreover, I am unpersuaded by Plaintiffs' expert testimony because it is untethered from the claims. For example, the expert opines that the claimed invention provides "higher user retention and engagement with the code base" and reduces "unintended code fragment." (D.I. 312 at 11–12). Plaintiffs do not point to any claim reciting such features nor do they link these purported benefits to a claimed limitation.

Accordingly, "taken individually or in combination, the recited limitations neither improve the functions of the computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) (citing *Alice*, 573 U.S. at 224). Because none of the claims recite an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application of the abstract idea, I conclude that the Asserted Patents claim ineligible subject matter under § 101.

## IV. Conclusion

For the reasons previously stated, I recommend GRANTING Defendant JBA's Motion for Summary Judgment (D.I. 269) and denying as moot all other motions pending in this action.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.

Appx3968

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: February 25, 2025

_____
Laura D. Hatcher
United States Magistrate Judge

22

**Appx3969**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| CADDO SYSTEMS, INC. and 511 TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICROCHIP TECHNOLOGY INCORPORATED, <br><br> Defendant. | Civil Action No. 6:20-cv-245-ADA <br><br><br> DEMAND FOR JURY TRIAL |

## ORDER

Before the Court are the parties' respective motions for summary judgment, *Daubert* motions, and disputed motions *in limine*. The Court held a hearing concerning these motions on May 18, 2022. During the hearing, the Court provided oral rulings on each of the motions. The Court now enters those rulings. The rulings are subject to all of the Court's clarifying explanations as set forth in the hearing transcript (ECF No. 205).

| Dkt. No. | Motion | Ruling |
|---|---|---|
| 107 | Caddo's Motion for Partial Summary Judgment Regarding the Priority Dates of the CIP Patents and to Preclude the Wroblewski Book as a Prior Printed Publication to the Asserted Patents | Denied. |
| 66 | Microchip's Motion to Strike Portions of Caddo's Expert Infringement Report | Granted-in-part: Mr. Sherwood's Doctrine of Equivalents opinions are stricken. <br><br> Denied on all other grounds. |
| 127 | Microchip's Cross-Motion for Summary Judgment of | Denied. |

**Appx4011**

| | | |
|---|---|---|
| | Noninfringement (of the Old Website and the Forum) | |
| 109 | Caddo's Motion for Partial Summary Judgment Regarding Infringement | Denied. |
| 105 | Microchip's Daubert Motion to Exclude Certain Opinions of Justin Blok and Robert Sherwood | Denied. |
| 99 | Caddo's Daubert Motion to Exclude Certain Opinions of Edward Tittel Regarding Invalidity | Granted-in-part: Mr. Tittel may testify on factual underpinning of inventorship, but may not opine on whether Mr. Wroblewski conceived and reduced the alleged prior invention to practice, and did not abandoned, concealed or suppressed, as that is a legal conclusion.<br><br>Denied on all other grounds. |
| 48 | Microchip's Motion to Strike Portions of Caddo's Final Infringement Contentions re Redesigned Website | Denied. |
| 103 | Microchip's Motions for Summary Judgment | Granted-in-part: Defendant's motion for summary judgment on pre-suit indirect infringement and willful infringement is granted.<br><br>Denied on all other grounds. |
| 101 | Caddo's Daubert Motion to Exclude Certain Opinions of Edward Tittel Regarding Noninfringement | Granted-in-part: Paragraphs 95 and 96 of Mr. Tittel's expert report—regarding the "pre-selecting", "browsing," "rolling over", "provisional selection" terms—are stricken. Also, Mr. Tittle's rebuttal opinion as to the numerical value of the recommended reasonable royalty rate (no more than 5%) is stricken.<br><br>Denied on all other grounds. |

Appx4012

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and
511 TECHNOLOGIES, INC.,

*Plaintiffs,*

v.

JETBRAINS AMERICAS INC.,
JETBRAINS INCORPORATED and
JETBRAINS S.R.O,

*Defendants.*

C.A. No.: 1:22-cv-01033-JLH

JURY TRIAL DEMANDED

FILED

JUN 1 2 2024

U.S. DISTRICT COURT DISTRICT OF DELAWARE

## JOINT STIPULATION TO NARROW THE CASE

Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc.'s (collectively, "Caddo") and

Defendant JetBrains Americas, Inc. ("JBA"), by and through their undersigned counsel, hereby

stipulate and agree, subject to the approval of the Court, to narrow the case as follows:

1.       For the first phase, by no later than June 5, 2024, Caddo will reduce the number of

asserted claims to 30.  By no later than June 19, 2024, JBA will reduce the number of prior art

references (excluding the admitted prior art in the asserted patents) to 40 references, with no more

than 20 references that have been charted in JBA's Invalidity Contentions and with the remaining

coming from the state of the art/background knowledge section.

2.       For the second phase, the Parties will further narrow with Caddo identifying 15

representative claims across the Asserted Patents, and JBA identifying 10 prior art references and

20 obviousness combinations after the close of expert discovery and 1 month before dispositive

motions are due.

3.       For the third phase, a week before Caddo provides JBA with the draft pretrial order,

Caddo will reduce the number of asserted claims to 10 claims to be tried.

**Appx4020**

The Parties also met and conferred regarding named Defendants JetBrains s.r.o. ("JBSRO") and JetBrains Incorporated ("JBI"), both of which have filed a motion to dismiss for insufficient service of process and lack of personal jurisdiction (*see* D.I. 200). Subject to the Court exercising jurisdiction over JBI and/or JBSRO, JBI and JBSRO will agree to be bound by this case-narrowing proposal if the Court exercises jurisdiction over each respective defendant. JBI and JBSRO make this agreement without waiver to any arguments made in their pending motion to dismiss. Caddo likewise agrees to assert the same 15 representative claims and try the same 10 claims against all defendants in the case should the Court exercise jurisdiction over JBI and/or JBSRO.

Dated: June 4, 2024

DEVLIN LAW FIRM LLC

MORRIS JAMES LLP

*/s/ Andrew DeMarco*
Timothy Devlin (#4241)
tdevlin@devlinlawfirm.com
Jason Shapiro (pro hac vice)
jshapiro@devlinlawfirm.com
Alex Chan (*pro hac vice*)
achan@devlinlawfirm.com
Peter A. Mazur (# 6732)
pmazur@devlinlwfirm.com
Andrew DeMarco (#6736)
ademarco@devlinlawfirm.com
1526 Gilpin Ave.
Wilmington, DE 19806
Telephone: (302) 449-9010

*Attorneys for Plaintiffs*
*Caddo Systems, Inc. and*
*511 Technologies, Inc.*

*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*JetBrains Americas, Inc.,*
*JetBrains s.r.o and*
*JetBrains Incorporated*

2
**Appx4021**

**SO ORDERED** this ___12th___ day of June, 2024

_____
United States MAGISTRATE Judge

`IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CADDO SYSTEMS, INC. and 511
TECHNOLOGIES, INC.,

      Plaintiffs,

      v.

JETBRAINS AMERICAS INC.
JETBRAINS INCORPORATED
and JETBRAINS S.R.O.,

      Defendants.

Civil Action No. 1:22-cv-01033-JLH

**JURY TRIAL DEMANDED**

## NOTICE OF PLAINTIFFS' SECOND REDUCTION OF ASSERTED CLAIMS

Pursuant to the Parties' Joint Stipulation to Narrow the Case (D.I. 225) in which Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc. (collectively, "Caddo"), by and through their undersigned counsel, have agreed to further reduce the number of asserted claims to fifteen (15), Plaintiffs hereby provide notice as to the identity of these fifteen (15) claims:

1. '411 patent: Claim 6 (1 claim);

2. '517 patent: Claims 1 and 4 (2 claims);

3. '880 patent: Claims 3, 4, 8 and 21 (4 claims);

4. '127 patent: Claims 12, 16-17, 21 and 24-25 (6 claims); and

5. '053 patent: Claims 1 and 14 (2 claims).

**Appx4023**

Date: October 16, 2024

Respectfully submitted,

*/s/ Andrew DeMarco*
Alex Chan (*pro hac vice*)
Andrew DeMarco (#6736)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19801
(302) 449-9010
achan@devlinlawfirm.com
ademarco@devlinlawfirm.com

*Counsel for Plaintiffs*
*Caddo Systems, Inc. and*
*511 Technologies, Inc.*

`IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CADDO SYSTEMS, INC. and 511 TECHNOLOGIES, INC., | |
| *Plaintiffs,* | C.A. No. 1:22-cv-01033-JLH |
| v. | |
| JETBRAINS AMERICAS INC. JETBRAINS INCORPORATED and JETBRAINS S.R.O., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

### NOTICE OF PLAINTIFFS' THIRD REDUCTION OF ASSERTED CLAIMS

Pursuant to the Parties' Joint Stipulation to Narrow the Case (D.I. 225) in which Plaintiffs

Caddo Systems, Inc. and 511 Technologies, Inc. (collectively, "Caddo"), by and through their

undersigned counsel, have agreed to further reduce the number of asserted claims from fifteen (15)

to ten (10), Plaintiffs hereby provide notice as to the identity of these ten (10) claims:

1. '517 patent: Claim 4 (1 claim);

2. '880 patent: Claims 3, 8 and 21 (3 claims);

3. '127 patent: Claims 12, 17, 21 and 25 (4 claims); and

4. '053 patent: Claims 1 and 14 (2 claims).

Date: January 24, 2025

Respectfully submitted,

/s/Andrew DeMarco
Andrew DeMarco (#6736)
ademarco@devlinlawfirm.com
Alex Chan (*pro hac vice*)
achan@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19801
Tel: (302) 449-9010

*Counsel for Plaintiffs*
*Caddo Systems, Inc. and*
*511 Technologies, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 24, 2025, all counsel of record who are

deemed to have consented to electronic service are being served with a copy of this document via

the Court's CM/ECF system per Local Rule CV-5.

/s/*Andrew DeMarco*
Andrew DeMarco

|   | Term | Court's Construction |
|---|------|---------------------|
| 1 | "multi-level hierarchical collapsing menu structure"<br><br>('411 patent, claim 1) | a hierarchical menu structure having more than one level where the menu collapses after a selection of a menu item is made |
| 2 | "access of said given level requires sequential access of each of the levels preceding said given level in the hierarchy"<br><br>('411 patent, claim 1; '517 patent, claim 1) | access of the given level requires sequential access through each of the levels preceding the given level in the hierarchy |
| 3 | "one said active link corresponding to each of the items selected"<br><br>('411 patent, claim 1; '517 patent, claim 1) | one active link corresponds to an item selected |
| 4 | "a plurality of graphical menu items"<br><br>('053 patent, claims 1–6, 16, and 17) | more than one graphical menu item |

I recommend that the following disputed claim terms be construed as follows:

|   | Term | Court's Construction |
|---|------|---------------------|
| 1 | "each level in the menu contains plural items"<br><br>('411 patent, claim 1; '517 patent, claim 1) | Preamble limiting; "each level in the menu contains more than one item" |
| 2 | "Active Path"<br><br>('411 patent, claims 1-4, 6; '517 patent, claims 1–6; '880 patent, | "a sequence of links created as a menu system is navigated" |

2

# Appx4029

Therefore, I recommend the Court find "plural items" in the preamble limiting and adopt the parties' joint construction that "plural items" means "more than one item."

### 2. "Active Path"

The term "Active Path" appears in the '411 patent in claims 1 through 4 and 6, the '517 patent in claims 1 through 6, the '880 patent in claims 1 and 6 through 9, and the '127 patent in claims 1 through 25. For example, claim 1 of the '411 patent states:

> 1. A method for navigating within a multi-level hierarchical collapsing menu structure where each level in the menu contains plural items . . . said method comprising the steps of: . . .
>
> > automatically constructing an Active Path as a sequence of hierarchical active links as items are selected using the graphical user menu system without the need for any additional interaction with the graphical user system, with one said active link corresponding to each of the items selected, each said active link being independently selectable thereby providing direct access to the hierarchical level from which the corresponding item was selected without the need to navigate using said graphical user menu system; . . .

Plaintiffs' proposed construction for "Active Path" is "a sequence listing of active links." Defendant proposes narrower constructions.

The asserted patents are directed to methods for navigating within a multi-level hierarchical collapsing menu structure. ('411 pat. at 2:28–30). Each level of the menu contains "plural items." (*Id.* at 2:28–37). As items are selected, the "Active Path" is constructed as a sequential listing of what the patent calls "active links." (*Id.* at 2:37–41). These active links correspond to an item selected. (*Id.*). The active links enable the user to directly access the level and items that correspond to a given level. (*Id.* at 2:41–43). This method, and by extension the "Active Path," allows for a more efficient way to navigate the hierarchical menu system. (*Id.* at 2:22–24).

9

**Appx4036**

Plaintiffs argue that the specification explicitly defines "Active Path" by citing excerpts from the patents' specifications that purportedly confine the "Active Path" to active links. (D.I. 179 at 30 (citing '411 pat. at 4:9–12 ("The Active Path 100 consists of a sequential listing of active links"); '880 pat. at 4:20–24 (same)). But as discussed above, the specification makes clear that the "Active Path" is not just a sequence of active links. It is a specific sequence assembled when (*i.e.* at the time of) navigating through a menu system. (*See* '411 pat. at 2:37–41 ("An Active Path is dynamically constructed as a sequence of active links as items are selected using the graphical user menu system, with one active link correspond to each of the items selected."); '517 pat. at 2:38–42 (same); '880 pat. at 2:41–44 (same)). Accordingly, I recommend the Court construe "Active Path" to mean "a sequence of links created as a menu system is navigated."

I also note that at least two other courts have similarly construed "Active Path" as recited in the in the '411, '517, '880, and '127 patents. Judge Albright of the U.S. District Court for the Western District of Texas construed "Active Path" to mean "a sequence of links dynamically created as a menu system is navigated." (D.I. 180-1). Similarly, Judge Young of the U.S. District Court for the District of Massachusetts construed "Active Path" to mean "a sequence of links constructed during menu navigation by the user." (D.I. 180-2 at 7). And, in fact, Judge Young's proposed construction was agreed to by Plaintiffs. (*Id.* ("The Court: 'A sequence of links constructed during menu navigation by the user.' Mr. Chan: I hate to say this. I'm fine with that[.]"). Thus, the "Active Path" is more than what Plaintiffs maintain it consists of. Judges Albright and Young appear to agree, and their constructions are consistent with mine here.

Accordingly, I recommend a construction consistent with those previously adopted (and even agreed to by Plaintiffs) that defines "Active Path" as "a sequence of links created as a menu system is navigated."

10

**Appx4037**

**Query**      **Reports**      **Utilities**      **Help**      **Log Out**

CLOSED,CASREF,PATENT

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:22-cv-01033-JLH-LDH

| | |
|---|---|
| Caddo Systems, Inc. et al v. Jetbrains Americas, Inc. | Date Filed: 08/04/2022 |
| Assigned to: Judge Jennifer L. Hall | Date Terminated: 04/10/2025 |
| Referred to: Judge Laura D. Hatcher | Jury Demand: Plaintiff |
| Related Case: 1:22-cv-01028-MN | Nature of Suit: 830 Patent |
| Cause: 35:1 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Caddo Systems, Inc.** | represented by | **Timothy Devlin** |
| | | Devlin Law Firm LLC |
| | | 1526 Gilpin Avenue |
| | | Wilmington, DE 19806 |
| | | (302) 449-9010 |
| | | Fax: (302) 353-4251 |
| | | Email: tdevlin@devlinlawfirm.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Andrew Peter DeMarco** |
| | | Devlin Law Firm LLC |
| | | 1526 Gilpin Avenue |
| | | Wilmington, DE 19806 |
| | | 610-457-9301 |
| | | Fax: 302-353-4251 |
| | | Email: ademarco@devlinlawfirm.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **James Michael Lennon** |
| | | Devlin Law Firm |
| | | 1526 Gilpin Avenue |
| | | 19806 |
| | | Wilmington, DE 19806 |
| | | 302-449-9010 |
| | | Fax: 302-353-4251 |
| | | Email: jlennon@devlinlawfirm.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Joel William Glazer** |
| | | Devlin Law Firm LLC |
| | | 1526 Gilpin Ave |
| | | Wilmington, DE 19806 |
| | | 440-667-7109 |

Appx004044

Email: jglazer@devlinlawfirm.com
*ATTORNEY TO BE NOTICED*

**Peter Akawie Mazur**
Devlin Law Firm LLC
1526 Gilpin Avenue
Wilmington, DE 19806
302-203-0078
Fax: 302-353-4251
Email: pmazur@devlinlawfirm.com
*ATTORNEY TO BE NOTICED*

**Veronica McCarty**
Saul Ewing LLP
1500 Market Street
Philadelphia, PA 19103
267-242-1668
Email: veronica.mccarty@saul.com
*TERMINATED: 03/19/2024*

**Plaintiff**

**511 Technologies, Inc.**              represented by **Timothy Devlin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Peter DeMarco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Michael Lennon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel William Glazer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Akawie Mazur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Veronica McCarty**
(See above for address)
*TERMINATED: 03/19/2024*

V.

**Defendant**

Appx004045

**Jetbrains Americas, Inc.**       represented by  **Aaron S. Kamlay**
Email: kamlay@butzel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cortlan S. Hitch**
Morris James LLP
500 Delaware Ave
Ste 1500
Wilmington, DE 19801
302-888-6988
Fax: 302-571-1750
Email: chitch@morrisjames.com
*ATTORNEY TO BE NOTICED*

**Daniel G. Vivarelli , Jr.**
Email: vivarelli@butzel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth Laurence Dorsney**
Morris James LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19899-2306
(302) 888- 6855
Fax: (302) 571-1750
Email: kdorsney@morrisjames.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jetbrains, Inc.**       represented by  **Kenneth Laurence Dorsney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jetbrains s.r.o.**       represented by  **Kenneth Laurence Dorsney**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/04/2022 | 1 | COMPLAINT FOR PATENT INFRINGEMENT filed with Jury Demand against Jetbrains Americas, Inc. ( Filing fee $ 402, receipt number ADEDC-3930879.) - filed by Caddo Systems, Inc., 511 Technologies, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Civil Cover Sheet)(lam) (Entered: 08/05/2022) |
| 08/04/2022 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (lam) (Entered: 08/05/2022) |

| 08/04/2022 | 3 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 7,191,411 B2 ; US 7,640,517 B2 ; US 8,352,880 B2 ; US 10,037,127 B2 ; US 11,182,053 B2. (lam) (Entered: 08/05/2022) |
|---|---|---|
| 08/05/2022 | 4 | Summons Issued as to Jetbrains Americas, Inc. on 8/5/2022. (lam) (Entered: 08/05/2022) |
| 08/05/2022 | 5 | Disclosure Statement pursuant to Rule 7.1: No Parents or Affiliates Listed filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 08/05/2022) |
| 08/10/2022 | | Case Assigned to Judge Maryellen Noreika. Please include the initials of the Judge (MN) after the case number on all documents filed. Associated Cases: 1:22-cv-01028-MN, 1:22-cv-01033-MN (rjb) (Entered: 08/10/2022) |
| 08/18/2022 | 6 | WAIVER OF SERVICE returned executed by Caddo Systems, Inc., 511 Technologies, Inc.: For Jetbrains Americas, Inc. waiver sent on 8/8/2022, answer due 10/7/2022. (Devlin, Timothy) (Entered: 08/18/2022) |
| 08/19/2022 | 7 | MOTION for Pro Hac Vice Appearance of Attorney Daniel G. Vivarelli, Jr. and Attorney Aaron S. Kamlay - filed by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 08/19/2022) |
| 08/19/2022 | | SO ORDERED re 7 MOTION for Pro Hac Vice Appearance of Attorney Daniel G. Vivarelli, Jr. and Attorney Aaron S. Kamlay filed by Jetbrains Americas, Inc. ORDERED by Judge Maryellen Noreika on 8/19/2022. (dlw) (Entered: 08/19/2022) |
| 08/22/2022 | | Pro Hac Vice Attorney Aaron S. Kamlay for Jetbrains Americas, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 08/22/2022) |
| 08/23/2022 | | Pro Hac Vice Attorney Daniel G. Vivarelli, Jr for Jetbrains Americas, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 08/23/2022) |
| 09/09/2022 | 8 | PROPOSED ORDER // STIPULATED PROTECTIVE ORDER by 511 Technologies, Inc., Caddo Systems, Inc. (Devlin, Timothy) Modified on 9/9/2022 (dlw). (Entered: 09/09/2022) |
| 09/09/2022 | 9 | STIPULATED PROTECTIVE ORDER. Signed by Judge Maryellen Noreika on 9/9/2022. (dlw) (Entered: 09/09/2022) |
| 10/03/2022 | 10 | STIPULATION TO EXTEND TIME for Jetbrains to answer, move, or otherwise respond to the Complaint to October 21, 2022 - filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/03/2022) |
| 10/03/2022 | | SO ORDERED re 10 STIPULATION TO EXTEND TIME for Jetbrains to answer, move, or otherwise respond to the Complaint to October 21, 2022 (Set/Reset Answer Deadlines: Jetbrains Americas, Inc. answer due 10/21/2022). ORDERED by Judge Maryellen Noreika on 10/3/2022. (dlw) (Entered: 10/03/2022) |
| 10/06/2022 | 11 | MOTION for Pro Hac Vice Appearance of Attorney Alex Chan - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 10/06/2022) |

| | | |
|---|---|---|
| 10/06/2022 | | SO ORDERED re 11 MOTION for Pro Hac Vice Appearance of Attorney Alex Chan filed by 511 Technologies, Inc., Caddo Systems, Inc. ORDERED by Judge Maryellen Noreika on 10/6/2022. (dlw) (Entered: 10/06/2022) |
| 10/21/2022 | 12 | MOTION to Dismiss for Failure to State a Claim - filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/21/2022) |
| 10/21/2022 | 13 | OPENING BRIEF in Support re 12 MOTION to Dismiss for Failure to State a Claim filed by Jetbrains Americas, Inc..Answering Brief/Response due date per Local Rules is 11/4/2022. (Dorsney, Kenneth) (Entered: 10/21/2022) |
| 10/21/2022 | 14 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Jetbrains, N.V. for Jetbrains Americas, Inc. filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/21/2022) |
| 11/04/2022 | 15 | ANSWERING BRIEF in Opposition re 12 MOTION to Dismiss for Failure to State a Claim filed by 511 Technologies, Inc., Caddo Systems, Inc..Reply Brief due date per Local Rules is 11/14/2022. (Devlin, Timothy) (Entered: 11/04/2022) |
| 11/14/2022 | 16 | REPLY BRIEF re 12 MOTION to Dismiss for Failure to State a Claim filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/14/2022) |
| 11/15/2022 | 17 | REQUEST for Oral Argument by Jetbrains Americas, Inc. re 12 MOTION to Dismiss for Failure to State a Claim . (Dorsney, Kenneth) (Entered: 11/15/2022) |
| 11/17/2022 | 18 | ORAL ORDER - IT IS HEREBY ORDERED that, within thirty (30) days from the date of this Order, the parties shall confer regarding proposed dates in the scheduling order and shall submit a proposed, coordinated order, which is also consistent with the following guidance. The parties shall provide final contentions (i.e., final infringement and invalidity contentions, as well as final non-infringement and validity contentions) around the time that fact discovery closes (i.e., several weeks prior to or after the deadline to complete fact discovery) and at least three weeks before Plaintiffs serves their opening claim construction brief. Final contentions shall include a party's contentions under its proposed construction(s), as well as under the opposing construction(s) (if such an alternative contention exists). As such, the parties are encouraged to exchange proposed claim terms and proposed constructions early in the case but in no event later than necessary to allow the parties to include alternative contentions in their final contentions. The joint claim construction chart shall be due one week after the parties have completed their exchange of final contentions, and the joint claim construction brief must be filed at least three weeks before the claim construction hearing. The parties shall leave at least three weeks between the claim construction hearing and the opening of expert discovery. The parties are to use the Court's form scheduling order, which is posted at http://www.ded.uscourts.gov (see Chambers, Judge Noreika, Forms), and the parties must include a proposal for the length and timing of trial. If there are disputes or issues that the Court needs to address in the proposed scheduling order, the parties shall direct the Court to the paragraph numbers in which those appear in a cover letter to the Court. ORDERED by Judge Maryellen Noreika on 11/17/2022. (dlw) (Entered: 11/17/2022) |
| 11/28/2022 | 19 | NOTICE of CHANGE IN ENTITY STATUS by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Devlin, Timothy) (Entered: 11/28/2022) |

Appx004048

| 11/29/2022 | 20 | ORAL ORDER re 19 Notice - Plaintiffs filed a Notice of Change in Entity Status in which they purport to request that the Court "confirm that it does not object to the USPTO issuing a decision on the Petition." Pursuant to Local Rule 7.1.2, "[u]nless otherwise ordered, all requests for relief shall be presented to the Court by motion." THEREFORE, IT IS HEREBY ORDERED that, if Plaintiffs wish the Court to take any action, they shall file an appropriate motion. Additionally, it appears that more than a month ago Plaintiffs' patent prosecution counsel incorrectly informed the PTO that this Court did not "object to the USPTO issuing a decision on the Petition". THEREFORE, IT IS FURTHER ORDERED that, on or before 11/30/2022, Plaintiffs shall inform the Court whether that incorrect statement has been retracted and, if so, when it was retracted and Plaintiffs shall also provide a copy of the retraction. ORDERED by Judge Maryellen Noreika on 11/29/2022. (dlw) (Entered: 11/29/2022) |
|---|---|---|
| 11/30/2022 | 21 | Letter to Hon. Maryellen Noreika from Timothy Devlin, Esq. regarding Nov. 29, 2022 Oral Order - re 20 Oral Order,,,,. (Attachments: # 1 Exhibit A)(Devlin, Timothy) (Entered: 11/30/2022) |
| 12/19/2022 | 22 | Letter to Honorable Maryellen Noreika from Timothy Devlin regarding Proposed Scheduling Order - re 18 Oral Order,,,,,,,. (Attachments: # 1 Proposed Scheduling Order)(Devlin, Timothy) (Entered: 12/19/2022) |
| 12/29/2022 | 23 | NOTICE of Appearance by Veronica Schad on behalf of 511 Technologies, Inc., Caddo Systems, Inc. (Schad, Veronica) (Entered: 12/29/2022) |
| 01/04/2023 | 24 | SCHEDULING ORDER: Joinder of Parties due by 1/6/2023. Amended Pleadings due by 1/6/2023. Fact Discovery completed by 10/13/2023. Opening Expert Reports due by 6/14/2024. Rebuttal Expert Reports due by 7/19/2024. Reply Expert Reports due by 8/16/2024. Expert Discovery due by 9/6/2024. Dispositive Motions due by 10/11/2024. Answering Brief due 11/8/2024. Reply Brief due 11/15/2024. Claim Construction Opening Brief served by 1/19/2024. Claim Construction Answering Brief served by 2/16/2024. Claim Construction Reply Brief served by 3/1/2024. Claim Construction Surreply Brief served by 3/15/2024. Joint Claim Construction Brief filed by 3/22/2024. A Markman Hearing is set for 4/12/2024 at 10:00 AM in Courtroom 4A before Judge Maryellen Noreika. A Pretrial Conference is set for 4/7/2025 at 10:00 AM in Courtroom 4A before Judge Maryellen Noreika. The first 5-day Jury Trial is set for 4/14/2025 at 09:30 AM in Courtroom 4A before Judge Maryellen Noreika. The second 5-day Jury Trial is set for 4/21/2025 at 09:30 AM in Courtroom 4A before Judge Maryellen Noreika. Signed by Judge Maryellen Noreika on 1/4/2023. (dlw) (Entered: 01/04/2023) |
| 01/13/2023 | 25 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Rule 26(a)(1) Initial Disclosures filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 01/13/2023) |
| 01/13/2023 | 26 | NOTICE OF SERVICE of Rule 26(a)(1) Initial Disclosures and Identification of Accused Products and Asserted Patents filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 01/13/2023) |
| 02/03/2023 | 27 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Paragraph 3 Disclosures filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 02/03/2023) |
| 02/09/2023 | 28 | NOTICE OF SERVICE of Plaintiffs' Supplemental Disclosures filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 02/09/2023) |

| | | |
|---|---|---|
| 02/15/2023 | 29 | STIPULATION TO EXTEND TIME (1) for Defendants to produce core technical documents and (2) for Plaintiffs to serve initial infringement contentions and for Defendants to serve initial invalidity contentions to March 3, 2023 and March 31, 2023, respectively - filed by Jetbrains Americas, Inc., LITB, Inc., Light In The Box Limited. (Flynn, Michael) (Entered: 02/15/2023) |
| 02/15/2023 | | SO ORDERED re (29 in 1:22-cv-01033-MN, 31 in 1:22-cv-01028-MN) STIPULATION TO EXTEND TIME (1) for Defendants to produce core technical documents and (2) for Plaintiffs to serve initial infringement contentions and for Defendants to serve initial invalidity contentions to March 3, 2023 and March 31, 2023, respectively. ORDERED by Judge Maryellen Noreika on 2/15/2023. (dlw) (Entered: 02/15/2023) |
| 03/03/2023 | 30 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s core technical documents filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 03/03/2023) |
| 03/24/2023 | 31 | NOTICE OF SERVICE of Defendant Jetbrains America Inc.'s Production of Sales Figures filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 03/24/2023) |
| 03/31/2023 | 32 | NOTICE OF SERVICE of Defendants Light In the Box Limited, LITB, Inc. and Jetbrains Americas Inc.'s Joint Initial Invalidity Contentions filed by Jetbrains Americas, Inc..(Hitch, Cortlan) (Entered: 03/31/2023) |
| 04/03/2023 | 33 | NOTICE OF SERVICE of Plaintiffs' Preliminary Infringement Contentions filed by 511 Technologies, Inc., Caddo Systems, Inc. (Devlin, Timothy) Modified on 4/3/2023 (dlw). (Entered: 04/03/2023) |
| 04/17/2023 | 34 | NOTICE OF SERVICE of Defendants' List of Proposed Claim Terms/Phrases and Proposed Constructions - filed by LITB, Inc., Light In The Box Limited.(Flynn, Michael) (Entered: 04/17/2023) |
| 04/17/2023 | 35 | NOTICE OF SERVICE of Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc.'s Identification of Claim Terms for Construction filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 04/17/2023) |
| 05/04/2023 | 36 | NOTICE OF SERVICE of Defendants' Light In The Box Limited, LITB, Inc. and Jetbrains Americas Inc.'s First Set of Joint Requests for Production to Plaintiffs (Nos. 1-10) filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 05/04/2023) |
| 05/19/2023 | 37 | NOTICE OF SERVICE of Plaintiffs First Set Of Requests For Production Of Documents To Defendant Jetbrains Americas, Inc. (Nos. 1-98) filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 05/19/2023) |
| 05/19/2023 | 38 | NOTICE OF SERVICE of Plaintiffs First Set of Interrogatories to Jetbrains Americas Inc. (Nos. 1-18) filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 05/19/2023) |
| 05/22/2023 | 39 | ORAL ORDER Setting Hearing on 12 MOTION to Dismiss for Failure to State a Claim - IT IS HEREBY ORDERED that a Motion Hearing is set for 6/22/2023 at 10:00 AM in Courtroom 4A before Judge Maryellen Noreika. The Court is setting aside thirty (30) minutes for the argument with the time split equally between the parties. Any slide presentations the parties wish to use during the hearing shall be emailed (in PDF format) to MN_civil@ded.uscourts.gov no later than 24 hours prior to the hearing with hard copies delivered to the Clerk's office within one (1) hour thereafter. Counsel may, however, agree upon a different time to exchange their |

| | | |
|---|---|---|
| | | respective slides. ORDERED by Judge Maryellen Noreika on 5/22/2023. (dlw) (Entered: 05/22/2023) |
| 05/24/2023 | 40 | NOTICE OF SERVICE of Plaintiffs' Amended 1st Set of RFPs (Nos. 1-98) filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 05/24/2023) |
| 05/26/2023 | 41 | Letter to The Honorable Maryellen Noreika from Timothy Devlin regarding Unopposed Request to Postpone the June 22, 2023 Hearing on the Motion to Dismiss. (Devlin, Timothy) (Entered: 05/26/2023) |
| 05/30/2023 | 42 | ORAL ORDER RESETTING Hearing on 12 MOTION to Dismiss for Failure to State a Claim - Upon the unopposed request by Plaintiffs, the 6/22/2023 motion hearing is RESET for 7/6/2023 at 10:00 AM in Courtroom 4A before Judge Maryellen Noreika. All other provisions of the 5/22/2023 Oral Order (D.I. 39) remain. ORDERED by Judge Maryellen Noreika on 5/30/2023. (dlw) (Entered: 05/30/2023) |
| 06/05/2023 | 43 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants RFP Nos 1-10 filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 06/05/2023) |
| 06/20/2023 | 44 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Response to Plaintiff's First Set of Interrogatories (Nos. 1-18) filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 06/20/2023) |
| 06/23/2023 | 45 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Responses to Plaintiffs' Amended First Set of Requests for Production (Nos. 1-98) filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 06/23/2023) |
| 06/30/2023 | 46 | ORAL ORDER RESETTING Start Time on Hearing on 12 MOTION to Dismiss for Failure to State a Claim - IT IS HEREBY ORDERED that the Motion Hearing set for 7/6/2023 shall now begin at 02:00 PM in Courtroom 4A before Judge Maryellen Noreika. ORDERED by Judge Maryellen Noreika on 6/30/2023. (dlw) (Entered: 06/30/2023) |
| 07/05/2023 | 47 | NOTICE of Appearance by Peter Akawie Mazur on behalf of 511 Technologies, Inc., Caddo Systems, Inc. (Mazur, Peter) (Entered: 07/05/2023) |
| 07/06/2023 | | Minute Entry for proceedings held before Judge Maryellen Noreika - Motion Hearing held on 7/6/2023 re Defendant's Motion to Dismiss for Failure to State a Claim ( 12 ). The Motion is GRANTED-IN-PART without prejudice and DENIED-IN-PART. The transcript shall serve as the Court's order. (Court Reporter Dale Hawkins.) (mdb) (Entered: 07/06/2023) |
| 07/14/2023 | 48 | NOTICE OF SERVICE of Plaintiffs' Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) filed by 511 Technologies, Inc., Caddo Systems, Inc..(Schad, Veronica) (Entered: 07/14/2023) |
| 07/20/2023 | 49 | STIPULATION TO EXTEND TIME for Defendant Jetbrains Americas, Inc. to respond to the remaining allegations in the Complaint to fourteen (14 days) after either Caddo files an Amended Complaint or the deadline to file the Amended Complaint expires, whichever is earlier - filed by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 07/20/2023) |
| 07/20/2023 | 50 | SO ORDERED re 49 STIPULATION TO EXTEND TIME for Defendant Jetbrains Americas, Inc. to respond to the remaining allegations in the Complaint to fourteen (14 days) after either Caddo files an Amended Complaint or the deadline to file the |

| | | |
|---|---|---|
| | | Amended Complaint expires, whichever is earlier. ORDERED by Judge Maryellen Noreika on 7/20/2023. (dlw) (Entered: 07/20/2023) |
| 07/24/2023 | 51 | First AMENDED COMPLAINT against Jetbrains Americas, Inc. - filed by Caddo Systems, Inc., 511 Technologies, Inc..(Devlin, Timothy) (Additional attachment(s) added on 7/25/2023: # 1 Redlined Comparison) (dlw). (Entered: 07/24/2023) |
| 07/24/2023 | 52 | EXHIBIT re 51 Amended Complaint by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Devlin, Timothy) (Entered: 07/24/2023) |
| 07/28/2023 | 53 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Objections and Responses to Plaintiffs' 30(b)(6) Deposition Notice filed by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 07/28/2023) |
| 08/07/2023 | 54 | MOTION to Dismiss for Failure to State a Claim - filed by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 08/07/2023) |
| 08/07/2023 | 55 | OPENING BRIEF in Support re 54 MOTION to Dismiss for Failure to State a Claim filed by Jetbrains Americas, Inc..Answering Brief/Response due date per Local Rules is 8/21/2023. (Hitch, Cortlan) (Entered: 08/07/2023) |
| 08/11/2023 | 56 | MOTION for Pro Hac Vice Appearance of Attorney Jason Shapiro - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 08/11/2023) |
| 08/14/2023 | | SO ORDERED re 56 MOTION for Pro Hac Vice Appearance of Attorney Jason Shapiro filed by 511 Technologies, Inc., Caddo Systems, Inc. ORDERED by Judge Maryellen Noreika on 8/14/2023. (dlw) (Entered: 08/14/2023) |
| 08/15/2023 | 57 | NOTICE OF SERVICE of (1) Defendant Jetbrains Americas, Inc.'s First Set of Interrogatories to Plaintiffs (Nos. 1-17); (2) Defendant Jetbrains Americas, Inc.'s First Set of Requests for Admission (Nos. 1-4); and (3) Defendant Jetbrains Americas, Inc.'s First Set of Requests for Production (Nos. 1-66) filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 08/15/2023) |
| 08/21/2023 | 58 | ANSWERING BRIEF in Opposition re 54 MOTION to Dismiss for Failure to State a Claim filed by 511 Technologies, Inc., Caddo Systems, Inc..Reply Brief due date per Local Rules is 8/28/2023. (Devlin, Timothy) (Entered: 08/21/2023) |
| 08/21/2023 | 59 | DECLARATION of Alex Chan re 58 Answering Brief in Opposition by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Devlin, Timothy) Modified on 8/22/2023 (mdb). (Entered: 08/21/2023) |
| 08/24/2023 | 60 | NOTICE OF SERVICE of 1) Plaintiffs' Notice of Deposition of Trisha Gee Pursuant to Fed. R. Civ. P. 30(b)(1); 2) Plaintiffs' Notice of Deposition of Paul Everitt Pursuant to Fed. R. Civ. P. 30(b)(1); 3) Plaintiffs' Notice of Deposition of Ivan Migalev Pursuant to Fed. R. Civ. P. 30(b)(1); 4) Plaintiffs' Notice of Deposition of Helen Scott Pursuant to Fed. R. Civ. P. 30(b)(1); 5) Plaintiffs' Notice of Deposition of Sergey Kuks Pursuant to Fed. R. Civ. P. 30(b)(1); 6) Plaintiffs' Notice of Deposition of Florin Patan Pursuant to Fed. R. Civ. P. 30(b)(1); and 7) Plaintiffs' Notice of Deposition of Roman Pronskiy Pursuant to Fed. R. Civ. P. 30(b)(1) filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 08/24/2023) |
| 08/25/2023 | 61 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s First Supplemental Response to Plaintiffs' First Set of Interrogatories (Nos. 1-18) filed by Jetbrains |

| | | |
|---|---|---|
| | | Americas, Inc..(Dorsney, Kenneth) (Entered: 08/25/2023) |
| 08/28/2023 | 62 | REPLY BRIEF re 54 MOTION to Dismiss for Failure to State a Claim filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 08/28/2023) |
| 08/28/2023 | 63 | REQUEST for Oral Argument by Jetbrains Americas, Inc. re 54 MOTION to Dismiss for Failure to State a Claim . (Dorsney, Kenneth) (Entered: 08/28/2023) |
| 08/28/2023 | 64 | NOTICE of JetBrains' Notice of 30(b)(6) Deposition to 511 Technologies, Inc. by Jetbrains Americas, Inc. (Dorsney, Kenneth) (Entered: 08/28/2023) |
| 08/28/2023 | 65 | NOTICE of JetBrains' Notice of 30(b)(6) Deposition to Caddo Systems, Inc. by Jetbrains Americas, Inc. (Dorsney, Kenneth) (Entered: 08/28/2023) |
| 08/31/2023 | 66 | OPPOSED MOTION for Leave to File Sur-Reply Brief - filed by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Text of Proposed Order)(McCarty, Veronica) Modified on 8/31/2023 (dlw). (Entered: 08/31/2023) |
| 08/31/2023 | 67 | Proposed SUR-REPLY BRIEF re 66 Opposed MOTION for Leave to File Sur-Reply Brief filed by 511 Technologies, Inc., Caddo Systems, Inc. (McCarty, Veronica) Modified on 8/31/2023 (dlw). (Entered: 08/31/2023) |
| 08/31/2023 | 68 | NOTICE OF SERVICE of (1) Plaintiffs' Second Set of Requests for Production of Documents to Defendant Jetbrains Americas, Inc. (Nos. 99-113); and (2) Plaintiffs' Second Set of Interrogatories to Defendant (Nos. 19-27) filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 08/31/2023) |
| 09/01/2023 | 69 | NOTICE to Take Deposition of Alan R. Loudermilk on October 4, 2023 filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/01/2023) |
| 09/01/2023 | 70 | NOTICE to Take Deposition of Armin Moehrle on October 5, 2023 filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/01/2023) |
| 09/01/2023 | 71 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Second Set of Requests for Production to Plaintiffs (Nos. 67-76) filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 09/01/2023) |
| 09/01/2023 | 72 | NOTICE OF SERVICE of Plaintiffs' First Set of Requests for Admission to Jetbrains Americas Inc. (Nos. 1-37) filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 09/01/2023) |
| 09/01/2023 | 73 | NOTICE OF SERVICE of Defendants Jetbrains America, Inc., Light in the Box Limited, and LITB's Supplemental Invalidity References filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/01/2023) |
| 09/01/2023 | 74 | NOTICE OF SERVICE of Plaintiffs Caddo Systems, Inc. and 511 Technologies, Inc.'s Supplemental Identification of Accused Products and Asserted Patents filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 09/01/2023) |
| 09/06/2023 | 75 | NOTICE of Subpoenas to Jonathan Feuchtwang by Jetbrains Americas, Inc. (Dorsney, Kenneth) (Entered: 09/06/2023) |
| 09/06/2023 | 76 | NOTICE OF SERVICE of (1) Plaintiffs' Notice of Deposition of Alexey Gopachenko Pursuant to Fed. R. Civ. P. 30(b)(1); (2) Plaintiffs' Notice of Deposition of Anna Kozlova Pursuant to Fed. R. Civ. P. 30(b)(1); (3) Plaintiffs' Notice of Deposition of Dmitry Jemerov Pursuant to Fed. R. Civ. P. 30(b)(1); (4) Plaintiffs' Notice of Deposition of Dmitry Kozhevnikov Pursuant to Fed. R. Civ. P. 30(b)(1); and (5) |

| | | |
|---|---|---|
| | | Plaintiffs' Notice of Deposition of Konstantin Bulenkov Pursuant to Fed. R. Civ. P. 30(b)(1) filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 09/06/2023) |
| 09/07/2023 | 77 | NOTICE OF SERVICE of Plaintiffs' Notice of Deposition of Brian Noll Pursuant to Fed. R. Civ. P. 30(b)(1) filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 09/07/2023) |
| 09/14/2023 | 78 | ANSWERING BRIEF in Opposition re 66 OPPOSED MOTION for Leave to File Sur-Reply Brief filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 9/21/2023. (Dorsney, Kenneth) (Entered: 09/14/2023) |
| 09/14/2023 | 79 | ORAL ORDER - Consistent with the Scheduling Order, the parties contacted Chambers to request a teleconference date for discovery disputes, IT IS HEREBY ORDERED that these discovery disputes are referred to Magistrate Judge Hatcher. The parties are directed to file Magistrate Judge Hatcher's "Motion for Teleconference to Resolve Discovery/Protective Order Disputes" which can be found at https://www.ded.uscourts.gov/judge/magistrate-judge-laura-d-hatcher, forms. ORDERED by Judge Maryellen Noreika on 9/14/2023. (dlw) (Entered: 09/14/2023) |
| 09/14/2023 | 80 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendant Jetbrains Americas Inc.s First Set of Requests for Admission (Nos. 1-4); Plaintiffs Responses and Objections to Defendants First Set of Requests for Production (Nos. 1-66); and Plaintiffs Response to Defendants First Set of Interrogatories (Nos. 1-17) filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 09/14/2023) |
| 09/15/2023 | 81 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Second Supplemental Response to Plaintiffs' First Set of Interrogatories (Nos. 1-18) filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/15/2023) |
| 09/18/2023 | 82 | MOTION For Teleconference To Resolve Discovery Disputes re 79 Oral Order,, - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 09/18/2023) |
| 09/18/2023 | 83 | REPLY to Response to Motion re 66 OPPOSED MOTION for Leave to File Sur-Reply Brief filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 09/18/2023) |
| 09/19/2023 | 84 | ORAL ORDER: The Court has reviewed the Motion for Teleconference to Resolve Discovery Disputes (D.I. 82). A discovery dispute teleconference is scheduled for October 2, 2023 at 1:00 PM Eastern Time before Judge Laura D. Hatcher. By no later than September 21, 2023, Plaintiff shall file with the Court a letter, not to exceed three pages and in no less than 12-point font, outlining the issues in dispute and its position on those issues. By no later than September 26, 2023, Defendant may file a responsive letter, not to exceed three pages and in no less than 12-point font, outlining its reasons for its opposition. Counsel is reminded to promptly provide courtesy copies. Counsel shall send dial-in information directly to the Court, no later than 24 hours prior to the hearing, using the following e-mail address: keith_kincaid@ded.uscourts.gov. The Court may choose to resolve the dispute prior to the telephone conference and will in that event cancel the conference. Ordered by Judge Laura D. Hatcher on 9/19/23. (kjk) (Entered: 09/19/2023) |
| 09/21/2023 | 85 | Letter to The Honorable Laura D. Hatcher from Timothy Devlin regarding Discovery Dispute - re 84 Oral Order,,,,,, Order Setting Teleconference,,,,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 |

| | | |
|---|---|---|
| | | Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 17, # 16 Exhibit 18)(Devlin, Timothy) (Entered: 09/21/2023) |
| 09/21/2023 | 86 | [SEALED] EXHIBIT re 85 Letter, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 15, # 2 Exhibit 16)(Devlin, Timothy) (Entered: 09/21/2023) |
| 09/25/2023 | 87 | REDACTED VERSION of 86 Exhibit to a Document by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 15, # 2 Exhibit 16)(Devlin, Timothy) (Entered: 09/25/2023) |
| 09/26/2023 | 88 | [SEALED] Letter to The Honorable Laura D. Hatcher from Cortlan S. Hitch regarding Jetbrains' Responsive Discovery Dispute Letter. (Hitch, Cortlan) (Entered: 09/26/2023) |
| 09/28/2023 | 89 | Unopposed MOTION to Issue Letters of Request for International Judicial Assistance - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 09/28/2023) |
| 09/28/2023 | 90 | OPENING BRIEF in Support re 89 Unopposed MOTION to Issue Letters of Request for International Judicial Assistance filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 10/12/2023. (Devlin, Timothy) (Main Document 90 replaced on 9/29/2023) (twk). (Entered: 09/28/2023) |
| 09/28/2023 | 91 | DECLARATION of Alex Chan re 90 Opening Brief in Support, 89 Unopposed MOTION to Issue Letters of Request for International Judicial Assistance by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 16-A, # 18 Exhibit 16-B, # 19 Exhibit 16-C, # 20 Exhibit 17, # 21 Exhibit 17-A, # 22 Exhibit 17-B, # 23 Exhibit 17-C)(Devlin, Timothy) Modified on 9/29/2023 (dlw). (Entered: 09/28/2023) |
| 09/29/2023 | 92 | ORAL ORDER REFERRING 89 Unopposed MOTION to Issue Letters of Request for International Judicial Assistance - IT IS HEREBY ORDERED that this motion is referred to Magistrate Judge Hatcher. ORDERED by Judge Maryellen Noreika on 9/29/2023. Motions referred to Laura D Hatcher.(dlw) (Entered: 09/29/2023) |
| 09/29/2023 | | CORRECTING ENTRY: D.I. 90 swapped per request of counsel, for version reflecting correct signature block. (twk) (Entered: 09/29/2023) |
| 09/29/2023 | 93 | NOTICE OF SERVICE of 1) Plaintiff Caddo Systems, Inc.'s Responses and Objections to Defendant Jetbrains Americas, Inc.'s Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6); and 2) Plaintiff 511Technologies, Inc.'s Responses and Objections to Defendant Jetbrains Americas, Inc.'s Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 09/29/2023) |
| 10/02/2023 | | Minute Entry for proceedings held before Judge Laura D. Hatcher - Discovery Teleconference held on 10/2/2023. (Court Reporter S. Ingram.) (kjk) (Entered: 10/02/2023) |
| 10/02/2023 | 94 | NOTICE OF SERVICE of (1) Defendant Jetbrains Americas, Inc.'s response to Plaintiffs' First Set of Requests for Admission (Nos. 1-37); (2) Defendant Jetbrains Americas, Inc.'s response to Plaintiffs' Second Set of Interrogatories (Nos. 19-27); and (3) Defendant Jetbrains Americas, Inc.'s response to Plaintiffs' Second Set of Requests |

| | | |
|---|---|---|
| | | for Production (Nos. 99-113) filed by Jetbrains Americas, Inc..(Hitch, Cortlan) (Entered: 10/02/2023) |
| 10/03/2023 | 95 | NOTICE OF SERVICE of Plaintiffs' Responses and Objections to Defendant Jetbrains Americas, Inc.'s Second Set of Requests for Production (Nos. 67-76) filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 10/03/2023) |
| 10/03/2023 | 96 | ORAL ORDER. For the reasons stated during the October 2, 2023 teleconference, the relief requested in Plaintiffs' letter motion (D.I. 85) is DENIED, and Plaintiffs' Unopposed Motion to Issue Letters for Request for International Judicial Assistance (D.I. 89) is GRANTED. Plaintiffs are directed to file revised letters of request to reflect that I will be signing them. The transcript of the October 2, 2023 teleconference contains the Court's rationale and further details regarding the Court's ruling. Ordered by Judge Laura D. Hatcher on 10/3/23. (kjk) (Entered: 10/03/2023) |
| 10/03/2023 | 97 | REDACTED VERSION of 88 Letter by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 10/03/2023) |
| 10/04/2023 | 98 | EXHIBIT re 91 Declaration,, 96 Oral Order,, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 16-A, # 2 Exhibit 16-B, # 3 Exhibit 16-C, # 4 Exhibit 17, # 5 Exhibit 17-A, # 6 Exhibit 17-B, # 7 Exhibit 17-C)(Devlin, Timothy) (Entered: 10/04/2023) |
| 10/05/2023 | 99 | ORDER Granting Exhibit # 17 in Docket Item 98. Signed by Judge Laura D. Hatcher on 10/5/23. (kjk) (Entered: 10/05/2023) |
| 10/10/2023 | 100 | ORDER Granting Exhibit # 16 in Docket Item 98. Signed by Judge Laura D Hatcher on 10/10/2023. (Entered: 10/10/2023) |
| 10/11/2023 | 101 | NOTICE OF SERVICE of (1) Objections and Responses to Defendant Jetbrains Americas, Inc.'s Notice of Subpoena to Jonathan Feuchtwang; and (2) Plaintiffs' First Supplemental Response to Defendant Jetbrains Americas, Inc.'s First Set of Interrogatories (Nos. 1-17) filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 10/11/2023) |
| 10/13/2023 | 102 | NOTICE OF SERVICE of SUPPLEMENTAL INVALIDITY CONTENTIONS filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 10/13/2023) |
| 10/13/2023 | 103 | STIPULATION TO AMEND THE SCHEDULING ORDER by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 10/13/2023) |
| 10/13/2023 | 104 | NOTICE OF SERVICE of (1) Defendant JetBrains Americas, Inc.'s First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories (Nos. 19-27); (2) Defendant JetBrains Americas, Inc.'s First Supplemental Responses and Objections to Plaintiff's First Set of Requests for Admission (Nos. 1-37) and ; (3) Defendnat JetBrains Americas. Inc's Third Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 1-18) filed by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 10/13/2023) |
| 10/16/2023 | 105 | SO ORDERED re 103 Stipulation to Amend Scheduling Order. Signed by Judge Maryellen Noreika on 10/16/2023. (dlw) (Entered: 10/16/2023) |
| 10/31/2023 | 106 | ORAL ORDER - The parties cannot agree on whether they are at an impasse as to discovery issues. IT IS HEREBY ORDERED that by NOON today, Defendant may file a letter of no more than two pages requesting a discovery dispute conference and explaining why it believes the parties have met their obligation to meet and confer and |

| | | |
|---|---|---|
| | | then Plaintiff may respond in a letter for no more than two pages by 4:00 PM. The letter requesting the conference shall state the issues for the teleconference but shall not include argument, and shall set forth all the meet and confers that have taken place regarding the issues, who participated and how the meet and confers occurred. ORDERED by Judge Maryellen Noreika on 10/31/2023. (dlw) (Entered: 10/31/2023) |
| 10/31/2023 | 107 | [SEALED] Letter to The Honorable Maryellen Noreika from Cortlan S. Hitch regarding Ocotber 31st Oral Order - re 106 Oral Order,,. (Hitch, Cortlan) (Entered: 10/31/2023) |
| 10/31/2023 | 108 | [SEALED] Letter to The Honorable Maryellen Noreika from Veronica McCarty regarding Courts October 31, 2023 Oral Order (D.I. 106), Meet and Confer. (Attachments: # 1 Exhibit 1 - SEALED, # 2 Notice of Service)(McCarty, Veronica) Modified on 11/7/2023 (dlw). (Entered: 10/31/2023) |
| 10/31/2023 | 109 | EXHIBIT 2 re 108 Letter by 511 Technologies, Inc., Caddo Systems, Inc. (McCarty, Veronica) Modified on 10/31/2023 (dlw). (Entered: 10/31/2023) |
| 10/31/2023 | 110 | ORAL ORDER re 107 Letter, 108 Letter - IT IS HEREBY ORDERED that the parties shall meet and confer on the bank statements dispute on November 1, 2023 as proposed by Plaintiff. To the extent that they are unable to come to an agreement, lead counsel for the parties will be required to meet and confer in person (not remotely) on or before November 7, 2023 and thereafter provide a status update to the Court. The fact that the discovery deadline is scheduled for November 3, 2023 will not be a basis for Plaintiff to resist production of documents. ORDERED by Judge Maryellen Noreika on 10/31/2023. (dlw) (Entered: 10/31/2023) |
| 11/03/2023 | 111 | NOTICE OF SERVICE of (1) Defendant Jetbrains Americas, Inc.'s Fourth Supplemental Response to Plaintiffs' First Set of Interrogatories (Nos. 1-18); and (2) Defendant Jetbrains Americas, Inc.'s Second Supplemental Response to Plaintiffs' Second Set of Interrogatories (Nos. 19-27) filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 11/03/2023) |
| 11/07/2023 | 112 | REDACTED VERSION of 107 Letter by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 11/07/2023) |
| 11/07/2023 | 113 | REDACTED VERSION of 108 Letter, by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 11/07/2023) |
| 11/17/2023 | 114 | Letter to The Honorable Maryellen Noreika from Cortlan S. Hitch regarding Joint Status Update - re 110 Oral Order,,. (Hitch, Cortlan) (Entered: 11/17/2023) |
| 11/17/2023 | 115 | MOTION to Confirm It Has No Objections to Plaintiffs' Large Entity Status - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 11/17/2023) |
| 11/17/2023 | 116 | [SEALED] OPENING BRIEF in Support re 115 MOTION to Confirm It Has No Objections to Plaintiffs' Large Entity Status filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 12/1/2023. (Attachments: # 1 Exhibit 1)(Devlin, Timothy) (Entered: 11/17/2023) |
| 11/17/2023 | 117 | DECLARATION of Alex Chan re 116 Opening Brief in Support by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6)(Devlin, Timothy) Modified on 11/20/2023 (dlw). (Entered: 11/17/2023) |

| 11/22/2023 | 118 | ORAL ORDER - Consistent with the Scheduling Order, the parties contacted Chambers to request a teleconference date for Plaintiffs' anticipated Motion to Amend, IT IS HEREBY ORDERED that this anticipated motion is referred to Magistrate Judge Hatcher. The parties are directed to file Magistrate Judge Hatcher's "Motion for Teleconference to Resolve Discovery/Protective Order Disputes" which can be found at https://www.ded.uscourts.gov/judge/magistrate-judge-laura-d-hatcher, forms. ORDERED by Judge Maryellen Noreika on 11/22/2023. (dlw) (Entered: 11/22/2023) |
| --- | --- | --- |
| 11/28/2023 | 119 | MOTION for Teleconference to Resolve Motion to Amend Dispute - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 11/28/2023) |
| 11/28/2023 | 120 | ORAL ORDER. The Court has reviewed the Motion for Teleconference regarding the outstanding dispute (D.I. 119). A teleconference is scheduled for December 13, 2023 at 1:00 PM Eastern Time before Judge Laura D. Hatcher. By no later than December 4, 2023, Plaintiffs shall file with the Court a letter, not to exceed three pages and in no less than 12-point font, outlining their position on the dispute. By no later than December 8, 2023, Defendant may file a responsive letter, not to exceed three pages and in no less than 12-point font, outlining the reasons for its opposition. Counsel is reminded to promptly provide courtesy copies. Counsel shall send dial-in information directly to the Court, no later than 24 hours prior to the hearing, using the following e-mail address: keith_kincaid@ded.uscourts.gov. The Court may choose to resolve the dispute prior to the telephone conference and will, in that event, cancel the conference. Ordered by Judge Laura D. Hatcher on 11/28/23. (kjk) (Entered: 11/28/2023) |
| 12/01/2023 | 121 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Final Invalidity Contentions filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 12/01/2023) |
| 12/01/2023 | 122 | [SEALED] ANSWERING BRIEF in Opposition re 115 MOTION to Confirm It Has No Objections to Plaintiffs' Large Entity Status filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 12/8/2023. (Hitch, Cortlan) (Entered: 12/01/2023) |
| 12/01/2023 | 123 | DECLARATION of Daniel G. Vivarelli, Jr. with Exhibits 1-3 re 122 Answering Brief in Opposition by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 12/4/2023 (dlw). (Entered: 12/01/2023) |
| 12/04/2023 | 124 | REDACTED VERSION of 116 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1)(McCarty, Veronica) (Entered: 12/04/2023) |
| 12/04/2023 | 125 | [SEALED] Letter to The Honorable Laura D. Hatcher from Veronica McCarty regarding Leave to Amend First Amended Complaint. (McCarty, Veronica) (Entered: 12/04/2023) |
| 12/04/2023 | 126 | [SEALED] DECLARATION and [SEALED] EXHIBITS 1-7 re 125 Letter by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 part 1/2, # 4 Exhibit 3 part 2/2, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(McCarty, Veronica) Modified on 12/5/2023 (dlw). (Entered: 12/04/2023) |
| 12/04/2023 | 127 | EXHIBITS 8-11 re 125 Letter by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit 8, # 2 Exhibit 9, # 3 Exhibit 10, # 4 Exhibit 11)(McCarty, Veronica) Modified on 12/5/2023 (dlw). (Entered: 12/04/2023) |

| | | |
|---|---|---|
| 12/04/2023 | 128 | NOTICE of Lodging (Exhibit 8 re 127 Public Exhibits) by 511 Technologies, Inc., Caddo Systems, Inc. (McCarty, Veronica) Modified on 12/5/2023 (dlw). (Entered: 12/04/2023) |
| 12/08/2023 | 129 | [SEALED] Letter to The Honorable Laura D. Hatcher from Cortlan S. Hitch regarding Defendant's Response to Plaintiffs' Motion for Leave to Amend - re 125 Letter. (Hitch, Cortlan) (Entered: 12/08/2023) |
| 12/08/2023 | 130 | [SEALED] DECLARATION of by Daniel G. Vivarelli, Jr. re 129 Letter by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 12/11/2023 (dlw). (Entered: 12/08/2023) |
| 12/08/2023 | 131 | [SEALED] REPLY BRIEF re 115 MOTION to Confirm It Has No Objections to Plaintiffs' Large Entity Status filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 4)(McCarty, Veronica) (Entered: 12/08/2023) |
| 12/08/2023 | 132 | REDACTED VERSION of 122 Answering Brief in Opposition, by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 12/08/2023) |
| 12/08/2023 | 133 | DECLARATION of Alex Chan re 131 Reply Brief by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(McCarty, Veronica) Modified on 12/11/2023 (dlw). (Entered: 12/08/2023) |
| 12/11/2023 | 134 | REDACTED VERSION of 125 Letter by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 12/11/2023) |
| 12/11/2023 | 135 | REDACTED VERSION of 126 Declaration, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, # 3 Exhibit 7)(McCarty, Veronica) (Entered: 12/11/2023) |
| 12/12/2023 | 136 | Official Transcript of Motion Hearing held on 07/06/2023 before Judge Maryellen Noreika. Court Reporter/Transcriber Dale C. Hawkins,Email: Dale_Hawkins@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 1/2/2024. Redacted Transcript Deadline set for 1/12/2024. Release of Transcript Restriction set for 3/11/2024. (dh) (Entered: 12/12/2023) |
| 12/13/2023 | | Minute Entry for proceedings held before Judge Laura D. Hatcher - Discovery Telephone Conference held on 12/13/2023. (Court Reporter Maureen McHugh.) (kjk) (Entered: 12/13/2023) |
| 12/13/2023 | 137 | ORAL ORDER. For the reasons set forth during today's hearing, a hearing is scheduled for January 18, 2024 at 9:00 AM Eastern Time regarding Plaintiffs' Motion to Amend (D.I. 125). By no later than January 8, 2024, Plaintiffs are ordered to file with the Court a letter, not to exceed five pages, in no less than 12-point font, regarding the issues articulated during today's hearing. By no later than January 12, 2024, Defendant is ordered to submit a letter, not to exceed five pages, in no less than 12-point font, in response. Counsel is reminded to promptly provide courtesy copies. Counsel shall send dial-in information directly to the Court, no later than 24 hours prior to the hearing, using the following e-mail address: keith_kincaid@ded.uscourts.gov. The Court may choose to resolve the dispute prior to the telephone conference and will in that event cancel the conference. Signed by Judge Laura D. Hatcher on 12/13/23. (kjk) (Entered: 12/13/2023) |

| 12/15/2023 | 138 | REDACTED VERSION of 129 Letter by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 12/19/2023 (dlw). (Entered: 12/15/2023) |
|---|---|---|
| 12/15/2023 | 139 | REDACTED VERSION of 130 Declaration by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 12/19/2023 (dlw). (Entered: 12/15/2023) |
| 12/19/2023 | 140 | REDACTED VERSION of 131 Reply Brief by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 4)(McCarty, Veronica) (Entered: 12/19/2023) |
| 12/26/2023 | 141 | Official Transcript of Telephonic Hearing held on December 13, 2023 before Judge Laura D. Hatcher. Court Reporter/Transcriber Maureen McHugh,Email: maureen_mchugh@paed.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (rlr) (Entered: 12/26/2023) |
| 12/29/2023 | 142 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Final Non-Infringement Contentions filed by Jetbrains Americas, Inc..(Hitch, Cortlan) (Entered: 12/29/2023) |
| 01/02/2024 | 143 | NOTICE OF SERVICE of Plaintiffs' Final Validity Contentions filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 01/02/2024) |
| 01/05/2024 | 144 | CLAIM Construction Chart by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 01/05/2024) |
| 01/08/2024 | 145 | [SEALED] Letter to The Honorable Laura D. Hatcher from Veronica McCarty regarding supplemental briefing in support of Plaintiffs' motion for leave to amend - re 137 Oral Order,,,, Order Setting Teleconference,,,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 5)(McCarty, Veronica) (Entered: 01/08/2024) |
| 01/08/2024 | 146 | EXHIBIT re 145 Letter, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4)(McCarty, Veronica) (Entered: 01/08/2024) |
| 01/09/2024 | | Case Reassigned to Judge Jennifer L. Hall. Please include the initials of the Judge (JLH) after the case number on all documents filed. (rjb) (Entered: 01/09/2024) |
| 01/12/2024 | | CORRECTING ENTRY: D.I. 147 previously deleted per counsels request. Counsel will re-file using the correct attorney to file under. (apk) (Entered: 01/12/2024) |
| 01/12/2024 | 147 | REDACTED VERSION of 145 Letter, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 5)(McCarty, Veronica) (Entered: 01/12/2024) |
| 01/12/2024 | 148 | [SEALED] Letter to The Honorable Laura D. Hatcher from Cortlan S. Hitch regarding Defendant's Supplemental Letter Opposing Plaintiffs' Motion for Leave to Amend. (Hitch, Cortlan) (Entered: 01/12/2024) |
| 01/12/2024 | 149 | [SEALED] DECLARATION re 148 Letter *Declaration of Daniel G. Vivarelli, Jr. in support of JetBrains' Supplemental Response Letter opposing Plaintiffs' Motion for Leave to Amend* by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 01/12/2024) |

| 01/12/2024 | 150 | REDACTED VERSION of 148 Letter *Defendants' Supplemental Response Letter Opposing Plaintiffs' Motion for Leave to Amend* by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 01/12/2024) |
| --- | --- | --- |
| 01/12/2024 | 151 | REDACTED VERSION of 149 Declaration *of Daniel G. Vivarelli, Jr. in support of JetBrains' Supplemental Response Letter opposing Plaintiffs' Motion for Leave to Amend* by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 01/12/2024) |
| 01/17/2024 | 152 | ORAL ORDER. The teleconference scheduled for January 18, 2024 regarding Plaintiffs' Motion to Amend (D.I. 125) is RESCHEDULED to February 2, 2024 at 1:00pm. Ordered by Judge Laura D. Hatcher on 1/17/24. (kjk) (Entered: 01/17/2024) |
| 01/17/2024 | 153 | ORAL ORDER Rescheduling Teleconference: The Discovery Teleconference that was scheduled for 1:00 pm on 2/2/2024 is now set for 03:00 PM. Ordered by Judge Laura D. Hatcher on 1/17/24. (kjk) (Entered: 01/17/2024) |
| 01/19/2024 | 154 | NOTICE OF SERVICE of (1) Plaintiffs' Opening Claim Construction Brief; and (2) Declaration of Alex Chan, Esq. in Support of Plaintiffs' Opening Claim Construction Brief (with Exhibits 1-2) filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 01/19/2024) |
| 01/22/2024 | 155 | NOTICE of of Supplemental Authority by 511 Technologies, Inc., Caddo Systems, Inc. re 125 Letter, 145 Letter, (Attachments: # 1 Exhibit 1)(McCarty, Veronica) (Entered: 01/22/2024) |
| 01/23/2024 | 156 | STATEMENT re 155 Notice (Other) *JetBrains' Response to Plaintiffs' Notice of Supplemental Authority* by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 01/23/2024) |
| 01/24/2024 | 157 | ORAL ORDER - Consistent with the Scheduling Order, the parties contacted Chambers to request a teleconference date for Plaintiffs' anticipated Motion to Strike, IT IS HEREBY ORDERED that this anticipated motion is referred to Magistrate Judge Hatcher. The parties are directed to file Magistrate Judge Hatcher's "Motion for Teleconference to Resolve Discovery/Protective Order Disputes" which can be found at https://www.ded.uscourts.gov/judge/magistrate-judge-laura-d-hatcher, forms. Ordered by Judge Jennifer L. Hall on 1/24/2024. (ceg) (Entered: 01/24/2024) |
| 01/25/2024 | 158 | MOTION FOR TELECONFERENCE TO RESOLVE MOTION TO STRIKE DISPUTE - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (McCarty, Veronica) (Entered: 01/25/2024) |

Appx004061

| | | |
|---|---|---|
| 01/29/2024 | 159 | ORAL ORDER. The Court has reviewed the Motion for Teleconference to Resolve Motion to Strike Dispute (D.I. 158). A teleconference is scheduled for Wednesday, February 14, 2024 at 1:00 PM Eastern Time before Judge Laura D. Hatcher. By no later than Thursday, February 1, 2024, any party seeking relief shall file with the Court a letter not to exceed three pages in no less than 12-point font outlining the issues in dispute and that party's position on those issues. By no later than Wednesday, February 7, 2024, any party opposing the application for relief may file a letter not to exceed three pages in no less than 12-point font outlining its opposition. Counsel is reminded to provide courtesy copies. Counsel shall send dial-in information directly to the Court no later than 24 hours prior to the hearing using the following e-mail address: keith_kincaid@ded.uscourts.gov. The Court may choose to resolve the dispute prior to the telephone conference and will, in that event cancel the conference. Ordered by Judge Laura D. Hatcher on 1/29/24. (kjk) Modified on 1/31/2024 (kjk). (Entered: 01/29/2024) |
| 02/01/2024 | 160 | Letter to The Honorable Laura D. Hatcher from Veronica McCarty regarding Caddo Systems, Inc., et. al. v. Jetbrains Americas Inc., C.A. No. 1:22-cv- 01033-JLH. (Attachments: # 1 Declaration of Alex Chan, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15)(McCarty, Veronica) (Entered: 02/01/2024) |
| 02/02/2024 | | Minute Entry for proceedings held before Judge Laura D. Hatcher - Telephone Conference held on 2/2/2024. (Court Reporter S. Ingram.) (kjk) (Entered: 02/02/2024) |
| 02/02/2024 | 161 | REPORT AND RECOMMENDATION: IT IS HEREBY ORDERED that the transcript of the February 2, 2024 teleconference shall serve as the Report and Recommendation of the Court regarding Plaintiffs' Motion to Amend (D.I. 125). For the reasons set forth in the transcript, Plaintiffs' Motion to Amend is GRANTED-IN-PART and DENIED-IN-PART. The time for objections will run from receipt of the transcript, which, if a party wishes to object, must be ordered within 14 days. Please note that when filing Objections pursuant to Federal Rule of Civil Procedure 72(b)(2), briefing consists solely of the Objections (no longer than ten (10) pages) and the Response to the Objections (no longer than ten (10) pages). No further briefing shall be permitted with respect to objections without leave of the Court. Ordered by Judge Laura D. Hatcher on 2/2/24. (kjk) (Entered: 02/02/2024) |
| 02/07/2024 | 162 | Letter to The Honorable Laura D. Hatcher from Kenneth L. Dorsney regarding Defendants' Response Letter opposing Plaintiffs' Motion to Strike. (Dorsney, Kenneth) (Main Document 162 replaced on 2/8/2024) (ceg). (Entered: 02/07/2024) |
| 02/07/2024 | 163 | DECLARATION re 162 Letter *Declaration of Daniel G. Vivarelli Jr. in support of Defendants' Response in opposition to Plaintiffs' Motion to Strike* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 02/07/2024) |
| 02/07/2024 | 164 | EXHIBIT re 161 REPORT AND RECOMMENDATIONS. Please note that when filing Objections pursuant to Federal Rule of Civil Procedure 72(b)(2), briefing consists solely of the Objections (no longer than ten (10) pages) and the Response to the Objections (no longer than ten - *Proposed Second Amended Complaint* by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Redlined Proposed Second Amended Complaint)(Devlin, Timothy) (Entered: 02/07/2024) |

| | | |
|---|---|---|
| 02/08/2024 | | CORRECTING ENTRY: The pdf for the Letter found at D.I. 162 has been replaced with a corrected version per counsel's request. The corrected version reflects the proper Judge's initials in the caption. (ceg) (Entered: 02/08/2024) |
| 02/14/2024 | | Minute Entry for proceedings held before Judge Laura D. Hatcher - Telephone Conference held on 2/14/2024. (Court Reporter D. Warner.) (kjk) (Entered: 02/14/2024) |
| 02/15/2024 | 165 | ORAL ORDER: For the reasons detailed during the teleconference on February 14, 2024, Caddo's motion to strike (D.I. 160) is DENIED. The transcript of the February 14, 2024 hearing contains the Court's rationale and further details regarding the Court's ruling. Ordered by Judge Laura D. Hatcher on 2/15/24. (kjk) (Entered: 02/15/2024) |
| 02/16/2024 | 166 | NOTICE OF SERVICE of Defendant JetBrains America Inc.'s Answering Claim Construction Brief filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 02/16/2024) |
| 03/01/2024 | 167 | NOTICE OF SERVICE of (1) Plaintiffs' Reply Claim Construction Brief; and (2) Declaration of Alex Chan in Support of Plaintiffs' Reply Claim Construction Brief (with Exhibits 3-6) filed by 511 Technologies, Inc., Caddo Systems, Inc..(McCarty, Veronica) (Entered: 03/01/2024) |
| 03/07/2024 | 168 | ORAL ORDER: Upon consideration of the Magistrate Judge's Report and Recommendation dated February 2, 2024 (D.I. 161 ), and no objections to the Report and Recommendation having been received, and the Court having reviewed the matter and finding that the Magistrate Judge's Report and Recommendation appears on its face to be legally and factually correct, IT IS HEREBY ORDERED that (1) the Report and Recommendation (D.I. 161 ) is ADOPTED, and (2) Plaintiffs' Motion to Amend (D.I. 125 ) is GRANTED-IN-PART and DENIED-IN-PART in accordance with Judge Hatcher's Report and Recommendation. Plaintiffs shall file their amended pleading on or before March 8, 2024. Ordered by Judge Jennifer L. Hall on 3/7/2024. (ceg) (Entered: 03/07/2024) |
| 03/08/2024 | 169 | Second AMENDED COMPLAINT against Jetbrains Americas, Inc., Jetbrains, Inc., Jetbrains s.r.o.- filed by Caddo Systems, Inc., 511 Technologies, Inc..(Devlin, Timothy) (Entered: 03/08/2024) |
| 03/08/2024 | 170 | EXHIBIT re 169 Amended Complaint by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Devlin, Timothy) (Entered: 03/08/2024) |
| 03/11/2024 | 171 | ORAL ORDER: Defendant's Motion to Dismiss (D.I. 54 ) and Plaintiffs' Motion for Leave to File Sur-Reply Brief (D.I. 66 ) are DENIED as moot because they relate to the First Amended Complaint, which is no longer the operative pleading. Ordered by Judge Jennifer L. Hall on 3/11/2024. (ceg) (Entered: 03/11/2024) |
| 03/15/2024 | 172 | NOTICE OF SERVICE of Defendant JetBrains Americas, Inc.'s Sur-Reply Claim Construction Brief filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 03/15/2024) |
| 03/19/2024 | 173 | NOTICE of Appearance by Andrew Peter DeMarco on behalf of 511 Technologies, Inc., Caddo Systems, Inc. (DeMarco, Andrew) (Entered: 03/19/2024) |
| 03/19/2024 | 174 | NOTICE requesting Clerk to remove Veronica McCarty as co-counsel. Reason for request: no longer with Devlin Law Firm. (DeMarco, Andrew) (Entered: 03/19/2024) |

| | | |
|---|---|---|
| 03/22/2024 | 175 | Letter to The Honorable Jennifer L. Hall from Cortlan S. Hitch regarding Enclosure of Defendant JetBrains Americas Inc.'s Technology Tutorial. (Hitch, Cortlan) (Entered: 03/22/2024) |
| 03/22/2024 | 176 | Letter to The Honorable Jennifer L. Hall from Andrew DeMarco regarding enclosure of Plaintiffs' Technology Tutorial. (DeMarco, Andrew) Modified on 3/22/2024 (ceg). (Entered: 03/22/2024) |
| 03/22/2024 | 177 | MOTION to Dismiss Second Amended Complaint for Failure to State a Claim - filed by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 3/22/2024 (ceg). (Entered: 03/22/2024) |
| 03/22/2024 | 178 | OPENING BRIEF in Support re 177 MOTION to Dismiss Second Amended Complaint for Failure to State a Claim, filed by Jetbrains Americas, Inc. Answering Brief/Response due date per Local Rules is 4/5/2024. (Hitch, Cortlan) Modified on 3/22/2024 (ceg). (Entered: 03/22/2024) |
| 03/22/2024 | 179 | JOINT CLAIM CONSTRUCTION BRIEF filed by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 03/22/2024) |
| 03/22/2024 | 180 | APPENDIX re 179 Joint Claim Construction Brief by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(DeMarco, Andrew) (Entered: 03/22/2024) |
| 03/25/2024 | 181 | ORAL ORDER: The Markman Hearing scheduled for April 12, 2024, is CONTINUED to a date to be determined. Ordered by Judge Jennifer L. Hall on 3/25/2024. (ceg) (Entered: 03/25/2024) |
| 03/29/2024 | | CORRECTING ENTRY: D.I. 182 has been removed from the docket per the request of counsel. (ceg) (Entered: 03/29/2024) |
| 03/29/2024 | 182 | [SEALED] ANSWERING BRIEF in Opposition re 177 MOTION to Dismiss for Failure to State a Claim *JetBrains' Motion to Dismiss Second Amended Complaint* filed by 511 Technologies, Inc., Caddo Systems, Inc..Reply Brief due date per Local Rules is 4/5/2024. (Attachments: # 1 Exhibit 6)(DeMarco, Andrew) (Entered: 03/29/2024) |
| 03/29/2024 | 183 | DECLARATION re 182 Answering Brief in Opposition, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 7)(DeMarco, Andrew) (Entered: 03/29/2024) |
| 04/01/2024 | 184 | STIPULATION TO EXTEND TIME for JetBrains Americas Inc. to file Reply Brief in support of its Motion to Dismiss to April 11, 2024 - filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 04/01/2024) |
| 04/02/2024 | | SO ORDERED, re 184 Stipulation and Order to Extend Time for JetBrains Americas Inc. to file Reply Brief to April 11, 2024. (*Reset Briefing Schedule re 177 MOTION to Dismiss for Failure to State a Claim: Reply Brief due 4/11/2024). Ordered by Judge Jennifer L. Hall on 4/2/2024. (ceg) (Entered: 04/02/2024) |
| 04/04/2024 | 185 | REDACTED VERSION of 182 Answering Brief in Opposition, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Redacted Exhibit 6)(DeMarco, Andrew) (Entered: 04/04/2024) |

| 04/11/2024 | 186 | REPLY BRIEF re 177 MOTION to Dismiss Second Amended Complaint, filed by Jetbrains Americas, Inc. (Dorsney, Kenneth) Modified on 4/12/2024 (ceg). (Entered: 04/11/2024) |
| --- | --- | --- |
| 04/11/2024 | 187 | REQUEST for Oral Argument by Jetbrains Americas, Inc. re 177 MOTION to Dismiss for Failure to State a Claim *JetBrains' Motion to Dismiss Second Amended Complaint*. (Dorsney, Kenneth) (Entered: 04/11/2024) |
| 04/12/2024 | 188 | ORAL ORDER REFERRING CASE: This case is referred to U.S. Magistrate Judge Laura D. Hatcher for all purposes up through and including summary judgment, and the pending motion(s) (D.I. 115 , 177 ). In addition, the Court requests that the parties consider consenting to the jurisdiction of Judge Hatcher for all purposes through trial. Accordingly, on or before April 19, 2024, the parties shall either (1) submit to the Clerk of Court an executed Form AO 85 Notice, Consent, and Reference of a Civil Action to a Magistrate Judge; (2) submit to the Clerk of Court an executed Form AO 85A Notice, Consent, and Reference of a Dispositive Motion to a Magistrate Judge that sets forth the parties' consent to consideration of the pending motions and/or Markman proceedings by a Magistrate Judge; or (3) file a joint letter indicating that both parties do not so consent. The letter should not indicate which party or parties did not consent. Ordered by Judge Jennifer L. Hall on 4/12/2024. (ceg) (Entered: 04/12/2024) |
| 04/19/2024 | 189 | Joint Letter to The Honorable Jennifer L. Hall from Andrew DeMarco regarding the parties not consenting to referral to Magistrate Judge Hatcher. (DeMarco, Andrew) Modified on 4/19/2024 (ceg). (Entered: 04/19/2024) |
| 04/25/2024 | 190 | SUMMONS Returned Executed by Caddo Systems, Inc., 511 Technologies, Inc..Jetbrains, Inc. served on 4/19/2024, answer due 5/10/2024. (Devlin, Timothy) (Entered: 04/25/2024) |
| 04/25/2024 | 191 | SUMMONS Returned Executed by Caddo Systems, Inc., 511 Technologies, Inc..Jetbrains s.r.o. served on 4/19/2024, answer due 5/10/2024. (Devlin, Timothy) (Entered: 04/25/2024) |
| 04/25/2024 | 192 | Opposed MOTION for Leave to File a Sur-Reply Brief - filed by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Text of Proposed Order) Motions referred to Laura D. Hatcher. (Devlin, Timothy) Modified on 4/26/2024 (ceg). (Entered: 04/25/2024) |
| 04/25/2024 | 193 | [SEALED] EXHIBIT re 192 MOTION for Leave to File *SUR-REPLY BRIEF Proposed PLAINTIFFS' SUR-REPLY IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 04/25/2024) |
| 04/25/2024 | 194 | REDACTED VERSION of 193 Exhibit to a Document, by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 04/25/2024) |
| 04/26/2024 | | CORRECTING ENTRY: The declaration and their exhibits filed as attachments to the motion at D.I. 192 have been removed. Motions and declarations are to be filed independent of each other. Counsel is to refile the declaration at new transaction number. (ceg) (Entered: 04/26/2024) |
| 04/26/2024 | 195 | DECLARATION re 192 MOTION for Leave to File a Sur-Reply Brief, 193 Exhibit to a Document, *Declaration of Alex Chan In Support of Proposed Sur-reply* by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # |

| | | |
|---|---|---|
| | | [3](#) Exhibit 3, # [4](#) Exhibit 4, # [5](#) Exhibit 5)(Devlin, Timothy) (Entered: 04/26/2024) |
| 04/26/2024 | 196 | ORAL ORDER: IT IS HEREBY ORDERED that the Markman hearing is rescheduled for June 6, 2024 at 1:00PM in Courtroom 2B. The Court will allocate three hours for the hearing. On or before May 8, 2024, Delaware and Lead counsel (i.e., those attorneys that will be leading trial) for the parties shall meet and confer and file an Amended Joint Claim Construction Chart that: (1) sets forth all agreed-upon constructions and all terms that remain in dispute, along with a concise statement of what the parties' dispute is for each term; (2) articulates what Plaintiffs contend is the plain and ordinary meaning of each term where Plaintiffs indicate no construction is necessary and/or the term should be given its plain and ordinary meaning; and (3) articulates what the parties contend the plain and ordinary meaning is of any agreed-upon term where the agreed meaning is the plain and ordinary meaning. The meet and confer shall focus on an attempt to reach agreement on any remaining disputed terms where possible and to focus the dispute over the remaining terms in light of the Joint Claim Construction Brief. The Amended Joint Claim Construction Chart shall be filed with a letter identifying by name each individual who participated in the meet and confer, when and how that meet and confer occurred, and how long it lasted. If no additional agreements on constructions were reached or if no dispute was narrowed, the letter shall so state. Any slide presentations or demonstratives that the parties wish to use during the hearing shall be emailed to Keith_Kincaid@ded.uscourts.gov no later than 24 hours prior to the hearing.Ordered by Judge Laura D. Hatcher on 4/26/24. (kjk) (Entered: 04/26/2024) |
| 05/01/2024 | [197](#) | Letter to The Honorable Laura D. Hatcher from Kenneth L. Dorsney regarding Defendant's request to reschedule the Markman hearing - re 196 Oral Order,,,,,,,, Set Hearings,,,,,,. (Dorsney, Kenneth) (Entered: 05/01/2024) |
| 05/02/2024 | 198 | ORAL ORDER. At the request of counsel (D.I. 197), the Markman hearing is RESCHEDULED to June 5, 2024 at 1:00pm. Ordered by Judge Laura D. Hatcher on 5/2/24. (kjk) (Entered: 05/02/2024) |
| 05/08/2024 | [199](#) | Letter to The Honorable Laura D. Hatcher from Andrew DeMarco regarding Amended Claim Construction Chart - re 196 Oral Order,,,,,,, Set Hearings,,,,,,. (Attachments: # [1](#) Exhibit 1-Amended Claim Construction Chart)(DeMarco, Andrew) (Entered: 05/08/2024) |
| 05/09/2024 | [200](#) | MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2) - filed by Jetbrains s.r.o., Jetbrains, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 05/09/2024) |
| 05/09/2024 | [201](#) | [SEALED] OPENING BRIEF in Support re [200](#) MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2) filed by Jetbrains s.r.o., Jetbrains, Inc..Answering Brief/Response due date per Local Rules is 5/23/2024. (Dorsney, Kenneth) (Entered: 05/09/2024) |
| 05/09/2024 | [202](#) | [SEALED] DECLARATION re [201](#) Opening Brief in Support, *Declaration of Daniel G. Vivarelli, Jr. in support of JetBrains S.R.O. and JetBrains Incorporated's Motion to Dismiss* by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Main Document 202 replaced on 5/16/2024) (kjk). (Entered: 05/09/2024) |
| 05/09/2024 | [203](#) | DECLARATION re [201](#) Opening Brief in Support, *Declaration of Igor Alshannikov in support of JetBrains S.R.O. and JetBrains Incorporated's Motion to Dismiss* by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 05/09/2024) |

| | | |
|---|---|---|
| 05/09/2024 | 204 | STATEMENT re 192 MOTION for Leave to File a Sur-Reply Brief *JetBrains Americas Inc.'s Opposition to Plaintiffs' Opposed Motion for Leave to file Sur-Reply* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 05/09/2024) |
| 05/09/2024 | 205 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Jetbrains, N.V. for Jetbrains s.r.o. filed by Jetbrains s.r.o.. (Dorsney, Kenneth) (Entered: 05/09/2024) |
| 05/09/2024 | 206 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Jetbrains, N.V. for Jetbrains, Inc. filed by Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 05/09/2024) |
| 05/14/2024 | 207 | ORAL ORDER: The Court has reviewed Plaintiffs' Motion for Leave to File a Sur-Reply Brief (D.I. 192) and the response thereto (D.I. 204). To start, it is not clear that Defendant's reply (D.I. 186) raises any new arguments. Moreover, it appears that the issues addressed in Plaintiffs' proposed sur-reply may overlap with those relevant to the most recent Motion to Dismiss (D.I. 200-202) and can be addressed, if necessary, by Plaintiffs in their response to that motion. If questions remain whether certain defendants have waived certain arguments relevant to a motion under Fed. R. Civ. P. 12(b)(6), Plaintiffs may address that issue if and when those defendants assert such defenses. Plaintiffs' Motion is DENIED.. Ordered by Judge Laura D. Hatcher on 5/14/24. (kjk) (Entered: 05/14/2024) |
| 05/14/2024 | 208 | ORAL ORDER: Having reviewed Plaintiffs' Motion for this Court to Confirm It Has No Objections to Plaintiffs' Large Entity Status (D.I. 115), the Court notes that much of the briefing on the Motion focuses on the substance of whether inequitable conduct occurred and does not address on what basis the Court should or should not object "to the USPTO issuing a decision" on Plaintiffs' petitions requesting the acceptance of a fee deficiency submission pursuant to 37 C.F.R. § 1.28. Determining whether inequitable conduct occurred is premature at this stage, and it is not clear upon what authority the Court may determine whether Plaintiffs acted in good faith under 37 C.F.R. § 1.28 in the first instance rather than defer that determination to the USPTO. Accordingly, I am inclined to not object on this issue before the USPTO without prejudice to either party litigating the issue of inequitable conduct as this action progresses. On or before May 22, 2024, each side shall submit a letter not longer than three single-spaced pages addressing the Court's proposed course of action. On or before May 29, 2024, each side may submit up to a one-page single-spaced letter responding to the arguments raised by the other side. Ordered by Judge Laura D. Hatcher on 5/14/24. (kjk) (Entered: 05/14/2024) |
| 05/14/2024 | | Set Deadlines: Status Letters to Judge Hatcher from the Plaintiff and Defendant due by 5/22/2024 per the oral order docketed at D.I. 208. (kjk) (Entered: 05/14/2024) |
| 05/16/2024 | 209 | Official Transcript of Motion to Amend Teleconference held on 02-22-2024 before Judge Hatcher. Court Reporter Stacy Ingram,Email: stacy_ingram@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 6/6/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/14/2024. (Ingram, Stacy) (Entered: 05/16/2024) |
| 05/16/2024 | | CORRECTING ENTRY: D.I. 202 replaced per the request of counsel. (kjk) (Entered: 05/16/2024) |

| 05/16/2024 | 210 | REDACTED VERSION of 201 Opening Brief in Support, by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 05/16/2024) |
| 05/16/2024 | 211 | REDACTED VERSION of 202 Declaration, by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 05/16/2024) |
| 05/20/2024 | 212 | STIPULATION TO EXTEND TIME to file brief in opposition to JetBrains' Motion to Dismiss to May 30, 2024 - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 05/20/2024) |
| 05/22/2024 | 213 | Letter to The Honorable Laura D. Hatcher from Kenneth L. Dorsney regarding Plaintiffs' Motion to Confirm Court does not Object to Large Entity Status. (Dorsney, Kenneth) (Entered: 05/22/2024) |
| 05/22/2024 | 214 | Letter to The Honorable Laura D. Hatcher from Timothy Devlin regarding Plaintiffs Motion for this Court to Confirm It Has No Objections to Plaintiffs Large Entity Status (D.I. 115) - re 115 MOTION to Confirm It Has No Objections to Plaintiffs' Large Entity Status . (Devlin, Timothy) (Entered: 05/22/2024) |
| 05/23/2024 | | SO ORDERED, re 212 Stipulation and Order to Extend Time to file Answering Brief in Opposition and Reply Brief in Support to JetBrains' Motion to Dismiss. (*Reset Briefing Schedule re 200 MOTION to Dismiss: Answering Brief due 5/30/2024; Reply Brief due 6/13/2024). Ordered by Judge Laura D. Hatcher on 5/23/2024. (ceg) (Entered: 05/23/2024) |
| 05/29/2024 | 215 | STIPULATION TO EXTEND TIME Caddo's time to file their brief in opposition to JetBrains' Motion to Dismiss to June 6, 2024 and JetBrains' reply in support of its Motion shall be extended to June 20, 2024 - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 05/29/2024) |
| 05/29/2024 | 216 | Letter to The Honorable Laura D. Hatcher from Cortlan S. Hitch regarding Defendant JetBrains America Inc.'s Response Letter per the Court's May 13th Oral Order and in Response to Plaintiffs' May 22nd Letter. (Hitch, Cortlan) (Entered: 05/29/2024) |
| 05/29/2024 | 217 | Letter to The Honorable Laura D. Hatcher from Timothy Devlin regarding response - re 213 Letter, 208 Oral Order,,,,,,. (Devlin, Timothy) (Entered: 05/29/2024) |
| 05/30/2024 | 218 | SO ORDERED, re 215 STIPULATION TO EXTEND TIME Caddo's time to file their brief in opposition to JetBrains' Motion to Dismiss to June 6, 2024 and JetBrains' reply in support of its Motion shall be extended to June 20, 2024 filed by 511 Technologies, Inc., Caddo Systems, Inc.. Signed by Judge Laura D. Hatcher on 5/30/24. (kjk) (Entered: 05/30/2024) |
| 05/31/2024 | 219 | MOTION for Pro Hac Vice Appearance of Attorney Priya S. Dalal - filed by Jetbrains Americas, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 05/31/2024) |
| 05/31/2024 | 220 | Pro Hac Vice Fee - Credit Card Payment received for Priya S. Dalal. ( re 219 MOTION for Pro Hac Vice Appearance of Attorney Priya S. Dalal )( Payment of $ 50, receipt number ADEDC-4420493).(Dorsney, Kenneth) (Entered: 05/31/2024) |
| 06/03/2024 | 221 | Joint MOTION for Exemption of Persons from May 15, 2023 Standing Order regarding Personal Devices - filed by Jetbrains Americas, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 06/03/2024) |

| 06/03/2024 | 222 | ORDER Granting 219 Motion for Priya S. Dalal, Esq., to Appear Pro Hac Vice. Signed by Judge Laura D. Hatcher on 6/3/24. (kjk) (Entered: 06/03/2024) |
| 06/03/2024 | 223 | ORDER Granting 221 Joint MOTION for Exemption of Persons from May 15, 2023 Standing Order regarding Personal Devices. Signed by Judge Laura D. Hatcher on 6/3/24. (kjk) (Entered: 06/03/2024) |
| 06/04/2024 | 224 | Joint STIPULATION to Amend the Scheduling Order by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 06/04/2024) |
| 06/04/2024 | 225 | Joint STIPULATION to Narrow the Case by Jetbrains Americas, Inc., Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 06/04/2024) |
| 06/04/2024 | 226 | NOTICE of AGREEMENT REGARDING CERTAIN MARKMAN HEARING TERMS by 511 Technologies, Inc., Caddo Systems, Inc. (DeMarco, Andrew) (Main Document 226 replaced on 6/4/2024) (ceg). (Entered: 06/04/2024) |
| 06/04/2024 | | CORRECTING ENTRY: The pdf for the Notice of Agreement found at D.I. 226 has been replaced with a corrected version per counsel's request. (ceg) (Entered: 06/04/2024) |
| 06/05/2024 | 227 | NOTICE of Appearance by Joel William Glazer on behalf of 511 Technologies, Inc., Caddo Systems, Inc. (Glazer, Joel) (Entered: 06/05/2024) |
| 06/05/2024 | | Minute Entry for proceedings held before Judge Laura D. Hatcher - Markman Hearing held on 6/5/2024. (Court Reporter D. Warner.) (kjk) (Entered: 06/05/2024) |
| 06/06/2024 | 228 | [SEALED] ANSWERING BRIEF in Opposition re 200 MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2), filed by 511 Technologies, Inc., Caddo Systems, Inc. Reply Brief due date per Local Rules is 6/13/2024. (Attachments: # 1 Declaration of Alex Chan, # 2 Exhibit 1, # 3 Exhibit 4, # 4 Exhibit 5)(DeMarco, Andrew) Modified on 6/14/2024 (ceg). (Main Document 228 replaced on 6/14/2024) (ceg). (Entered: 06/06/2024) |
| 06/06/2024 | 229 | [SEALED] EXHIBIT re 228 Answering Brief in Opposition, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 6) (DeMarco, Andrew) (Entered: 06/06/2024) |
| 06/06/2024 | 230 | NOTICE of Plaintiffs' Reduction of Asserted Claims, by 511 Technologies, Inc., Caddo Systems, Inc. (DeMarco, Andrew) Modified on 6/7/2024 (ceg). (Entered: 06/06/2024) |
| 06/07/2024 | | CORRECTING ENTRY: The declaration and the exhibits filed as attachments to the brief at D.I. 228 have been removed. Briefs and declarations are to be filed independent of each other. Counsel will refile the documents accordingly. (kjk) (Entered: 06/07/2024) |
| 06/07/2024 | 231 | DECLARATION re 228 Answering Brief in Opposition, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 4, # 3 Exhibit 5) (DeMarco, Andrew) (Entered: 06/07/2024) |
| 06/10/2024 | 232 | STIPULATION to Amend the Scheduling Order (Updated) by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 06/10/2024) |

| | | |
|---|---|---|
| 06/12/2024 | 233 | ORDER re 225 Granting The Joint Stipulation to Narrow The Case filed by Jetbrains s.r.o., Jetbrains, Inc., Jetbrains Americas, Inc. Signed by Judge Laura D. Hatcher on 6/12/24. (kjk) (Entered: 06/12/2024) |
| 06/12/2024 | 234 | ORDER re 232 Granting Joint Stipulation To Amend Scheduling Order filed by Jetbrains Americas, Inc., SCHEDULING ORDER: ( Opening Expert Reports due by 7/26/2024., Rebuttal Expert Reports due by 8/23/2024., Reply Expert Reports due by 9/20/2024., Expert Discovery due by 10/11/2024., Dispositive Motions due by 10/25/2024., Answering Brief due 11/8/2024., Reply Brief due 11/15/2024., Draft Pretrial Order and Motions in Limine due by 1/31/2025., Responses to Pretrial Order due by 2/28/2025., Joint Pretrial Order due by 3/31/2025., Proposed Preliminary and Final Jury Instructions, Voir Dire and Special Verdict Forms due 3/31/25., A Final Pretrial Conference is set for 4/7/2025 at 10:00 AM in Courtroom 6D before Judge Jennifer L. Hall., A Jury Trial is set for 4/14/2025 at 10:00 AM in Courtroom 6D before Judge Jennifer L. Hall.) ** See Order for details. Signed by Judge Laura D. Hatcher on 6/12/24. (kjk) (Entered: 06/12/2024) |
| 06/13/2024 | 235 | REDACTED VERSION of 229 Exhibit to a Document by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 6)(Devlin, Timothy) (Entered: 06/13/2024) |
| 06/13/2024 | 236 | REDACTED VERSION of 228 Answering Brief in Opposition, by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 06/13/2024) |
| 06/14/2024 | | CORRECTING ENTRY: D.I. 228 has been placed under seal per counsel's request. The main pdf for this filing has also been replaced with a corrected version. The caption on the filing has been updated to reflect the filing is under seal. (ceg) (Entered: 06/14/2024) |
| 06/18/2024 | 237 | ORAL ORDER: Having reviewed Plaintiffs' Motion for this Court to Confirm It Has No Objections to Plaintiffs' Large Entity Status (D.I. 115) and the related briefing (D.I. 116, 122, 131, 213, 214, 214, 216, 217), and seeing that the parties failed to provide any authority or case law on-point explaining on what basis the Court has authority to object "to the USPTO issuing a decision" on Plaintiffs' petitions requesting the acceptance of a fee deficiency submission pursuant to 37 C.F.R. § 1.28, and the Court itself having found none, IT IS HEREBY ORDERED that Plaintiffs' Motion for this Court to Confirm It Has No Objections to Plaintiffs' Large Entity Status is GRANTED without prejudice to either party to later litigate, where appropriate, the issues raised in the briefing. Ordered by Judge Laura D. Hatcher on 6/18/24. (kjk) (Entered: 06/18/2024) |
| 06/20/2024 | 238 | [SEALED] REPLY BRIEF re 200 MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2) filed by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 06/20/2024) |
| 06/20/2024 | 239 | [SEALED] DECLARATION re 238 Reply Brief *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains s.r.o and Jetbrains, Inc.'s Reply Brief* by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 06/20/2024) |
| 06/20/2024 | 240 | NOTICE of Defendant's Reduction of Asserted Prior Art by Jetbrains Americas, Inc. re 233 Order (Dorsney, Kenneth) (Entered: 06/20/2024) |
| 06/26/2024 | 241 | REDACTED VERSION of 238 Reply Brief by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 06/26/2024) |

| 06/26/2024 | 242 | REDACTED VERSION of 239 Declaration *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains s.r.o and Jetbrains, Inc.'s Reply Brief* by Jetbrains s.r.o., Jetbrains, Inc.. (Dorsney, Kenneth) (Entered: 06/26/2024) |
|---|---|---|
| 06/27/2024 | 243 | REQUEST for Oral Argument by Jetbrains s.r.o., Jetbrains, Inc. re 200 MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2). (Dorsney, Kenneth) (Entered: 06/27/2024) |
| 07/26/2024 | 244 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Opening Expert Report of Monty G. Myers on Invalidity and Non-Infringing Alternatives filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 07/26/2024) |
| 07/29/2024 | 245 | NOTICE OF SERVICE of (1) AFFIRMATIVE EXPERT REPORT OF STEPHEN A. HOLZEN; and (2) OPENING EXPERT REPORT OF ROBERT SHERWOOD filed by 511 Technologies, Inc., Caddo Systems, Inc..(DeMarco, Andrew) (Entered: 07/29/2024) |
| 08/23/2024 | 246 | NOTICE OF SERVICE of (1) Jetbrains Americas, Inc.'s Rebuttal Expert Report of W. Christopher Bakewell regarding Damages; and (2) Jetbrains Americas, Inc.'s Rebuttal Expert Report of Monty G. Myers regarding Non-Infringement filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 08/23/2024) |
| 08/23/2024 | 247 | NOTICE OF SERVICE of RESPONSIVE EXPERT REPORT OF ROBERT SHERWOOD REGARDING THE VALIDITY OF U.S. PATENT NOS. 7,191,411; 7,640,517; 8,352,880; 10,037,127 and 11,182,053 filed by 511 Technologies, Inc., Caddo Systems, Inc..(DeMarco, Andrew) (Entered: 08/23/2024) |
| 09/06/2024 | 248 | REPORT AND RECOMMENDATIONS ON CLAIM CONSTRUCTION. Please note that when filing Objections pursuant to Federal Rule of Civil Procedure 72(b)(2), briefing consists solely of the Objections (no longer than ten (10) pages) and the Response to the Objections (no longer than ten (10) pages). No further briefing shall be permitted with respect to objections without leave of the Court. Objections to R&R due by 9/20/2024. Signed by Judge Laura D. Hatcher on 9/6/24. (kjk) (Entered: 09/06/2024) |
| 09/09/2024 | 249 | NOTICE of Appearance by James Michael Lennon on behalf of 511 Technologies, Inc., Caddo Systems, Inc. (Lennon, James) (Entered: 09/09/2024) |
| 09/09/2024 | 250 | MOTION for Pro Hac Vice Appearance of Attorney Alan Wright - filed by 511 Technologies, Inc., Caddo Systems, Inc.. Motions referred to Laura D. Hatcher. (Lennon, James) (Entered: 09/09/2024) |
| 09/09/2024 | 251 | Pro Hac Vice Fee - Credit Card Payment received for Alan Wright. ( re 250 MOTION for Pro Hac Vice Appearance of Attorney Alan Wright )( Payment of $ 50, receipt number ADEDC-4493877).(Lennon, James) (Entered: 09/09/2024) |
| 09/11/2024 | 252 | ORDER granting 250 Motion for Alan Wright, Esq., to Appear Pro Hac Vice. Signed by Judge Laura D. Hatcher on 9/11/24. (kjk) (Entered: 09/11/2024) |
| 09/19/2024 | 253 | NOTICE to Take Deposition of Stephen Holzen on October 3, 2024 filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/19/2024) |
| 09/19/2024 | 254 | NOTICE to Take Deposition of Robert Sherwood on September 24, 2024 filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/19/2024) |

Appx004071

28 of 38                               4/22/2025, 3:15 PM

| 09/19/2024 | 255 | NOTICE to Take Deposition of Robert Sherwood on September 26, 2024 filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 09/19/2024) |
|---|---|---|
| 09/20/2024 | 256 | OBJECTIONS by Jetbrains Americas, Inc. to 248 REPORT AND RECOMMENDATIONS. (Hitch, Cortlan) Modified on 9/20/2024 (ceg). (Main Document 256 replaced on 9/20/2024) (ceg). (Entered: 09/20/2024) |
| 09/20/2024 | 257 | Letter to The Honorable Jennifer L. Hall from Cortlan S. Hitch regarding Courtesy Copies of Items Associated with JetBrains' Objection to Report and Recommendation - re 256 Objections,. (Hitch, Cortlan) (Entered: 09/20/2024) |
| 09/20/2024 | | CORRECTING ENTRY: The pdf for the Objections found at D.I. 256 has been replaced with a corrected version per the request of counsel. (ceg) (Entered: 09/20/2024) |
| 09/20/2024 | 258 | NOTICE OF SERVICE of (1) Reply Expert Report of Robert Sherwood; and (2) Reply Expert Report of Stephen A. Holzen filed by 511 Technologies, Inc., Caddo Systems, Inc..(DeMarco, Andrew) (Entered: 09/20/2024) |
| 09/23/2024 | 259 | NOTICE OF SERVICE of Defendant JetBrains Americas, Inc's Reply Expert Report of Monty G. Myers regarding Invalidity filed by Jetbrains Americas, Inc..(Hitch, Cortlan) (Entered: 09/23/2024) |
| 10/01/2024 | 260 | NOTICE OF SERVICE of Defendant JetBrains Americas, Inc.'s Amended Notice of Deposition of Stephen Holzen filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 10/01/2024) |
| 10/01/2024 | 261 | NOTICE OF SERVICE of Notice of Deposition of Monty Myers for October 9, 2024 and October 10, 2024 filed by 511 Technologies, Inc., Caddo Systems, Inc..(Devlin, Timothy) (Entered: 10/01/2024) |
| 10/03/2024 | 262 | RESPONSE in Opposition re 256 Objections to the Report and Recommendation on Claim Construction, filed by 511 Technologies, Inc., Caddo Systems, Inc. (Devlin, Timothy) Modified on 10/3/2024 (ceg). (Entered: 10/03/2024) |
| 10/16/2024 | 263 | NOTICE of Plaintiffs' Second Reduction of Asserted Claims by 511 Technologies, Inc., Caddo Systems, Inc. re 225 Stipulation (DeMarco, Andrew) (Entered: 10/16/2024) |
| 10/21/2024 | 264 | NOTICE OF SERVICE of Defendant Jetbrains Americas Inc.'s Second Notice of Reduction of Asserted Prior Art filed by Jetbrains Americas, Inc..(Dorsney, Kenneth) (Entered: 10/21/2024) |
| 10/25/2024 | 265 | MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Text of Proposed Order)Motions referred to Laura D. Hatcher. (DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 266 | [SEALED] OPENING BRIEF in Support re 265 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 11/8/2024. (DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 267 | [SEALED] DECLARATION re 266 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # |

Appx004072

29 of 38                 4/22/2025, 3:15 PM

|  |  |  |
|---|---|---|
|  |  | 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 268 | MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen - filed by Jetbrains Americas, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 269 | MOTION for Summary Judgment - filed by Jetbrains Americas, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 270 | [SEALED] OPENING BRIEF in Support re 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen , 269 MOTION for Summary Judgment filed by Jetbrains Americas, Inc..Answering Brief/Response due date per Local Rules is 11/8/2024. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 271 | [SEALED] STATEMENT re 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen , 269 MOTION for Summary Judgment *Defendant's Concise Statement of Facts in support of its Combined Motions for Summary Judgment and to Exclude Expert Testimony* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 272 | [SEALED] DECLARATION re 270 Opening Brief in Support, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. I of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 273 | [SEALED] DECLARATION re 270 Opening Brief in Support, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. II of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 274 | [SEALED] DECLARATION re 270 Opening Brief in Support, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. III of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 275 | MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Text of Proposed Order)Motions referred to Laura D. Hatcher.(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 276 | DECLARATION re 270 Opening Brief in Support, *Declaration of Monty G. Myers in support of Defendant's Daubert Motion to Exclude Mr. Sherwood's Opinions* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/25/2024) |
| 10/25/2024 | 277 | [SEALED] OPENING BRIEF in Support re 275 MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 11/8/2024. (DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 278 | MOTION for Partial Summary Judgment - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Text of Proposed Order)Motions referred to Laura D. Hatcher.(DeMarco, Andrew) (Entered: 10/25/2024) |

| 10/25/2024 | 279 | [SEALED] STATEMENT re 278 MOTION for Partial Summary Judgment *CONCISE STATEMENT OF FACTS* by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 10/25/2024) |
|---|---|---|
| 10/25/2024 | 280 | [SEALED] OPENING BRIEF in Support re 278 MOTION for Partial Summary Judgment filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 11/8/2024. (DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 281 | [SEALED] DECLARATION re 280 Opening Brief in Support by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 282 | [SEALED] DECLARATION re 277 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 283 | MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY - filed by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Text of Proposed Order)Motions referred to Laura D. Hatcher.(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 284 | [SEALED] OPENING BRIEF in Support re 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY filed by 511 Technologies, Inc., Caddo Systems, Inc..Answering Brief/Response due date per Local Rules is 11/8/2024. (DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/25/2024 | 285 | [SEALED] DECLARATION re 284 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(DeMarco, Andrew) (Entered: 10/25/2024) |
| 10/28/2024 | | LOCAL RULE 7.1.1 NOTICE: In accordance with Local Rule 7.1.1, except for civil cases involving pro se parties or motions brought by nonparties, every nondispositive motion shall be accompanied by an averment of counsel for the moving party that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion. Unless otherwise ordered, failure to so aver may result in dismissal of the motion. The records of this case do not reflect such an averment by counsel for DI# 268. Please file the averment using the event code STATEMENT, found under OTHER DOCUMENTS. (ceg) (Entered: 10/28/2024) |
| 10/28/2024 | 286 | STATEMENT re 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen *Defendant JetBrains Americas, Inc.'s Rule 7.1.1 Certification* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 10/28/2024) |
| 10/29/2024 | 287 | STATEMENT re 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY , 265 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL , 275 MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT *RULE 7.1.1 CERTIFICATE* by 511 Technologies, Inc., Caddo |

| | | |
|---|---|---|
| | | Systems, Inc.. (Devlin, Timothy) (Entered: 10/29/2024) |
| 11/01/2024 | 288 | REDACTED VERSION of 270 Opening Brief in Support, by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/01/2024) |
| 11/01/2024 | 289 | REDACTED VERSION of 271 Statement, by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/01/2024) |
| 11/01/2024 | 290 | REDACTED VERSION of 272 Declaration, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. I of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/01/2024) |
| 11/01/2024 | 291 | REDACTED VERSION of 273 Declaration, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. II of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/01/2024) |
| 11/01/2024 | 292 | REDACTED VERSION of 266 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 293 | REDACTED VERSION of 267 Declaration, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 294 | REDACTED VERSION of 284 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 295 | REDACTED VERSION of 285 Declaration, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 296 | REDACTED VERSION of 277 Opening Brief in Support, by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 297 | REDACTED VERSION of 282 Declaration, by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 298 | REDACTED VERSION of 279 Statement by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 299 | REDACTED VERSION of 280 Opening Brief in Support by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/01/2024) |
| 11/01/2024 | 300 | REDACTED VERSION of 274 Declaration, *Declaration of Daniel G. Vivarelli, Jr. in support of Jetbrains Americas Inc.'s Motions for Summery Judgment and Daubert Motions (Vol. III of III)* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/01/2024) |
| 11/01/2024 | 301 | REDACTED VERSION of 281 Declaration by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(DeMarco, Andrew) (Entered: 11/01/2024) |

| | | |
|---|---|---|
| 11/08/2024 | 302 | ANSWERING BRIEF in Opposition re 275 MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 11/15/2024. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 303 | DECLARATION re 302 Answering Brief in Opposition, *// executed by Daniel G. Vivarelli, Jr.* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 304 | ANSWERING BRIEF in Opposition re 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 11/15/2024. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 305 | DECLARATION re 304 Answering Brief in Opposition, *// executed by Daniel G. Vivarelli, Jr.* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 306 | [SEALED] ANSWERING BRIEF in Opposition re 265 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 11/15/2024. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 307 | [SEALED] DECLARATION re 306 Answering Brief in Opposition, *executed by Daniel D. Vivarelli, Jr.* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 308 | ANSWERING BRIEF in Opposition re 278 MOTION for Partial Summary Judgment filed by Jetbrains Americas, Inc..Reply Brief due date per Local Rules is 11/15/2024. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 309 | DECLARATION re 308 Answering Brief in Opposition *executed by Daniel D. Vivarelli, Jr.* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 310 | STATEMENT re 308 Answering Brief in Opposition, 304 Answering Brief in Opposition, 302 Answering Brief in Opposition, 306 Answering Brief in Opposition, *Defendant's Concise Statement of Facts in support of its opposition to Plaintiffs' Summary Judgment Motions and Motions to Exclude Certain Expert Testimony* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Main Document 310 replaced on 11/14/2024) (twk). (Entered: 11/08/2024) |
| 11/08/2024 | 311 | STATEMENT re 279 Statement *Defendant's Response to Plaintiffs' Concise Statement of Facts in support of their Motion for Partial Summary Judgment of No Invalidity* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/08/2024) |
| 11/08/2024 | 312 | [SEALED] ANSWERING BRIEF in Opposition re 268 Defendant JetBrains Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen, 269 Defendant JetBrains Americas Inc.'s Motion for Summary Judgment filed by 511 Technologies, Inc., Caddo Systems, Inc. Reply Brief due date per Local Rules is 11/15/2024. (DeMarco, Andrew) (Main Document 312 replaced on 11/12/2024) (ceg). Modified on 11/12/2024 (ceg). (Entered: 11/08/2024) |
| 11/08/2024 | 313 | [SEALED] STATEMENT re 271 Statement, *PLAINTIFFS RESPONSE TO JETBRAINS CONCISE STATEMENT OF FACTS* by 511 Technologies, Inc., Caddo Systems, Inc.. (DeMarco, Andrew) (Entered: 11/08/2024) |

| | | |
|---|---|---|
| 11/08/2024 | 314 | [SEALED] DECLARATION re 312 Answering Brief in Opposition, *in support of Plaintiffs' Combined Response to Defendants Motion for Summary Judgement, and Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen* by 511 Technologies, Inc., Caddo Systems, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24)(DeMarco, Andrew) (Entered: 11/08/2024) |
| 11/12/2024 | | CORRECTING ENTRY: The pdf for the Answering Brief in Opposition found at D.I. 312 has been replaced to correct the title of the document. Also, the filing has been linked to D.I. 269 at the request of counsel. (ceg) (Entered: 11/12/2024) |
| 11/14/2024 | 315 | REDACTED VERSION of 312 Answering Brief in Opposition, by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 11/14/2024) |
| 11/14/2024 | 316 | REDACTED VERSION of 313 Statement by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 11/14/2024) |
| 11/14/2024 | 317 | REDACTED VERSION of 314 Declaration,,, by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 9, # 4 Exhibit 13, # 5 Exhibit 14, # 6 Exhibit 16, # 7 Exhibit 17)(DeMarco, Andrew) (Entered: 11/14/2024) |
| 11/14/2024 | 318 | REDACTED VERSION of 306 Answering Brief in Opposition, by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/14/2024) |
| 11/14/2024 | 319 | REDACTED VERSION of 307 Declaration by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/14/2024) |
| 11/14/2024 | | CORRECTING ENTRY: Per counsel's request, D.I. 310 has been replaced with a corrected version due to improper formatting resulting in enumeration error. (twk) (Entered: 11/14/2024) |
| 11/15/2024 | 320 | [SEALED] REPLY BRIEF in Support re 278 PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY OVER PURPORTED PRIOR ART SYSTEMS TKDESK VERSION 1.1 AND SNAX VERSION 1.2.8, filed by Caddo Systems, Inc., 511 Technologies, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 4, # 4 Exhibit 9, # 5 Exhibit 20, # 6 Exhibit 21)(DeMarco, Andrew) Modified on 11/18/2024 (ceg). (Entered: 11/15/2024) |
| 11/15/2024 | 321 | DECLARATION re 320 Reply Brief, by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 3, # 2 Exhibit 5, # 3 Exhibit 6, # 4 Exhibit 7, # 5 Exhibit 8, # 6 Exhibit 10, # 7 Exhibit 11, # 8 Exhibit 12, # 9 Exhibit 13, # 10 Exhibit 14, # 11 Exhibit 15, # 12 Exhibit 16, # 13 Exhibit 17, # 14 Exhibit 18, # 15 Exhibit 19) (DeMarco, Andrew) (Entered: 11/15/2024) |
| 11/15/2024 | 322 | [SEALED] MEMORANDUM in Opposition *RESPONSE TO DEFENDANTS CONCISE STATEMENT OF FACTS IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS SUMMARY JUDGMENT MOTION AND MOTIONS TO EXCLUDE EXPERT TESTIMONY (D.I. 310)* filed by Caddo Systems, Inc., 511 Technologies, Inc..Reply Brief due date per Local Rules is 11/22/2024. (DeMarco, Andrew) (Entered: 11/15/2024) |

| 11/15/2024 | 323 | [SEALED] REPLY BRIEF re 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen , 269 MOTION for Summary Judgment filed by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/15/2024) |
|---|---|---|
| 11/15/2024 | 324 | DECLARATION re 323 Reply Brief, *executed by Daniel D. Vivarelli, Jr.* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 11/15/2024) |
| 11/15/2024 | 325 | [SEALED] REPLY BRIEF in Support re 265 DAUBERT MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL, filed by Caddo Systems, Inc., 511 Technologies, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(DeMarco, Andrew) Modified on 11/18/2024 (ceg). (Entered: 11/15/2024) |
| 11/15/2024 | 326 | DECLARATION re 325 Reply Brief, by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 11/15/2024) |
| 11/15/2024 | 328 | REPLY BRIEF re 275 MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT filed by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 11/15/2024) |
| 11/15/2024 | 329 | [SEALED] REPLY BRIEF re 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY filed by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 2)(DeMarco, Andrew) (Entered: 11/15/2024) |
| 11/15/2024 | 331 | DECLARATION re 329 Reply Brief by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 1)(DeMarco, Andrew) (Entered: 11/15/2024) |
| 11/18/2024 | | DEFICIENCY NOTICE by the Court issued to Plaintiffs re 329 Reply Brief. This filing does not comply with Local Rule 5.2(b)(1). Plaintiffs are directed to supplement the docket accordingly with a certificate of service. (ceg) Modified on 11/18/2024 (ceg). (Entered: 11/18/2024) |
| 11/18/2024 | | CORRECTING ENTRY: D.I. 327, 330, and 332 have been removed from the docket per the filer's request. These docket items were filed in error and duplicates of other entries filed the same day. (ceg) (Entered: 11/18/2024) |
| 11/18/2024 | 332 | CERTIFICATE OF SERVICE of 329 Reply Brief, by Caddo Systems, Inc., 511 Technologies, Inc. (DeMarco, Andrew) Modified on 11/18/2024 (ceg). (Entered: 11/18/2024) |
| 11/21/2024 | 333 | REDACTED VERSION of 323 Reply Brief, by Jetbrains Americas, Inc.. (Hitch, Cortlan) (Entered: 11/21/2024) |
| 11/22/2024 | 334 | REQUEST for Oral Argument by Jetbrains Americas, Inc. re 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen , 269 MOTION for Summary Judgment . (Hitch, Cortlan) (Entered: 11/22/2024) |
| 11/22/2024 | 335 | REDACTED VERSION of 325 Reply Brief, by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(DeMarco, Andrew) (Entered: 11/22/2024) |
| 11/22/2024 | 336 | REDACTED VERSION of 329 Reply Brief by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 2)(DeMarco, Andrew) (Entered: |

| | | |
|---|---|---|
| | | 11/22/2024) |
| 11/22/2024 | 337 | REDACTED VERSION of 320 Reply Brief, by Caddo Systems, Inc., 511 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 4, # 4 Exhibit 9, # 5 Exhibit 20, # 6 Exhibit 21)(DeMarco, Andrew) (Entered: 11/22/2024) |
| 11/22/2024 | 338 | REDACTED VERSION of 322 Memorandum in Opposition, by Caddo Systems, Inc., 511 Technologies, Inc.. (DeMarco, Andrew) (Entered: 11/22/2024) |
| 01/21/2025 | 339 | MOTION for Teleconference to Resolve Discovery Dispute - filed by Jetbrains Americas, Inc.. Motions referred to Laura D. Hatcher.(Dorsney, Kenneth) (Entered: 01/21/2025) |
| 01/24/2025 | 340 | NOTICE of Third Reduction of Asserted Claims by Caddo Systems, Inc., 511 Technologies, Inc. re 225 Stipulation (DeMarco, Andrew) (Entered: 01/24/2025) |
| 01/30/2025 | 341 | ORAL ORDER: Having reviewed the pending motion regarding validity of the asserted patents under 35 U.S.C. § 101 (D.I. 269, 270, 312, 323) and the Notice of Plaintiffs' Third Reduction of Asserted Claims (D.I. 340) that dropped the patent containing the claim allegedly representative of the asserted patents; it appearing that there are six pending motions and that the case is set to proceed to trial on April 14, 2025; the Court having conducted a preliminary review of the § 101 motion; and it further appearing to the Court that its concerns about the asserted patents validity under § 101 may be entirely case dispositive; IT IS HEREBY ORDERED AS FOLLOWS: (1) the parties must promptly meet and confer on the issue of representativeness and identify whether other claim(s) of the remaining patents is/are representative for purposes of resolving the § 101 motion; if the parties cannot agree on a representative claim, then on or before February 4, 2025, Defendants shall identify what claim(s) is/are representative and the bases therefore in a brief not to exceed 10 pages; and Plaintiffs may respond with a brief not to exceed 10 pages by February 6, 2025. In those submissions, the parties should also address: (a) whether the asserted patents are invalid under § 101 by incorporating argument on the foregoing representative claim(s) issue; and (b) what Supreme Court or Federal Circuit case is most similar to the challenged claim(s). That is, if the Court is to analogize the claims at issue in the motion to claims that have previously been found to be patent (in)eligible by a higher court, which case provides the best analogy? (2) The parties must complete a mandatory in-person mediation by February 12, 2025. (3) The parties must file a joint status letter update regarding settlement by February 14, 2025. ORDERED by Judge Laura D. Hatcher on 1/30/25. (kjk) (Entered: 01/30/2025) |
| 01/31/2025 | 342 | NOTICE OF SERVICE of Plaintiffs Draft Pretrial Order filed by Caddo Systems, Inc., 511 Technologies, Inc..(Devlin, Timothy) (Entered: 01/31/2025) |
| 02/04/2025 | 343 | STATEMENT re 341 Oral Order,,,,,,,,, Set Deadlines,,,,,,, *Defendant JetBrains Americas Inc.'s Supplemental Brief in support of its Arguments for Invalidity of the Asserted Patents* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 02/04/2025) |
| 02/06/2025 | 344 | RESPONSE to Order re 341 Oral Order,,,,,,,, Set Deadlines,,,,,,, filed by Caddo Systems, Inc., 511 Technologies, Inc.. (Devlin, Timothy) (Entered: 02/06/2025) |
| 02/13/2025 | 345 | Joint STATUS REPORT *following Mediation* by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 02/13/2025) |

Appx004079

| | | |
|---|---|---|
| 02/25/2025 | 346 | REPORT AND RECOMMENDATIONS Granting 269 Jetbrains Americas Inc.'s Motion For Summary Judgment and Denying as Moot the remaining pending motions to include 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY filed by 511 Technologies, Inc., Caddo Systems, Inc., 265 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. W. CHRISTOPHER BAKEWELL filed by 511 Technologies, Inc., Caddo Systems, Inc., 275 MOTION TO EXCLUDE EXPERT TESTIMONY OF MONTY MYERS' OPINIONS REGARDING NONINFRINGEMENT filed by 511 Technologies, Inc., Caddo Systems, Inc., 268 MOTION Defendant JetBrians Americas Inc.'s Daubert Motions as to Certain Opinions of Mr. Sherwood and Mr. Holzen filed by Jetbrains Americas, Inc., 200 MOTION to Dismiss Based upon Fed. R. Civ. P. 12(b)(5) and 12(b)(2) filed by Jetbrains s.r.o., Jetbrains, Inc., 278 MOTION for Partial Summary Judgment filed by 511 Technologies, Inc., Caddo Systems, Inc., 177 MOTION to Dismiss for Failure to State a Claim JetBrains' Motion to Dismiss Second Amended Complaint filed by Jetbrains Americas, Inc. Please note that when filing Objections pursuant to Federal Rule of Civil Procedure 72(b)(2), briefing consists solely of the Objections (no longer than ten (10) pages) and the Response to the Objections (no longer than ten (10) pages). No further briefing shall be permitted with respect to objections without leave of the Court. Objections to R&R due by 3/11/2025. Signed by Judge Laura D. Hatcher on 2/25/25. (kjk) Modified on 2/25/2025 (kjk). (Entered: 02/25/2025) |
| 02/28/2025 | 347 | Joint STIPULATION to Amend the Scheduling Order for Pretrial Disclosures by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 02/28/2025) |
| 03/03/2025 | 348 | SO ORDERED, re 347 Stipulation and Order to Amend the Scheduling Order. The deadline for Defendants to provide responses to Plaintiffs' draft Pretrial Order is extended to March 7, 2025. Signed by Judge Jennifer L. Hall on 3/3/2025. (ceg) (Entered: 03/03/2025) |
| 03/05/2025 | 349 | Joint STIPULATION to Stay the Case by Jetbrains Americas, Inc.. (Dorsney, Kenneth) (Entered: 03/05/2025) |
| 03/06/2025 | 350 | SO ORDERED, re 349 Stipulation and Order to Stay Case pending the Court's resolution of Caddo's forthcoming objections to Judge Hatcher's Report and Recommendation. The current schedule, including the pretrial conference and trial dates, are vacated. Signed by Judge Jennifer L. Hall on 3/6/2025. (ceg) (Entered: 03/06/2025) |
| 03/11/2025 | 351 | OBJECTION to 346 Report and Recommendations by 511 Technologies, Inc., Caddo Systems, Inc.. (Devlin, Timothy) (Entered: 03/11/2025) |
| 03/11/2025 | 352 | REQUEST for Oral Argument by 511 Technologies, Inc., Caddo Systems, Inc. re 346 REPORT AND RECOMMENDATIONS re 283 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MONTY G. MYERS REGARDING INVALIDITY filed by 511 Technologies, Inc., Caddo Systems, Inc., 265 MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMON. (Devlin, Timothy) (Entered: 03/11/2025) |
| 03/25/2025 | 353 | RESPONSE to 351 Objections re 346 Report and Recommendation, by Jetbrains Americas, Inc. (Hitch, Cortlan) Modified on 3/25/2025 (ceg). (Entered: 03/25/2025) |
| 03/28/2025 | 354 | NOTICE of Supplemental Authority by 511 Technologies, Inc., Caddo Systems, Inc. (Attachments: # 1 Exhibit 1)(Devlin, Timothy) (Entered: 03/28/2025) |

| | | |
|---|---|---|
| 03/31/2025 | 355 | ORDER: IT IS HEREBY ORDERED that Plaintiffs' objections (D.I. 351 ) are OVERRULED, the Report and Recommendation (D.I. 346 ) is ADOPTED, and Defendant JBA's Motion for Summary Judgment (D.I. 269 ) is GRANTED. IT IS FURTHERED ORDERED that the remaining pending motions (D.I. 177 , 200 , 265 , 268 , 275 , 278 , 283 , 339 ) are DENIED as moot. IT IS FINALLY ORDERED that the parties shall meet and confer and submit a proposed form of judgment. (*See Order for details). Signed by Judge Jennifer L. Hall on 3/31/2025. (ceg) (Entered: 03/31/2025) |
| 04/09/2025 | 356 | PROPOSED Final Judgment, by Jetbrains Americas, Inc., Jetbrains s.r.o., Jetbrains, Inc. (Dorsney, Kenneth) Modified on 4/9/2025 (ceg). (Entered: 04/09/2025) |
| 04/10/2025 | 357 | FINAL JUDGMENT. (CASE CLOSED). Signed by Judge Jennifer L. Hall on 4/10/2025. (ceg) (Main Document 357 replaced on 4/10/2025) (ceg). (Entered: 04/10/2025) |
| 04/10/2025 | 358 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) US 7,191,411 B2; US 7,640,517 B2; US 8,352,880 B2; US 10,037,127 B2; US 11,182,053 B2. (Attachments: # 1 Final Judgment)(ceg) (Entered: 04/10/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/22/2025 15:14:43 | | | |
| **PACER Login:** | DNLZITO123 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01033-JLH-LDH Start date: 1/1/1975 End date: 4/22/2025 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |